IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| **Janet May, et al.**<br>                    Plaintiffs,<br><br>    v.<br><br>**City of Montgomery, Alabama,** a<br>municipal corporation; **Bobby N. Bright,**<br>in his official capacity as Mayor of the<br>City of Montgomery<br><br>                    Defendants. | CIVIL ACTION NO.<br>2:07 cv 738-MHT-WC |

# Plaintiffs' Submission of Evidence
# for Preliminary Injunction

The plaintiffs submit the following additional exhibits:

Exhibit I – an "early" preclearance letter (that is, one early in the

60-day review period) dated 18 September 1989 (re: Fair Campaign Practices

Act)

Exhibit J – another early preclearance letter dated 14 July 2006

(re: voter registration forms)

Exhibit K – an objection letter dated 26 December 1972 (re: Justice

of Peace)

Exhibit L – another objection letter date 8 January 2007 (re: Mobile

County Commission vacancies)

Exhibit M – a preclearance letter dated 19 July 2006 (re: Act 2006-

252)

Exhibit N – a conference paper by Luis Ricardo Fraga and Maria Lizet Ocampo regarding "more information requests"

Exhibit O – a more information request (re: Ashland)

Exhibit P – a more information request (re: Waller ISD)

Exhibit Q – a reopened submission with an objection (re: Mississippi assistance to voters)

Exhibit R -- a reopened submission with an objection (re: Galdden Tractor Shed as polling place)

Exhibit S – a letter interposing a provisional objection (re: North Carolina law on boards of commissioners)

Submitted by,


/s/ Edward Still

Cecil Gardner                        Edward Still
The Gardner Firm                     2112 11th Avenue South
Post Office Drawer 3103              Suite 201
Mobile AL 36652                      Birmingham AL 35205-2844
    phone 251-433-8100                  phone: 205-320-2882
    fax 251-433-8181                    fax: 877-264-5513
    email cgardner@gmlegal.com          email: Still@votelaw.com


Sam Heldman
The Gardner Firm
2805 31st St. NW
Washington DC 20008
    phone 202-965-8884
    email sam@heldman.net


CERTIFICATE OF SERVICE

I certify that on 21 August 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

J. Gerald Hebert, Esq.
The Campaign Legal Center
1640 Rhode Island Ave., NW, Suite
650
Washington, DC 20036

Larry Menefee, Esq.
407 South McDonough Street
Montgomery, AL 36104

<u>/s/ Edward Still</u>

3

U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                     _Washington, D.C. 20530_

**SEP 18 1989**

Honorable Don Siegelman
Attorney General
State of Alabama
11 South Union Street
Montgomery, Alabama 36130-1601

Dear Mr. Attorney General:

This refers to Act No. 88-873, the Fair Campaign Practices
Act (FCPA), for the State of Alabama, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c. We received your letter notifying
us of your inability to submit further information regarding this
act on August 22, 1989. Supplemental information was received
from the Alabama Secretary of State on August 30, 1989. Although
the State of Alabama has still not provided all of the additional
information requested in our letters of December 16, 1988, and
March 7, 1989, we are concerned that further delays may prevent
implementation of important legislation. Accordingly, we set
forth herein a determination under Section 5 of each voting
change occasioned by the FCPA which is clearly identified in
currently available materials. If you subsequently determine
that the act adopts other changes that affect voting or that our
present understanding of the changes is in error, such matters
should be raised for future determination.

With this understanding, the Attorney General does not
interpose objection to the following changes: the requirements
that candidates report campaign contributions and expenditures
at certain times before elections as well as on a yearly basis
afterwards; the requirements respecting the formation and duties
of political committees; the format of required reports; and,
the various penalties for noncompliance. These are all changes
affecting voting which we have been able clearly to identify as
such from the original submission or from the additional written
materials provided by you or the Alabama Secretary of State.
However, we feel a responsibility to point out that Section 5 of
the Voting Rights Act expressly provides that the failure of the
Attorney General to object does not bar any subsequent judicial
action to enjoin the enforcement of such changes. In addition,
as authorized by Section 5, the Attorney General reserves the
right to reexamine any of these changes if additional information

- 2 -

that would otherwise require an objection comes to his attention during the remainder of the sixty-day review period.  See the Procedures for the Administration of Section 5 (28 C.F.R. 51.41 and 51.43).

With regard to the remainder of the submission now before us, we note that certain provisions of the predecessor Corrupt Practices Act of 1915 do not appear to have analogues in the Fair Campaign Practices Act, and the State has failed to discuss whether the repeal of those provisions effects actual changes in practices or procedures affecting voting.  Accordingly, to the extent these repeals occasion substantive changes affecting voting, they are not evaluated herein because the State has not identified them in an "unambiguous and recordable manner" (Allen v. State Board of Elections, 393 U.S. 544, 571 (1969)) as required by the Act.  See also McCain v. Lybrand, 465 U.S. 236, 243-50 (1984); United States v. Board of Commissioners, 435 U.S. 110, 136 (1978).

Finally, State officials have yet to agree on the scope of changes relating to candidates' financial reporting requirements imposed by the FCPA.  It seems that all officials agree that the FCPA requires every individual who receives contributions or makes expenditures in excess of certain amounts identified in the FCPA, e.g., $1,000 for local offices, $3,000 for district offices, and $10,000 for other state offices, must comply with new reporting requirements.  We interpose no objection to this change.  However, your office and that of the Secretary of State seem to disagree on whether those who qualify as candidates under state law and who receive or expend less than the identified amounts must also comply with the FCPA reporting requirements. Accordingly, should the State wish to enforce such a reporting requirement it will be necessary to clearly set forth the change in an appropriate submission to the Attorney General or bring the matter before the District Court for the District of Columbia for the required declaratory judgment.  Such changes are unenforce-able unless and until Section 5 preclearance requirements have been satisfied.  See 28 C.F.R. 51.10.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

**U.S. Department of Justice**

Civil Rights Division

---

JKT:MSR:ANS:maf
DJ 166-012-3
2006-4509

*Voting Section - NWB.*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

July 14, 2006

Ms. Misty S. Fairbanks
Assistant Attorney General
11 South Union Street
Montgomery, Alabama 36130

Dear Ms. Fairbanks:

This refers to the changes to the State of Alabama voter registration forms, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your submission on May 15, 2006; supplemental information was received on June 5, 2006.

The Attorney General does not interpose any objection to the specified changes. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes. In addition, as authorized by Section 5, we reserve the right to reexamine this submission if additional information that would otherwise require an objection comes to our attention during the remainder of the sixty-day review period. Procedures for the Administration of Section 5 of the Voting Rights Act (28 C.F.R. 51.41 and 51.43).

Sincerely,

John Tanner
Chief, Voting Section

DJ 166#012-3

Honorable William J. Baxley
Attorney General
State of Alabama
Montgomery, Alabama  36104

Dear Mr. Attorney General:

This letter is in reference to your submission to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965 of Act Numbers 1585 and 2443, which we received on Wednesday, Regular Session 1971. Additional information pertinent to Act Numbers 1585 and 2443 was received from July 5, 1972, through August 24, 1972. Further information relevant to your submission was requested on October 20, 1972, and received October 24, 1972.

We have considered the submitted changes and supporting information as well as data compiled by the Bureau of the Census and information and comments from interested parties, including local and state officials of Alabama. On the basis of this information the Attorney General will not object to the provisions in Act Number 1585 abolishing Justice of the Peace Courts or to the changes in Act Number 2443 which establish Justice Courts for each county.

However we are unable to conclude as we must under the Voting Rights Act, that the provisions in Act Number 2443 making the office of judge for the Justice Courts appointive will not have the purpose or effect of abridging the voting rights of racial minority. Therefore, on behalf of the Attorney General, I must interpose an objection to that provision.

DEC 26 1972



We recognize the state's legitimate interest in reforming its court system to conform to constitutional mandates. Our decision to object, however, is based on information indicating that in many counties in which Justice of the Peace Courts existed prior to Act Number 1555, Negroes have sought and won election to that office and our belief, based on relevant accumulated data, that the opportunity similarly to win election as judge of the newly created Justice Courts is effectively negated by the appropriate provisions of Act Number 2645.

While we realize the difficulties caused by these conclusions, we are persuaded that the Voting Rights Act requires this result. Of course, Section 5 permits you to seek a declaratory judgment from the District Court for the District of Columbia that the changes herein found objectionable neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race.

Sincerely,

DAVID L. NORMAN
Assistant Attorney General
Civil Rights Division

# U.S. Department of Justice

## Civil Rights Division



*Voting Section*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

## FAX Transmittal Sheet

**Date:** 12/18/06

| **To:** | **Name:** | Ed Still |
| | **Organization:** | |
| | **FAX No:** | 877-264-5513 |
| | **Off. Phone:** | |
| **From:** | **Name:** | Daniel Sneaben |
| | **FAX No:** | 202-307-2569 |
| | **Off. Phone:** | 202-305-8294 |

**Subject:**

**Number of pages transmitted (including this sheet):** 3

*Hope you can read this — it's a Xerox of an Onionskin!*



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*               *Washington, D.C. 20530*

Mr. Troy King                                           **JAN - 8 2007**
Attorney General

Mr. John J. Park, Jr.
Assistant Attorney General
State of Alabama
Alabama State House
11 South Union Street
Montgomery, Alabama 36130

Dear Messrs. King and Park:

This letter refers to the change in method of selection for filling vacancies on the Mobile County Commission from special election to gubernatorial appointment in Mobile County, Alabama, pursuant to decisions of the Alabama Supreme Court in *Stokes v. Noonan*, 534 So. 2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So. 2d 1013 (Ala. 2005), submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, as amended. This matter arises from an order entered on August 18, 2006, by a three-judge panel in *Kennedy v. Riley*, 445 F. Supp. 2d 1333 (M.D. Ala. 2006), ruling that the State of Alabama submit the two decisions for preclearance under Section 5. We received your submission on November 9, 2006.

We have carefully considered the information you have provided, as well as census data, comments, and information from other interested parties. Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed change "neither has the purpose nor will have the effect" of denying or abridging the right to vote on account of race. *Georgia v. United States*, 411 U.S. 526 (1973). *See also* Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. § 51.52. "A change affecting voting is considered to have a discriminatory effect under Section 5 if it will lead to a retrogression in the position of members of a racial or language minority group (*i.e.*, will make members of such a group worse off than they had been before the change) with respect to their opportunity to exercise the electoral franchise effectively." 28 C.F.R. § 51.54(a) (citing *Beer v. United States*, 425 U.S. 130, 140-42 (1976)).

Pursuant to Act No. 85-237, a vacancy on the Mobile County Commission is to be filled through popular election by the voters within the relevant single-member district. That statute was precleared by the Attorney General under Section 5 on June 17, 1985 (File No. 1985-1645),

-2-

and was first implemented in a 1987 District 1 special election. Pursuant to decision of the Alabama Supreme Court in *Stokes v. Noonan*, that method of filling vacancies was changed from election by the voters of the district to appointment by the Governor of Alabama in 1988, and reaffirmed by *Riley v. Kennedy* in 2005.

Pursuant to the decision of the three-judge federal panel in *Kennedy v. Riley*, the State has submitted the changes effected by *Stokes v. Noonan* and *Riley v. Kennedy* for review under Section 5 of the Voting Rights Act. Additionally, we understand that Alabama law has changed, legislatively reversing the decision in these cases and restoring the authority to fill vacancies to the voters themselves for future elections. This is the effect of Act No. 2006-342, which was signed by the Governor on April 12, 2006, and which would govern all future vacancies. The question before us, therefore, is limited to whether the change effected by *Stokes v. Noonan* and *Riley v. Kennedy* will lead to impermissible retrogression, caused by the appointment, rather than election, of an individual to fill a vacancy on the Mobile County Commission for a term expiring in 2008.

In evaluating whether a change affecting voting will lead to impermissible retrogression, the Attorney General compares the submitted change to the practice or procedure in effect at the time of the submission. 28 C.F.R. § 51.54(a). In light of your submission, we note that a change brought about by a state court decision is subject to Section 5. *Branch v. Smith*, 538 U.S. 254, 262 (2003). A practice or procedure that is not legally enforceable under Section 5 cannot serve as a benchmark; the comparison is with the last legally enforceable practice or procedure used by the jurisdiction. *Id.* Changes that are not precleared are not enforceable. 42 U.S.C. § 1973c; *Hathorn v. Lovorn*, 457 U.S. 255, 269 (1982); *Clark v. Roemer*, 500 U.S. 646, 652 (1991). Because the changes pursuant to *Stokes* and *Riley* were never precleared, they cannot serve as the benchmark. *See Kennedy*, 445 F. Supp. 2d at 1336, (citing *Abrams v. Johnson*, 521 U.S. 74, 96-97 (1997)); *Gresham v. Harris*, 695 F.Supp. 1179, 1183 (N.D. Ga. 1988) (three-judge court), *aff'd sub nom. Poole v. Gresham*, 495 U.S. 954 (1990). The benchmark is determined without regard to its legality under state law. *Kennedy*, 445 F. Supp. 2d at 1336 (citing *City of Lockhart v. United States*, 460 U.S. 125, 132-133 (1983)); *Perkins v. Matthews*, 400 U.S. 379, 394-95 (1971).

Thus, the last precleared procedure for filling vacancies in the Mobile County Commission that was in force or effect was the special election method set forth in Act No. 85-237. *Kennedy*, 445 F. Supp. 2d at 1336. This Act remains in full force and effect, as it affects voting, was precleared, and was implemented in the 1987 special election cycle. *See Young v. Fordice*, 520 U.S. 273, 282-83 (1997); *Lockhart*, 460 U.S. at 132-33. It is therefore the benchmark against which we measure the proposed change to fill vacancies by appointment of the Governor of Alabama.

The measurement is straightforward. As a result of litigation under the Voting Rights Act, Mobile County is governed by the three-member Mobile County Commission, the members of which are elected from single-member districts. *Brown v. Moore*, Civ. Act. No. 75-298-P

-3-

(S.D. Ala. 1976) (unpublished opinion). One of the single-member districts, District 1, is over sixty-three percent African-American in population and registered voters. The African-American voters of District 1 enjoy the opportunity to elect minority candidates of their choice to the County Commission; indeed, they enjoyed it in the 1987 special election in which Act 85-237 was first implemented. There is no dispute that the change would transfer this electoral power to a state official elected by a statewide constituency whose racial make-up and electoral choices regularly differ from those of the voters of District 1. Attorneys General have on at least ten occasions previously interposed objections to changes in method of selection from election to appointment in Alabama and elsewhere. For instance, in 1971, the Attorney General objected to Act No. 2445 of the Alabama Legislature, which changed the method of selection of judges of Justice of the Peace Courts in Alabama from election to appointment. Letter of David L. Norman, Assistant Attorney General, Civil Rights Division, to Hon. William J. Baxley, Attorney General, State of Alabama, Dec. 26, 1973.

The transfer of electoral power effected by *Stokes v. Noonan* and *Riley v. Kennedy* appears to diminish the opportunity of minority voters to elect a representative of their choice to the Mobile County Commission. We have received no indication that the voters of District 1 would have selected the particular individual selected by the Governor. Under these circumstances, the State has failed to carry its burden of proof that the change is not retrogressive. On behalf of the Attorney General, therefore, I must interpose an objection to the change in method of selection for vacancies occurring on the Mobile County Commission from special election to gubernatorial appointment.

We note that under Section 5, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. *See* 28 C.F.R. § 51.44. In addition, you may request that the Attorney General reconsider the objection. *See* 28 C.F.R. § 51.45. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the method of selection for vacancies on the Mobile County Commission by gubernatorial appointment will continue to be legally unenforceable as a matter of federal law. *Clark v. Roemer*, 500 U.S. 646 (1991); 28 C.F.R. § 51.10.

We also have been advised, as suggested above, that the State has, in essence, re-enacted the provisions of Act No. 85-237 in Act No. 2006-342, which similarly provides that future vacancies on the Mobile County Commission will be filled by special election. To the extent that Act No. 2006-342 does not change the voting practices and procedures set forth in Act No. 85-237, it need not be submitted for Section 5 review. We respectfully request your advice as to whether changes covered by Section 5 are contained in the 2006 law. In the meantime, special elections may be held pursuant to Act No. 85-237.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Alabama plans to take concerning this matter. If you have any

-4-

questions, please call Robert Lowell (202-514-3539), an attorney in the Voting Section. Because this matter has been the subject of pending litigation in *Kennedy v. Riley*, we are serving copies of this letter by facsimile transmission to the Court and counsel of record.

Sincerely,

Wan J. Kim
Assistant Attorney General

U.S. Department of Justice

Civil Rights Division

JKT:MSR:EAM:maf:par
DJ 166-012-3
2006-4637

*Voting Section - NWB*
*950 Pennsylvania Avenue, NW*
*Washington, DC  20530*

July 19, 2006

Mr. John J. Park, Jr.
Assistant Attorney General
11 South Union Street
Montgomery, Alabama  36130

Dear Mr. Park:

  This refers to Act No. 2006-252, which provides certain jurisdictions with State-law authority to retain federal court-ordered methods of election and numbers of officials, for the State of Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.  We received your submission on June 1, 2006.

  The Attorney General does not interpose any objection to the specified change.  However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the change.  Procedures for the Administration of Section 5 of the Voting Rights Act (28 C.F.R. 51.41).

       Sincerely,

       John Tanner
      Chief, Voting Section

**More Information Requests and the Deterrent Effect of Section 5 of the Voting Rights Act**

Luis Ricardo Fraga
Stanford University
650.723.5219
Luis.Fraga@stanford.edu


Maria Lizet Ocampo
Stanford University
650.387.7472
mlocampo@google.com

**Abstract**

In his essay we provide a comprehensive analysis of the impact of more information requests (MIRs) issued by the Department of Justice under the Section 5 Preclearance Provision of the Voting Rights Act. In so doing, we assess the impact of MIRs in deterring covered jurisdictions from pursuing voting procedures and practices that were discriminatory against protected minority groups. An MIR is contained in a formal letter from a senior official within the DOJ sent to a submitting jurisdiction requesting that it provide additional information about a proposed change. We begin our essay by developing a framework of compliance where we specify the major players, their primary goals and strategies, and the final outcomes that structure the process of preclearance. In the second part of the essay, we provide the first-ever analysis of the issuance and deterrent effect of MIRs for all voting changes submitted to the DOJ for the period January 1982 to August 2005. We compare the number of changes to the number of objections and we identify patterns in MIR-induced outcomes. We find that MIRs are a critical mechanism through which the DOJ induces compliance with Section 5 above and beyond the compliance resulting from formal objections. We also find that there is considerable variation across jurisdictions and across types of changes between MIR-induced outcomes and formal objections. Lastly, we find that in some time periods the deterrent effect of MIRs far exceeds the compliance resulting from the issuance of formal objection letters.

Revised version of essay prepared for delivery at the symposium Protecting Democracy: Using Research to Inform the Voting Rights Reauthorization Debate, The Chief Justice Earl Warren Institute on Race, Ethnicity and Diversity, University of California, Berkeley, School of Law (Boalt Hall), and the Institute of Governmental Studies, University of California, Berkeley, Washington, DC, February 9, 2006. Portions of this essay were submitted as a special report to the Senate Judiciary Committee regarding its hearings on the renewal of the Voting Rights Act, May 23, 2006.

It is impossible to assess the impact of the Voting Rights Act (VRA) without a thorough consideration of the role of the Section 5 Preclearance Provision. This subdivision of the law transformed the traditional relationship between national and state governments in that it gave the Department of Justice (DOJ) and the United States District Court for the District of Columbia[1] the capacity to review directly the potential impact of a broad range of proposed changes in electoral procedures and practices to determine if they might be discriminatory. This *ex ante* intervention was specifically designed to expand voting rights to African Americans, and later specific language minorities, by limiting their need to seek legal remedies in the federal courts after jurisdictions had already held elections using allegedly discriminatory election systems. Section 5 was designed to overcome the burden on plaintiffs to file lawsuits challenging discriminatory voting changes in federal courts within covered jurisdictions where local judges might be inclined to favor traditional political interests.[2]

The logic of Section 5 assumed that African Americans and language minorities were much more likely to have their interests fully considered by the Department of Justice (DOJ) or the DC Court than by a local federal district judge.[3] When the constitutionality of the entire VRA, including Section 5 specifically, was upheld by the Supreme Court in *South Carolina v. Katzenbach*,[4] so was the capacity of the DOJ and the DC Court to play a significant role in determining the impact of the Voting Rights Act. The role was expanded even further in *Allen v.*

---

[1] Because so few changes are submitted to the DC District Court, we will refer to submission to the DOJ as the primary arena within which Section 5 is administered. We fully acknowledge that a jurisdiction can, at any time, choose to submit their change to the DC District Court for review.

[2] Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (NY: Columbia University Press, 1976), 312-313.

[3] Roman argues that the inclusion of the Department of Justice in Section 5 review was an afterthought by the Congress and that Congress expected most of the reviews to occur in the DC District Court. *See* John J. Roman, "Section Five of the VRA: The Formation of an Extraordinary Federal Remedy," *American University Law Review* 22 (2) (1972): 124.

[4] 383 U.S. 301 (1966).

*State Board of Elections*[5] in which the Supreme Court enlarged the scope of the VRA to prohibit practices and procedures that led to vote dilution, allowing vote dilution to be considered in preclearance reviews under Section 5.

The realization of the goals of Section 5 depends on both effective enforcement by the Department of Justice and the federal courts and voluntary compliance of covered jurisdictions. The number of personnel and other resources necessary to monitor the hundreds of thousands of decisions and actions taken by state and local governments in the process of conducting elections has been a perennial challenge to the federal government. Ironically, despite the principled position taken by Congress in 1965 and the Supreme Court in 1966 and 1969 to promote the full and effective participation of African Americans in all aspects of elections, neither body has distributed or mandated the amount of money necessary to ensure that full enforcement of all provisions of the VRA occurs.

Not surprisingly, a debate on the effectiveness of DOJ actions regarding Section 5 has always existed. Two main criticisms have been levied against the DOJ. First, it is argued that the DOJ has no comprehensive way of knowing whether or not all covered jurisdictions have submitted all relevant election related changes for review. Second, because of the DOJ's dependence on voluntary submission, it has tended to engage in negotiations with covered jurisdictions that have not been as forceful or demanding as necessary to maximize the protection of voting rights. These two criticisms are outlined most clearly by Ball, Crane, and Lauth, where they describe these limits in implementing Section 5 as leading to "compromised compliance."[6] Department of Justice officials, not surprisingly, argue that they do all that they can with the resources that they are given. Reliance on voluntary compliance is acknowledged, as is

---

[5] 393 U.S. 544 (1969).
[6] Howard Ball, Dale Crane, and Thomas P. Lauth, *Compromised Compliance: Implementation of the 1965 Voting Rights Act* (Westport, CT: Greenwood Press, 1982), 57.

awareness that in some instances "second-best results" or the making of decisions largely on "political considerations" can occur.[7]  These officials, however, are confident that the DOJ has most often promoted "high levels of compliance" by covered jurisdictions nonetheless.[8]

The DOJ has consistently issued objections to submitted changes.  Ball, Crane, and Lauth report that from 1965 to 1981, a total of 35,000 voting changes were submitted for preclearance. The DOJ objected to 815, or 2.3 percent, of these changes.[9]  Based on data maintained by the DOJ, from 1982 through July 29, 2005, a total of 387,673 changes were submitted to it by covered jurisdictions.  The DOJ objected to a total of 2,282 changes.  This represents 0.6 percent of all changes submitted during this period.[10]  Only 54 changes were objected to between 2000 and July 29, 2005.

Interestingly, both critics and supporters of DOJ's Section 5 enforcement present arguments about DOJ's Section 5 enforcement record with little systematic analysis of longitudinal data regarding DOJ internal review of submissions and the ultimate disposition of submitted changes.  Assessing DOJ actions based on the number of objections is useful, but it may miss other ways that the DOJ influences jurisdictions to comply with the VRA.  In fact, interpreting the recent decrease in the number of objections issued by the DOJ as evidence that jurisdictions are now more prone to make electoral changes that comply with the VRA may underestimate the critical role that the DOJ can play in directing jurisdictions to comply.  A systematic assessment of a fuller range of DOJ Section 5-related practices and decisions fills a

---

[7] Drew S. Days III, "Section 5 and the Role of the Justice Department," in *Controversies in Minority Voting: The Voting Rights Act in Perspective*, eds. Bernard Grofman and Chandler Davidson (Washington: DC: The Brookings Institution, 1992), 61.  From 1990 through June 23, 2005, a total of 792 objections to proposed changes have been issued by the DOJ.  However, only 44 of these objections were issued between 2000 and 2005.
[8] Ibid.
[9] Ball, Crane, Lauth, (1982), 137.
[10] US Department of Justice.  "Section 5 Objection Determinations."
 http://www.usdoj.gov/crt/voting/sec_5/obj-activ.htm.

critical gap in understanding the impact and continued need for Section 5 of the Voting Rights Act.

This essay is comprised of two parts.  First, we describe the framework of DOJ-based Section 5 enforcement.  We identify the major players, describe their primary goals and strategies, and detail the possible outcomes of DOJ Section 5 review.  We do this to understand better the full range of stakeholders as well as their interests and choices to maximize gains in the complex arena of compliance with Section 5.  In outlining this framework, we focus on the role of **more information requests (MIRs)** issued by the Department of Justice as part of their work in reviewing submitted changes.  An MIR is contained in a formal letter from a senior official within the DOJ sent to the submitting jurisdiction requesting that it provide additional information about a proposed change in voting procedure or practice.[11]  These letters state that the DOJ needs the requested information to evaluate fully whether or not the proposed change is consistent with the VRA.  A letter may contain multiple requests for information.  In sending such a letter, we argue that the DOJ may signal the submitting jurisdictions about the assessment of their proposed change.[12]  Second, we provide the first-ever analysis of the issuance and deterrent effect of MIRs for all voting changes submitted to the DOJ for the period January 1982 to July 2005.[13]  We categorize the changes by year submitted, type of voting change, and state.  We then compare the number of changes to the number of objections.  Finally we note the number of MIRs issued and MIR-induced outcomes.  We measure the impact of this MIR-induced compliance by specifying if, after receiving the MIR, the covered jurisdiction: 1)

---

[11] Department of Justice, 28 C.F.R. §51.37, Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, as Amended.
[12] Three examples of more information letters appear in Appendix A.
[13] Only partial data are presently available from the Department of Justice for 2005.

withdrew the proposed change,[14] 2) submitted a superseding change that replaced the original change, or 3) never responded to the request or responded with insufficient information.[15]  Each of these three outcomes has the effect of invalidating the proposed change under the VRA since jurisdictions cannot institute a change without first obtaining preclearance.

In the end, we use our framework of compliance and our analysis of DOJ-generated data to quantify the critical role that MIRs have played in promoting compliance by covered jurisdictions.  MIRs are among the mechanisms used by the DOJ to promote submission, facilitate full review, and develop understanding with all relevant players in the preclearance process.  MIRs are far more frequently issued than are objection letters and are a much needed added measure to assess both compliance with and the continuing need for Section 5 of the Voting Rights Act.  MIRs may, ultimately, be a better indicator of how much compromised compliance actually occurs in the process of Section 5 preclearance than objections.

**Stakeholders and Interests in Compliance with Section 5**

We define compliance as the submission to the DOJ,[16] with full information, of all changes in voting procedures or practices, and the acceptance by the submitting jurisdiction of the determination made by the DOJ.  We posit that there are three primary set of actors[17] in the process of compliance with Section 5 of the Voting Rights Act.  The first set of actors includes the covered jurisdiction and those officials within a jurisdiction with direct responsibility for overseeing elections and voting.  Under the VRA in 1965, a number of states, largely in the

---

[14] The three letters in Appendix A resulted in withdrawals.

[15] Collectively, we refer to these categories as MIR-induced outcomes.  The inference that we draw from the MIR-induced outcomes is supportable based upon our analysis.  We note, however, that there could be some circumstances in which a voting change is withdrawn as a result of circumstances external to preclearance.

[16] Or the District Court of the District of Columbia.  See fn. 1.

[17] We do not include federal judges, members of Congress, or the President as primary actors.  Clearly they have affected the evolution of Section 5 through court decisions and modifications of the legislation.  We suggest that these players are better understood as decision-makers who sporadically affect interpretations of Section 5, but are not consistent participants in the implementation of Section 5.

South, were subject to the Section 5 Preclearance Provision.  They were identified on the basis of the trigger formula in the Act.  The trigger formula was modified in 1970 and especially in 1975 when the VRA was expanded to include language minorities, specifically Latinos, Asian Americans, Native Americans, and Alaska Natives.  At present, nine entire states are covered under Section 5, as are fifty-four additional counties and twelve individual townships in other states.[18]   All governmental subdivisions within a covered jurisdiction are also covered under the Section 5 provision.  The second set of actors is comprised of African American and language minority voters who live in covered jurisdictions.  We include in this set of actors advocacy groups such as the Lawyer's Committee for Civil Rights (LCCR), the NAACP Legal Defense Fund, and the Mexican American Legal Defense and Education Fund (MALDEF) as well as private attorneys who represent African American and language minority voters.  The final set of actors we identify in the preclearance process is contained within the Department of Justice.  DOJ actors affecting Section 5 are the Attorney General, the Assistant Attorney General for the Civil Rights Division, and the attorneys and analysts or paraprofessionals in the Voting Section who are generally the first to review a submission.

Each set of actors has a distinct set of goals in Section 5 Preclearance.  Covered jurisdictions' primary goal is to implement a proposed voting change.  That is, regardless of the nature or purpose of a voting change, the jurisdiction has, consistent with the distribution of political influence currently operating within it, decided to make the change and will want to see it precleared and put into practice.  By comparison, the primary goals of African American and

---

[18]  The states covered in their entirety are: Alabama, Alaska, Arizona, Georgia, Louisiana, Mississippi, South Carolina, Texas, and Virginia (six counties and three cities in Virginia have successfully bailed out of coverage). The number of covered counties in states not covered as a whole are: California-4, Florida-5, New York-3, North Carolina-40, and South Dakota-2. The number of townships in states not covered as a whole are: Michigan-2 and New Hampshire-10.  The entire list of covered jurisdictions can be found at:
 http://www.usdoj.gov/crt/voting/sec_5/covered.htm.

language minority voters as well as their advocates is to maximize their rates of voting participation and related election of first choice candidates to public office and also prevent the implementation of voting changes that discriminate against them. Lastly, the primary goal of the DOJ is to guarantee that proposed voting changes comply with current legal standards of the Voting Rights Act, namely that they do not have a retrogressive purpose or effect. What becomes immediately apparent is that the goals of each of these actors are not necessarily consistent with one another, although alignment is theoretically possible.

What strategies and related actions, then, are pursued by each set of actors in their attempts to attain the goals specified above? This is where we begin to see the critical role that MIRs can play in affecting assessments of Section 5's effectiveness. There are four primary strategies that a covered jurisdiction can pursue to implement a desired change: 1) implement the change without submitting it to the DOJ; 2) implement changes but selectively submit only some of them to the DOJ; 3) submit changes for preclearance with only limited or biased information in anticipation that the DOJ might not preclear a full submission; or 4) provide a full submission with all relevant information to the DOJ.[19] Clearly the first three strategies are not in compliance with the spirit or letter of the VRA. There are two primary strategies pursued by African Americans, language minorities, and those acting on their behalf: 1) monitor changes in election procedures or practices occurring within jurisdictions, and 2) assess these changes to determine if they are discriminatory or not. Lastly, the DOJ has four strategies it can pursue in assessing submissions it has received: 1) rely upon the information provided by the covered jurisdiction and included within its original submission; 2) rely upon the information provided by African Americans and language minorities in their assessments of proposed changes; 3) secure

---

[19]Guidelines for jurisdictions submitting changes to the DOJ are located at:
 http://www.usdoj.gov/crt/voting/sec_5/guidelines.htm.

information through independent research; or 4) secure additional information from the submitting jurisdiction through the issuance of a more information request (MIR). There is variation in the extent to which some actors can pursue multiple strategies simultaneously. Submitting jurisdictions are legally limited to one strategy (full submission and disclosure), however minority groups and the DOJ can pursue several of the identified strategies at the same time.

The last step in our framework is analyzing the outcomes that can result from the Section 5 review process. Past studies have analyzed Section 5 outcomes, and thus effectiveness, based solely on whether the DOJ approves a proposed change or issues an objection. Issuing an objection is the ultimate sanction that the DOJ can impose under Section 5 and is the clearest indication that a jurisdiction is proposing a change that has a discriminatory purpose or is likely to have a discriminatory effect. The primary criticism levied against the DOJ in this context is the low number of objections it issues. This criticism, however, misses other ways in which DOJ can influence covered jurisdictions' adoption of voting changes that may have a discriminatory purpose or effect.

Our study focuses on the effect DOJ can have on covered jurisdictions' implementation of voting changes by issuing more information requests (MIRs). MIRs can affect implementation of voting changes because covered jurisdictions can take four distinct actions in response to an MIR. First, a covered jurisdiction can respond to the MIR by supplying the requested information. Second, it can withdraw the proposed change. Third, it can submit another change that supersedes the original proposed change in response to the questions raised in the MIR. Finally, it can choose not to respond to the MIR. In each of the last three circumstances, the covered jurisdiction, if it is complying with the law, will not implement the

original proposed change since a covered jurisdiction may not legally implement any voting change without first obtaining preclarance.  As such, withdrawal, superseded change, and no response can be understood as having the same ultimate impact as the issuance of an objection. For their part, African American and language minority voters may react to DOJ's administrative review by either accepting DOJ's determination or challenging the voting change independently in a court of law, although it is less likely such litigation will be successful if the proposed change has been approved by the DOJ.

Our framework of compliance is outlined in Figure 1.  The framework serves three purposes.  First, it places any assessment of the impact of Section 5 within the appropriate context of the range of actors, goals, strategies, and potential consequences that comprise complex and interdependent relationships that arise.  Second, it allows us to appreciate fully the critical role that MIRs can play in promoting Section 5 compliance.  While objections are one indicator of DOJ enforcement efforts, the issuance and consequences of MIRs are also important. MIRs serve as a means through which the DOJ enhances the information that it has available to assess a proposed change, which can reduce the chances that determinations are based on limited, biased, or simply incomplete information.  Moreover, MIRs can signal to jurisdictions that a proposed change might be problematic, for example, have a discriminatory impact the jurisdiction had not recognized.  Third, by specifying actors, goals, strategies, and consequences, we are in a better position to assess the past and future consequences of the implementation of Section 5.  This assessment should help inform any possible revision in the structure and implementation of Section 5.

**The Role of MIRs in Section 5 Compliance, 1982-2005**

**Sources of Data.** Our analysis utilizes data provided by the Department of Justice. We requested any combination of reports that showed changes, objections, and more information requests by year, jurisdiction, and change type for years 1982 to 2005. Additionally, we requested any reports showing MIRs since 1982 that resulted in changes being withdrawn and then subsequently resubmitted.

In response, DOJ provided Submission Tracking and Processing System (STAPS) Statistic Reports for Changes and Objections by year and state as well as by year and change type. No statistics report that combined both state and change type for submissions and objections was available. No statistics report was available for More Information Requests which showed change type and state, and no statistics report was available for withdrawals. One MIR report was available that listed total MIRs by submission number. DOJ also provided a "Submission Listing Report: Followup and Study Report for the Action ASK" for all states. Initially, DOJ produced this information for individual states, but in the process of our FOIA requests, DOJ's records software was updated and the report was modified to include all states. This 3,483 page document provides a summary of all actions taken at the DOJ regarding a submitted change receiving an MIR; therefore, it is more instructive of the impact of MIRs than the reports that simply summarize final changes and objections.

In the end, we coded the following information for each submitted change receiving an MIR: state, county, sub-jurisdiction, submission number, change type, number of MIRs, more information follow-ups, and the final outcomes of the original change submitted for the period January 1982 to July 2005. Summary reports with this information are not maintained by the DOJ. We generated all of these summary statistics based on the detailed information on each submission maintained by the DOJ.

The MIR data were coded into fifteen change types to mirror the categories used by the DOJ. These categories were: redistricting, annexation, polling place, precinct, re-registration or voter purge, incorporation, bilingual procedures, method of election, form of government, consolidation or division of political units, special election, voting methods, candidate qualifications, voter registration procedures, and miscellaneous.[20]

Outcomes of the issuance of MIRs were initially coded into the twenty-seven categories used by the DOJ. These were further reduced to fourteen categories. We focus our analysis on three specific outcome categories: 1) objection, 2) no objection, and 3) the sum of withdrawals, no determination (ND)/superseded, and no response.[21] "Objections" refer to the issuance of a formal objection letter by the DOJ. "No objection" refers to an approval in the process of preclearance. The "withdraw" category contains all submitted changes issued a MIR that ended in withdrawal or no determination/withdrawal. In such circumstances, the jurisdiction withdrew the proposed change initially submitted. Changes that ended in "ND/superseded" occur when the jurisdiction submitted another proposed change to replace the change initially submitted. Finally, the "no response" category includes changes initially submitted that resulted in an MIR or more information follow-up, but no additional information was received. A "more information follow-up" is when an additional request for more information follows an initial MIR. In these circumstances, the additional information received in response to the first MIR was insufficient for DOJ to make a determination on the change. In each of the circumstances -- withdrawal, no determination/superseded, and no response -- the initial change has no legal approval to be implemented. As such, the impact of each of these outcomes can be understood as similar to the outcome that results from the issuance of a letter of objection. That is, the

---

[20] A listing of all categories of change type appears in Appendix B.
[21] A complete listing of coding categories for the impact of MIRs is provided in Appendix C.

submitted change has no legal standing to be implemented.[22]  As importantly, in each of these circumstances, the final outcome of the change was determined by the submitting jurisdiction: the jurisdiction chose to withdraw, submit a superseding change, or not provide the information necessary.

### The Context of Compliance.

Table 1 reveals that the total number of changes submitted by covered jurisdictions varies from year to year.  The smallest number of changes submitted was 12,416 in 1983, and the largest number was 22,763 in 1992.  The numbers go up in 1992 and 2002, years after which reapportionment and related redistricting have their greatest impact as a result of new population data provided by a decennial Census.[23]  A grand total of 387,673 changes were submitted between 1982 and July of 2005.

As indicated in Table 2, the largest number of changes submitted, 94,261 (24.3 percent), were modifications to polling places, followed by annexations at 78,186 (20.2 percent), precincts at 53,438 (13.8 percent), and voter registration procedures at 41,337 (10.7 percent).  These four types of changes accounted for 68.9 percent of all changes submitted.  The "miscellaneous" category accounted for 53,492 (13.8 percent) of all submissions.  The main categories of submitted changes do not change dramatically across the seventeen years examined.

More submitted changes consistently come from the states of Texas and Georgia relative to any other states, as revealed in Table 3.  This is most likely because those states contain a large number of political sub-jurisdictions including counties, cities/towns, school districts, water

---

[22] We are fully aware that the DOJ does not have the capacity to monitor whether or not these changes are subsequently implemented.  We note that this is true for the DOJ even when it issues an objection letter.
[23] Reapportionment and redistricting periods encompass not only redistricting plans, but other related voting changes, including rerouting voting precinct boundaries to correspond to new districts, polling place changes to address new voting precinct boundaries, changes in voter registration locations, and many other related election rules and procedures.

districts, and sanitation districts, among others. Texas also has more counties than any other state, with 254. Texas surpasses all of the other states by far with a total of 162,397 submitted changes from 1982 to 2005. It is followed by Georgia with a total of 53,646 submitted changes, or just under one-third the number from Texas. Virginia, Arizona, Alabama, Louisiana, and South Carolina comprise a third major group with 28,768, 26,773, 24,428, 23903, and 23,594 submitted changes, respectively. The number of submitted changes drops significantly to 12,305 from North Carolina (where only forty counties are covered by Section 5) and 11,753 from Mississippi.

A reexamination of the data in Tables 1-3 allows us to appreciate the number of changes DOJ objected to by year, change type, and state. The number of objected to changes has gone down substantially since 1995. For the years 1982-1994, a yearly average of 165 were issued as compared to the period 1995-2004 when the annual average was only 13.4. This is a dramatic reduction. It is evident from Table 2 that three types of changes account for the largest bulk of objections: annexation, method of election, and redistricting. Together these three types of changes account for 80.2% of all objections issued between 1982 and 2005. As revealed in Table 3, the top six states with the largest number of objected to changes in rank order are South Carolina with 796, Georgia with 370, Louisiana with 274, Alabama with 198, Texas with 194, and Mississippi with 151. Together these six states account for 87% of all objections since Section 5 was renewed in 1982.

**Patterns in the Issuance of More Information Requests.**

Following the analysis above, we now examine the issuance of MIRs by year, change type, and state. It becomes immediately apparent in column three of Table 1 that the total number of MIRs issued over the time period, 13,697, far exceeds the number of objections.

MIRs exceed objections by a factor of six.  However, similar to the decrease in the number of objections after 1994, there is a decrease in the number of MIRs in this period.  From 1982-1994 an average of 899.5 MIRs were issued per year, whereas the annual average for the period 1995 to 2004 was only 199.7.

The top five categories in which MIRs were issued are annexation, method of election, polling place, precinct, and redistricting.  Similar to the issuance of objection letters, the categories of annexation, method of election, and redistricting account for a substantial portion, 56.2 percent, of all MIRs.  However, as reflected in Table 2, a much wider range of types of changes received MIRs than was the case with objections.  Examination of Table 3 reveals that the same five states – Georgia, Texas, Louisiana, South Carolina, and Alabama – are also the top states to receive MIRs.  Together they received 74.2 percent of all MIRs issued between 1982 and 2005.

### Assessing the Outcomes of MIRs.

The above analysis suggests that MIRs can play a significant role in the overall process of preclearance leading to compliance with the Voting Rights Act.  They are issued with considerable frequency.  Their focus can be consistent with that of objections, but they also have been utilized to clarify the impact of a broader range of voting procedures and practices.  In this section, we assess the impact of MIRs on the documented outcomes of changes to voting procedures and practices as determined by the DOJ.  We pay special attention to comparing these documented outcomes to the issuance of formal objections by the DOJ.

Table 1 reveals MIRs did not always precede the issuance of an objection by the DOJ.  A total of 2,282 objections were made to proposed changes during 1982 to July 2005, yet only 763 of these objections were preceded by the issuance of a MIR at some point in the process of

review.  By comparison, the sum of MIR-induced outcomes of withdrawals, superseded changes, and no responses, across the same time period, is 1,162.  This indicates that MIRs directly affected over a thousand additional changes, by making their implementation illegal.  Thus, MIRs increased the DOJ's impact in Section 5 enforcement by **51** percent between 1982 and July 2005.

Table 2 reveals that there is considerable variation in the kinds of voting changes impacted by MIRs, compared to that of objections, by change type.  As stated earlier, during the period examined, the largest number of objections to changes (1,016) blocked annexations.  MIRs, by comparison, had their greatest deterrent effect in the area of method of election, where 359 changes were not approved.  The second and third most objected to change types were method of election (426) and redistricting (388), respectively.  These also resulted in similarly high MIR-induced outcomes, including the 359 changes regarding method of election and 198 redistricting changes.  The third highest number of MIR-induced outcomes was for polling place changes.  Precinct changes received the next highest number of MIR-induced outcomes at 109.  Interestingly, annexations had the largest difference in the impact of MIR-induced outcomes relative to objections.  Although annexations were the change type that led to the largest number of objections, they were only affected by MIR-induced outcomes in 58 submitted changes.

Table 3 depicts state-by-state comparisons of the impact of MIRs relative to objections.  The rank ordering of states where MIR-induced outcomes have affected the most changes is distinct from the list of those receiving the most objections.  The largest impact of MIRs was in Texas (366), followed by Georgia (193), Alabama (181), South Carolina (103), Mississippi (93), and Louisiana (73).  Texas had a disproportionately higher deterrent effect for MIRs compared to

objections, with MIR-induced outcomes affecting submitted changes at a rate 1.89 times greater than objections.

Finally, a look back at Table 1 illustrates that the impact of MIRs, relative to objections, has grown dramatically since 1999. The number of submitted changes affected by MIRs was consistently greater than the number of changes affected by objections from 1999 to July 2005. The ratio of MIR-induced outcomes to objections was 22.4 in 1999, 12.5 in 2000, and 8.8 in 2001. It drops noticeably lower in 2002, but MIRs still affect more than two times the number of changes than those affected by objections.

Figure 2 provides a graphic comparison of objections and MIR-induced outcomes by year for 1982 to 2005. The uniqueness of the period after 1999 until 2005 is clearly apparent, although MIR-induced outcomes did outnumber objections in both 1990 and 1996. This pattern suggests that MIRs are having a strong deterrent effect under Section 5 that is lost by examining only objections.

### MIRs, Compliance, and the Deterrent Effect of Section 5

We began our analysis of more information requests by developing a framework of compliance that outlined the primary actors, goals, strategies, and outcomes that structure the process of preclearance under Section 5. This was done to inform our understanding of the varied and oftentimes competing interests that determine the extent to which compliance with the Voting Rights Act occurs. We also developed the framework to position the role that more information requests (MIRs) have in the overall process of preclearance. Although rarely studied as a critical part of the impact of Section 5, we hypothesized that MIRs may be another major way that the DOJ affects the extent that covered jurisdictions comply with their obligations to

pursue and implement electoral procedures and practices that do not deny or abridge the right to vote to African Americans and identified language minorities.

Our analysis of data provided by the DOJ for the period 1982 to 2005 allows us to reach two significant conclusions regarding the critical role of MIRs in the larger processes of preclearance and compliance under Section 5.  First, MIRs are issued at far higher rates than letters of objection.  As such, they have the potential to impact a wider range and larger number of changes submitted to the DOJ for review, compared to objections.  The pattern in the number of MIRs issued over time follows a similar decline in the number of objections.  Moreover, the frequency of MIR-induced outcomes varies by change type and especially by state.  Second, our measure of the impact of MIR-induced outcomes that were likely to deter the pursuit of procedures and practices that could have a discriminatory effect demonstrates that MIRs increase the number of changes that did not have legal standing to be implemented under Section 5 by a full **51** percent from 1982 to 2005.  This effect is significantly greater in the recent period of 1999 to 2005 where MIRs deterred **605 percent** more changes than did formal objections.  Interestingly, MIRs do not have their greatest impact on submitting jurisdictions by ultimately resulting in the issuance of objections to changes, as well under half of all objections were preceded by an MIR.  Rather, MIRs have an impact entirely separate from whether an objection is issued.  We also find that there is variation in this impact across change types and by state.

This research has direct implications for the further consideration of impact and future need to maintain Section 5 of the Voting Rights Act.  Assessments of the impact of Section 5 and the need for maintaining Section 5 must include the impact of More Information Requests on preventing discriminatory voting changes from being implemented.   We have clearly demonstrated that MIRs can be studied, and their impact can be specified.  Our analysis suggests

that public officials, scholars, and other analysts run the risk of underestimating the impact of,

and continuing need for, Section 5 if they do not fully consider the role of MIRs in the larger

processes of preclearance and compliance.

**Fraga and Ocampo**                    **More Information Requests**                    19

**Table 1**

### Number of Changes, Objections, and MIR-Induced Outcomes by Year, 1982-2005

| Year | All Submissions | | More Info Requests | | Outcomes for Changes Receiving a MIR | | | | | | | |
|------|---|---|---|---|---|---|---|---|---|---|---|---|
| | Changes | Objections | # of MIR | More info Follow up | No Objection | Objection | Withdraw | Superseded | No Response | MIR-Induced Outcome | MIR-Induced Outcome and Objections | MIR Outcome/All Objections |
| 1982 | 37 | 111 | 954 | 94 | 845 | 45 | 5 | 1 | 1 | 7 | 118 | 0.06 |
| 1983 | 416 | 70 | 1023 | 334 | 785 | 65 | 45 | 10 | 3 | 58 | 128 | 0.83 |
| 1984 | 16489 | 110 | 1067 | 246 | 853 | 25 | 26 | 2 | 8 | 36 | 146 | 0.33 |
| 1985 | 14418 | 172 | 978 | 93 | 799 | 49 | 19 | 0 | 4 | 23 | 195 | 0.13 |
| 1986 | 21898 | 639 | 1346 | 374 | 966 | 33 | 33 | 6 | 33 | 72 | 711 | 0.11 |
| 1987 | 15321 | 85 | 700 | 73 | 467 | 95 | 22 | 2 | 5 | 29 | 114 | 0.34 |
| 1988 | 18957 | 135 | 468 | 276 | 222 | 45 | 16 | 16 | 17 | 49 | 184 | 0.36 |
| 1989 | 12499 | 168 | 480 | 133 | 254 | 42 | 22 | 15 | 6 | 43 | 211 | 0.26 |
| 1990 | 17900 | 110 | 1108 | 303 | 755 | 71 | 60 | 18 | 92 | 170 | 280 | 1.55 |
| 1991 | 19253 | 129 | 1183 | 122 | 772 | 86 | 77 | 5 | 1 | 83 | 212 | 0.64 |
| 1992 | 22763 | 92 | 980 | 69 | 706 | 45 | 64 | 9 | 9 | 82 | 174 | 0.89 |
| 1993 | 17858 | 193 | 752 | 315 | 496 | 56 | 56 | 1 | 11 | 68 | 261 | 0.35 |
| 1994 | 18222 | 133 | 654 | 194 | 419 | 31 | 25 | 0 | 10 | 35 | 168 | 0.26 |
| 1995 | 14149 | 32 | 323 | 41 | 297 | 5 | 7 | 1 | 3 | 11 | 43 | 0.34 |
| 1996 | 18592 | 9 | 180 | 20 | 151 | 6 | 11 | 0 | 3 | 14 | 23 | 1.56 |
| 1997 | 15854 | 18 | 223 | 58 | 198 | 5 | 4 | 3 | 4 | 11 | 29 | 0.61 |
| 1998 | 14826 | 17 | 107 | 42 | 74 | 10 | 11 | 0 | 3 | 14 | 31 | 0.82 |
| 1999 | 13642 | 5 | 274 | 147 | 151 | 6 | 8 | 104 | 0 | 112 | 117 | 22.40 |
| 2000 | 16558 | 6 | 267 | 42 | 183 | 4 | 5 | 0 | 61 | 66 | 72 | 11.00 |
| 2001 | 14497 | 10 | 301 | 93 | 184 | 14 | 72 | 1 | 15 | 88 | 98 | 8.80 |
| 2002 | 18564 | 23 | 185 | 39 | 100 | 19 | 49 | 3 | 2 | 54 | 77 | 2.35 |
| 2003 | 16295 | 9 | 70 | 7 | 47 | 6 | 11 | 1 | 6 | 18 | 27 | 2.00 |
| 2004 | 17035 | 5 | 67 | 5 | 53 | 0 | 8 | 0 | 5 | 13 | 18 | 2.60 |
| 2005 | 5380 | 1 | 7 | 0 | 1 | 0 | 0 | 0 | 6 | 6 | 7 | 6.00 |
| Total | 387673 | 2282 | 13697 | 3120 | 9778 | 763 | 656 | 198 | 308 | 1162 | 3444 | 0.51 |

**Table 2**

**Change Types, Objections, and MIR-Induced Outcomes by Change Type, 1982-2005**

| Change Type | All Submissions | | MIRs Issued | | Outcomes for Changes Receiving MIR | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Changes | Objections | # of MIR | More info Follow up | No Objection | Objection | Withdraw | Superseded | No Response | Total MIR-Induced Outcome (W,S, NR) | MIR-Induced Outcome and Objections | MIR-Induced Outcomes/All Objections |
| Redistricting | 8694 | 388 | 1234 | 227 | 676 | 246 | 131 | 40 | 27 | 198 | 586 | 0.51 |
| Annexation | 78186 | 1016 | 3734 | 811 | 3161 | 17 | 39 | 0 | 19 | 58 | 1074 | 0.06 |
| Polling Place | 94261 | 31 | 1927 | 391 | 1374 | 29 | 136 | 1 | 46 | 183 | 214 | 5.90 |
| Precinct | 53438 | 37 | 1318 | 191 | 916 | 43 | 73 | 3 | 33 | 109 | 146 | 2.95 |
| Reregistration or Voter Purge | 275 | 7 | 83 | 21 | 46 | 3 | 13 | 0 | 5 | 18 | 25 | 2.57 |
| Incorporation | 3691 | 3 | 117 | 37 | 98 | 0 | 3 | 0 | 3 | 6 | 9 | 2.00 |
| Bilingual Procedures | 2916 | 6 | 95 | 30 | 72 | 4 | 7 | 0 | 6 | 13 | 19 | 2.17 |
| Method of Election | 14780 | 426 | 2728 | 921 | 1569 | 314 | 149 | 117 | 93 | 359 | 785 | 0.84 |
| Form of Government | 2202 | 35 | 206 | 43 | 160 | 10 | 3 | 0 | 12 | 15 | 50 | 0.43 |
| Consolidation or Division of Political Units | 1161 | 9 | 88 | 12 | 71 | 2 | 8 | 0 | 2 | 10 | 19 | 1.11 |
| Special Election | 25401 | 49 | 326 | 65 | 208 | 25 | 10 | 15 | 13 | 38 | 87 | 0.78 |
| Voting Methods | 4473 | 1 | 43 | 7 | 33 | 1 | 3 | 0 | 3 | 6 | 7 | 6.00 |
| Candidate Qualifications | 3367 | 13 | 285 | 90 | 211 | 6 | 7 | 1 | 5 | 13 | 26 | 1.00 |
| Voter Registration Procedures | 41337 | 19 | 445 | 29 | 391 | 7 | 29 | 1 | 1 | 31 | 50 | 1.63 |
| Miscellaneous | 53492 | 242 | 1068 | 245 | 792 | 56 | 45 | 20 | 40 | 105 | 347 | 0.43 |
| Totals | 387674 | 2282 | 13697 | 3120 | 9778 | 763 | 656 | 198 | 308 | 1162 | 3444 | 0.51 |

**Table 3**
**Number of Changes, Objections, and MIR-Induced Outcomes by State, 1982-2005**

| State | All Submissions | | MIRs Issued | | Outcomes for Changes Receiving a MIR | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Changes | Objections | # of MIR | More info Foll | No Objection | Objection | Withdraw | Superseded | No Response | Total MIR-Induced Outcome (W,S, NR) | MIR-Induced Outcome and Objections | MIR-Induced Outcome/All Objections |
| **ALABAMA** | 24428 | 198 | 1159 | 301 | 743 | 58 | 64 | 24 | 93 | 181 | 379 | 0.91 |
| **ALASKA** | 5537 | 2 | 315 | 115 | 311 | 0 | 3 | 0 | 1 | 4 | 6 | 2.00 |
| **ARIZONA** | 26773 | 32 | 534 | 149 | 454 | 12 | 9 | 4 | 15 | 28 | 60 | 0.88 |
| **ARKANSAS** | 7 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| **CALIFORNIA** | 3374 | 60 | 186 | 9 | 114 | 2 | 4 | 1 | 0 | 5 | 65 | 0.08 |
| **COLORADO** | 132 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| **FLORIDA** | 3514 | 14 | 196 | 242 | 177 | 4 | 8 | 0 | 0 | 8 | 22 | 0.57 |
| **GEORGIA** | 53646 | 370 | 3274 | 539 | 2528 | 102 | 156 | 12 | 25 | 193 | 563 | 0.52 |
| **HAWAII** | 289 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| **ILLINOIS** | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| **LOUISIANA** | 23903 | 274 | 1512 | 400 | 1047 | 159 | 45 | 15 | 13 | 73 | 347 | 0.27 |
| **MASSACHUSETTS** | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| **MICHIGAN** | 365 | 0 | 24 | 1 | 19 | 0 | 5 | 0 | 0 | 5 | 5 | - |
| **MISSISSIPPI** | 11753 | 151 | 874 | 126 | 499 | 123 | 58 | 14 | 21 | 93 | 244 | 0.62 |
| **NEW HAMPSHIRE** | 227 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| **NEW MEXICO** | 201 | 1 | 59 | 57 | 55 | 0 | 0 | 1 | 3 | 4 | 5 | 4.00 |
| **NEW YORK** | 4217 | 14 | 121 | 75 | 34 | 4 | 51 | 0 | 2 | 53 | 67 | 3.79 |
| **NORTH CAROLINA** | 12305 | 142 | 832 | 96 | 582 | 75 | 22 | 4 | 3 | 29 | 171 | 0.20 |
| **SOUTH CAROLINA** | 23594 | 796 | 1188 | 234 | 856 | 77 | 36 | 3 | 64 | 103 | 899 | 0.13 |
| **SOUTH DAKOTA** | 2011 | 1 | 51 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 1 | 0.00 |
| **TEXAS** | 162397 | 194 | 3034 | 760 | 2038 | 129 | 185 | 120 | 61 | 366 | 560 | 1.89 |
| **VIRGINIA** | 28768 | 31 | 337 | 15 | 271 | 18 | 10 | 0 | 7 | 17 | 48 | 0.55 |
| **WYOMING** | 201 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| **Totals** | 387673 | 2280 | 13697 | 3120 | 9778 | 763 | 656 | 198 | 308 | 1162 | 3442 | 0.51 |

**Figure 1. Compliance Under Section 5**

| ACTORS | GOALS | STRATEGIES | OUTCOMES |
|---|---|---|---|
| Covered Jurisdiction | Implement proposed change | Not Submit<br>Selectively Submit<br>Submit with limited/ biased information<br>Submit with full information | Respond to MIR<br>No response<br>Superseded change<br>Withdrawal<br>Litigate |
| Affected Groups<br>  African Americans<br>  Language Minorities<br>  Advocacy Groups | Maximizing voting and representation | Monitor changes<br>Assess changes | Accept<br>Litigate |
| Dept. of Justice<br>  Attorney General<br>  Asst. AG Civil Rights<br>  Chief Voting Section<br>  Attorneys Voting Section<br>  Analysts/Paraprofessionals | Guarantee that proposed electoral procedures, practices, and effects comply with VRA | Rely upon information from covered jurisdiction<br>Rely upon assessment of Af. Ams., language minorities<br>Secure own information (FBI)<br>Secure additional information through more information requests (MIRs) | Preclear<br>Object<br>More Information Follow-up |



Figure 2. Objections and MIR-Induced Outcomes by Year

**Appendix A. Sample More Information Letter**



**U.S. Departme . of Justice**

Civil Rights Division

JDR:TFM:NG:nj
DJ 166-012-3
2000-2137

*Voting Section*
*P.O. Box 66128*
*Washington, DC 20035-6128*

July 24, 2000

Ms. Anne M. Byrom
City Clerk
P.O. Box 170220
Tarrant, Alabama 35217-0220

Dear Ms. Byrom:

This refers to two annexations (Ordinance Nos. 915 and 916 (2000)) to the City of Tarrant in Jefferson County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your submission on May 23, 2000.

Our analysis indicates that the information sent is insufficient to enable us to determine that the proposed changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, as required under Section 5. The following information is necessary so that we may complete our review of your submission:

1. We understand that the city has designated the areas annexed pursuant to Ordinance Nos. 915 and 916 (2000) to District 1. Please indicate whether this information is correct, and explain the basis for the choice of councilmember district.

2. A detailed chronological description of the process leading to adoption of the annexations and their designation to District 1. Include a description of all of the events, meetings, hearings, debates, or discussions, whether formal or informal, involving any city official or city employee regarding the relative merits and demerits of the annexations and their designation to District 1, and the anticipated impact on the ability of minorities to elect persons of their choice to the

-2-

city council in District 1. Also, please include an explanation for the rejection of alternative district designations or redistricting plans, to the extent such alternatives were raised with the council.

3. Copies of all documents, including any correspondence, notes, minutes, tapes, and transcripts of all discussions, meetings and hearings, whether formal or informal, newspaper articles, editorials, letters to the editor, and advertisements, as well as any other publicity relating to the proposed annexations, their designation to District 1 and any alternatives suggested.

4. Copies of any reports, studies, analyses, summaries, or other documents or publications used by the city in determining (a) whether the annexations would have any impact on the minority electorate; (b) whether an alternative designation of the annexed land to District 5 was possible; and (c) whether, rather than designating the annexed areas to a particular district, it was possible to redraw the boundaries of the councilmember districts so as to include the newly annexed areas and fairly recognize minority voting strength in the expanded city.

5. A detailed description of any input or request made by any member of the minority community regarding the proposed annexations and their designation to District 1. Provide the name and daytime telephone number of any minority person or organization commenting on the proposed annexations, the substance of the comments or suggestions, the action taken by the city in response, and the reasons for the city's action.

6. A map (preferably a 1990 Census map) showing the current city limits, the district lines for the city councilmember districts, and the newly annexed areas.

7. Election returns from each voting precinct located in the City of Tarrant for all state, county, school district, and municipal elections for offices from 1990 to the present in which a black candidate participated. For each such election, indicate the position sought (indicate the incumbent(s), if any, and whether incumbency was by election or appointment); the number of positions to be filled; the name and race of each candidate; the number of votes each candidate received, by precinct; and the number of registered voters, by race and precinct, at the time of each election. If such registration data are unavailable, provide an estimate of the black population percentages by precinct at the time of the election and explain the basis for the estimate.

-3-

8. Voter registration data by race for the City of Tarrant for each year since 1996, and current voter registration statistics by race for each councilmember district.

In addition, concerns have been raised that the designation of the areas annexed pursuant to Ordinance Nos. 915 and 916 to District 1 may worsen the opportunity of minority voters to elect a candidate of choice to the city council from this district. Your response to these concerns will be of assistance in our review of your submission.

The Attorney General has sixty days to consider a completed submission pursuant to Section 5. This sixty-day review period will begin when we receive the information specified above. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.37). However, if no response is received within sixty days of this request, the Attorney General may object to the proposed change consistent with the burden of proof placed upon the submitting authority. See 28 C.F.R. 51.40 and 51.52(a) and (c). Changes which affect voting are legally unenforceable unless Section 5 preclearance has been obtained (i.e. the residents of annexed areas are not entitled to vote in city elections until the annexations have been precleared). Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10. Therefore, please inform us of the action the City of Tarrant plans to take to comply with this request.

If you have any questions concerning this letter or if we can assist you in obtaining the requested information, you should call Ms. Natalie Govan (202-307-2242) of our staff. Refer to File No. 2000-2137 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

Joseph D. Rich
Acting Chief
Voting Section



**U.S. Department of ~~stice~~**

Civil Rights Division

JDR:JR:SL:nj
2001-1838
2001-2137
2001-2217

*Voting Section*
*P.O. Box 66128*
*Washington, DC 20035-6128*

August 23, 2001

Joseph P. Rapisarda, Jr., Esq.
County Attorney
P.O. Box 27032
Richmond, Virginia 23273-7032

Dear Mr. Rapisarda:

This refers to the 2001 redistricting plan for the Henrico
County School District; and the 2001 redistricting plan for the
board of supervisors, the creation, elimination, and realignment
of voting precincts, and the polling place changes for Henrico
County, Virginia submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received
your submissions on July 2 and 26, 2001.

With the exception of the polling place change in the Cedar
Fork Precinct, the Attorney General does not interpose any
objection to the specified changes. However, we note that
Section 5 expressly provides that the failure of the Attorney
General to object does not bar subsequent litigation to enjoin
the enforcement of the changes. See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.41).

With regard to the polling place change in the Cedar Fork
Precinct, our analysis indicates that the information sent is
insufficient to enable us to determine that the change does not
have the purpose and will not have the effect of denying or
abridging the right to vote on account of race, color, or
membership in a language minority group, as required under
Section 5. The following information is necessary so that we may
complete our review of your submission:

-2-

1.  A map of the precinct detailing the location of any schools, churches and other locations within, or no more than 1500 yards from the boundary of the precinct that could be utilized as a polling place. Provide the name and street address for each aforementioned site. Please indicate which of these or any additional locations, if any, were considered by the county but not selected and the reasons for their rejection.

2.  Copies of any documents, including notes, or correspondence between the supervisors, employees, and members of the public, reports, studies, analyses, summaries, newspaper articles, editorials, and advertisements, or any other publicity concerning the proposed change. You may omit sending material already provided.

3.  A complete description of all efforts made by the county to seek input from members of the affected black community regarding the proposed polling place change. Provide the names and daytime telephone numbers of black persons who commented, or whose input was sought, and describe the comments made and what response, if any, the county made to these comments.

4.  A detailed description of any community or other group, that hold public meetings, gatherings or functions at the Confederate Hills Recreation Center (the "Center"), including whether members of the black community use this building and how frequently they do so.

5.  A description of the public transportation available in the Cedar Fork Precinct (e.g., buses, taxicabs, etc.), the schedule of operation, and any bus routes that could be used by voters, potential voters, and other persons seeking to reach the Center who may not have personal transportation to this location.

Additionally, it has been alleged that the proposed polling place change, with its lack of accessibility and relocation from a predominantly black to a predominantly white neighborhood, may adversely affect the ability of black voters to participate in the election process. Any response you could provide to these concerns would assist us in reviewing your submission.

The Attorney General has sixty days to consider a completed submission pursuant to Section 5. This sixty-day review period will begin when we receive the information specified above. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.37). However, if no response is received within sixty days of this request, the Attorney General may object to the proposed change consistent with the burden of proof placed upon the

-3-

submitting authority.  See 28 C.F.R. 51.40 and 51.52(a) and (c).
Changes which affect voting are legally unenforceable unless
Section 5 preclearance has been obtained.  Clark v. Roemer, 500
U.S. 646 (1991); 28 C.F.R. 51.10.  Therefore, please inform us of
the action Henrico County plans to take to comply with this
request.

If you have any questions concerning this letter or if we
can assist you in obtaining the requested information, you should
call Ms. Sonah Lee (202-616-2340) of our staff.  Refer to File
No. 2001-1838 in any response to this letter so that your
correspondence will be channeled properly.

Sincerely,

Joseph D. Rich
Acting Chief
Voting Section



U.S. Department of ⁀stice

Civil Rights Division

JDR:JBG:KEM:par
DJ 166-012-3
2001-2312
2001-2612

*Voting Section*
*P.O. Box 66128*
*Washington, DC 20035-6128*

October 2, 2001

Larry C. Smith, Esq.
County Attorney
Mr. P. Michael Cinnamon
Director of Elections
P.O. Box 192
Columbia, South Carolina    29202

Dear Messrs. Smith and Cinnamon:

    This refers to the procedures for conducting the November 6, 2001, special tax election and two polling place changes (Lincolnshire and Ward 18) for Richland County, South Carolina, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your submissions on August 9 and August 28, 2001.

    The Attorney General does not interpose any objection to the special tax election and Lincolnshire polling place change. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.41).

    With regard to the Ward 18 polling place change, our analysis indicates that the information sent is insufficient to enable us to determine that the proposed change does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, as required under Section 5. The following information is necessary so that we may complete our review of your submission:

    1. Identify any state requirements that govern the selection of a polling place for a voting precinct.

-2-

2. Copies of any minutes, summaries, tapes, or transcripts of meetings, hearings, and sessions, whether formal or informal, during which the proposed change was discussed. Copies of any publicity regarding the polling place change, including newspaper articles, letters to the editor, editorials with respect to the location of the polling place, and copies or descriptions of any other media coverage.

3. A complete description of all efforts made by the county to obtain the views of minority residents of Ward 18 or Richland County regarding the proposed polling place change. Provide the names and daytime telephone numbers of minority persons who commented, or whose views were sought regarding the proposed changes, describe the comments, if any, made by minority persons and the county's response, if any, to these comments.

4. With regard to potential alternative locations, if any, for the Ward 18 polling place:

   a) Identify all locations that were considered, but not chosen.

   b) For each site considered, please indicate its location on a map of Ward 18, and its surrounding area and provide the road mileage from that location to the Watkins Elementary School. A map indicating Census boundaries would be preferable, but is not necessary.

   c) For each site considered, please provide an explanation as to why it was not selected.

5. Identify the municipal and county voting districts which include Ward 18, and:

   a) Identify the candidates for office in these districts by name and race, for the 2001 election cycle.

   b) For the last three election cycles (including all primary and general elections), provide the vote totals for each candidate in these districts, and the name and race of each such candidate.

6. A detailed description of any community or other groups that hold public meetings, gatherings, or functions at the Crescent Hill Baptist Church, including whether members of the black community use this building and, if so, the frequency of this usage.

- 3 -

Concerns have been raised that the proposed Ward 18 polling place is a church, whose congregation consists entirely of white persons, which is not frequented by persons in the minority community and whose use as a polling place may discourage minority voter turnout. Any information you may wish to provide on this issue would assist us in reviewing your submission.

The Attorney General has sixty days to consider a completed submission pursuant to Section 5. This sixty-day review period will begin when we receive the information specified above. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.37). However, if no response is received within sixty days of this request, the Attorney General may object to the proposed change consistent with the burden of proof placed upon the submitting authority. See also 28 C.F.R. 51.40 and 51.52(a) and (c). Changes which affect voting are legally unenforceable unless Section 5 preclearance has been obtained. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10. Therefore, please inform us of the action Richland County plans to take to comply with this request.

If you have any questions concerning this letter or if we can assist you in obtaining the requested information, you should call Ms. Kelly Murnane (202-616-7176) of our staff. Refer to File No. 2001-2312 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

Joseph D. Rich
Acting Chief
Voting Section

## Appendix B. Coding Categories for Change Type

| | |
|---|---|
| Redistricting | Limited redistricting |
| | Redistricting plan |
| | Districting plan |
| Annexation | Annexation |
| | Deannexation |
| Polling Place | Polling place |
| Precinct | Precinct |
| Reregistration or Voter Purge | Purge/reidentification of voters |
| Incorporation | Creation of special district |
| | Incorporation |
| Bilingual Procedures | Bilingual procedures |
| Method of Election | Forty percent plurality requirement |
| | Abolishment of elected office |
| | Anti-single shot requirement adopted |
| | Anti-single shot requirement eliminated |
| | Concurrent terms |
| | Establishment of elected office |
| | Implementation schedule |
| | Majority vote requirement |
| | Method of staggering terms |
| | Method of selection |
| | Method of election |
| | Nominating procedures |
| | Nonpartisan elections |
| | Number of officials |
| | Numbered positions adopted |
| | Numbered positions eliminated |
| | Open primary |
| | Partisan elections |
| | Plurality vote requirement |
| | Residency districts adopted |
| | Residency districts eliminated |
| | Staggered terms |
| | Term of office |
| Form of Government | Form of government |
| | Powers and duties |
| | Transfer of powers |
| Consolidation or Division of Political Units | Boundary changes |
| | Consolidation of jurisdictions |
| | Consolidation or division of jurisdictions |
| | Dissolution of jurisdiction |
| | Division of jurisdictions |
| Special Election | Special election procedures |
| Voting Methods | Voting method |
| Candidate Qualifications | Candidate qualifications to serve in office |
| | Candidate qualification procedures |

**Fraga and Ocampo**                          **More Information Requests**                          34

| Voter Registration Procedures | Voter registration |
|---|---|
| | Voting qualifications/eligibility |
| Miscellaneous | Absentee Voting |
| | Designation of annexed area to election district |
| | Bailout |
| | Ballot format |
| | Campaign financing provisions |
| | Compensation |
| | Creation of judicial district |
| | Election administration |
| | Full vote on elected body |
| | General election |
| | Initiative, referendum, recall procedures |
| | Joint election procedures |
| | Other |
| | Political activity |
| | Primary election |
| | Redistricting procedures |
| | Referendum requirement |
| | Runoff election |
| | Tiebreaking vote |
| | Procedures for filling vacancies |
| | Voter assistance procedures |

**Fraga and Ocampo**                    **More Information Requests**                    35

### Appendix C. Coding Categories for MIR Outcomes

| Outcome Categories | All Coded Outcomes | Description of Coded Outcomes |
|---|---|---|
| No Objection | No Objection | No objection |
| Objection | Objection | Objection |
| | | Objection continued |
| Withdraw | Withdraw | Notice of withdrawal |
| | ND/wd | No determination--change withdrawn |
| | ND/rel ch | No determination--related change unprecleared |
| ND/Superseded | ND/Superseded | No determination--change superseded |
| | ND/not final | No determination--change not finally adopted |
| | ND/not cov | No determination--not covered by Section 5 |
| | ND | No determination |
| | Admin Close | Administratively closed |
| No Response | More info request | Additional information requested |
| | More info foll | Additional information request follow-up |
| | Add info recd | Additional information received |
| | Other | Declaratory judgment denied |
| | | Declaratory judgment action dismissed |
| | | Declaratory judgment filed |
| | | Declaratory judgment granted |
| | | Improper submission--substantively deficient |
| | | Interim response |
| | | N/A |
| | | No determination--declar. Judgmt. Action filed |
| | | No determination--court ordered change |
| | | No determination--improper submitting auth. |
| | | Notice of objection reconsideration by A.G. |
| | | Objection withdrawn |
| | | Reconsideration of objection requested |



**U.S. Departmen. of Justice**

Civil Rights Division

# FILED

JDR:RPL:HMM:par
DJ 166-012-3
2004-0067

MAR 15 2004

*Voting Section - NWB.*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

RECEIVED

**CLERK**
**U. S. DISTRICT COURT**
**MIDDLE DIST. OF ALA**

March 8, 2004

MAR 1 ...

UNITED STATES DISTRICT JUDGE
MIDDLE DISTRICT OF ALABAMA
MONTGOMERY ALABAMA

John K. Johnson, Esq.
P.O. Box 434
Rockford, Alabama  35136-0434

Dear Mr. Johnson:

This refers to the 2003 redistricting plan and the realignment of voting precincts for the City of Ashland in Clay County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.  We received your submission on January 9, 2004.

Our analysis indicates that the information sent is insufficient to enable us to determine that the proposed redistricting plan does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, as required under Section 5.  The following information is necessary so that we may complete our review of your submission:

1.    A description of the process by which the city adopted the 2003 redistricting plan, including: a) a copy of any written redistricting criteria adopted or used by the city in developing the proposed plan, or, if written criteria were not prepared, a detailed description of the redistricting criteria, if any, that were used;  (b) copies of any written instructions or guidance and a detailed description of any oral instructions or guidance given, whether formally or informally, by the city to the demographer regarding the preparation of the proposed and any alternative plans; (c) a description and copies of any alternative plans, whether formal or informal, that were reviewed and considered by the city, including for any such plan, statistical population data and maps; (d) for each plan identified in item (c) that the city did not adopt, including the plan submitted by the ADC, set forth the factual basis for the city's determination that the adopted plan better satisfies the reapportionment criteria; and (e) the factual basis, including any reports, studies, analyses, or views, whether formal or

- 2 -

informal, for the city's determination that implementation of the plan will not adversely affect the ability of black voters to continue to exercise the franchise effectively under the proposed plan, compared to the benchmark plan.  You need not include any information that has been previously provided.

2.  To the extent not previously provided, copies of the following:  (a) all documents relating to the proposed and alternative plans, including notes, summaries, minutes, tapes, and transcripts of all discussions, meetings (in particular, the September 15, 2003, regular city council meeting) and hearings, whether formal or informal, at which the proposed and alternative plans were discussed; and (b) any correspondence among the elected officials, employees, demographer(s), consultants, and members of the public that addressed the proposed or alternative plans.

3.  A current city map, preferably a 2000 Census map, indicating the residence of each incumbent city councilmember.

4.  A detailed description of the city's efforts, both formal or informal, to secure the views of the minority community regarding the proposed change.  Describe the substance of any comments or suggestions received from members of the minority community, indicate the names and daytime telephone numbers of the persons making comments or suggestions, and explain the city's response, if any.

5.  Election returns by voting precinct, located in whole or in part within the current city limits, for all state, county, municipal, school district, and special district elections in which a black candidate participated, from 1994 to the present. For each election, indicate the following:  (a) the office sought; (b) each candidate's name and race; (c) the number of votes for each candidate (by precinct, if more than one); (d) the total number of persons who voted and the number of black persons who voted, by precinct (provide an estimate if exact figures are unavailable); and (e) the number of registered voters, by race, and by precinct, at the time of the election (if these data are unavailable and voting was by precinct, provide a map showing the precinct boundaries for each election).  If such registration data are unavailable, provide an estimate of the black population percentages by precinct at the time of the election and the basis for any such estimate.

- 3 -

The Attorney General has sixty days to consider a completed submission pursuant to Section 5. This sixty-day review period will begin when we receive the information specified above. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.37). However, if no response is received within sixty days of this request, the Attorney General may object to the proposed redistricting plan consistent with the burden of proof placed upon the submitting authority. See 28 C.F.R. 51.40 and 51.52(a) and (c). Changes which affect voting are legally unenforceable unless Section 5 preclearance has been obtained. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10. Therefore, please inform us of the action the City of Ashland plans to take to comply with this request.

Because the 2003 redistricting plan and the realignment of voting precincts are directly related, they must be reviewed simultaneously. Accordingly, it would be inappropriate for the Attorney General to make a determination on the realignment of voting precincts until the requested information regarding the city's proposed redistricting plan has been received.

If you have any questions concerning this letter or if we can assist you in obtaining the requested information, you should call Ms. Heather Moss (202-353-0792) of our staff. Refer to File No. 2004-0067 so that your correspondence will be channeled properly.

Since the Section 5 status of the city's post-2000 redistricting plan is before the court insofar as it relates to the dismissal of John Dillard, et al., v. City of Ashland, 87-T-1154-N (M.D. Ala.), we are providing a copy of this letter to the court and counsel of record in that case.

Sincerely,

Joseph D. Rich
Chief, Voting Section

cc: The Honorable Myron H. Thompson
    James U. Blacksher, Esq.



**U.S. Department of Justice**

Civil Rights Division

JKT:RPL:ANS:maf
DJ 166-012-3
2007-2064

*Voting Section - NWB.*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

May 29, 2007

Thomas A. Sage, Esq.
Vinson & Elkins
1001 Fannin Street, Suite 2500
Houston, Texas 77002-6760

Dear Mr. Sage:

This refers to the procedures for conducting the May 12, 2007, special bond election for the Waller Independent School District (ISD) in Waller County, Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your submission on April 3, 2007.

Our analysis indicates that the information sent is insufficient to enable us to determine that the proposed change does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, as required under Section 5.

The following information is necessary so that we may complete our review of your submission:

1. Please provide an explanation for the District's choice of polling place and early voting site for the election, including the choice of the City of Waller, which had no municipal election, rather than the larger City of Prairie View which had a contested municipal election on that date. Please provide all records related to that decision. (You need not provide documents currently available on the ISD's website).

2. Please provide an explanation for the District's choice to hold the special election in May, rather than in November 2007, given the large number of Prairie View residents whose timely voter registration applications from the November 2006 election had not yet been processed by the County.

-2-

3.  Please identify any person(s), organization or any other entity that contacted the district regarding use of any other polling or early voting locations, or that suggested that the ISD hold the bond election on the November 2007 uniform election date.

4.  Please provide copies of all Spanish and Vietnamese translations of the voting notices, forms, instructions, and other materials related to the May 12 bond election. Please also describe the ISD's plan for providing assistance to Spanish-speaking and Vietnamese-speaking voters at the ISD's polling place and early voting locations.

We also note that while the District has made 12 submissions for Section 5 review since 1996 (including 7 for special election procedures), the District made no submissions at all from 1978 through 1995. The district had submitted a proposed change in the date of trustee elections from April to August, to which the Attorney General interposed an objection in 1978 citing the effect on Prairie View voters who would be off campus at the time chosen for the election. After submitting a new date, the District did not submit any voting changes until 1996. Please advise us if the District conducted any special elections or enacted any other voting changes during that period, and please submit the procedures for such election for Section 5 review concurrently with your response to this request for additional information.

The Attorney General has sixty days to consider a completed submission pursuant to Section 5. This sixty-day review period will begin when we receive the information specified above. See the Procedures for the Administration of Section 5 of the Voting Rights Act (28 C.F.R. 51.37). However, if no response is received within sixty days of this request, the Attorney General may object to the proposed change consistent with the burden of proof placed upon the submitting authority. See 28 C.F.R. 51.40 and 51.52(a) and (c). Changes which affect voting are legally unenforceable unless Section 5 preclearance has been obtained. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10. Therefore, please inform us of the action the district plans to take to comply with this request.

If you have any questions concerning this letter or if we can assist you in obtaining the requested information, you should call Mr. Aaron Silverman (202-305-3963) of our staff. Refer to File No. 2007-2064 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

John Tanner
Chief, Voting Section

JUL 6 1979

Honorable A. F. Summer
Attorney General
State of Mississippi
Post Office Box 220
Jackson, Mississippi   39205

Dear Mr. Attorney General:

This is in reference to House Bill No. 854
of the Regular Session of the 1979 Mississippi
Legislature, which relates to assistance in voting
for blind, physically disabled, or illiterate voters,
submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended.
Your submission was received on May 7, 1979.

By letter of June 19, 1979, we notified you
that the Attorney General did not interpose an
objection to the change in the State of Mississippi's
system of providing assistance to voters that is
contained in H.B. 854.  We did, however, inform you
that, as authorized by Section 5, the Attorney General
reserved the right to reexamine this submission if
additional information that would otherwise require
an objection came to his attention during the remainder
of the sixty-day period.

Since June 19, 1979, this Department has
received information which has caused us to reevaluate
this matter.  On the basis of that further review and
analysis, we can no longer conclude that the system of
assistance provided by H.B. 854 does not have a racially
discriminatory purpose and will not have a racially
discriminatory effect.

- 2 -

According to the 1970 census, although blacks constitute but 31 percent of Mississippi's residents aged 25 and over, 71.1 percent of all such persons who have completed less than five years of formal education are black.  Accordingly, a disproportionately large number of black as opposed to white voters must depend on assistance in order to effectively exercise their right to vote.  It is our experience, based on the observation of a substantial number of elections, that in fact the vast majority of voters who request assistance because of illiteracy are black.  Under existing law, prior to H.B. 854, according to O'Neal v. Simpson, 350 So.2d 998, S.Ct. of Miss. (1977), illiterate voters could receive assistance from the person of their choice, whether or not that person was a registered voter or resided in the precinct of the assisted voter, there was no limit on the number of voters that one person could assist, and no other person was permitted or required to be present when the assistance was given.  Under H.B. 854 the person giving assistance must be a registered voter of the precinct of the voters receiving assistance, one person may only assist five others, and the poll manager must be present while the assistance is given.

Our research and experience indicates it is common for more than five black voters to receive assistance from the same person or for the person giving assistance not to reside in the same precinct as the voters receiving assistance and that most poll managers are white.  We note in addition that the rules on assistance contained in H.B. 854 are more restrictive than those of most other comparable states and that we have received no explanation of why such restrictive rules are necessary.

Under these circumstances and as indicated above, we are unable to conclude that the proposed system of assistance does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color.  Therefore, on behalf of the Attorney General, I must interpose an objection to H.B. 854.

- 3 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection is to make the implementation of the system of assistance provided by H.B. 854 legally unenforceable.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division

OCT 20 1978

Mr. Samuel C. Cashio
District Attorney
18th Judicial District
State of Louisiana
Post Office Box 357
Maringouin, Louisiana   70577

Dear Mr. Cashio:

This is in reference to the polling place change to the Gladden Tractor Shed in Ward 2, Precinct 1 of Pointe Coupee Parish, Louisiana, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended.  Your submission was received on August 21, 1978.

On September 20, 1978, we advised you that the Attorney General interposed no objection to this polling place change, but that

"the Attorney General reserves the right to reexamine this submission if additional information that would otherwise require an objection comes to his attention during the remainder of the sixty-day period".

Since our letter of September 20, 1978, this Department has received information which has caused us to reevaluate this matter.  On the basis of that further review and analysis, we can no longer conclude that the use of the Gladden Tractor Shed site as a polling place will not have a discriminatory effect on black voters in the precinct.

cc:  Public File

-- 2 --

According to information coming to our attention since the time of our prior consideration of this matter, activities at this polling place on election day during the September 16, 1978, election made black voters feel unwelcome at the site and some of the reported conduct associated with election day activities there was threatening and intimidating to black citizens. In addition, we understand that this new polling place is located in a sparsely populated, remote area, that the site is less convenient than alternative sites in the Town of Innis, Louisiana, the location of the former polling place, and that voters, many of whom are black, must travel through Innis in order to get to the Gladden Tractor Shed, the facilities of which are poor in comparison to alternative sites in Innis such as, for example, the Innis fire station.

Under these circumstances and as indicated above, we are unable to conclude that the change to this polling place does not have the effect of denying or abridging the right to vote on account of race or color. Therefore, on behalf of the Attorney General, I must interpose an objection to the use of the Gladden Tractor site as the polling place location for Ward 2, Precinct 1, for future elections.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change does not have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make further use of the Gladden Tractor Shed as a polling place unlawful.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

Mr. Samuel C. Cashio                              APR 17 1979
District Attorney
18th Judicial District
State of Louisiana
Post Office Box 357
Maringouin, Louisiana 78757

Dear Mr. Cashio:

        This is in reference to the reconsideration of
the October 20, 1978 objection pursuant to Section 5
of the Voting Rights Act, as amended, to the use of
the Gladden Tractor Shed as the polling place in Ward 2,
Precinct 1 of Pointe Coupee Parish, Louisiana.  Your
request for reconsideration was received on February 13,
1979.

        As you know, the Attorney General only has the
authority under Section 5 to object to voting changes
that are made with a racially discriminatory purpose
or that will have a racially discriminatory effect.
Under this standard, we have considered the information
you have provided to us, have conducted further inquiry
of our own, and have reconsidered the information previously
before us.  On the basis of this analysis and review it
is our conclusion that the Parish has satisfied its burden
of proving that the use of the Gladden Tractor Shed as
the polling place in Ward 2, Precinct 1 did not have a
racially discriminatory purpose and has not had and will
not have a racially discriminatory effect.  In particular,
the Gladden Tractor Shed appears to be more convenient to
black residents of the precinct than had previously appeared
to be the case.  Accordingly, on behalf of the Attorney
General, I am withdrawing the objection interposed on
October 20, 1978.  However, I feel a responsibility to
point out that Section 5 of the Voting Rights Act expressly
provides that the failure of the Attorney General to object
does not bar any subsequent judicial action to enjoin the
enforcement of the voting change in question.

                        Sincerely,



                        Drew S. Days III
                        Assistant Attorney General
                        Civil Rights Division



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

**DEC 14 1989**

Michael Crowell, Esq.
Tharrington, Smith & Hargrove
P.O. Box 1151
Raleigh, North Carolina  27602

Dear Mr. Crowell:

This refers to Chapter 195, H.B. 595 (1989), which allows, until August 1, 1990, the board of commissioners to change its method of election without holding a referendum election and permits the adoption of specified additional election features; and the June 26, 1989, Resolution of the board of commissioners, which implements Chapter 195 (1989) to provide for an increase in the number of commissioners from five to seven; a change in the method of election from at large by majority vote and staggered terms (3-2) to four commissioners elected from single-member districts and three commissioners elected at large, all by plurality vote for staggered terms (4-3), with the three at-large seats elected concurrently without numbered posts; a districting plan; an implementation schedule; and procedures for selecting party nominees in the event of a tie in the primary for Lee County, North Carolina, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  Information completing your submission was received on November 9, 1989.

The information initially provided by the county with respect to these changes was received by the Attorney General on June 19 and July 7, respectively.  Thereafter, on August 16, 1989, pursuant to Section 51.37 of the Procedures for the Administration of Section 5, 28 C.F.R. 51.37, we requested additional information needed to analyze the changes.  In response you submitted additional information on several dates

- 2 -

culminating with a letter received by us on November 9, 1989, in which you specifically addressed various allegations by other interested parties which we had passed on to you at your request. As we explained in our November 20, 1989, letter, we found the supplemental information you provided in the response received November 9, 1989, necessary to a proper review of the changes under Section 5 and we, therefore, advised you that the statutory sixty-day period for substantive review of the submitted changes began with your response received November 9, 1989, making a final determination regarding the submitted changes due no later than January 8, 1990.

By your November 29, 1989, letter, you have taken the position that the response received November 9, 1989, does not materially supplement the county's submission so as to extend the statutory sixty-day period of review to January 8, 1990, and you therefore take the position that the deadline for an objection under Section 5 is December 4, 1989. Of course, we disagree.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52(a)). In making the required determination, we view it important to take into consideration all of the information and comments available to us. Because we have not had an adequate opportunity to do so subsequent to receiving your November 9 response in this matter and to eliminate any question about whether these changes may be considered as precleared after December 4, 1989, we feel it incumbent upon us to interpose an objection, provisionally, until such time as we can complete a careful analysis of this submission. See Procedures for the Administration of Section 5 (28 C.F.R. 51.52(c)). Therefore, on behalf of the Attorney General, I must interpose an objection to the submitted changes at the present time. However, we will continue to evaluate all of the material that we have received, including the supplemental information and arguments received November 9, 1989, and will let you know as soon as a determination on the merits can be made. At that time we will advise you as to whether the objection interposed herein will be continued or withdrawn. In the meantime, we understand that the county is anxious to obtain a determination quickly and we will expedite our review to the extent possible consistent with our responsibilities under Section 5.

- 3 -

If you have any questions concerning these matters, feel free to call Sandra S. Coleman, Deputy Chief, Voting Section, at 202-724-6718.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division