`IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Janet May, et al.,                          )
                                            )
        Plaintiffs,                         )
                                            )    Civil Action No. 2:07-cv-738-N
        v.                                  )
                                            )
City of Montgomery, Al. et al.,             )
                                            )
        Defendants.                         )
_____)

## DEFENDANTS' BRIEF OPPOSING INJUNCTIVE RELIEF

Defendants, City of Montgomery, Alabama, and Bobby Bright, in his official capacity as Mayor of the City, offer the following brief in opposition to the Plaintiffs' request for any injunctive relief.  The issues before the court are whether to stay the elections scheduled for Tuesday, August 28, 2007 and the court indicated in the scheduling conference of Monday, August 20, 2007 that it would consider a final ruling on the merits of whether or not the June 14, 2007 preclearance letter from the Department of Justice (DOJ) is an effective  preclearance of this election schedule. Defendants point out that if DOJ decides to object to this election schedule and if this court declines to find the continuing validity of the June 14th preclearance letter,  the Defendants may still challenge the DOJ determination in the U.S. District Court for the District of Columbia.

Defendants will first offer a statement of facts and then address the legal issues.  Because this case is before the Court for entry of final judgment on the claims under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, we present our arguments analyzing the case in light of the history of Section 5 practices by the Department of Justice and the relevant case law.  Those practices show quite clearly two things:  that the Department of Justice's consistent practice when interposing an objection to a Section 5 preclearance submission is to explicitly state that the Department of Justice

is interposing an objection; second, that when the Department of Justice acts on an expedited basis and interposes an objection, the Department has interposed a provisional objection as set forth in 28 CFR 51.43.

In view of the proximity of the election (one week from today) and plaintiffs' request to enjoin it, Defendants are of the view that in the event this Court decides that the City's election schedule has not been precleared in view of the June 14, 2007 letter and by operation of law, this Court should nevertheless permit the elections to go forward. In this event, this Court should apply the traditional four part test for granting preliminary injunctive relief in the context of the Section 5. Finally, defendants argue herein that plaintiffs lack standing to sue, and that the equitable doctrine of laches bars any relief in this case. A list of filed Exhibits attached to this brief is at the end of this brief.

### A.  Statement of Facts

The City of Montgomery operates under Act No. 618 of the 1973 Regular Session of the Alabama Legislature. City elections for a Mayor and nine council members from single-member districts are held every four years. The Act provides for a three week period between the first election and any necessary runoff election. In preparing for the 2007 elections the City needed an election schedule that would allow at least six weeks between the first election and any runoff election so as to comply with the Uniformed and Overseas Citizens Absentee Voting Act of 1986, 42 U.S.C. §§ 1973ff (UOCAVA). That six week time is deemed a best practice to allow for the transmission and return of absentee ballots from registered voters serving in the miliary overseas. UOCACA applies to municipal elections by virtue of Section 17-11-3 of the *Alabama Code*, which provides in part:

(a) Any qualified elector of this state may apply for and vote an absentee ballot ...in any primary, general, special, or **municipal election**, if he or she makes application ...and meets one of the following requirements:.....

**(5) The person is a member of, or spouse or dependent of a member of, the armed forces of the United States or is similarly qualified to vote absentee pursuant to the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. 1973ff.** (*emphasis added*) full text at Exhibit 1

This interpretation of state law was supported by the Attorney General for the state, the Alabama League of Municipalities, and Montgomery County election officials.[1]  The City was confronted with having any election conducted under Act 618 being challenged in court for failure to comply with UOCAVA.

The only other existing statutory provision that would allow the City to hold UOCAVA compliant election was  *Alabama Code* (1975) § 11-46-5:

The governing body of a municipality having a general municipal election or runoff election required by general or local act at a time different from the dates now or hereafter provided by Article 2, Chapter 46 of Title 11, **may elect by ordinance to have the election at the same time required by Article 2** and the election made by ordinance shall not have the effect of changing the beginning of a term of office or the time for taking office.

The election schedule is provided for in § 11-46-21 and the schedule for qualifying is provided for in §§ 11-46-22 and 25(g).  Exhibit 5   At the regular city council meeting on February 6, 2007 the council unanimously, including plaintiff May, adopted Ordinance 13-2007 which provides for the same election schedule before this court.  Exhibit 6 p.1 Subsequently, Dr. Joe Reed requested that

---

[1]  There is extensive "guidance" from the federal government as to the need for a six week election interval for handling absentee ballots.  See Exhibit 2  Report of the U.S. Election Assistance Commission, Best Practices for Facilitating Voting by U.S. Citizens Covered by the Uniformed and Overseas Citizens Absentee Voting Act, September 2004, Executive Summary. Exhibit 3 Letter from U.S. Department of Justice, Assistant Attorney General Acosta to Honorable Nancy Worley, Alabama Secretary of State, September 29, 2004.  Exhibit 4 Complaint *United States v. State of Alabama*, et. al. MD. Ala, filed March 9, 2006 filed against the State of Alabama in 2006 alleging a violation of UOCAVA because the State election schedule did not allow enough time between the primary and runoff for an overseas ballot to make the roundtrip and be counted.

3

City attempt to obtain legislation to change the election dates for Act 618 to meet UOCAVA standards. The Mayor agreed to try that approach and vetoed Ordinance 13-2007 which was unanimously upheld by the council on February 20th.

At the March 6th City Council meeting the Mayor reported the election dates in proposed legislation known as HB 866 and the council voted 8-0 in favor of those dates and urged the legislature to pass the bill. On June 5th, after efforts failed in a very contentious legislative session, the City Council voted 9-0, including plaintiff May, to suspend the rules and consider Ordinance 42-2007. Then the council voted 9-0, again with plaintiff May voting in favor, to adopt the Ordinance. Ex. 6 p. 10-11 Thus, there were three separate unanimous votes over four months in support of this election schedule.

The Ordinance was promptly submitted to the Department of Justice for preclearance on June 13th, (Ex. 7) and expedited review was requested. The Ordinance was precleared by letter June 14, 2007. Ex 8.[2]

The City immediately began election preparations including publishing legal notices, confirming polling sites and poll workers etc. There was no mention of the election schedule at the next council meeting on June 19th. Candidate qualifying opened on July 3rd and closed on July 17th. Four candidates have qualified to run for Mayor and sixteen candidates have qualified for the nine city council seats. Five of the council seats are uncontested. Ex. 10 On July 23rd undersigned counsel received the letter attached to the Complaint as Exhibit G from the Department of Justice

---

[2]There was nothing remarkable about the language of the preclearance letter. It contained standard language. See Exhibit 9 for two other preclearance letters received by the city in the same month. Note that the same reservation of an ability to "reexamine" the "no objection" determination within the time remaining was included. That language was included in those two letters even though there was little or no time remaining of that 60 day period.

informing the City that pursuant to 28 C.F.R. 51.43 the DOJ would "reexamine" the submission. Since the City's initial submission of the new election schedule on June 13, 2007, sixty nine days ago, the Department of Justice has not interposed an objection to the election schedule. The only Section 5 decision that the Department of Justice has made, as noted above, was the June 14, 2007 decision to preclear the new election schedule.

Absentee ballots were mailed in July. Many of those are already returned. Eight-seven absentee ballots for UOCAVA applicants were mailed, forty-two of those ballots were to black registered voters. Ex. 11  Early absentee voting at city hall is also taking place. At this point candidates have campaigned vigorously, 650 poll workers have been trained, ballots of the candidates who qualified have been printed, and post cards have been mailed to all 114,000 voters informing them of the election dates and their place of voting.

When the allegations by Dr. Reed that 3,000 newly arriving college students at ASU would be "disenfranchised" by the change in election date were first received (well after preclearance was obtained), the City sought to determine the registration history of ASU students. A search of the voter registration database maintained by the County to determine the number of 18 through 22 year olds, a five year age cohort, who registered to vote during the month of September at ASU for each year from the last municipal election to the present. The results are:

| Year | Number registered | |
|------|-------------------|---|
| 2003 | 18 | |
| 2004 | 141 | |
| 2005 | 1 | |
| 2006 | 142 | Ex.12 |

## ARGUMENT

### B. The Relevant Legal Standards

By its very terms, Section 5 of the Voting Rights Act states that the Attorney General must

act on a submission within sixty days or the voting changes set forth in that submission may be enforced.  The relevant Section 5 language is as follows:

Whenever a State or political subdivision … shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, **or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made.** Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. **In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section.** Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 and any appeal shall lie to the Supreme Court. **(emphases added).**

In this case, the City requested expedited approval as set forth in Section 5.  The Attorney General apparently felt that the City had made a "good cause show[ing]" for "expedited approval" and thus made a decision the next day.  In making his expedited decision as set forth in the June 14, 2007 letter, and to quote the exact language of Section 5, "the Attorney General has affirmatively indicated that such objection will not be made."     While Section 5 does authorize the Attorney General to reexamine the submission, the Attorney General must do so "during the remainder of the sixty day period".  The plain language of Section 5, therefore, would seem to dispose of the

plaintiffs' Section 5 claim.  Preclearance occurs under Section 5 <u>either</u> when the Attorney General

fails to object to a submission within sixty days <u>or</u> if he grants preclearance on an expedited basis

and no objection has occurred during the sixty day period.  In this case, both events have now

happened.  That should be the end of the matter.

When the Attorney General granted preclearance to the City on June 14, 2007, the Attorney

General apparently believed that the submission was complete at that time or he would have asked

for more information.  He did not do so and instead precleared the election schedule.   Thus since

the submission was deemed complete at that time, the Attorney general had sixty days to render his

decision to object and he has failed to do so.

So that the defendants' position is clear to this Court, we take the position that preclearance

of the voting changes has occurred here because the Attorney General failed to object within sixty

days of the City's submission, a submission that the Attorney General was complete when he

precleared it on June 14.

It is important for this Court to understand why Congress was concerned that state and local

governments receive prompt review of their voting changes.  As the Supreme Court has explained:

> In light of the potential severity of the s 5 remedy, the statutory
> language, and the legislative history, we think it clear that Congress
> intended to provide covered jurisdictions with an expeditious
> alternative to declaratory judgment actions. The congressional intent
> is plain: The extraordinary remedy of postponing the implementation
> of validly enacted state legislation was to come to an end when the
> Attorney General failed to interpose a timely objection based on a
> complete submission.

*Morris v. Gressette*, 432 U.S. 491, 504 (1977).  In *Morris, supra*, the Court read section 5

to impose strict time limits on the Attorney General:  "Although there was to be no bar to

subsequent constitutional challenges to the implemented legislation, there also was to be 'no

dragging out' of the extraordinary federal remedy beyond the period specified in the statute. *Switchmen's Union v. National Mediation Board*, 320 U.S., at 305, 64 S.Ct., at 99." *Morris, supra*, 504.

The reason that Congress decided to provide two alternative routes for obtaining Section 5 preclearance--judicial preclearance from the DC court or administrative preclearance from the Attorney General--was "to provide covered jurisdictions with an expeditious alternative to declaratory judgment actions." *Morris v. Gressette*. 432 U.S. 491, 504 (1977). That "expeditious alternative" would be undermined if the Attorney General either fails to act within the statutory sixty day period, or if the Attorney General grants Section 5 preclearance on an expedited basis and then attempts to interpose an objection later.

When a jurisdiction receives a letter granting Section 5 preclearance, as the City of Montgomery did here, it is entitled to rely on that decision. That is because voting changes that have not been precleared are legally unenforceable unless and until they are precleared. *Clark v. Roemer*, Thus, even in those cases where the Attorney General grants expedited review and preclears voting changes, and in the process of doing so informs the state or political subdivision that the Attorney General reserves the right to reexamine the decision to preclear during the remainder of the sixty day period (which does not appear to be authorized by the language statute), the jurisdiction must be given a clear decision from the Attorney General regarding the legal status of the voting changes that have been submitted.

It was apparently for this reason that the Department of Justice has adopted a regulation which states that if it makes a decision not to object to a voting change but later reexamines that

decision, the Attorney General should interpose an objection to the changes.  The regulation,[3]

codified at 28 CFR §51.43 states as follows:

**51.43 Reexamination of decision not to object.**

After notification to the submitting authority of a decision to interpose no objection to a submitted change affecting voting has been given, the Attorney General may reexamine the submission if, prior to the expiration of the 60-day period, information indicating the possibility of the prohibited discriminatory purpose or effect is received. **In this event, the Attorney General may interpose an objection provisionally and advise the submitting authority that examination of the change in light of the newly raised issues will continue and that a final decision will be rendered as soon as possible. (emphasis added).**

The Court can plainly see the value to a submitting jurisdiction if the Department of

Justice had followed this approach in this case.  The City obtained a letter of preclearance and

immediately started to implement the change in election schedule: candidates started qualifying

and campaigning, the City spent between $100,000 and $200,000 (Ex 10) in election

preparations, etc.   If the Department believed that allegations made after preclearance was

granted were sufficiently serious that they might call for an objection, the reasonable and

responsible thing to do would have been to interpose an objection during that reexamination,

provisionally or otherwise, as prescribed in its own regulations.  On the other hand, if the

Department did not believe that a reexamination would result in an objection, it might do what it

---

[3]  We understand that the Department of Justice intends to participate in this case during the hearing today.  They may argue that their interpretation of the Voting Rights Act or their own regulations is different from the defendants, and further, that their interpretation is entitled to deference.  But deference has its limits.  As the Supreme Court explained in *Presley v. Etowah County Com'n*, 502 U.S. 491, 508-09 (1992), in rejecting the Attorney General's interpretation of Section 5: "Deference does not mean acquiescence. As in other contexts in which we defer to an administrative interpretation of a statute, we do so only if Congress has not expressed its intent with respect to the question, and then only if the administrative interpretation is reasonable. See, *e.g.,* *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-844, 104 S.Ct. 2778, 2781-2782, 81 L.Ed.2d 694 (1984). Because the first of these conditions is not satisfied in the cases before us we do not defer to the Attorney General's interpretation of the Act."
.

did here and not object.  Regardless of the Department of Justice's current views, one thing is clear: it would be blatantly irresponsible for the Department of Justice to sit back following preclearance, watch the City implement the new election schedule, tell the City it was re-examining its decision but not interpose an objection, and later interpose an objection on the eve of an election.  Obviously, the Department of Justice has not interposed an objection, but if it was going to attempt to do so during the sixty day period, it should have followed its own regulations and interposed an objection within the statutory time frame.

**C.  Legal Standards for Equitable Relief**

The Eleventh Circuit has established that the Plaintiff must satisfy the following four factors for preliminary injunctive relief to be ordered: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) the threatened injury to the plaintiff outweighs the harm an injunction may cause to the defendant; and (4)  granting the injunction would not disserve the public's interest.  *Church v City of Huntsville*, 30 F. 3d 1332, 1342 (11th Cir.1994);  *Gold Coast Publications, Inc. v. Corrigan,* 42 F. 3d 1336, 1343 (11th Cir. 1994).

**1. Likelihood of Success on the Merits**

As noted above, defendants are of the view that preclearance has been obtained.  This defense is strongly supported not only by the language of Section 5 itself, but the correspondence and actions taken (or not taken) by the Department of Justice during the sixty day period. The Plaintiffs' claim for success on the Section 5 claim is based on their attorney's interpretaion of the July 23rd letter from DOJ to Menefee.   The relevant paragraph quoted in its entirety is:

> Title 28 C.F.R. 51.43 provides that the Attorney General has the right to
> reexamine a submission if additional information is received within the sixty -day

period whcih indicated the possiblility of a prohibited discriminatory purpose or effect.  The sixty-day review period of this submission ends on August 13, 2007.  On July 13, 2007, we received a letter alleging that the proposed changes are discriminatory under Section 5.  Accordingly, the Attorney Gneral is reexamining the submitted changes.  **Furthermore, in view of the additonal information we have received, we find the information contained in the submission is insufficient to enable us to determine that the proposed changes do not have the prupos and will not have the effect of denying or abridging the right to vote on accout of race, color, or membership in a language minority group, as required under Section 5.**  The following information is necessary so that we may complete our review of your submission: (and then lists four questions)

(emphasis added)

The plaintiffs say in their Complaint and in their Brief that the emphasized sentence "...means that the Attorney General has effectively withdrawn the preclearance..."  We strongly disagree.  If that is what the Attorney General meant to say then that is what the Attorney General would have said.  If the Attorney General had intended to say "this effectively withdraws preclearance" he would have said so.  He did not and the City relied on that language.  We do not know what an "effective withdrawal" is.

However, to be clear the Attorney General would have followed the language of the same C.F.R. section that he cited in the letter and thus interposed a " provisional objection". (See Ex 17 for an example of a "provisonal objection" in 1990)  The Attorney General did  not avail himself of the second option afforded the Attorney General in 28 CFR 51.43, which is quoted above.  With no provisional objection, nor any other objection,  having been rendered, the time has expired for review on August 13, 2007 and the preclearance letter of June 14, 2007 is fully effective.

This reading is consistent with the language and structure of that letter.  As to the language, there is no word of objection, provisional objection, recision or cancellation of the

preclearance letter of June 14[th,] or any similar language.  The Department of Justice has long

experience knowing how to interpose an objection.   Typical language used by the Attorney

General would be "On behalf of the Attorney General, therefore, I must interpose an objection

to..."[4]  This paragraph in the letter invokes the C.F.R. 51.43 reexamination of the submission, the

reasons for the reexamination, and the questions needed to be answered.

        This reading is consistent with the language and structure of Title 28 C.F.R. 51.43.  This

section is entitled "Reexamination of decision not to object." and is directly applicable to this

situation.  This Code section has two sentences.  The first sentence says when the section

applies,  "After notification...of a decision to interpose no objection...has been given..".  The first

sentence the lists the first of two discretionary actions that the Attorney General **may** take.  First,

"..the  Attorney General **may reexamine** the submission if, prior to the expiration of the 60-day

period..." and he decided to do so and explains why in the letter.  Note that the reexamination

can only take place prior to the expiration of the 60-day period.   If the Attorney General

exercises his first option to reexamine the submission the second sentence then gives him a

second option "...the Attorney General **may interpose an objection provisionally**...".  The

Attorney General decided not to exercise his second option and interpose a provisional

objection.

        This reading is consistent with broad purpose and structure of the Voting Rights Act and

its regulations.  The 60-day period has long been understood to close any reexamination of a

previously precleared submission or any submission that the Attorney General did not timely act

---

        [4] See, for example, Exhibit 13 DOJ Objection Letter to King and Park,  Jan. 8, 2007 at
p.3. and similarly Ex. 14 DOJ to Kilmichael, Ex. 15 DOJ to McComb. Ex 16 DOJ three letters
1970-80

upon.

It is critical for the submitting jurisdiction to have a clear understanding of the DOJ determination and a limit on the time of review so as to plan their affairs, particularly so in the present case where election preparations were well underway in reliance upon the preclearance granted June 14th. In situations very different from the present one, where the initial submission "does not satisfy the requirements of Sec. 51.27" and no prelcearance has been issued, the Attorney General may obtain additional information from the authority and have time beyond the initial 60 days to make his decision. See 28 C.F.R. 51.37.

Whatever the Attorney General intended, other than to reexamine, by the July 23rd letter he certainly did not object, provisionally object, or cancel or rescind the preclearance letter of June 14th. That preclearance letter of June 14th remains the default baseline from which we operate. The City had no option but to continue to proceed with preparing for the election. The Attorney General continues to review materials and what or when he intends to do anything further on this matter we are not informed. Whatever the Attorney General may claim is the correct reading of his own regulations the City should be able to rely on the plain meaning or those regulations. If DOJ needs different authority than this understanding permits he can simply rewrite their regulations.

Defendants' further retain the right to go to the District Court for the District of Columbia to challenge any adverse determination from DOJ. However, this court can find that the 60-day period has run and, no objection being interposed, the Ordinance is precleared.

**2. Threat of irreparable harm**

*Wright, Miller and Kane*, at section 2948.1, describe this factor as

13

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstrations that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered........

The chief function of a temporary restraining order is to preserve the *status quo* until the merits of the controversy can be fully and fairly adjudicated. *Suntrust Bank v. Houghton Mifflin Co.,* 268 F.3d 1257, 1265 (11th Cir. 2001); *citing Notheastern Fl. Chapter of Ass'n of Gen. Contractors of America v, City of Jacksonville, Fl*, 896 F.2d 1283, 1284 (11th Cir.1990). A court enters a preliminary injunction to prevent the plaintiff from being injured, and where there is no adequate remedy at law. Irreparable harm to the moving party creates the urgency justifying immediate relief, and is, therefore, a vital element of injunctive relief.   See generally, 11 A. C. Wright, A. Miller, and M. Kane, *Federal Practice and Procedure*, Section 2948.1 (2d ed. 1995).

There is no irreparable harm.  There clearly is an adequate remedy at law.  The court can order new elections if, after a full hearing, it determines that remedy is appropriate in light of the violation it may find.  There is no urgency other than that created by the Plaintiffs.  This could have all been presented to the court more than two months ago.  This eleventh hour request should not be considered.

This court in 1982, also as a three judge panel, faced an even more compelling claim where the Department of Justice had clearly objected to the legislative redistricting plan.  While some changes were made to the plan they were not adequate to meet all of the DOJ objections and the elections were allowed to go forward as scheduled.   *Burton v. Hobbie*, 543 F.Supp 235 (M.D.Ala. 1982) (3-judge court), aff'd, 459 U.S. 961, 103 S.Ct. 286, 74 L.Ed. 2d 272 (1982) and see the later District court opinion at 561 F.Supp. 1029

**3. Balance of Hardships**

14

None of the interests before this court are harmed by holding elections. All parties would appear to be harmed by **not** holding elections. The plaintiffs are three candidates, one being an incumbent, seeking public office. They have campaigned since at least June 5th and indefinitely delaying these elections would seem to harm even these plaintiff-candidates. Unless the plaintiffs see some advantage to their campaign in filing this litigation or in delaying the public vote on their candidacy. Certainly 114,000 registered voters of the city, including those voting by absentee ballot from military service will be harmed by granting a stay. The public purse and public officials who have paid for and prepared for this elections will be harmed. All candidates who have spent their own funds and the funds their supporters will be seriously harmed if elections are cancelled. The money and effort are largely wasted and for most candidates, particularly those non-incumbents with modest resources, will have great difficulty running again at a later date.

**4. Public Interest**

The public interest is largely discussed above. The right to vote is central to the democracy and should go forward. The voters have attended candidate forums, studied campaign literature and advertisements and should be allowed to cast their ballots.

**ADDITIONAL FACTORS MITIGATING AGAINST ISSUANCE OF INJUNCTIVE RELIEF**

The preliminary and injunctive relief sought is at the heart of the equitable powers of the court. Therefore, the court should consider the delay caused by the plaintiffs in bringing this request to the court. Certainly the plaintiffs have known at least since June 5th about these election dates and they waited over two and half months to request this action.

Additionally, plaintiff May has on at least three occasions over a period four months

15

voted in support of this election schedule, most recently on June 5th.   Up to this point, as both a

public official and a private citizen, her request to this court to stop this election is not deserving

of the type of protection that she seeks from this court.

All three of the named plaintiffs are candidates.  Their right to vote and participate in this

election has in no way been harmed by these election dates.  They try to assert claims for

students who do not live in Montgomery.  The are attempting to use this court to manipulate the

election system in their quest for political office.  This court should be extremely cautious not to

allow it be an instrument for the personal political advantage in this electoral contest.  These

named plaintiffs lack standing. Standing is a threshold question in every case before a federal

court.  In *Robert v Wamser*, 883 F.2d 617, 621-22 (8th Cir. 1989) the court said that the

candidate, Roberts, did not have standing to assert a voting rights claim.  He was a candidate

trying to further his own interests:

> Here, Roberts is not an aggrieved voter suing to protect his right to vote. Nowhere
> in his complaint (or anywhere else) does Roberts claim that his right to vote has
> been infringed because of his race. Nor does Roberts allege that he is suing on
> behalf of persons who are unable to protect their own rights. ...Because Roberts is
> not seeking to enforce his right to vote, but rather to improve the odds of his
> being elected, the question becomes whether he is an "aggrieved person" within
> the meaning of the Voting Rights Act. ....We conclude that an unsuccessful
> candidate attempting to challenge election results does not have standing under
> the Voting Rights Act. ..The possible divergence of interests between a candidate
> seeking office and a citizen attempting to protect his right to vote underscores the
> dubious nature of Roberts's claim to standing under the Voting Rights Act. The
> history of this litigation exhibits that Roberts's primary concern was in getting
> elected, and that whatever displeasure he might have regarding election
> procedures originates from that concern.

These plaintiffs are not entitled to this extraordinary relief of canceling the elections for all the

other candidates, including their opponents, and all the voters of this city.

C.  Argument

This court should deny any preliminary injunctive relief to stay the pending elections regardless of what determination it makes about preclearance. The City comes to this court with "clean hands" having done all within its power to conduct timely and legal elections and having done everything within its power to expedite the DOJ review process. The plaintiffs come to this court late and with "unclean hands". In even more extreme circumstances where defendants were before the court with "unclean hands" or clear objections by DOJ or had displayed dilatory tactics the courts have refused to enjoin elections at such a late time. *Burton v Hobbie*, *supra*. See also *Charlton County Board of Ed. V. U.S.* 459 F. Supp. 530, 536 (D.D.C. 197), "The eleventh-hour nature of the Government's injunctive motion provides a final reason to decline to interfere with the August 8 primary." In *Wilson v North Carolina Board of Elections*, 317 F.Supp. 1299 (M.D.N.C. 1970) the defendant county board had not even submitted the change to DOJ but the court declines to order special elections.

The Section 5 cases cited by the plaintiffs are not really applicable to the issues before this three-judge court. Both *Clark v. Roemer* and *Lopez v. Monterey County* cases (cited at pp. 4-5 of their brief) stand for the proposition that if the Attorney General interposes a timely objection to a submitted change, Section 5 plaintiffs are entitled to an injunction barring enforcement of the changes. Both cases are inapplicable to the case <u>sub judice</u> for the simple reason that the voting changes occasioned by the City's new election schedule have <u>not</u> been the subject of a timely objection by the Department of Justice.

Nor is the election eve injunction issued by Justice Kennedy as Circuit Justice in *Lucas v. Townsend*, 486 U.S. 1301 (19__) applicable to the issues present here. In *Lucas*, the voting change at issue was the date for holding a school bond referendum and it was "acknowledged

17

that the Attorney General had not precleared the referendum." *Lucas*, *supra* at 1301. Given the allegations in *Lucas* that the County's selection of the date to hold the bond referendum was purposefully discriminatory aimed at minimizing black voter turnout, and the fact that preclearance was admittedly not obtained, one can understand why an injunction might issue. Moreover, in granting the injunction, Justice Kennedy's in chambers' decision noted that while the injunction would impose a burden on the county, that burden can "fairly be ascribed to [the County's] own failure to seek preclearance sufficiently in advance of the date chosen for the election." *Id.*

We respectfully submit that those cases are really beside the point, since none of them address the legal issue here: whether the Department of Justice interposed a timely objection within the statutory sixty-day period when it initially precleared a new election schedule for the City and later notified the City that it was re-examining that decision (but failed to interpose any objection). We submit that given the current posture of this case, the best course of action for the Court to follow is similar to the one described by the Supreme Court in *Berry v. Doles*, 438 U.S. 190 (1978). In *Berry*, the Court was faced with a situation where a Georgia county implemented staggered terms without getting Section 5 preclearance. Four days prior to the election, private plaintiffs filed an action to enforce Section 5 of the Voting Rights Act on the grounds that the staggered terms provisions had not been precleared. The request for relief was not acted on by the three-judge court until several months after the election. At that time, the three-judge court found that the change to staggered terms had not been precleared and enjoined further enforcement of the changes. The three-judge court, however, refused to set aside the election and plaintiffs filed a direct appeal to the Supreme Court.

18

The Supreme Court did not set aside the elections. Instead, the Court "adopt[ed] the suggestion of the United States that the District Court should enter an order allowing appellees 30 days within which to apply for approval of the 1968 voting change under § 5. If approval is obtained, the matter will be at an end. If approval is denied, appellants are free to renew to the District Court their request for simultaneous election of all members of the Board at the 1978 general election." *Berry, supra*, at 192-193.

Although *Berry* involved a situation where the local government had not obtained preclearance (unlike the City of Montgomery here), the Supreme Court's common sense approach to the remedial issue is instructive in the event this Court determines that the City has <u>not</u> obtained preclearance of the change in election schedule. If the Department of Justice now attempts to object, and this Court rejects the City's arguments that such an objection would be untimely, the City respectfully submits that this three-judge Court should not enjoin the election for the reasons set forth above. Instead, this Court should give the City thirty days to file an action in the DC court seeking judicial preclearance under section 5 of the Voting Rights Act of the change in election schedule. If the City obtains judicial preclearance, then "the matter will be at an end." *Berry v. Doles, supra*. If preclearance is denied, plaintiffs can renew their request for injunctive relief in the form of special elections. *Id*.

## Conclusion

The City of Montgomery has diligently attempted since the beginning of this year to find an election schedule that complies with UOCAVA. By early June there was only one option available. The City adopted Ordinance 42-2007, promptly submitted  it  for preclearance, and promptly received preclearance. With no time to waste, the City began to prepare for elections

relying on the preclearance from DOJ. It is now clear that at least 87 absentee voters under

UOCAVA would not be allowed to vote in a runoff if the Ordinance had not been adopted.

Defendants believe that, based on history, at most 18 potential new registered voters may not

have time to establish residency in the City before elections.

This court should today issue an order denying any temporary or preliminary relief. The

court should then issue an opinion and order dismissing the Section 5 claim of the plaintiffs,

finding that Ordinance 42-2007 was precleared.

 **Exhibit List**

1       Ala. Code 17-11-3
2       Report U.S. Election Assistance Commission
3       Letter DOJ to Nancy Worley
4       Complaint, U.S. v Ala, MD Ala
5       Ala Code 11-46-5
6       Minutes of City Council meetings
7       DOJ Submission June 13, 2007
8       DOJ Preclearance June 14, 2007
9       DOJ Two preclearance letters
10      Affidavit of City Clerk -Brenda Blalock
11      List of UOCAVA absentee voters
12      Declaration of Larry Menefee
13      DOJ objection letter to King & Park 1-07
14      DOJ objection letter Town of Kilmichael Dec. 2001
15      DOJ objection letter McComb June, 1999
16      DOJ Three objection letters 1970-80
17      DOJ provision objection January 8, 1990

Respectfully submitted this 17th day of  August, 2007.

**/s/ Larry Menefee**

LARRY T. MENEFEE
407 S. McDonough Street
Montgomery, AL 36104
(334) 265-6002
Fax: (334) 832-9476
Bar No: ASB-0745-F35L

20

lmenefee@knology.net

J. Gerald Hebert
Campaign Legal Center
1640 Rhode Island Ave., NW Suite 650
Washington, DC 20036
(202) 736-2200 ext. 11 (office)
(202) 736-2222 (fax)
Virginia Bar Number 38432
GHebert@campaignlegalcenter.org

Attorneys  for Defendants

### CERTIFICATE OF SERVICE

I certify that on this   17th   day of August, 2007. I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

Edward Still                                          Sam Heldman
Email: still@votelaw.com                             sam@heldman.net

Cecil Gardner                                        **/s/ Larry Menefee**
cgardner@gmlegal.com                                 LARRY T. MENEFEE

http://alisdb.legislature.state.al.us/acas/ACASLogin.asp

<u>Section 17-11-3</u>

1. **Absentee balloting generally.**

THIS SECTION WAS AMENDED AND RENUMBERED BY ACT 2006-570 IN THE 2006 REGULAR SESSION, EFFECTIVE JANUARY 1, 2007. IT IS FORMER SECTION 17-10-3. THIS IS NOT IN THE CURRENT CODE SUPPLEMENT.

(a) Any qualified elector of this state may apply for and vote an absentee ballot by mail or by hand delivery, as provided in Sections 17-11-5 and 17-11-9, in any primary, general, special, or **municipal election**, if he or she makes application in writing therefor not less than five days prior to the election in which he or she desires to vote and meets one of the following requirements:

(1) The person will be out of the county or the state, or the municipality for municipal elections, on election day.

(2) The person has any physical illness or infirmity which prevents his or her attendance at the polls, whether he or she is within or without the county on the day of the election.

(3) The person works on a shift which has at least 10 hours which coincide with the hours the polls are open at his or her regular polling place.

(4) The person is enrolled as a student at an educational institution located outside the county of his or her personal residence attendance at which prevents his or her attendance at the polls.

**(5) The person is a member of, or spouse or dependent of a member of, the armed forces of the United States or is similarly qualified to vote absentee pursuant to the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. 1973ff.**

(6) The person has been appointed as an election officer or named as a poll watcher at a polling place other than his or her regular polling place.

**(b) An applicant for an absentee ballot who is a member of the armed forces of the United States, including the Alabama National Guard, the United States Naval Reserves, the United States Air Force Reserves, and the United States Army Reserve on active duty or active duty for training or an applicant who is the spouse of any member of the armed forces or any other applicant qualified to vote absentee pursuant to the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. 1973ff, may make application for an absentee ballot by filling out the federal postcard application form, authorized and provided for under the provisions of "The Federal Voting Assistance Act of 1955," Public Law 296, Chapter 656, H.R. 4048, approved August 9, 1955, 84th Congress 1st Session.**

(c) Any registered elector who requires emergency treatment of a licensed physician within five days of an election may apply for an emergency absentee ballot for the election and may vote by returning the absentee ballot no later than noon on the day the election is held. The attendant physician shall describe and certify the circumstances as constituting an emergency on a special

form designed by the Secretary of State and provided by his or her office to local absentee election managers. The special form shall be attached to the application.

(d) Any registered elector whose name appears on the poll list of qualified voters may vote by an emergency absentee ballot if he or she is required by his or her employer under unforeseen circumstances to be out of the county on an emergency business trip on election day. Under such circumstances, the applicant shall apply for an emergency absentee ballot at the office of the absentee election manager no later than the close of the business day one day prior to the election. The applicant shall complete and file an application form designed by the Secretary of State for emergency absentee voters. The form shall contain an affidavit which the applicant shall sign or swear acknowledging that he or she was not aware of the out-of-county business requirement prior to five days before the election. An applicant who meets the requirements of this subsection may vote by an emergency absentee ballot. After voting the ballot, the voter shall hand the ballot to the absentee election manager.

(e) Notwithstanding any other provision of otherwise applicable law, in the event more than one absentee ballot is cast in the name of the single voter, whether any such multiple ballot is cast by mail or otherwise, none of the affidavit envelopes containing the multiple ballots shall be opened, and none of the multiple ballots shall be counted, except in the event of an election contest, upon the order of the election contest tribunal. Upon the conclusion of an election contest or, in the event no such contest is filed, upon the expiration of time for filing such a contest, the multiple ballots shall be provided to the district attorney, with photocopies provided to the state Attorney General, for such investigation, prosecution, or other action as may be appropriate under applicable law.

*(Acts 1975, No. 1147, p. 2251, §1; Acts 1986, No. 86-428, p. 791, §1; Acts 1994, No. 94-320, p. 553, §1; Acts 1996, 2nd Ex. Sess., No. 96-885, p. 1699, §1; Act 99-388, p. 615, §1; Act 2001-1097, 4th Sp. Sess., p. 1147, §1; §17-11-3; amended and renumbered by Act 2006-570, p. 1331, §52.)*



Report of the

U. S. Election Assistance Commission

on

Best Practices for Facilitating Voting by U.S. Citizens
Covered by the
Uniformed and Overseas Citizens Absentee Voting Act

September 2004

In consultation with the

Federal Voting Assistance Program
Department of Defense

U.S. Election Assistance Commission
Program
1225 New York Avenue, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 566-3100
Toll-Free: (866) 747-1471
(8683)
http://www.eac.gov

Federal Voting Assistance

1155 Defense Pentagon
Washington, DC 20301-1155
Telephone: (703) 588-1584
Toll-Free: (800) 438-VOTE

http://www.fvap.gov

# EXECUTIVE SUMMARY

The *Help America Vote Act of 2002 (HAVA)* (Public Law 107-252, Section 242, dated October 29, 2002), directs the Election Assistance Commission, in consultation with the Secretary of Defense, to conduct a study on the best practices for facilitating voting by absent Uniformed Services voters (as defined in section 107(1) of the *Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA)*) and overseas voters (as defined in section 107(5) of such *Act*). *HAVA* provided a number of issues to consider in conducting the study. Highlights of the areas covered in this report are as follows:

1   The *National Defense Authorization Act for Fiscal Year 2002 (NDAA FY-02)* (Public Law 107-107) guarantees state residency for military personnel.

2   *UOCAVA* ensures the rights of absent Uniformed Services voters and overseas voters to register to vote and cast absentee ballots for Federal offices. Citizens covered by the *UOCAVA* have the right to a secret ballot through state law.

3   *HAVA* amended the *UOCAVA* to prohibit states from refusing to process a registration and/or absentee ballot request from an absent Uniformed Services voter because the form came in too early in an election year.

4   Thirty-two states and territories allow for a total of 45 days of transmission time for the absentee ballot and 27 states have a State Write-in Absentee Ballot to help to ensure the voter can cast a ballot in time to meet the state's ballot deadline.

5   The Federal Voting Assistance Program's (FVAP's) post-election surveys and the U.S. Postal Service statistics indicate that a 45-day transit time is needed for absentee ballots sent through international mail or the military APO/FPO (overseas) post offices.

6   FVAP helps to ensure the timely transmission of balloting materials to absent Uniformed Services voters and overseas voters by monitoring selected counties in each state prior to an election to help determine whether ballots are mailed in sufficient time according to state law and for the voter to receive, vote and return the ballot by the state deadline for casting votes.

7   FVAP has developed a standard oath for state ballot return envelopes as required by the *HAVA*.

8   *HAVA* amended the *UOCAVA* to allow for the use of a single application to request ballots through two subsequent general elections for Federal offices for citizens covered by *UOCAVA*.

9   *NDAA FY-02* amended the *UOCAVA* to allow for the use of a single application to be used to request voter registration and to request an absentee ballot [see

Section 102 (a)(4)].

10 Forty-nine states and territories allow the use of facsimile machines to transmit absentee ballot applications.

Many states have developed best practices that enhance and facilitate absentee registration and voting by *UOCAVA* voters. This report serves as a vehicle to share these best practices with other state and local election officials who administer absentee voting programs for these citizens.

# RECOMMENDATIONS

After reviewing the studies and best practices provided by the Department of Defense Federal Voting Assistance Program and the information found in the FVAP *HAVA* Interpretive Memo (Exhibit 1), the U.S. Election Assistance Commission recommends that each state:

1   Mail absentee ballots at least 45 days prior to the deadline for receipt of voted absentee ballots. While many states already do this, a significant number do not mail ballots out until 30 days before the election. If the official ballot is not available by this time, military and overseas voters have a short period of time to receive, vote, and return their absentee ballots in order to be counted in the regular absentee ballot delivery process. Even though electronic transmission of election materials offers an alternative to speed ballot transit time, inadequate ballot transit time through the mail remains the primary obstacle to timely delivery of absentee ballots for those *UOCAVA* citizens who request them.

2   Encourage further use of faxing and e-mail in the distribution of absentee ballots (see Section J of studies conducted), continue working with local U.S. post offices to expedite ballots, and consider alternative mailing methods such as U.S. Global Priority/Express Mail. *UOCAVA* voters are often in locations around the world that do not have timely or reliable mail delivery. Election officials can work with the FVAP to explore ballot delivery approaches that address these circumstances. (*HAVA* Title II, Section 241)

3   Perform an internal survey of their election jurisdictions to determine compliance with state law for the mailing of absentee ballots to *UOCAVA* citizens. State elections officials are in the best position to help to ensure that sufficient time is allowed for distribution and return of absentee ballots to *UOCAVA* citizens.

4   Ensure local election offices are aware of *UOCAVA* issues. Having a designated contact at the local level would simplify the dissemination of *UOCAVA* information and communications for *UOCAVA* voters to help ensure quality information is being provided. This is consistent with the *HAVA* goal of promoting methods of election administration that are convenient, accessible and easy to use for voters. (*HAVA* Title VII, Section 702)

5   Prepare a *UOCAVA* voter guide for publication on their website and in hard copy

to distribute to voters. This could be as simple as a one page flier such as Minnesota and Nebraska have done, or a more comprehensive booklet such as Indiana's. There is a great deal of information that can be incorporated directly from the FVAP's website and other materials to minimize the amount of effort required. Providing a simple description of the *UOCAVA* process along with local election office contact information provides all the information a voter needs to register and/or make an absentee ballot request. (*HAVA* Title VII, Section 702) Local election offices should link to this state information on *UOCAVA* and should have hard copies for distribution. State and local websites should be made accessible to disabled *UOCAVA* citizens.

6  Provide on their elections website procedures for *UOCAVA* citizens to follow pertinent to that state, as illustrated in Exhibit 7, the Texas Secretary of State Elections Division homepage (http://www.sos.state.tx.us/elections). Since *UOCAVA* voters are located all over the globe, using the Internet is often the quickest and most convenient method for them to access information. It is important that information be easy to find and concisely presented since many forward deployed military voters, in particular, have limited time slots for Internet usage. (*HAVA* Title VII, Section 702)

7  Ensure that election officials throughout the state receive training in the provisions of *UOCAVA*. Citizens covered by *UOCAVA* constitute approximately 3% of the U.S. voting age population. Consequently, some local election officials may not have much experience with this process. Training of local election officials will help ensure better service to this category of voters. FVAP trains local election officials at state conferences, provides a special section for local election officials on their website, and distributes a monthly memo to state and county election officials on *UOCAVA* issues. FVAP also provides policy guidance and recommended practices through interpretive memos, letters to state officials, a newsletter for Voting Assistance Officers and presentations at meetings of national and international election official organizations. (*UOCAVA* Title I, Section 101)

8  Each state that requires postmarking on the ballot return envelope, consider using the date the voter provides on the envelope with his/her signature as evidence of when the voter cast the ballot. This avoids the problem of a ballot return envelope not being properly postmarked or the postmark being difficult to read. As further proof that this is the date the voter cast the ballot, the voter may be required to sign an oath attesting to the truth and accuracy of the information he/she has provided. (*HAVA* Title VII, Section 701)

9  Consider changing election dates where necessary to allow sufficient time for local offices to print ballots and for the voter to receive, vote and return the ballot. In some states, primary election dates may be too close to the general election period to allow adequate time for preparing and mailing absentee ballots so they can be received and returned by the voters. (*HAVA* Title II, Section 241; *UOCAVA* Title I, Section 102)

10  Provide a State Write-In Absentee Ballot to ensure *UOCAVA* citizens without access to regular mail service can cast a ballot. States should consider automatically mailing such ballots to voters if regular ballots are not available at least 45 days in advance of an election.

# CONCLUSION

After the 2002 election, many areas of improvement to the U.S. election system became evident. Through legislation and practical aids, states have improved their processes and procedures. Undoubtedly, this has helped *UOCAVA* voters in exercising their right to vote. However, as this report indicates, more can be done to carry out this important responsibility to our Uniformed Services members and our overseas citizens.

**U.S. Department of Justice**

Civil Rights Division

_____

_Office of the Assistant Attorney General_                    _Washington, DC 20530_

September 29, 2004

VIA FACSIMILE

The Honorable Nancy Worley
Secretary of State
State Capitol, Room S 105
600 Dexter Avenue
Montgomery, AL 36104

   Re: <u>Potential Ballot Delays to Overseas Voters</u>

Dear Secretary Worley:

On July 21, 2004, the Department of Defense and the Department of Justice sent you a letter regarding compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 42 U.S.C. §§ 1973ff to 1973ff-6. That letter discussed, among other things, the deadlines for preparing and transmitting ballots to overseas civilian and military voters in time for the November 2 General Election. As we fast approach those deadlines, the Department of Justice seeks your cooperation in ensuring full compliance with UOCAVA.

Pursuant to UOCAVA, qualified overseas civilian and military voters who have applied for an absentee ballot by the 30th day before a federal election must be given an opportunity to vote by absentee ballot. To effectuate this right, election officials must mail absentee ballots to such voters sufficiently in advance of the election to allow them a fair opportunity to cast a valid ballot. The Federal Voting Assistance Program of the Department of Defense (FVAP) strongly recommends allowing 45 days to ensure voters have time to receive, cast and return the ballots by the applicable state deadlines. Studies conducted by federal postal authorities have established that a _minimum_ of 30 days is necessary for the round-trip transit of absentee ballots mailed to overseas voters and then sent back to election officials.

In our prior letter we noted our willingness to assist you in complying with UOCAVA and suggested a number of actions that you could undertake to ensure that absentee ballots are available to overseas voters in time for the fall election, e.g., expedited delivery, electronic transmission, etc. The Department of Justice remains ready to assist you in complying with this federal statute. However, we will not hesitate to take legal action if necessary to make sure that overseas voters are not disenfranchised.

A recent Department of Defense survey of selected counties in some states has indicated that not all jurisdictions have mailed their absentee ballots. To aid us in our enforcement efforts, we ask that you please advise us by October 1, 2004, whether your State's absentee ballots have been sent out on time and in compliance with UOCAVA. If necessary, we would ask you, as your state's chief election

official, to conduct a survey of local election officials to determine whether absentee ballots have actually been sent out. If we can answer any questions, do not hesitate to contact Rebecca Wertz in our Voting Section at 202-514-6342.

We appreciate your prompt attention to this important issue.

Sincerely,

R. Alexander Acosta
Assistant Attorney General

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

RECEIVED

2006 MAR -9  P 4: 56

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA.

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| STATE OF ALABAMA; BOB RILEY, | ) | |
| GOVERNOR OF THE STATE OF ALABAMA; | ) | |
| TROY KING, ATTORNEY GENERAL | ) | |
| OF THE STATE OF ALABAMA; NANCY L. | ) | |
| WORLEY, SECRETARY OF STATE OF THE | ) | |
| STATE OF ALABAMA, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

The United States of America alleges:

1.       This action is brought by the Attorney General on behalf of the United States

pursuant to the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 42 U.S.C.

§§ 1973ff *et seq.*, which provides, *inter alia*, that absent uniformed services voters and overseas

voters ("UOCAVA voters") shall be permitted "to use absentee registration procedures and to

vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 42

U.S.C. § 1973ff-1.  This action is brought to ensure that UOCAVA voters, who are otherwise

qualified to vote in Alabama's federal primary run-off elections, will have an opportunity to vote

in those elections and have their ballots counted.  The United States seeks both a preliminary

injunction to obtain compliance with the federal law at the June 27, 2006 run-off election, and

permanent relief to ensure future compliance with UOCAVA.

2.       This Court has jurisdiction pursuant to 42 U.S.C. § 1973ff-4 and 28 U.S.C. §

1345.

3.      The Defendant State of Alabama is charged with the responsibility of assuring

that State election laws, as applied, comply with the provisions of UOCAVA.

4.      Defendant Bob Riley is sued in his official capacity as Governor of the State of

Alabama.  Defendant Troy King is sued in his official capacity as Attorney General of the State

of Alabama.  Defendant Nancy L. Worley is sued in her official capacity as the Secretary of State

of the State of Alabama.  The Secretary of State is charged with receiving the results of federal

elections from the officials of each county.  Ala. Code §§ 17-20-3, 17-19-4.  The Governor, in

the presence of the Secretary of State and the Attorney General, or either of them in the absence

of the other, is charged with ascertaining which candidates or electors are elected and notifying

them by proclamation.  Ala. Code §§ 17-20-4, 17-19-5.

5.      On June 6, 2006, the State of Alabama will conduct a federal primary election in

which voters will select their respective parties' candidates for seven seats in the United States

House of Representatives.  A run-off election will be held on June 27, 2006, if necessary, if no

candidate receives a majority of votes in the primary.  Alabama has conducted three run-off

elections for Congressional seats in recent years.  Specifically, in 2004 there was one run-off

election for a seat in the United States House of Representatives, and in 2002 there were two run-

off elections for seats in the United States House of Representatives.

6.      County election officials of Alabama have received timely requests for absentee

ballots from voters who are entitled to vote pursuant to the provisions of UOCAVA.

7.      Under Alabama law, only those absentee ballots postmarked by the day before the

2

election, and received by noon on the day of election, are counted. Ala. Code § 17-10-23. If a

primary run-off election is required in 2006, the absentee ballots must be received by election

officials by noon on June 27, 2006. The county executive committee must certify and return the

results of the primary election to the state executive committee no later than June 14, 2006, and

the results of the primary election must be publicly declared no later than June 16, 2006. Ala.

Code § 17-16-35.

      8.     In order to allow UOCAVA voters a fair opportunity to vote by absentee ballot,

election officials in Alabama must mail the ballots to the voters sufficiently in advance of the

election so that voters can receive, cast and return their absentee ballots by the deadline

established under Alabama law.

      9.     Based on data from the United States Postal Service and the Military Postal

Service Agency, the Federal Voting Assistance Program ("FVAP") of the Department of Defense

and the United States Election Assistance Commission recommend that States allow 45 days for

the round-trip transit of an overseas ballot. At a minimum, FVAP has determined that States

must provide no less than 30 days for the round-trip transit of a ballot to overseas locations.

      10.    Because of the compressed period of time between the primary and run-off

elections in Alabama, absentee ballots will not be mailed sufficiently before the June 27, 2006

federal run-off election, if one is necessary, to afford UOCAVA voters an opportunity to vote.

Election officials will mail absentee ballots for any run-off election no earlier than several days

after the June 6 primary election, and likely after the certification and public declaration of the

results of the primary election on June 14 and 16, respectively, allowing no more than 13 days for

round-trip transmission of ballots.

11.    The inability of election officials in Alabama to mail absentee ballots to UOCAVA voters on a date sufficiently in advance of June 27, 2006, so as to allow the voting and return of ballots by the deadline established by State law, will deprive certain specially covered United States citizens of an opportunity to vote in the federal primary run-off election in violation of UOCAVA.

12.    An order of this Court is necessary requiring Defendants to take corrective action in order to protect the rights granted by UOCAVA both in the 2006 elections and in future elections.

WHEREFORE, plaintiff prays that this Court hear this action pursuant to 42 U.S.C. § 1973ff-4 and 28 U.S.C. § 1345; issue a declaratory judgment under 28 U.S.C. § 2201 that the failure of Alabama officials to send absentee ballots to UOCAVA voters in sufficient time to be received, cast, and returned by the State's deadline in any federal run-off election violates UOCAVA; and issue permanent injunctive relief ordering the defendants, their agents and successors in office, and all persons acting in concert with them:

       (1)    to include, in conjunction with the mailing of regular absentee ballots to UOCAVA voters for the June 6, 2006 federal primary election, a blank state authorized special write-in ballot to be used in the event of a federal run-off election on June 27, 2006, along with information regarding how voters can obtain all necessary information about any possible federal run-off election and other appropriate instructions regarding the casting of

4

such ballot;

(2)   within eight (8) days of the June 6, 2006 federal primary, to: (a) publish

prominently on the websites of the Secretary of State, as well as any

County election website where a run-off election will occur, information

identifying the federal contests for which a run-off election will be

necessary under State law and the names of the candidates for each run-off

election; and (b) notify the Federal Voting Assistance Program and other

appropriate news media and websites that are focused on military and

overseas voters, regarding the federal races involved in a run-off election

and the candidates participating in that election;

(3)    to count as validly cast ballots, in contests relating to the selection of

nominees for federal office, those ballots cast by voters, who are qualified

to vote in Alabama pursuant to UOCAVA, and who otherwise comply

with State law for absentee voting, provided that the ballot is executed and

sent (whether by federal postal services or commercial delivery services)

or delivered in person by June 27, 2006, and received on or before noon on

Friday, July 7, 2006. Notwithstanding the above, election results may be

formally certified based on ballots received by the close of the polls in any

election in which the number of outstanding absentee ballots from

UOCAVA voters could not mathematically alter the outcome, subject to

amendment or re-certification for any election where such ballots returned

5

by the extended receipt deadline change the total of votes cast for any
candidate;

(4)    to accept for federal offices, at the June 27, 2006 primary run-off election,
the Federal Write-in Absentee Ballot provided for in UOCAVA, 42 U.S.C.
§ 1973ff-2, provided that ballot is cast by a UOCAVA voter, is executed
and sent (whether by federal postal services or commercial delivery
services) or delivered in person by June 27, 2006, and is received by mail
on or before noon on July 7, 2006;

(5)    to accept, for the June 27, 2006 primary run-off election, any special write-
in ballot or the Federal Write-in Absentee Ballot transmitted by facsimile
or by email of a scanned completed ballot, along with any other documents
required by State law, provided that the ballot is cast by a UOCAVA voter
and is received on or before noon on June 27, 2006;

(6)    to take such steps as are necessary to afford UOCAVA voters who are
eligible to participate in the June 27, 2006 federal primary run-off election
a reasonable opportunity to learn of this Court's order;

(7)    to take such steps as are necessary to assure that UOCAVA voters shall
have a fair and reasonable opportunity to participate in future run-off
elections for federal office; and

(8)    to provide a report to the United States concerning the number of
UOCAVA ballots, including Federal Write-in Ballots, by county, received

6

and counted for the June 27, 2006 federal primary run-off election within

45 days of that election pursuant to this Court's order.

The United States of America further prays that this Court order such other relief as the

interests of justice may require, together with the costs and disbursements of this action.

Respectfully submitted this the 9th day of March, 2006.

ALBERTO R. GONZALES
Attorney General

By:

_____
WAN J. KIM
Assistant Attorney General
Civil Rights Division

LEURA GARRETT CANARY
United States Attorney

_____
JOHN K. TANNER
Chief, Voting Section

_____
REBECCA J. WERTZ
Deputy Chief
VERONICA S. JUNG
EMILY B. SMITH
Trial Attorneys
Voting Section
Civil Rights Division
U.S. Department of Justice
Room 7254-NWB
950 Pennsylvania Avenue, NW
Washington, DC 20530
(800) 253-3931 (telephone)

Excerpts from Code of Alabama (1975) as amended, found at
http://alisdb.legislature.state.al.us/acas/ACASLogin.asp   Emphasis added.

Section 11-46-5

1. **Date of elections in certain municipalities.**

The governing body of a municipality having a general municipal election or runoff election required by general or local act at a time different from the dates now or hereafter provided by Article 2, Chapter 46 of Title 11, **may elect by ordinance to have the election at the same time required by Article 2** and the election made by ordinance shall not have the effect of changing the beginning of a term of office or the time for taking office.

*(Acts 1980, No. 80-243, p. 320; Acts 1993, No. 93-760, p. 1514, §1.)*

Section 11-46-21

1. **Time of elections; notice; assumption of duties by elected officers.**

(a) The regular municipal elections in cities and towns **shall be held on the fourth Tuesday** in August 1984, and quadrennially thereafter, and, when necessary as provided in subsection (d) of Section 11-46-55, **a second or runoff election shall be held on the sixth Tuesday** next thereafter following the regular election.

*(Acts 1961, No. 663, p. 827, §2; Acts 1971, No. 159, p. 434; Acts 1980, No. 80-94, p. 140, §1; Acts 1982, No. 82-458, p. 711, §2; Acts 1987, No. 87-581, p. 928, §1; Act 2006-354, §2.)*

Section 11-46-22

1. **Notice of elections.**

(a) It shall be the duty of the mayor to give notice of all municipal elections by publishing notice thereof in a newspaper published in the city or town, and, if no newspaper is published in the city or town, then by posting notices thereof in three public places in the city or town. When the notice is of a regular election, **the notice shall be published on the first Tuesday in July** preceding the election ...   **Candidates may begin to qualify after the notice of election is given by the mayor.**

Section 11-46-25

1. **Ballots; statements of candidacy; withdrawal of candidacy.**

(g) The mayor shall cause to be printed on the ballots the name of any qualified elector who has, **by 5:00 P.M. on the third Tuesday in July preceding the date set for the election, filed a statement of candidacy**,....

Exhibit B

REGULAR MEETING
COUNCIL OF THE CITY OF MONTGOMERY
FEBRUARY 6, 2007 – 10:00 A.M.

The Council met in regular session on Tuesday, February 6, 2007, at 10:00 a.m., in the Council Chamber, City Hall, with the following members present:

PRESENT: SPEAR, HEAD, AYAY, NUCKLES, CALHOUN, COOK, PRUITT, JINRIGHT. -8

ABSENT: RODY -1

Councillor Roby entered the Council Chamber at 10:00 a.m.

The President of the Council, Charles Jinright, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting. The meeting was opened with prayer by The Reverend Frank Snowden and the Pledge of Allegiance.

Councillor Nuckles made a motion to adopt the Minutes of the January 16, 2007, Work Session, which motion carried with the following vote:

AYES: SPEAR, HEAD, COOK, RODY, PRUITT, JINRIGHT. -6
NAYS: NONE. -0
ABSTAINED: AYAY, NUCKLES, CALHOUN. -3
ABSENT: NONE. -0

Councillor Nuckles made a motion to adopt the Minutes of the January 16, 2007 Regular Session, which motion carried with the following vote:

AYES: UNANIMOUS -9
NAYS: NONE. -0
ABSTAINED: NONE. -0
ABSENT: NONE. -0

The Clerk stated this was the time and place to hear and consider all objections and protests to the following proposed ordinance:

ORDINANCE NO. _____

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF MONTGOMERY, ALABAMA as follows:

SECTION 1. That the Zoning Ordinance of Montgomery, Alabama, adopted September 17, 1963, be amended by removing the following described property from INST' (Institutional) Zoning District to a B-2 (Commercial) Zoning District.

Lot 7 and the east half of Lot 8 of the Loeb Realty Company Subdivision of part of Hooper Gilmer and Hall Tract as said Map appears of record in the Office of the Judge of Probate, Montgomery County, Alabama in the Plat Book 4, at page 70, less and except therefrom the westerly 5 ft. of said east one-half of Lot 8.

SECTION 2. This ordinance shall take effect upon its passage, approval and publication, or as otherwise provided by law.

Tommy Tyson was present representing the Planning Commission. No one was present representing this item. Helen Harris, of Capital Heights Neighborhood Association, Marcia Allison and Thomas Kipper were present in opposition of this item.

001769

001752

from any and all liability arising from the construction of said directional signage.

b. The above described directional signage will be allowed to remain during the term of the franchise set out herein upon the written approval by the City Building Inspector and the City Engineer.

c. Should the city determine that it is necessary to enlarge, reconstruct or improve the street or any facility located in said rights-of-way, the city shall be held harmless should such enlargement, reconstruction, or improvement damage or injure any physical property, including the directional signage.

7. That the Mayor and the City Clerk be, and are hereby authorized and directed to execute and attest, respectively, for and on behalf of the city of Montgomery, Alabama the "Franchise Agreement" containing the above terms.

Councilor Roby made a motion to suspend the rules in order that the foregoing ordinance could be placed upon its final passage, which motion carried with the following vote:

AYES:                    UNANIMOUS                --9
NAYS:                    NONE                     --0
ABSTAINED:               NONE                     --0
ABSENT:                  NONE                     --0

The rules having been suspended, Councilor Roby made a motion to adopt the foregoing ordinance, which motion carried with the following vote:

AYES:                    UNANIMOUS                --9
NAYS:                    NONE                     --0
ABSTAINED:               NONE                     --0
ABSENT:                  NONE                     --0

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

ORDINANCE NO. 13-2007

AN ORDINANCE SETTING THE DATES
FOR GENERAL MUNICIPAL ELECTIONS AND RUNOFF ELECTIONS AND
THE DATES FOR FILING AS CANDIDATES IN SUCH ELECTIONS

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF MONTGOMERY, ALABAMA as follows:

SECTION 1. Pursuant to and under the authority granted by Alabama Code (1975) §11-46-5, as amended, the City Council of the City of Montgomery, Alabama elects by ordinance to have the general municipal election and runoff election required by Act 618, Acts of Alabama (1973), to be held at the same time required by Chapter 46 of Title 11, Alabama Code (1975), as amended, including specifically §11-46-21 thereof, as follows:

(A)    The regular municipal elections in the City of Montgomery shall be held on the fourth Tuesday in August 2007 and quadrennially thereafter, and, when necessary, as provided in said Act 618, a second or runoff election shall be held on the sixth Tuesday next thereafter following the general election.

(B)    The date for filing a statement of candidacy for the office of Mayor or for member of the City Council shall be no earlier than the first Tuesday in July and no later than the third Tuesday in July preceding the regular municipal election for Mayor and members of the City Council.

Provided nothing contained in Article 2, Chapter 46 of Title 11, Alabama Code (1975), as amended, shall have the effect of changing the beginning of the term of office or the time for taking office or the year during which a municipal election is to be held, or the

qualifications or requirements of candidates for election to the office of Mayor or member of the City Council.

SECTION 2. The provisions of said Act 618 relating to the dates of the elections and for filing statements of candidacy for Mayor or City Council in a general municipal election are superseded to the extent the same are in conflict herewith.

SECTION 3. This Ordinance shall become effective upon passage, approval and publication or as otherwise provided by law.

Councilor Nuckles made a motion to suspend the rules in order that the foregoing ordinance could be placed upon its final passage, which motion carried with the following vote:

AYES:       UNANIMOUS       --9
NAYS:       NONE            --0
ABSTAINED:  NONE            --0
ABSENT:     NONE            --0

The rules having been suspended, Councilor Nuckles made a motion to adopt the foregoing ordinance, which motion carried with the following vote:

AYES:       UNANIMOUS       --9
NAYS:       NONE            --0
ABSTAINED:  NONE            --0
ABSENT:     NONE            --0

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

ORDINANCE NO. 14-2007

ORDINANCE AMENDING ORDINANCE NO. 70-2002 APPENDIX A & B TO CHANGE VOTING PRECINCTS 1D, 2A, 2C, 2E, 2F, 3A, 5K and 5L.

WHEREAS, Pursuant to Act 618 of the 1973 Regular Session of the Alabama Legislature the Council of the City of Montgomery adopted Ordinance No. 72-2001 setting forth the nine Council Districts; and

WHEREAS, The Department of Justice has approved said redistricting; and

WHEREAS, Pursuant to Section 11-46-24 of The Code of Alabama the Council of the City of Montgomery adopted Ordinance No. 70-2002 dividing its council districts into voting centers, which are precincts; and

WHEREAS, the Department of Justice has approved said precincts; and

WHEREAS, the City of Montgomery desires to amend 1D, 2A, 2C, 2E, 2F, 3A, 5K and 5L of Appendix A of Ordinance No. 70-2002 which sets forth the legal description of the voting precincts for municipal elections of the City of Montgomery and Appendix B which is a map showing the voting precincts described in Appendix A; and

NOW, THEREFORE, BE IT ORDAINED BY THE COUNCIL, OF THE CITY OF MONTGOMERY, ALABAMA, that 1D, 2A, 2C, 2E, 2F, 3A, 5K and 5L of Ordinance No. 70-2002 Appendix A and B are hereby amended as in Attachment Appendix A (Amendment) and Appendix B Amendment (Map) and all previous ordinances establishing voting precincts for the City of Montgomery are hereby superseded to the extent that they are inconsistent herewith.

"Appendix A Amendment"

"Appendix B Amendment (Map) on File in the City Clerk's Office"

REGULAR MEETING
COUNCIL OF THE CITY OF MONTGOMERY
FEBRUARY 20, 2007 – 5:00 P.M.

The Council met in regular session on Tuesday, February 20, 2007, at 5:00 p.m., in the Council Chamber, City Hall, with the following members present:

| PRESENT: | SPEAR, HEAD, AIAV, NUCKLES, CALHOUN, COOK, RORY, JINRIGHT | 8- |
| ABSENT : | PRUITT | 1- |

The President of the Council, Charles Jinright, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting. The meeting was opened with prayer by President Charles Jinright and the Pledge of Allegiance.

Councilor Nuckles made a motion to adopt the Minutes of the February 6, 2007, Work Session, which motion carried with the following vote:

| AYES: | SPEAR, HEAD, AIAV, NUCKLES, COOK, RORY, JINRIGHT | 7- |
| NAYS: | NONE | 0- |
| ABSTAINED: | CALHOUN | 1- |
| ABSENT: | PRUITT | 1- |

Councilor Nuckles made a motion to adopt the Minutes of the February 6, 2007, Regular Session, which motion carried with the following vote:

| AYES: | SPEAR, HEAD, AIAV, NUCKLES, CALHOUN, COOK, RORY, JINRIGHT | 8- |
| NAYS: | NONE | 0- |
| ABSTAINED: | NONE | 0- |
| ABSENT: | PRUITT | 1- |

Councilor Pruitt entered the Council Chamber at 5:02 p.m.

The Clerk stated she was in receipt of the following Mayoral Veto:

ORDINANCE NO. 13-2007

AN ORDINANCE SETTING THE DATES
FOR GENERAL MUNICIPAL ELECTIONS AND RUNOFF ELECTIONS AND
THE DATES FOR FILING AS CANDIDATES IN SUCH ELECTIONS

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF MONTGOMERY,
ALABAMA as follows:

SECTION 1. Pursuant to and under the authority granted by *Alabama Code* (1975) §11-46-5, as amended, the City Council of the City of Montgomery, Alabama elects by ordinance to have the general municipal election and runoff election required by Act 618, *Acts of Alabama* (1973), to be held at the same time required by Article 2, Chapter 46 of Title 11, *Alabama Code (1975)*, as amended, including specifically §11-46-21 thereof, as follows:

(A)    The regular municipal elections in the City of Montgomery shall be held on the fourth Tuesday in August 2007 and quadrennially thereafter, and, when necessary as provided in said Act 618, a second or runoff election shall be held on the sixth Tuesday next thereafter following the general election.

00182

(b)    The date for filing a statement of candidacy for the office of Mayor or for member of the City Council shall be no earlier than the first Tuesday in July and no later than the third Tuesday in July preceding the regular municipal election for Mayor and members of the City Council.

Provided nothing contained in Article 2, Chapter 46 of Title 11, *Alabama Code (1975)*, as amended, shall have the effect of changing the beginning of the term of office or the time for taking office or the year during which a municipal election is to be held, or the qualifications or requirements of candidates for election to the office of Mayor or member of the City Council.

SECTION 2. The provisions of said Act 618 relating to the dates of the elections and for filing statements of candidacy for Mayor or City Council in a general municipal election are superseded to the extent the same are in conflict herewith.

SECTION 3. This Ordinance shall become effective upon passage, approval and publication or as otherwise provided by law.

Mayor Bright's reason for the Veto:

1.  Obtained additional information which will require getting state legislative approval, noting this is no fault of the City Council.

Councillor Spear made a motion to uphold the Mayor's Veto, which motion carried with the following vote:

| AYES: | UNANIMOUS | --9 |
| NAYS: | NONE | --0 |
| ABSTAINED: | NONE | --0 |
| ABSENT: | NONE | --0 |

The Clerk stated she was in receipt of the following Mayoral Veto:

## RESOLUTION NO. 23-2007

## RESOLUTION CHANGING THE DATES OF COUNCIL MEETINGS TO COINCIDE WITH MUNICIPAL ELECTIONS

WHEREAS, Municipal Elections will be held August 28, 2007 and the Run-off Election will be held October 9, 2007; and

WHEREAS, the Council desires to change the dates and times of the Regularly Scheduled Council Meetings to coincide with the Canvassing of the Returns for these two elections:

NOW, THEREFORE, BE IT RESOLVED BY THE COUNCIL, OF THE CITY OF MONTGOMERY, ALABAMA, that the Regularly Scheduled Council Meeting of August 21, 2007 at 5:00 p.m. be changed to August 28, 2007, at 7:00 p.m. and the October 2, 2007, 10:00 a.m. Council Meeting be changed to October 9, 2007 at 7:00 p.m.

Mayor Bright's reason for the Veto:

1.  Obtained additional information which will require getting state legislative approval, noting this is no fault of the City Council.

Councillor Spear made a motion to uphold the Mayor's Veto, which motion carried with the following vote:

| AYES: | UNANIMOUS | --9 |
| NAYS: | NONE | --0 |

9

| ABSTAINED: | NONE | --0 |
| ABSENT: | NONE | --0 |

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

## ORDINANCE NO. 15-2007

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF MONTGOMERY, ALABAMA as follows:

SECTION 1. That the Zoning Ordinance of Montgomery, Alabama, adopted September 17, 1963, be amended by removing the following described property from INST (Institutional) Zoning District to a B-2 (Commercial) Zoning District:

Lot 7 and the east half of Lot 8 of the Loeb Realty Company Subdivision of part of Hooper Gilmer and Hall Tract as said Map appears of record in the Office of the Judge of Probate, Montgomery County, Alabama in the Plat Book 4, at page 70, less and except therefrom the westerly 5 ft. of said east one-half of Lot 8.

SECTION 2. This ordinance shall take effect upon its passage, approval and publication, or as otherwise provided by law.

Tommy Tyson was present representing the Planning Commission. No one was present representing this item. No one was present in opposition of this item.

Councilor Calhoun made a motion to sustain the recommendation of the Planning Commission and adopt the foregoing ordinance, which motion carried with the following vote:

| AYES: | UNANIMOUS | --9 |
| NAYS: | NONE | --0 |
| ABSTAINED: | NONE | --0 |
| ABSENT: | NONE | --0 |

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

## ORDINANCE NO. 16-2007

CITY OF MONTGOMERY, ALABAMA

for

$44,400,000
GENERAL OBLIGATION SCHOOL WARRANTS,
SERIES 2007

dated February 1, 2007

Adopted:

001053

SECTION 1. The Report is hereby adopted by the City Council as its ascertainment of the cable-related needs and interests of the community. The City Council further adopts the revisions to the Report and to incorporate final exhibits prior to distribution to the cable operators.

SECTION 2. The City Council hereby closes the ascertainment of cable-related needs and interests and the review of the past performance of the cable operators contemplated by 47 U.S.C. §546(a).

SECTION 3. The City Council hereby establishes that the deadline for submission of responses to the Request For Formal Renewal Proposal for a Cable Franchise shall be thirty (30) days from the date received by the cable operators.

(Report on file in City Clerk's Office)

Councillor Spear made a motion to suspend the rules in order that the foregoing resolution could be placed upon its final passage, which motion carried with the following vote:

| | | |
|---|---|---|
| AYES: | UNANIMOUS | --9 |
| NAYS: | NONE | --0 |
| ABSTAINED: | NONE | --0 |
| ABSENT: | NONE | --0 |

The rules having been suspended, Councillor Spear made a motion to adopt the foregoing resolution, which motion carried with the following vote:

| | | |
|---|---|---|
| AYES: | UNANIMOUS | --9 |
| NAYS: | NONE | --0 |
| ABSTAINED: | NONE | --0 |
| ABSENT: | NONE | --0 |

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

RESOLUTION NO. 40-2007

WHEREAS, the U.S. Congress has adopted Uniform Overseas and Citizen's Absentee Voting Act (UOCAVA) which sets forth certain standards which must be achieved with regard to elections held by municipalities in Alabama, and elsewhere; and

WHEREAS, Act 618, Acts of Alabama (1973), as amended, sets forth the dates for holding municipal elections and runoff elections and for the qualification of candidates which dates and times are not in compliance with the Federal standards and requirements; and

WHEREAS, the Alabama Legislature has enacted several acts to accommodate the Federal requirements relating to municipal elections, including but not limited to Acts 2006-281 and 2006-354, which have been submitted to the U.S. Department of Justice without its objection, but which Acts are not applicable to the City of Montgomery, which is governed by Act 618, which was not so amended; and

WHEREAS, the City Council of the City of Montgomery enacted an ordinance pursuant to Alabama Code §11-46-5 in an effort to change the election and qualifying dates for municipal elections in the City of Montgomery to bring them in compliance with the Federal laws; and

WHEREAS, the validity of that ordinance was challenged on the basis that changing the dates of elections requires action by the Alabama Legislature and, on that basis, was vetoed by the Mayor of Montgomery to permit legislation to accomplish the necessary changes in the election laws;

NOW, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF MONTGOMERY, ALABAMA that the Mayor be authorized to have prepared legislation which would place the election dates for the Montgomery City elections in compliance with

000052

the federal laws and that the Montgomery Legislative Delegation be requested to introduce such legislation.

BE IT FURTHER RESOLVED that a copy of this resolution be forwarded to the Montgomery Legislative Delegation.

Councillor Spear made a motion to suspend the rules in order that the foregoing resolution could be placed upon its final passage, which motion carried with the following vote:

AYES:        UNANIMOUS        --9
NAYS:        NONE             --0
ABSTAINED:   NONE             --0
ABSENT:      NONE             --0

The rules having been suspended, Councillor Spear made a motion to adopt the foregoing resolution, which motion carried with the following vote:

AYES:        SPEAR, HEAD, MAY, NUCKLES, CALHOUN,
             ROBY, PRUITT, JINRIGHT              --8
NAYS:        COOK                                --1
ABSTAINED:   NONE                                --0
ABSENT:      NONE                                --0

The Clerk stated this was the time and place to hear and consider the following proposed resolution:

RESOLUTION NO. 41-2007

WHEREAS, the City of Montgomery has the legal authority to apply for Federal assistance from the U. S. Department of Housing and Urban Development (HUD); and

WHEREAS, the City of Montgomery has the institutional, managerial and financial capability (including funds to pay the non-Federal share of program costs) to plan, manage and complete the Federal programs:

NOW, THEREFORE, BE IT RESOLVED BY THE COUNCIL OF THE CITY OF MONTGOMERY, ALABAMA, that Mayor Bobby N. Bright is hereby authorized to act as the City of Montgomery's official representative in connection with the proposed FY2007 HUD application for $2,160,366 in CDBG funds; $1,191,043 in HOME funds; $21,813 in ADDI funds; $92,510 in ESG funds; and, to provide any additional information as may be required. (Actual funding in each category is subject to Congressional appropriation and may vary from the foregoing figures).

Councillor Nuckles made a motion to suspend the rules in order that the foregoing resolution could be placed upon its final passage, which motion carried with the following vote:

AYES:        UNANIMOUS        --9
NAYS:        NONE             --0
ABSTAINED:   NONE             --0
ABSENT:      NONE             --0

The rules having been suspended, Councillor Nuckles made a motion to adopt the foregoing resolution, which motion carried with the following vote:

AYES:        UNANIMOUS        --9
NAYS:        NONE             --0
ABSTAINED:   NONE             --0
ABSENT:      NONE             --0

The Clerk stated this was the time and place to hear and consider the following proposed resolution:

# REGULAR MEETING
## COUNCIL OF THE CITY OF MONTGOMERY
### MARCH 6, 2007 – 10:00 A.M.

The Council met in regular session on Tuesday, March 6, 2007, at 10:00 a.m., in the Council Chambers, City Hall, with the following members present:

PRESENT:    SPEAR, HEAD, MAY, NUCKLES, CALHOUN, COOK,    -8
            RORY, PRUITT.

ABSENT :    JINRIGHT    -1

The President Pro Tem of the Council, James Nuckles, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting. The meeting was opened with prayer by Councilor Jim Spear and the Pledge of Allegiance.

Councilor Spear made a motion to adopt the Minutes of the February 20, 2007, Work Session, which motion carried with the following vote:

AYES:       SPEAR, HEAD, MAY, COOK, RORY, PRUITT,    -6
            JINRIGHT
NAYS:       NONE    -0
ABSTAINED:  NUCKLES, CALHOUN    -2
ABSENT:     JINRIGHT    -1

Councilor Spear made a motion to adopt the Minutes of the February 20, 2007, Regular Session, with editorial changes to Ordinance No. 16-2007, on Page 25 and Page 37, which motion carried with the following vote:

AYES:       SPEAR, HEAD, MAY, NUCKLES, CALHOUN, COOK    -8
            RORY, PRUITT.
NAYS:       NONE    -0
ABSTAINED:  NONE    -0
ABSENT:     JINRIGHT    -1

Mayor Bright reported that the proposed dates for the municipal elections are:
Qualifications Begin – July 24; Election – October 2; Run-Off Election – November 13; Qualifications End – August 21; and Assume Office – November 20.

Councilor Spear made a motion to approve the dates of the election as stated above, which motion carried with the following vote:

AYES:       SPEAR, HEAD, MAY, NUCKLES, CALHOUN, COOK    -8
            RORY, PRUITT.
NAYS:       NONE    -0
ABSTAINED:  NONE    -0
ABSENT:     JINRIGHT    -1

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

ORDINANCE NO. _____

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF MONTGOMERY, ALABAMA, as follows:

SECTION 1. That the Zoning Ordinance of Montgomery, Alabama, adopted September 17, 1963, be amended by rezoning the following described property from an AGR-1 (Residential Agricultural) Zoning District to a PUD (Planned Unit Development) Zoning District.

041116

10

REGULAR MEETING
COUNCIL OF THE CITY OF MONTGOMERY
JUNE 5, 2007 – 10:00 A.M.

The Council met in regular session on Tuesday, June 5, 2007, at 10:00 a.m., in the Council Chamber, City Hall, with the following members present:

PRESENT:    SPEAR, HEAD, MAY, NUCKLES, CALHOUN, COOK, ROBY, PRUITT, JINRIGHT    -9

ABSENT:    NONE    -0

The President of the Council, Charles Jinright, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting. The meeting was opened with prayer by Councilor Martha Roby and the Pledge of Allegiance.

Councilor Spear made a motion to adopt the Minutes of the May 15, 2007, Work Session, as circulated, which motion carried with the following vote:

AYES:    SPEAR, HEAD, MAY, ROBY, PRUITT, JINRIGHT    -6
NAYS:    NONE    -0
ABSTAINED:    NUCKLES, CALHOUN, COOK    -3
ABSENT:    NONE    -0

Councilor Spear made a motion to adopt the Minutes of the May 15, 2007, Regular Session, with editorial corrections, which motion carried with the following vote:

AYES:    SPEAR, HEAD, MAY, COOK, ROBY, PRUITT, JINRIGHT    -7
NAYS:    NONE    -0
ABSTAINED:    NUCKLES, CALHOUN    -2
ABSENT:    NONE    -0

Councilor Cook reported that the Public Safety Standing Committee met May 22, 2007, and passed out copies of the minutes. Councilor Cook stated it was the consensus of the Committee to report to the Council that the Committee supports the Montgomery Police Department (MPD) continuing to field test the Taser Camera System and requests that the MPD give another report at the end of September regarding their field tests.

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

ORDINANCE NO. _____

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF MONTGOMERY, ALABAMA as follows:

SECTION 1.  That the Zoning Ordinance of Montgomery, Alabama, adopted September 17, 1963, be amended by removing the following described property from an AGR-1 (Residential Agricultural) Zoning District to a PUD (Planned Unit Development) Zoning District.

A parcel of land in the southwest ¼ of Section 13, in the southwest ¼ of the east ½ of the southeast ¼ of Section 14, and in the northeast ¼ of the northeast ¼ of Section 23, T15N, R17E, Montgomery County, Alabama, more particularly described as follows: Begin at a concrete monument at the SW corner of said Section 13; thence N89°18'16"E along an old fence a distance of 1,271.08 ft. to a paint mark in a concrete water trough at the southeast corner of the southwest ¼ of said Section 13; thence N00°14'44"W along the southwest ¼ of the southwest ¼ of said Section 13, thence N00°14'44"W along an old fence along the east line of the southwest ¼ a distance of 1,324.44 ft. to a ⅝" iron pin at an old fence corner; thence S89°32'24"W along an old fence along the north line of said southwest ¼ of

ORDINANCE NO. 42-2007

AN ORDINANCE SETTING THE DATES
FOR GENERAL MUNICIPAL ELECTIONS AND RUNOFF ELECTIONS AND
THE DATES FOR FILING AS CANDIDATES IN SUCH ELECTIONS

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF MONTGOMERY,
ALABAMA as follows:

SECTION 1. Pursuant to and under the authority granted by Alabama Code (1975) §11-46-5, as amended, the City Council of the City of Montgomery, Alabama elects by ordinance to have the general municipal election and runoff election required by Act 618, Acts of Alabama (1973), to be held at the same time required by Article 2, Chapter 46 of Title 11, Alabama Code (1975), as amended, including specifically §11-46-21 thereof, as follows:

(A)    The regular municipal election in the City of Montgomery shall be held on the fourth Tuesday in August 2007 and quadrennially thereafter, and, when necessary as provided in said Act 618, a second or runoff election shall be held on the sixth Tuesday next thereafter following the general election.

(B)    The date for filing a statement of candidacy for the office of Mayor or for member of the City Council shall be no earlier than the first Tuesday in July and no later than the third Tuesday in July preceding the regular municipal election for Mayor and members of the City Council.

Provided nothing contained in Article 2, Chapter 46 of Title 11, Alabama Code (1975), as amended, shall have the effect of changing the beginning of the term of office or time for taking office or the year during which a municipal election is to be held, or the qualifications or requirements of candidates for election to the office of Mayor or member of the City Council.

SECTION 2. The provisions of said Act 618 relating to the dates of the elections and for filing statements of candidacy for Mayor or City Council in a general municipal election are superseded to the extent the same are in conflict herewith.

SECTION 3. This Ordinance shall become effective upon passage, approval and publication or as otherwise provided by law.

Councillor Spear made a motion to suspend the rules in order that the foregoing ordinance could be placed upon its final passage, which motion carried with the following vote:

| AYES: | UNANIMOUS | --9 |
| NAYS: | NONE | --0 |
| ABSTAINED: | NONE | --0 |
| ABSENT: | NONE | --0 |

The rules having been suspended, Councillor Spear made a motion to adopt the foregoing ordinance, which motion carried with the following vote:

| AYES: | UNANIMOUS | --9 |
| NAYS: | NONE | --0 |
| ABSTAINED: | NONE | --0 |
| ABSENT: | NONE | --0 |

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

REGULAR MEETING
COUNCIL OF THE CITY OF MONTGOMERY
JULY 3, 2007 – 10:00 A.M.

The Council met in regular session on Tuesday, July 3, 2007, at 10:00 a.m., in the Council Chamber, City Hall, with the following members present:

PRESENT:     SPEAR, HEAD, MAY, NUCKLES, CALHOUN, COOK,
             ROBY, PRUITT, JINRIGHT                           -9-

ABSENT:      NONE                                             -0-

The President of the Council, Charles Jinright, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting. The meeting was opened with prayer by Councilor Jinright and the Pledge of Allegiance.

Councillor Pruitt left the Council Chamber at 10:01 a.m.

Councillor Nuckles made a motion to adopt the Minutes of the June 19, 2007, Work Session, which motion carried with the following vote:

AYES:        SPEAR, MAY, NUCKLES, COOK, ROBY, JINRIGHT       --6
NAYS:        NONE                                            --0
ABSTAINED:   HEAD, CALHOUN                                   --2
ABSENT:      PRUITT                                          --1

Councillor Nuckles made a motion to adopt the Minutes of the June 19, 2007, Regular Session, which motion carried with the following vote:

AYES:        SPEAR, MAY, NUCKLES, CALHOUN, COOK, ROBY,
             JINRIGHT                                        --7
NAYS:        NONE                                            --0
ABSTAINED:   HEAD                                            --1
ABSENT:      PRUITT                                          --1

Councillor Pruitt entered the Council Chamber at 10:03 a.m.

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

ORDINANCE NO. _____

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF MONTGOMERY, ALABAMA as follows:

SECTION 1.   That the Zoning Ordinance of Montgomery, Alabama, adopted September 17, 1963, be amended by removing the following described property from an AGR-1 (Residential Agriculture) Zoning District to a B-2 (Commercial) Zoning District.

Commence at an iron pin located at the northeast corner of the southwest ¼ of the southwest ¼ of Section 15, T15N, R17E, Montgomery County, Alabama; thence S00°39'31"E, 667.33 ft. to an iron pin; thence S00°44'04"W, 469.77 ft. to an iron pin and point of beginning for the herein described parcel of land; thence S00°44'04"W, 73.08 ft. to an iron pin; thence S89°23'47"E, 105.25 ft. to an iron pin located 102.68 ft. to an iron pin; thence S89°23'47"E, 105.25 ft. to an iron pin located on the west ROW (ROW varies) of Interstate No. 65 (southbound exit ramp); thence along said ROW the following three (3) courses: (1) S33°50'19"W, 509.11 ft.; (2) S39°03'35"W, 93.20 ft.; (3) S57°53'36"W, 182.06 ft. to an iron pin; thence leaving said ROW N09°09'32"W, 327.17 ft. to an iron pin located on the south side of a cul-de-sac (radius 50') on the proposed ROW (60') of Road "B"; thence along said ROW the following two (2) courses: (1) chord bearing N21°39'06"W, chord distance 79.70 ft., radius 50.00'; (2)

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

ORDINANCE NO. _____

REQUIRING COMPLAINT AND LAW ENFORCEMENT CONTACT REPORT TO CITY COUNCIL.

The City Council of Montgomery is requiring by Ordinance that a report be prepared and presented to the City Council in writing, of all complaints issued against and of all official contact with the Montgomery Police Department of the following City employees and their immediate families:

- The Mayor of the City of Montgomery
- The Executive Assistants to the Mayor
- All City Department Heads
- All Montgomery Police Officers

This report will be compiled by the City Clerk and presented to the Council no later than 5:00 p.m. the Friday before the next council meeting.

This report is for information and status content only and will not preclude or interfere with due process rights of any person.

The penalty for violation of this Ordinance will be a fine of $250.00 per violation.

Councillor Cook made a motion to suspend the rules in order that the foregoing ordinance be placed upon its final passage, which motion was defeated by the following vote; therefore, tabling this item until the next regular meeting:

| | | |
|---|---|---|
| AYES: | MAY, NUCKLES, COOK | --3 |
| NAYS: | SPEAR, HEAD, CALHOUN, RORY, PRUITT, JINRIGHT | --6 |
| ABSTAINED: | NONE | --0 |
| ABSENT: | NONE | --0 |

ORDINANCE NO. _____

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF MONTGOMERY, ALABAMA, that Ordinance No. 42-2007, an Ordinance setting the dates for general municipal elections and runoff elections and the dates for filing as candidates in such elections, be and is hereby repealed.

Councillor May made a motion to suspend the rules in order that the foregoing ordinance be placed upon its final passage, which motion was defeated by the following vote; therefore, tabling this item until the next regular meeting:

| | | |
|---|---|---|
| AYES: | MAY, NUCKLES, CALHOUN, COOK | --4 |
| NAYS: | SPEAR, HEAD, RORY, PRUITT, JINRIGHT | --5 |
| ABSTAINED: | NONE | --0 |
| ABSENT: | NONE | --0 |

The Clerk stated this was the time and place to hear and consider the following proposed resolution:

RESOLUTION NO. 163-2007

WHEREAS, the City of Montgomery owns property known as "Maxwell Heights" on Air Base Boulevard; and

WHEREAS, the property is more particularly shown on the map attached hereto as Exhibit A; and

REGULAR MEETING
COUNCIL OF THE CITY OF MONTGOMERY
JULY 17, 2007 – 5:00 P.M.

The Council met in regular session on Tuesday, July 17, 2007, at 5:00 p.m., in the Council Chamber, City Hall, with the following members present:

PRESENT:        HEAD, NIAV, NUCKLES, CALHOUN, COOK,                    -8
                ROBY, PRUITT, JINRIGHT.

ABSENT:         SPEAR                                                   -1

The President of the Council, Charles Jinright, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting. The meeting was opened with prayer by Chaplain Nick Sebastian, MPD, and the Pledge of Allegiance.

Councillor Nuckles made a motion to adopt the Minutes of the July 3, 2007, Work Session, which motion carried with the following vote:

AYES:           NIAV, NUCKLES, ROBY, PRUITT, JINRIGHT                   -5
NAYS:           NONE                                                    -0
ABSTAINED:      HEAD, CALHOUN, COOK                                     -3
ABSENT:         SPEAR                                                   -1

Councillor Nuckles made a motion to adopt the Minutes of the July 3, 2007, Regular Session, which motion carried with the following vote:

AYES:           HEAD, NIAV, NUCKLES, CALHOUN, COOK, ROBY,
                PRUITT, JINRIGHT                                        -8
NAYS:           NONE                                                    -0
ABSTAINED:      NONE                                                    -0
ABSENT:         SPEAR                                                   -1

Councillor Nuckles stated the Ad Hoc Committee on Copper Theft will meet in the Council Conference Room, Thursday, July 19, 2007, at 9:00 a.m., to further discuss and develop proposed legislation.

Councillor Cook left the Council Chamber at 5:16 p.m.

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

ORDINANCE NO. _____

REQUIRING COMPLAINT AND LAW ENFORCEMENT CONTACT REPORT TO CITY COUNCIL.

The City Council of Montgomery is requiring by Ordinance that a report be prepared and presented to the City Council in writing, of all complaints issued against and of all official contact with the Montgomery Police Department of the following City employees and their immediate families:

-   The Mayor of the City of Montgomery;
-   The Executive Assistants to the Mayor
-   All City Department Heads
-   All Montgomery Police Officers

This report will be compiled by the City Clerk and presented to the Council no later than 5:00 p.m., the Friday before the next council meeting.

15

This report is for information and status content only and will not preclude or interfere with due process rights of any person.

The penalty for violation of this Ordinance will be a fine of $250.00 per violation.

Councilman Nuckles made a motion to adopt the foregoing ordinance, which motion was defeated by the following vote:

| | | |
|---|---|---|
| AYES: | MAY, NUCKLES, CALHOUN | --3 |
| NAYS: | HEAD, RORY, PRUITT, JINRIGHT | --4 |
| ABSTAINED: | NONE | --0 |
| ABSENT: | SPEAR, COOK | --2 |

Councillor Cook entered the Council Chamber at 5:19 p.m.

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

ORDINANCE NO. _____

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF MONTGOMERY, ALABAMA, that Ordinance No. 42-2007, an Ordinance setting the dates for general municipal elections and runoff elections and the dates for filing as candidates in such elections, be and is hereby repealed.

Councillor May made a motion to adopt the foregoing ordinance, which motion failed by the following vote:

| | | |
|---|---|---|
| AYES: | MAY, NUCKLES, CALHOUN, COOK | --4 |
| NAYS: | HEAD, RORY, PRUITT, JINRIGHT | --4 |
| ABSTAINED: | NONE | --0 |
| ABSENT: | SPEAR | --1 |

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

ORDINANCE NO. 48-2007

AN ORDINANCE GRANTING TO ATLANTIC AND PACIFIC DEVELOPMENT, LLC
A FRANCHISE TO CONSTRUCT, INSTALL AND MAINTAIN A BALCONY OVER
A PORTION OF THE GRAHAM STREET RIGHT OF WAY

BE IT ORDAINED by the City Council of the City of Montgomery, Alabama:

1. That a franchise, containing the hereinafter prescribed terms and conditions be, and the same hereby is granted unto Atlantic and Pacific Development, LLC and its successors and assigns in the ownership of the following described parcel for the purpose of constructing, installing and maintaining a balcony over and on a portion of the right-of-way of Graham Street owned by the City of Montgomery subject to the terms and conditions contained in the Franchise Agreement which is incorporated herein by reference as if set out here in full:

Commence at the intersection of the north right of way of Cloverdale Road (70' ROW) with the east right of way of Graham Street (60' ROW); thence run along the said east right of way of Graham Street, N 00° 46', 28", W, 171.21 feet to the point of beginning; thence from said point of beginning, leave said right of way and run N 89° 13', 32", W, 4.50 feet to a point; thence run N 0°4', 46', 28", W, 56.16 feet to a point; thence run N 89° 13', 32", E, 4.50 feet to a point lying on the aforementioned east right of way of Graham Street; thence run along said east right of way, S 00° 46', 28", E, 56.16 feet to the point of beginning.

# LARRY T. MENEFEE
### ATTORNEY AT LAW
407 SOUTH McDONOUGH STREET
MONTGOMERY, ALABAMA 36104

TELEPHONE (334) 265-6002
FAX (334) 832-9476

Email: lmenefee@knology.net

June 13, 2007

**By Fax and Express Mail**

Chief, Voting Section
Civil Rights Division
Room 7254 - NWB
Department of Justice
950 Pennsylvania Ave. N.W.
Washington, DC 20530

Re:    Submission under Section 5 of the Voting Rights Act of 1965
        **Expedited Consideration Requested**
        **Change in qualifying and election dates- City of Montgomery, Alabama**

Dear Sirs:

As required by Section 5 of the Voting Rights Act of 1965, I am submitting for preclearance review of the Department of Justice Ordinance 42-2007 of the City of Montgomery adopted June 5, 2007. The Ordinance elects the dates for qualifying and voting for municipal elections, for mayor and nine council members, as permitted by *Alabama Code* (1975) § 11-46-5, as amended. The Ordinance provides for:

A.  elections on the fourth Tuesday (28th ) in August, runoff six weeks thereafter (October 9th )
B.  qualifying opens the first Tuesday (3rd) in July and closes on the third Tuesday (17th) in July.

Ordinance 42-2007 was unanimously adopted by the City Council and signed by the Mayor. A copy of the Ordinance, the minutes of the City Council meeting, and referenced state statues are attached at pages A through F.

This is a change from the prior election dates which were provided for in Act No. 618 of the 1973 Regular Session of the Alabama Legislature. Act 618 is the act that provides for the Mayor Council form of government for Montgomery. Article IV of that Act provides that elections shall be held on the second Tuesday in October with any necessary runoff three weeks later.

The City was concerned that the provisions of The Uniformed and Overseas Citizens Absentee Voting Act of 1986, 42 U.S.C. §§ 1973ff may not be adequately met. The guidance from the Department of Justice recommends 45 days between any general and runoff election. See the letter from DOJ to state election officials September 29, 2004 at the DOJ website. During the recently completed regular session of the Alabama Legislature the City sought to have passed an act that would amend the election dates provided in the Act 618. Finally, on June 5th,

Civil Rights Division
June 13, 2007
Page 2

with only one day left in the legislative session and it impossible for the legislature to pass the needed legislation, the City Council adopted Ordinance 42-2007. The City exercised the authority granted it under *Alabama Code* (1975) § 11-46-5 which provides:

> The governing body of a municipality having a general municipal election or runoff election required by general or local act at a time different from the dates now or hereafter provided by Article 2, Chapter 46 of Title 11, **may elect by ordinance to have the election at the same time required by Article 2** and the election made by ordinance shall not have the effect of changing the beginning of a term of office or the time for taking office.

The election schedule is provided for in § 11-46-21 and the schedule for qualifying is provided for in §§ 11-46-22 and 25(g). Excerpts of those statutes are attached. Ordinance 42-2007 did not have the purpose nor will it have the effect of discriminating against minority voters. The Ordinance does not constitute a retrogression of minority voting strength in the City.

There is currently before you two other submissions for preclearance from the City of Montgomery. They are numbered 2007-2417 and 2007-2669 and are part of the City's effort to prepare for the upcoming municipal elections. The City of Montgomery has a population of 201,564 persons according to the 2000 census and Montgomery County has a population of approximately 224,000. The City is governed by a Mayor and nine member council elected from single-member districts. The City is approximately half black and half white. Four of the City Council members are black. The Mayor is white.[1] The City has responsibility for conducting the municipal elections every four years. The County has responsibility for conducting all other national, state and local elections.

Responses to some of the criteria in the regulations published at 28 CFR § 51.27 that are appropriate are set forth below. We refer you to those prior recent submissions for the historical electoral and demographic data identified in Footnote 1.

    a.  A copy of the Ordinance is attached.
    b.  This submission is made by Larry Menefee, 407 S. McDonough Street, Montgomery, AL., 36104, 334-265-6002, fax 334-832-9476, lmenefee@knology.net, attorney for the City of Montgomery, Alabama. If Mr. Menefee is not available you may contact

---

[1] The prior submission of the reapportioned city council districts (2002-2838) and the subsequent submission of polling places for use in city elections (2003-0344), both of which were precleared, had an extensive history of election returns, candidate identification, and demographic data both in print and electronic format. Additionally a prior submission of an annexation (2005-3680) which was precleared November 16, 2005, included election results for the 2003 elections for Mayor and City Council and registered Voters at Tab C to that submission.

Civil Rights Division
June 13, 2007
Page 3

      Mr. J. Gerald Hebert, 202-736-2200 ext 11 or Mr. Walter Byars, City Attorney, at 334-241-2050.

c.   The City of Montgomery is the submitting authority and responsible for the change.

d.   The submitting authority is located in Montgomery County, Alabama.

e.   The City of Montgomery has authority to change the election and qualifying dates pursuant to the provision of Section 11-46-5, *Code of Alabama*, 1975.

f.   The changes were made to comply with The Uniformed and Overseas Citizens Absentee Voting Act of 1986, 42 U.S.C. §§ 1973ff and guidance from DOJ.

g.   There is no pending litigation regarding this ordinance.

h.   Current minority members of the Montgomery City Council are:

      Janet May, 1412 S. Perry Street., 269-0093
      James A. Nuckles, 3134 Patrick Road, 834-4015
      Cornelius "C.C" Calhoun, 1055 Largo Lane, 613-9100
      Willie Cook, 5060 Woodley Rd., 281-7775

Other community contacts:

      Jerome Gray, ADC, 263-4040
      Joe A. Reed, fmr. City Concillor, 834-9790
      John F. Knight, Jr., State Representative, 242-7751
      Sidney T. Williams, fmr. City Concillor, 281-6546
      Kenneth L. Thomas, Esq., Atty., 270-1033
      Terry G. Davis, Esq., Atty., 270-0592

## Conclusion

The submitted ordinance was adopted to follow The Uniformed and Overseas Citizens Absentee Voting Act of 1986, 42 U.S.C. §§ 1973ff and guidance from the Department of Justice. There will be no retrogressive effect on the political participation of minority residents. I hope you will find this submission complete, will be able to give it your expedited attention, and preclear these four ordinances. If you need any further information please promptly contact me.

Sincerely,

Larry T. Menefee

Enclosures:  Pages A through F

ORDINANCE NO. 42-2007

AN ORDINANCE SETTING THE DATES
FOR GENERAL MUNICIPAL ELECTIONS AND RUNOFF ELECTIONS AND
THE DATES FOR FILING AS CANDIDATES IN SUCH ELECTIONS

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF MONTGOMERY,
ALABAMA as follows:

SECTION 1.   Pursuant to and under the authority granted by *Alabama Code* (1975) §11-46-5, as amended, the City Council of the City of Montgomery, Alabama elects by ordinance to have the general municipal election and runoff election required by Act 618, *Acts of Alabama (1973)*, to be held at the same time required by Article 2, Chapter 46 of Title 11, *Alabama Code (1975)*, as amended, including specifically §11-46-21 thereof, as follows:

(A)   The regular municipal elections in the City of Montgomery shall be held on the fourth Tuesday in August 2007 and quadrennially thereafter, and, when necessary as provided in said Act 618, a second or runoff election shall be held on the sixth Tuesday next thereafter following the general election.

(B)   The date for filing a statement of candidacy for the office of Mayor or for member of the City Council shall be no earlier than the first Tuesday in July and no later than the third Tuesday in July preceding the regular municipal election for Mayor and members of the City Council.

Provided nothing contained in Article 2, Chapter 46 of Title 11, *Alabama Code (1975)*, as amended, shall have the effect of changing the beginning of the term of office or the time for taking office or the year during which a municipal election is to be held, or the qualifications or requirements of candidates for election to the office of Mayor or member of the City Council.

SECTION 2.   The provisions of said Act 618 relating to the dates of the elections and for filing statements of candidacy for Mayor or City Council in a general municipal election are superseded to the extent the same are in conflict herewith.

SECTION 3.   This Ordinance shall become effective upon passage, approval and publication or as otherwise provided by law.

ADOPTED this the ___5th___ day of ___June___, 2007.

BOBBY N. BRIGHT, MAYOR

ATTEST:

BRENDA GALE BLALOCK, CITY CLERK

42-2007

A

REGULAR MEETING
COUNCIL OF THE CITY OF MONTGOMERY
JUNE 5, 2007 -- 10:00 A.M.

The Council met in regular session on Tuesday, June 5, 2007, at 10:00 a.m., in the Council Chamber, City Hall, with the following members present:

PRESENT:     SPEAR, HEAD, MAY, NUCKLES, CALHOUN, COOK,
             ROBY, PRUITT, JINRIGHT
                                                                    -9

ABSENT:      NONE
                                                                    -0

The President of the Council, Charles Jinright, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting. The meeting was opened with prayer by Councillor Martha Roby and the Pledge of Allegiance.

\* \* \* \* \*

The Clerk stated this was the time and place to hear and consider the following proposed ordinance:

ORDINANCE NO. 42-2007

AN ORDINANCE SETTING THE DATES
FOR GENERAL MUNICIPAL ELECTIONS AND RUNOFF ELECTIONS AND
THE DATES FOR FILING AS CANDIDATES IN SUCH ELECTIONS

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF
MONTGOMERY, ALABAMA as follows:

SECTION 1.  Pursuant to and under the authority granted by *Alabama Code* (1975) §11-46-5, as amended, the City Council of the City of Montgomery, Alabama elects by ordinance to have the general municipal election and runoff election required by Act 618, *Acts of Alabama (1973)*, to be held at the same time required by Article 2, Chapter 46 of Title 11, *Alabama Code (1975)*, as amended, including specifically §11-46-21 thereof, as follows:

(A)     The regular municipal elections in the City of Montgomery shall be held on the fourth Tuesday in August 2007 and quadrennially thereafter, and, when necessary as provided in said Act 618, a second or runoff election shall be held on the sixth Tuesday next thereafter following the general election.

(B)     The date for filing a statement of candidacy for the office of Mayor or for member of the City Council shall be no earlier than the first Tuesday in July and no later than the third Tuesday in July preceding the regular municipal election for Mayor and members of the City Council.

Provided nothing contained in Article 2, Chapter 46 of Title 11,

B

*Alabama Code (1975)*, as amended, shall have the effect of changing the beginning of the term of office or the time for taking office or the year during which a municipal election is to be held, or the qualifications or requirements of candidates for election to the office of Mayor or member of the City Council.

SECTION 2. The provisions of said Act 618 relating to the dates of the elections and for filing statements of candidacy for Mayor or City Council in a general municipal election are superseded to the extent the same are in conflict herewith.

SECTION 3. This Ordinance shall become effective upon passage, approval and publication or as otherwise provided by law.

Councillor Spear made a motion to suspend the rules in order that the foregoing ordinance could be placed upon its final passage, which motion carried with the following vote:

AYES:         UNANIMOUS
              --9
NAYS:         NONE
              --0
ABSTAINED:    NONE
              --0
ABSENT:       NONE
              --0

The rules having been suspended, Councillor Spear made a motion to adopt the foregoing ordinance, which motion carried with the following vote:

AYES:         UNANIMOUS
              --9
NAYS:         NONE
              --0
ABSTAINED:    NONE
              --0
ABSENT:       NONE
              --0

* * * * *

There being no further business to come before the Council, the meeting, upon motion, duly adjourned at 5:34 p.m.

_____
BRENDA GALE BLALOCK, CITY CLERK

_____
CHARLES W. JINRIGHT, PRESIDENT
COUNCIL OF THE CITY OF MONTGOMERY

*Signed copies will be available and after approval at the next Council meeting.*

C

Excerpts from Code of Alabama (1975) as amended, found at
http://alisdb.legislature.state.al.us/acas/ACASLogin.asp   Emphasis added.

### Section 11-46-5

1. Date of elections in certain municipalities.

The governing body of a municipality having a general municipal election or runoff election required by general or local act at a time different from the dates now or hereafter provided by Article 2, Chapter 46 of Title 11, **may elect by ordinance to have the election at the same time required by Article 2** and the election made by ordinance shall not have the effect of changing the beginning of a term of office or the time for taking office.

*(Acts 1980, No. 80-243, p. 320; Acts 1993, No. 93-760, p. 1514, §1.)*

### Section 11-46-21

1. Time of elections; notice; assumption of duties by elected officers.

(a) The regular municipal elections in cities and towns **shall be held on the fourth Tuesday in August 1984**, and quadrennially thereafter, and, when necessary as provided in subsection (d) of Section 11-46-55, a second or runoff election shall be held on the sixth Tuesday next thereafter following the regular election.

*(Acts 1961, No. 663, p. 827, §2; Acts 1971, No. 159, p. 434; Acts 1980, No. 80-94, p. 140, §1; Acts 1982, No. 82-458, p. 711, §2; Acts 1987, No. 87-581, p. 928, §1; Act 2006-354, §2.)*

### Section 11-46-22

1. Notice of elections.

(a) It shall be the duty of the mayor to give notice of all municipal elections by publishing notice thereof in a newspaper published in the city or town, and, if no newspaper is published in the city or town, then by posting notices thereof in three public places in the city or town. When the notice is of a regular election, **the notice shall be published on the first Tuesday in July** preceding the election ...  **Candidates may begin to qualify after the notice of election is given by the mayor.**

### Section 11-46-25

1. Ballots; statements of candidacy; withdrawal of candidacy.

(g) The mayor shall cause to be printed on the ballots the name of any qualified elector who has, **by 5:00 P.M. on the third Tuesday in July preceding the date set for the election, filed a statement of candidacy,**....

D

Each Probate Judge, Sheriff, and the Clerk and Register of the Circuit Court is required by law to preserve this slip or pamphlet in a book kept in his office until the Act is published in permanent form.

# ALABAMA LAW

### (Regular Session, 1973)

---

Act No. 618          H. 796—Jones (F), Taylor, Harris, Barron

## AN ACT

To provide a form of municipal government to be known as the Mayor-Council form of government, which may be adopted by any city in the State of Alabama having a population of not less than 70,000 nor more than 135,000 according to the last or any succeeding Federal or municipal census; to provide the method by which any such city may adopt the Mayor-Council form of government; to provide for the calling and holding of elections to vote thereon; to define and provide the legal status, form of government and powers of any such city under the Mayor-Council form of government; to provide as the governing body of such city a city council; to provide for the number of members of the council, their election and terms of office; to provide the functions, duties, powers and authority of the city council; to provide for the election, appointment or designation of officers and employees of the city and for their qualifications, duties, functions, powers and authority; to provide for the election, term, qualifications and compensation of a Mayor and for the filling of vacancies in the office of Mayor and to provide the duties and authority of the Mayor; to provide for the control of the finances of such city; to provide for an annual budget its preparation, submission, and adoption and the effect thereof; to create and define the powers, functions, duties and authority of the department of finance and the director of the department of finance; to regulate purchases and contracts of such city; to provide for the terms and effects of succession in government of any city adopting the Mayor-Council form of government; to make various other provisions for any such city which adopts the Mayor-Council form of government and for the government thereof; and to provide for the means of abandoning the Mayor-Council form of government and the adoption by the city of other forms of municipal government in lieu thereof.

*Be It Enacted by the Legislature of Alabama:*

E.

893

to persons who apply therefor. At the end of each year, the council shall cause a full and complete examination of all the books and accounts of the city to be made by a certified public accountant, or by the state department of public examiner of public accounts, and shall cause the result of such examination to be published in the manner above provided for publication of statements of monthly expenditures. Such examination shall not be made two years in succession by the same accountant.

### Article IV.  MAYOR.

4.01.  Election; term; qualification.—The first mayor shall be elected at the same election at which the councilmen are elected under the provisions of section 1.07 of Article I of this act and shall hold office until the second Tuesday in November of that year ending in an odd number which would give him a term of office most closely approximating four years and until his successor is elected and qualified. The first mayor shall qualify and take office in the manner hereinafter prescribed on the second Monday following the date the election of all nine councilmen is completed or on the second Monday following the election of such mayor whichever last occurs. The regular election for mayor shall be held on the second Tuesday in October of the year during which the term of the first mayor elected hereunder terminates and every four years thereafter. The mayor elected at any such regular election, shall on or before the second Tuesday of November following his election qualify by making oath that he is eligible for said office and will execute the duties of same according to the best of his knowledge and ability. Said oath may be administered by any person authorized to administer an oath under the laws of Alabama. At any election for mayor the candidate receiving the highest number of votes for the office shall be elected thereto, provided such candidate receives a majority of all votes cast for such office. If at the first election a majority is not received by any candidate for the office of mayor, then a second election shall be held on the third Tuesday thereafter in the same mode and manner and under the same rules and regulations provided in section 1.07 of Article I hereof with respect to the election of the first mayor.

4.02.  Statement of candidacy.—Any person desiring to become a candidate at any election for the office of mayor may become such candidate by filing in the office of the judge of probate of the county in which such city is situated, a statement in writing of such candidacy, accompanied by an affidavit taken and certified by such judge of probate or by a notary public that such person is duly qualified to hold the office for which he desires to be a candidate. Such statement shall be filed at least twenty-one days before the day set for

U.S. Department of Justice

Civil Rights Division

JKT:MSR:ALP:par
DJ 166-012-3
2007-3091

*Voting Section - NWB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

June 14, 2007

Larry T. Menefee, Esq.
407 South McDonough Street
Montgomery, Alabama 36104

Dear Mr. Menefee:

This refers to the Ordinance No. 42-2007 (2007), which provides for changes in the dates for qualifying and voting in municipal elections for mayor and council members for the City of Montgomery in Montgomery County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your submission on June 13, 2007.

The Attorney General does not interpose any objection to the specified changes. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes. In addition, as authorized by Section 5, we reserve the right to reexamine this submission if additional information that would otherwise require an objection comes to our attention during the remainder of the sixty-day review period. Procedures for the Administration of Section 5 of the Voting Rights Act (28 C.F.R. 51.41 and 51.43).

Sincerely,

*Maureen S Riordan*

John Tanner
Chief, Voting Section

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JANET MAY, JOHN DOW, AND
WILLIAM BOYD,                          )
                                       )
    Plaintiffs,                        )
                                       )
v.                                     )   CASE NO.  2:07cv738
                                       )
CITY OF MONTGOMERY,                    )
ALABAMA, A MUNICIPAL                   )
CORPORATION; BOBBY N. BRIGHT,          )
IN HIS OFFICIAL CAPACITY AS            )
MAYOR OF THE CITY OF                   )
MONTGOMERY,                            )
                                       )
    Defendants.

### AFFIDAVIT OF BRENDA BLALOCK

STATE OF ALABAMA        )

COUNTY OF MONTGOMERY   )

Before me, a Notary Public in and for said State and County, personally appeared **Brenda Blalock** and, after first being duly sworn by me, did depose and state as follows:

My name is Brenda Gale Blalock. I am over nineteen years of age. I am employed by the City of Montgomery, Alabama, and hold the position of City Clerk. I have held this position since 1997. As Clerk I am responsible for, among other matters, the conduct of municipal elections and maintaining records of city meetings. It is in that capacity and with personal knowledge that I state the following:

As City Clerk, I began preparation for the 2007 Montgomery municipal elections in late 2006. One of the most pressing concerns was compliance with the Uniformed Overseas Citizens' Absentee Voting Act (hereafter UOCAVA). I had conversations regarding UOCAVA compliance with other election officials, the Alabama League of Municipalities and the City Attorney's office. I came to the conclusion that Montgomery would have to comply with

UOCAVA or be subject to suit for the failure to do so; and that our election schedule under Act 618 did not allow enough time for our ballots to make the round trip overseas for voters casting ballots under UOCAVA.    The main problem was that Act 618, which governs our municipal election schedule, provided only three weeks between the first election and the runoff.    The federal authorities had indicated that in order to comply with UOCAVA, election officials should allow at least six weeks for the mailing and return of overseas and military absentee ballots.    In 2006, the U.S. Department of Justice sued the State of Alabama for failure to comply with UOCAVA.

In early 2007, I became aware that there was an optional election schedule available under Alabama Code (1975) §11-46-5, by the adoption of an ordinance electing to have the same election dates set forth in § 11-46-21, which statute is applicable to other municipalities having the mayor-council form of government.    I discussed this option with the City Attorney, and we began this discussion with the City Council in January, 2007.    In February 6, 2007, the City Council unanimously enacted Ordinance 13-2007 adopting the alternative schedule available in §11-46-21 of the Alabama Code.    This was vetoed by the Mayor based on information that legislative approval was required to change the election dates set forth in Act 618.

A second option was to seek a change in the election schedule as set out in Act 618, which would require legislative action.    After the veto, a joint effort was made to get the Montgomery legislative delegation to change our election dates by legislation.    Legislation was drafted by the City Attorney's Office both general legislation amending the election schedule of Class 3 municipalities and local legislation to amend Act 618.    The legislative delegation elected to pursue a local bill amending Act 618 to change our election dates and, when that failed, the City Council on June 5, 2007, to achieve compliance with UOCAVA, unanimously suspended the rules and unanimously adopted Ordinance 42-2007, under the authority of Alabama Code

2

§11-46-5. This election schedule that was ultimately adopted by the City of Montgomery in Ordinance 42-2007 has six weeks between the first election and runoff.

Within two days of adoption, I communicated with counsel about submission of Ordinance 42-2007 to the Department of Justice for Section 5 preclearance. The preclearance submission was made on June 13, 2007 and it requested expedited consideration. Preclearance was received the next day on June 14, 2007.

Upon receipt of the preclearance letter to the City from the Department of Justice (Copy attached as Exhibit 1), and relying expressly on it, I immediately began the steps to implement this year's municipal elections. The legal notice to the public and potential candidates ran in local papers beginning on July 3, 2007. Candidate qualifying opened on July 3rd and closed on July 17th. Four candidates qualified for Mayor. Sixteen candidates qualified for the nine council seats. Five of the council seats are uncontested. The ballot was sent to the printer on July 18, 2007. The first absentee ballots were mailed on July 20, 2007, including those registered voters who are on the UOCAVA list. Based upon my personal count, at least 42 of those UOCAVA voters who have been sent absentee ballots are black.

Postcards notifying the 114,000 registered voters in the City were specially printed, and were mailed on July 26, 2007.

The City of Montgomery uses County election staff and facilities to help with our election preparation. I am in regular contact with that staff during our election years. I specifically informed the county election staff of Ordinance 42-2007 on June 6, 2007. I had to and did confirm that all 44 polling places were available with necessary utilities and contracts for rental, where applicable. We identified 650 poll workers who would be trained and available for work on the election dates—August 28 and October 9, 2007.

3

At this point, August 21, 2007—one week before the election:  all poll workers have attended a day of poll worker training; all the voting facilities have been arranged; the ballots are currently being packaged for delivery to the polling sites; and absentee ballots are being returned from voters; and other voters have already cast ballots early at the voting machine in City Hall.

To date, the City of Montgomery has incurred the following expenses in connection with the scheduled 2007 municipal election:

Ballot printing $50,000

Postcards to voters $10,846.90

Advertising approximately $ 63,000.00 +

In addition to these expenses, the City has incurred expenses to the County for fees for the County's services to be calculated in accordance with the rates established in the contract with the County.

These expenses do not include the extensive time expended by the City staff in preparing for the election and their related expenses.  The only remaining significant expenses are the fees to pay the poll workers for work on Election Day. Those fees vary from $75 to $125 each, depending on the duties of each poll worker.  Essentially all the costs to date would be lost if, at this late date, the elections are not permitted to go forward as scheduled in accordance with Ordinance 42-2007, which was passed unanimously by the City Council.

Further Affiant saith not.

Brenda Blalock

**SWORN to and SUBSCRIBED before me this the** 21st **day of August, 2007.**

My commission expires 10/16/09

Notary Public

4

MONTGOMERY

# Registrant Search Results

**MONTGOMERY**

| Registrant ID Status | Registrant Name Address | Birth Date | Reg. Date | Precinct Part | Party | Gender | Race |
|---|---|---|---|---|---|---|---|
| 030053409 ACTIVE | PARKER, PHILLIP LEROY 1143 LAKEWOOD DR MONTGOMERY, AL 36109-5017 | 8/1/1947 | 10/26/1990 | 0305.05 | | MALE | WHITE |
| 030040012 ACTIVE | PATTERSON, KENNETH A 2517 CHESTNUT ST MONTGOMERY, AL 36107-3030 | 3/18/1966 | 10/15/1984 | 0414.03 | | MALE | BLACK |
| 030002063 ACTIVE | PERSONS, SETH GORDON, III 104 ARLINGTON RD MONTGOMERY, AL 36105-1704 | 11/16/1958 | 5/26/1978 | 0101.10 | | MALE | WHITE |
| 030055066 ACTIVE | RIEWALD, DEAN CHARLES 523 CAPITOL PARKWAY CT MONTGOMERY, AL 36107-1233 | 6/22/1966 | 5/8/1992 | 0407.06 | | MALE | WHITE |
| 030073020 ACTIVE | SHUMWAY, JEFFREY WAYNE 1800 PARKVIEW DR S MONTGOMERY, AL 36117-7701 | 8/15/1959 | 6/18/1997 | 0308.03 | | MALE | WHITE |
| 030125361 ACTIVE | SIEBERT, EVITA A APT F 1012 MAGNOLIA CURV MONTGOMERY, AL 36106-2161 | 1/30/1946 | 10/23/2006 | 0101.05 | | FEMALE | WHITE |
| 030100814 ACTIVE | SMITH, KIMBERLY VONTRICE 5862 VIRGIL CT MONTGOMERY, AL 36116-6928 | 6/14/1984 | 10/25/2002 | 0505.07 | | FEMALE | BLACK |
| 030004588 ACTIVE | SMITH, MILDRED BROUN 953 E FAIRVIEW AVE MONTGOMERY, AL 36106-2143 | 2/13/1930 | 4/11/1968 | 0101.05 | | FEMALE | WHITE |
| 030128228 ACTIVE | PERDUE, DANA J 3610 SHAGG ST MONTGOMERY, AL 36108-4325 | 3/30/1977 | 4/26/2007 | 0207.01 | | MALE | BLACK |
| 030115099 ACTIVE | CHAPPELL, MARIO R 2137 MONA LISA DR MONTGOMERY, AL 36111-2709 | 10/11/1986 | 10/25/2004 | 0201.02 | | MALE | BLACK |
| 030125882 ACTIVE | EASTMAN, ANTHONY CARL 1128 BEECHDALE RD MONTGOMERY, AL 36109-5109 | 6/16/1987 | 7/27/2006 | 0305.05 | | MALE | WHITE |



MONTGOMERY

# Registrant Search Results

**MONTGOMERY**

| Registrant ID Status | Registrant Name Address | Birth Date | Reg. Date | Precinct Part | Party | Gender | Race |
|---|---|---|---|---|---|---|---|
| 030123495 ACTIVE | GILMORE, DAVID D 4323 SUNSHINE DR MONTGOMERY, AL 36116-2854 | 12/13/1986 | 9/25/2006 | 0501.02 | | MALE | BLACK |
| 030128028 ACTIVE | HALBERT, WILA JOAN 1003 COLISEUM BLVD MONTGOMERY, AL 36109-1211 | 12/6/1951 | 10/25/2006 | 0303.02 | | FEMALE | WHITE |
| 030088644 ACTIVE | HELM, KHAMPHOUY THAMMAVONG 6328 SYCAMORE DR MONTGOMERY, AL 36117-4530 | 12/27/1976 | 10/25/2000 | 0415.11 | | FEMALE | ASIAN |
| 030121055 ACTIVE | MUHAMMAD, SHUKURA ANISE 9213 STILLFOREST CT MONTGOMERY, AL 36117-8408 | 10/14/1985 | 1/21/2005 | 0512.07 | | FEMALE | BLACK |
| 030042240 ACTIVE | PETERS, ROSSIE LEE 4087 CLOVIS DR MONTGOMERY, AL 36105-2711 | 9/2/1958 | 10/1/1980 | 0202.05 | | MALE | BLACK |
| 030073574 ACTIVE | SANFORD, BRIAN F 124 W VANDERBILT LOOP MONTGOMERY, AL 36109-3234 | 11/27/1978 | 2/9/1998 | 0306.01 | | MALE | WHITE |
| 030073021 ACTIVE | SHUMWAY, YVONNE 1800 PARKVIEW DR S MONTGOMERY, AL 36117-7701 | 10/24/1954 | 6/18/1997 | 0308.03 | | FEMALE | WHITE |
| 030067711 ACTIVE | SIMMONS, KAVORIS LAKEY 3332 E BROOKWOOD MONTGOMERY, AL 36116-3046 | 3/5/1978 | 3/5/1996 | 0501.08 | | MALE | BLACK |
| 030079762 ACTIVE | THRASHER, JOE DAVID 3518 OAK GROVE CIR MONTGOMERY, AL 36116-1177 | 4/17/1978 | 9/2/1999 | 0105.01 | | MALE | WHITE |
| 030126477 ACTIVE | WATTS, BRIDGETT 42 FISHER DR MONTGOMERY, AL 36115-3016 | 3/28/1972 | 10/3/2006 | 0304.01 | | FEMALE | WHITE |
| 030088989 ACTIVE | BRIGGS, DONALD SCOTT 301 NAVAJO DR MONTGOMERY, AL 36117-4016 | 6/7/1962 | 10/16/2000 | 0511.01 | | MALE | WHITE |

# Registrant Search Results

**MONTGOMERY**

| Registrant ID Status | Registrant Name Address | Birth Date | Reg. Date | Precinct Part | Party | Gender | Race |
|---|---|---|---|---|---|---|---|
| 030015902 ACTIVE | COLE, RICHARD DOUGLAS, II 4156 JOHNSTOWN DR MONTGOMERY, AL 36109-2512 | 2/8/1960 | 3/15/1978 | 0304.01 | | MALE | WHITE |
| 030045593 ACTIVE | DAVIS, STEVEN WYATT 437 FOREST HILLS DR MONTGOMERY, AL 36109-3511 | 3/17/1969 | 5/7/1987 | 0305.03 | | MALE | WHITE |
| 030127922 ACTIVE | DEMERATH, JOSEPH JOHN-PAUL 3158 KNIGHTSBRIDGE CURV MONTGOMERY, AL 36111-1206 | 2/24/1981 | 10/16/2006 | 0104.02 | | MALE | WHITE |
| 030124456 ACTIVE | GIBSON, CHRISTOPHER KEVIN 5809 DARIEN DR MONTGOMERY, AL 36117-3021 | 6/29/1987 | 3/13/2006 | 0415.09 | | MALE | WHITE |
| 030025211 ACTIVE | JACKSON, MICHAEL RUFUS 660 MAYFLOWER DR MONTGOMERY, AL 36116-5417 | 8/9/1954 | 8/24/1976 | 0514.02 | | MALE | BLACK |
| 030093499 ACTIVE | KENDRICK, KIMBERLY LAVONNE 2067 REXFORD RD MONTGOMERY, AL 36116-1133 | 11/8/1976 | 8/29/2002 | 0105.01 | | FEMALE | BLACK |
| 030094233 ACTIVE | MAYS, EDWARD O 4973 VIRGINIA LOOP RD MONTGOMERY, AL 36116-4705 | 7/13/1972 | 3/22/2002 | 0505.07 | | MALE | BLACK |
| 030123492 ACTIVE | PATTERSON, LAWRENCE, SR 174 LAUDERDALE ST MONTGOMERY, AL 36116-3702 | 8/21/1961 | 9/25/2006 | 0514.05 | | MALE | BLACK |
| 030090746 ACTIVE | ALLEN, JAQUETTA RENEE 912 HALLWOOD LN MONTGOMERY, AL 36117-8907 | 4/26/1983 | 4/26/2001 | 0509.05 | | FEMALE | BLACK |
| 030121757 ACTIVE | BAXLEY, WESLEY K 1041 DAVID DR MONTGOMERY, AL 36117-4488 | 1/10/1967 | 5/24/2006 | 0415.11 | | MALE | WHITE |
| 030110467 ACTIVE | CANNON, CHARLES SEDBERRY 7331 LAKESIDE CT MONTGOMERY, AL 36117-3957 | 9/4/1950 | 9/14/2004 | 0309.02 | | MALE | WHITE |

# Registrant Search Results

**MONTGOMERY**

| Registrant ID Status | Registrant Name Address | Birth Date | Reg. Date | Precinct Part | Party | Gender | Race |
|---|---|---|---|---|---|---|---|
| 030035582 ACTIVE | GIVAN, SANDRA DENISE<br>6119 MARGO PL<br>MONTGOMERY, AL 36117-2508 | 7/2/1963 | 5/30/1983 | 0103.01 | | FEMALE | BLACK |
| 030077116 ACTIVE | HOLYFIELD, MELISSA CHERIE<br>816 BALFOUR RD<br>MONTGOMERY, AL 36117-3014 | 5/2/1980 | 6/16/1998 | 0415.09 | | FEMALE | BLACK |
| 030022165 ACTIVE | MANN, DARREN KEITH<br>1400 BUCKINGHAM DR<br>MONTGOMERY, AL 36116-2881 | 11/27/1962 | 5/15/1981 | 0501.02 | | MALE | WHITE |
| 030045227 ACTIVE | MORGAN, BONNIE, JR<br>APT C<br>4211 STRATHMORE DR<br>MONTGOMERY, AL 36116-3251 | 7/26/1969 | 10/2/1987 | 0106.03 | | MALE | BLACK |
| 030126491 ACTIVE | SAMONTE, ALBERTO C<br>3512 CLAIBORNE CIR<br>MONTGOMERY, AL 36116-8800 | 8/7/1966 | 10/3/2006 | 0513.10 | | MALE | WHITE |
| 030037027 ACTIVE | SANDERS, CHARLES DUNCAN, JR<br>30 CREEK DR<br>MONTGOMERY, AL 36117-4131 | 8/19/1966 | 9/7/1984 | 0511.01 | | MALE | WHITE |
| 030085209 ACTIVE | SMART, HUNTER BARRETT<br>3236 FERNWAY DR<br>MONTGOMERY, AL 36111-1832 | 9/9/1981 | 12/22/1999 | 0104.02 | | MALE | WHITE |
| 030099277 ACTIVE | THAMES, JOEL LEE<br>APT 520<br>3721 WARES FERRY RD<br>MONTGOMERY, AL 36109-2882 | 6/12/1970 | 10/16/2002 | 0305.02 | | MALE | WHITE |
| 030086794 ACTIVE | WARD, MAXWELL BENSON<br>2157 MEADOW LANE DR<br>MONTGOMERY, AL 36106-2518 | 2/1/1970 | 9/11/2000 | 0101.03 | | MALE | WHITE |
| 030102213 ACTIVE | WESTBROOK, EDWARD KYLE<br>5244 MILLWOOD RD<br>MONTGOMERY, AL 36109-4800 | 1/20/1984 | 2/4/2003 | 0306.03 | | MALE | WHITE |
| 030123494 ACTIVE | ANDREWS, BARBARA A<br>2139 DOROTHY ST<br>MONTGOMERY, AL 36108-3425 | 12/21/1971 | 9/25/2006 | 0413.02 | | FEMALE | BLACK |

# Registrant Search Results

**MONTGOMERY**

| Registrant ID Status | Registrant Name Address | Birth Date | Reg. Date | Precinct Part | Party | Gender | Race |
|---|---|---|---|---|---|---|---|
| 030120524 ACTIVE | BREWER, MARK LORENZO, SR 2707 KNOLLWOOD DR MONTGOMERY, AL 36116-3816 | 12/10/1973 | 1/9/2006 | 0106.03 | | MALE | BLACK |
| 030124505 ACTIVE | JOHNSON, CHEQUEA ARNAZ 252 HUNTLEY DR MONTGOMERY, AL 36105-3131 | 7/19/1980 | 10/5/2004 | 0208.02 | | MALE | BLACK |
| 030005361 ACTIVE | PERNELL, JOE NATHAN 1307 CLAY ST MONTGOMERY, AL 36104-2973 | 12/13/1951 | 3/8/1976 | 0204.10 | | MALE | BLACK |
| 030123498 ACTIVE | SAMSON, CAITLIN RENE 2840 PAGE PL MONTGOMERY, AL 36116-3143 | 8/8/1988 | 9/25/2006 | 0106.03 | | FEMALE | WHITE |
| 030076786 ACTIVE | SCARVER, JOSLYNN DENISE 7142 MITYLENE FOREST TRL MONTGOMERY, AL 36117-7636 | 10/5/1980 | 10/7/1998 | 0309.02 | | FEMALE | BLACK |
| 030094096 ACTIVE | STEPHENS, MARCUS B 402 GATSBY DR MONTGOMERY, AL 36106-2688 | 5/22/1982 | 2/27/2002 | 0102.09 | | MALE | WHITE |
| 030082211 ACTIVE | JENKINS, PRINTIS R 473 PLANTERS RD MONTGOMERY, AL 36109-1831 | 7/7/1981 | 10/1/1999 | 0304.01 | | MALE | BLACK |
| 030094310 ACTIVE | CLINKSCALES, DAVID EARL 148 HILLABEE CT MONTGOMERY, AL 36117-4135 | 6/6/1963 | 4/30/2002 | 0511.01 | | MALE | BLACK |
| 030097446 ACTIVE | GOODWIN, BORIS T 4228 E LAWNWOOD DR MONTGOMERY, AL 36108-5012 | 5/20/1970 | 9/6/2002 | 0206.01 | | MALE | BLACK |
| 030126478 ACTIVE | HENRY, REGGIE VAN, JR 4838 SUNSHINE DR MONTGOMERY, AL 36116-2828 | 1/14/1981 | 10/3/2006 | 0501.02 | | FEMALE | WHITE |
| 030118299 ACTIVE | JONES, TANESHA RENEE 6041 WARES FERRY RD MONTGOMERY, AL 36117-3213 | 4/18/1985 | 10/27/2004 | 0415.04 | | FEMALE | BLACK |

# Registrant Search Results

**MONTGOMERY**

| Registrant ID Status | Registrant Name Address | Birth Date | Reg. Date | Precinct Part | Party | Gender | Race |
|---|---|---|---|---|---|---|---|
| 030053900 ACTIVE | SANKEY, DONALD RAY<br>739 CAPRI ST<br>MONTGOMERY, AL 36105-1511 | 1/31/1973 | 9/19/1991 | 0412.02 | | MALE | BLACK |
| 030048480 ACTIVE | SHIELDS, REGIS CARL<br>207 HILLTOP TER<br>MONTGOMERY, AL 36109-2805 | 2/4/1959 | 10/25/1988 | 0305.02 | | MALE | WHITE |
| 030125362 ACTIVE | SIEBERT, MICHAEL F<br>APT F<br>1012 MAGNOLIA CURV<br>MONTGOMERY, AL 36106-2161 | 5/11/1951 | 10/23/2006 | 0101.05 | | MALE | WHITE |
| 030076514 ACTIVE | SMITH, KEVIN JAMES<br>5860 GREEN WAY<br>MONTGOMERY, AL 36117-2302 | 1/15/1980 | 6/16/1998 | 0103.01 | | MALE | WHITE |
| 030128227 ACTIVE | BOSWELL, CARMAL D<br>APT C<br>4908 HATTON AVE<br>MONTGOMERY, AL 36108-5503 | 8/6/1988 | 4/26/2007 | 0209.05 | | FEMALE | BLACK |
| 030069761 ACTIVE | CHRISTEN, LAVON M<br>7285 GREENFIELD RD<br>MONTGOMERY, AL 36117-7507 | 6/17/1960 | 8/30/1996 | 0309.02 | | MALE | BLACK |
| 030035024 ACTIVE | FRANK, MICHAEL WILLIAM<br>9914 DOGWOOD CT<br>MONTGOMERY, AL 36117-5604 | 9/28/1953 | 9/20/1983 | 0512.02 | | MALE | WHITE |
| 030105826 ACTIVE | HARRIS, PAUL<br>7305 LIVE OAK CT<br>MONTGOMERY, AL 36117-3575 | 4/6/1953 | 1/14/2004 | 0308.03 | | MALE | BLACK |
| 030064922 ACTIVE | KELLIHER, JOHN PHILLIP<br>2624 CHESTERFIELD CT<br>MONTGOMERY, AL 36117-3032 | 2/5/1969 | 11/2/1994 | 0513.04 | | MALE | WHITE |
| 030109031 ACTIVE | MCKINNON, STEPHANIE LA CHIEL<br>212 DELLWOOD CT<br>MONTGOMERY, AL 36108-5304 | 10/21/1977 | 8/31/2004 | 0209.05 | | FEMALE | BLACK |
| 030114233 ACTIVE | PARQUETTE, MICHAEL DAVID<br>104 CEDAR ST<br>MONTGOMERY, AL 36110- | 12/14/1983 | 10/14/2004 | 0406.02 | | MALE | WHITE |

# Registrant Search Results

## MONTGOMERY

| Registrant ID Status | Registrant Name Address | Birth Date | Reg. Date | Precinct Part | Party | Gender | Race |
|---|---|---|---|---|---|---|---|
| 030101987 ACTIVE | SHARPE, DEBBIE ELAINE 3720 QUENBY CT MONTGOMERY, AL 36116-4532 | 10/2/1960 | 8/4/2003 | 0514.05 | | FEMALE | BLACK |
| 030123978 ACTIVE | SMART, BENJAMIN A 806 AUTUMN RIDGE RD MONTGOMERY, AL 36117-6967 | 10/30/1964 | 9/26/2006 | 0308.03 | | MALE | WHITE |
| 030037414 ACTIVE | TRAVIS, WILLIAM TERRY 27 GABON WAY MONTGOMERY, AL 36109-2864 | 3/29/1956 | 6/11/1984 | 0305.01 | | MALE | WHITE |
| 030129095 ACTIVE | TODD, SHARRON ELISE 10 BROADWAY ST MONTGOMERY, AL 36110-2104 | 1/20/1979 | 5/11/2007 | 0411.01 | | FEMALE | WHITE |
| 030127433 ACTIVE | BARROWS, JOHN R APT A 4108 PERDIDO DR MONTGOMERY, AL 36110-4207 | 3/27/1975 | 10/12/2006 | 0408.03 | | MALE | BLACK |
| 030070843 ACTIVE | DAWSON, TOMMY WRIGHT, JR 3320 WOODPARK DR MONTGOMERY, AL 36116-3623 | 8/29/1976 | 10/21/1996 | 0514.05 | | MALE | BLACK |
| 030107334 ACTIVE | DEAN, DONALD Q 37 MICHIGAN AVE MONTGOMERY, AL 36110-1735 | 12/17/1978 | 7/23/2004 | 0406.03 | | MALE | BLACK |
| 030124659 ACTIVE | GAY, TERRY 39 DAVIS DR MONTGOMERY, AL 36105-2902 | 11/29/1981 | 9/27/2006 | 0202.02 | | MALE | BLACK |
| 030098586 ACTIVE | HEMPHILL, SHAREE WHITE 21 KIRKPATRICK AVE MONTGOMERY, AL 36113-6343 | 7/3/1962 | 10/21/2002 | 0204.06 | | FEMALE | WHITE |
| 030047791 ACTIVE | JOHNSON, DARRELL KURT 5886 BRIDLE PATH LN MONTGOMERY, AL 36116-1032 | 4/18/1964 | 8/23/1988 | 0105.01 | | MALE | BLACK |
| 030099176 ACTIVE | LOFSTROM, JOCELYN STEVENS 325 OAK ST MONTGOMERY, AL 36113-6230 | 12/9/1968 | 3/3/2003 | 0204.06 | | FEMALE | WHITE |

## Registrant Search Results

**MONTGOMERY**

| Registrant ID Status | Registrant Name Address | Birth Date | Reg. Date | Precinct Part | Party | Gender | Race |
|---|---|---|---|---|---|---|---|
| 030096521 ACTIVE | MORSE, CAROLINE DIANA 3055 LANSDOWNE DR MONTGOMERY, AL 36111-1818 | 4/10/1984 | 5/3/2002 | 0104.02 | | FEMALE | WHITE |
| 030077425 ACTIVE | STEWART, WILLIE EDWARD 617 MARTHA ST MONTGOMERY, AL 36104-3333 | 9/23/1973 | 10/21/1998 | 0404.01 | | MALE | BLACK |
| 030015751 ACTIVE | TAYLOR, JIMMY W 545 CHATSWORTH DR MONTGOMERY, AL 36109-2326 | 1/28/1955 | 6/10/1982 | 0304.01 | | MALE | WHITE |
| 030124038 ACTIVE | WEBSTER, KEDRIC E 7154 WHITE OAK LN MONTGOMERY, AL 36117-3570 | 3/12/1972 | 10/4/2006 | 0308.03 | | MALE | BLACK |
| 030077912 ACTIVE | WHEAT, HERBERT TONY 3218 BROOKWOOD MONTGOMERY, AL 36116-3012 | 12/17/1979 | 10/14/1998 | 0501.08 | | MALE | BLACK |
| 030029026 ACTIVE | BUSH, CHARLES WILLIAM 739 FELDER AVE MONTGOMERY, AL 36106-1928 | 2/2/1954 | 3/9/1972 | 0403.03 | | MALE | WHITE |
| 030087764 ACTIVE | CHOI, JONG WOONG 4640 HARVEST WAY MONTGOMERY, AL 36106-3137 | 10/20/1980 | 9/6/2000 | 0102.04 | | MALE | ASIAN |
| 030123497 ACTIVE | GANT, CYNTHIA RACHEL 3836 MACLAMAR RD MONTGOMERY, AL 36111-1522 | 7/13/1987 | 9/25/2006 | 0101.15 | | FEMALE | BLACK |
| 030004079 ACTIVE | MAY, PATRICK W 2824 TREMONT ST MONTGOMERY, AL 36110-1135 | 7/23/1962 | 10/15/1980 | 0408.03 | | MALE | BLACK |
| 030123496 ACTIVE | MILNER, JOHN C 2080 W ABERDEEN DR MONTGOMERY, AL 36116-2145 | 7/14/1970 | 9/25/2006 | 0105.01 | | MALE | BLACK |

Total for MONTGOMERY :  87

Total number of Registrants :  87

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Janet May, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 2:07-cv-738-N |
| v. | ) | |
| | ) | |
| City of Montgomery, Al. et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF LARRY T. MENEFEE**

I, Larry T. Menefee, make the following declaration in the above-styled case.

1. I am counsel of record for Defendants in this action. I make this Declaration in response to the court's direction on August 20th to submit evidence by noon, August 21st.

2. I asked Mr. Charles Pyron, Applications Development Manager for Montgomery County, to conduct a search of the voter registration database maintained by the County to determine the number of 18 through 22 year olds, a five year age cohort, who registered to vote during the month of September at Alabama State University during each of the following years. The results of that search by Mr. Pyron are:

| September, 2003 | 18 |
|---|---|
| September, 2004 | 141 |
| September, 2005 | 1 |
| September, 2006 | 142 |

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed on _August 21,_____, 2007.

Larry T. Menefee

**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

January 8, 2007

Mr. Troy King
Attorney General

Mr. John J. Park, Jr.
Assistant Attorney General
State of Alabama
Alabama State House
11 South Union Street
Montgomery, Alabama 36130

Dear Messrs. King and Park:

This letter refers to the change in method of selection for filling vacancies on the Mobile County Commission from special election to gubernatorial appointment in Mobile County, Alabama, pursuant to decisions of the Alabama Supreme Court in _Stokes v. Noonan_, 534 So. 2d 237 (Ala. 1988), and _Riley v. Kennedy_, 928 So. 2d 1013 (Ala. 2005), submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C.

§ 1973c, as amended. This matter arises from an order entered on August 18, 2006, by a three-judge panel in _Kennedy v. Riley_, 445 F. Supp. 2d 1333 (M.D. Ala. 2006), ruling that the State of Alabama submit the two decisions for preclearance under Section 5. We received your submission on November 9, 2006.

We have carefully considered the information you have provided, as well as census data, comments, and information from other interested parties. Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed change "neither has the purpose nor will have the effect" of denying or abridging the right to vote on account of race. _Georgia v. United States_, 411 U.S. 526 (1973). _See also_ Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. § 51.52. "A change affecting voting is considered to have a discriminatory effect under Section 5 if it will lead to a retrogression in the position of members of a racial or language minority group (_i.e._, will make members of such a group worse off than they had been before the change) with respect to their opportunity to exercise the electoral franchise effectively." 28 C.F.R. § 51.54(a) (citing _Beer v. United States_, 425 U.S. 130, 140-42 (1976)).

Pursuant to Act No. 85-237 a vacancy on the Mobile County Commission is to be filled through popular election by the voters within the relevant single-member district. That

statute was precleared by the Attorney General under Section 5 on June 17, 1985 (File No. 1985-1645), and was first implemented in a 1987 District 1 special election. Pursuant to decision of the Alabama Supreme Court in *Stokes v. Noonan*, that method of filling vacancies was changed from election by the voters of the district to appointment by the Governor of Alabama in 1988, and reaffirmed by *Riley v. Kennedy* in 2005.

Pursuant to the decision of the three-judge federal panel in *Kennedy v. Riley*, the State has submitted the changes effected by *Stokes v. Noonan* and *Riley v. Kennedy* for review under Section 5 of the Voting Rights Act. Additionally, we understand that Alabama law has changed, legislatively reversing the decision in these cases and restoring the authority to fill vacancies to the voters themselves for future elections. This is the effect of Act No. 2006-342, which was signed by the Governor on April 12, 2006, and which would govern all future vacancies. The question before us, therefore, is limited to whether the change effected by *Stokes v. Noonan* and *Riley v. Kennedy* will lead to impermissible retrogression, caused by the appointment, rather than election, of an individual to fill a vacancy on the Mobile County Commission for a term expiring in 2008.

In evaluating whether a change affecting voting will lead to impermissible retrogression, the Attorney General compares the submitted change to the practice or procedure in effect at the time of the submission. 28 C.F.R. § 51.54(a). In light of your submission, we note that a change brought about by a state court decision is subject to Section 5. *Branch v. Smith*, 538 U.S. 254, 262 (2003). A practice or procedure that is not legally enforceable under Section 5 cannot serve as a benchmark; the comparison is with the last legally enforceable practice or procedure used by the jurisdiction. *Id.* Changes that are not precleared are not enforceable. 42 U.S.C.
§ 1973c; *Hathorn v. Lovorn*, 457 U.S. 255, 269 (1982); *Clark v. Roemer*, 500 U.S. 646, 652 (1991). Because the changes pursuant to *Stokes* and *Riley* were never precleared, they cannot serve as the benchmark. *See Kennedy*, 445 F. Supp. 2d at 1336, (citing *Abrams v. Johnson*, 521 U.S. 74, 96-97 (1997)); *Gresham v. Harris*, 695 F.Supp. 1179, 1183 (N.D. Ga. 1988) (three-judge court), *aff'd sub nom. Poole v. Gresham*, 495 U.S. 954 (1990). The benchmark is determined without regard to its legality under state law. *Kennedy,* 445 F. Supp. 2d at 1336 (citing *City of Lockhart v. United States*, 460 U.S. 125, 132-133 (1983)); *Perkins v. Matthews*, 400 U.S. 379, 394-95 (1971).

Thus, the last precleared procedure for filling vacancies in the Mobile County Commission that was in force or effect was the special election method set forth in Act No. 85-237. *Kennedy*, 445 F. Supp. 2d at 1336. This Act remains in full force and effect, as it affects voting, was precleared, and was implemented in the 1987 special election cycle. *See Young v. Fordice*, 520 U.S. 273, 282-83 (1997); *Lockhart*, 460 U.S. at 132-33. It is therefore the benchmark against which we measure the proposed change to fill vacancies by appointment of the Governor of Alabama.

The measurement is straightforward. As a result of litigation under the Voting Rights Act, Mobile County is governed by the three-member Mobile County Commission, the members of which are elected from single-member districts. *Brown v. Moore*, Civ. Act. No. 75-298-P (S.D. Ala. 1976) (unpublished opinion). One of the single-member districts, District 1, is over sixty-three percent African-American in population and registered voters. The African-American voters of District 1 enjoy the opportunity to elect minority candidates of their choice to the County Commission; indeed, they enjoyed it in the 1987 special election in which Act 85-237 was first implemented. There is no dispute that the change would transfer this electoral power to a state official elected by a statewide

constituency whose racial make-up and electoral choices regularly differ from those of the voters of District 1. Attorneys General have on at least ten occasions previously interposed objections to changes in method of selection from election to appointment in Alabama and elsewhere. For instance, in 1971, the Attorney General objected to Act No. 2445 of the Alabama Legislature, which changed the method of selection of judges of Justice of the Peace Courts in Alabama from election to appointment. Letter of David L. Norman, Assistant Attorney General, Civil Rights Division, to Hon. William J. Baxley, Attorney General, State of Alabama, Dec. 26, 1973.

The transfer of electoral power effected by *Stokes v. Noonan* and *Riley v. Kennedy* appears to diminish the opportunity of minority voters to elect a representative of their choice to the Mobile County Commission. We have received no indication that the voters of District 1 would have selected the particular individual selected by the Governor. Under these circumstances, the State has failed to carry its burden of proof that the change is not retrogressive. On behalf of the Attorney General, therefore, I must interpose an objection to the change in method of selection for vacancies occurring on the Mobile County Commission from special election to gubernatorial appointment.

We note that under Section 5, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. *See* 28 C.F.R. § 51.44. In addition, you may request that the Attorney General reconsider the objection. *See* 28 C.F.R. § 51.45. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the method of selection for vacancies on the Mobile County Commission by gubernatorial appointment will continue to be legally unenforceable as a matter of federal law. *Clark v. Roemer*, 500 U.S. 646 (1991); 28 C.F.R. § 51.10.

We also have been advised, as suggested above, that the State has, in essence, re-enacted the provisions of Act No. 85-237 in Act No. 2006-342, which similarly provides that future vacancies on the Mobile County Commission will be filled by special election. To the extent that Act No. 2006-342 does not change the voting practices and procedures set forth in Act No. 85-237, it need not be submitted for Section 5 review. We respectfully request your advice as to whether changes covered by Section 5 are contained in the 2006 law. In the meantime, special elections may be held pursuant to Act No. 85-237.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Alabama plans to take concerning this matter. If you have any questions, please call Robert Lowell (202-514-3539), an attorney in the Voting Section. Because this matter has been the subject of pending litigation in *Kennedy v. Riley*, we are serving copies of this letter by facsimile transmission to the Court and counsel of record.

Sincerely,

/s/   Wan J. Kim
Assistant Attorney General

**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*          *Washington, DC 20530*

December 11, 2001

J. Lane Greenlee, Esq.
P.O. Box 430
Winona, Mississippi 38967-0430

Dear Mr. Greenlee:

This refers to the cancellation of the June 5, 2001, general election for the Town of Kilmichael in Montgomery County, Mississippi, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your response to our September 21, 2001, request for additional information on October 12, 2001; supplemental information was received on November 26 and 27, 2001.

We have considered carefully the information you have provided, as well as census data, and comments and information from other interested parties. As discussed further below, I cannot conclude that the town's burden under Section 5 has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the cancellation of the June 5, 2001, general election.

According to the 2000 Census, the Town of Kilmichael has a population of 830, of whom 52.4 percent are black. Since 1990, black residents have become a majority of the town's population and, recently, a majority of its registered voters.

The town is governed by a mayor and a five-member Board of Aldermen, all of whom are elected at the same time to four-year terms, under an at-large system with a plurality vote requirement. Currently, the mayor and all five board members are white. Only one black person has served on the board; in fact, since 1965, only four other black candidates have ever run for board positions. None of these four was successful. Until 2001, no black person had sought the office of mayor.

The office of mayor and all board seats were to be filled at the June 5, 2001, general election. During the qualification period for this election, for the first time a significant number of black candidates qualified for both races. In the Board of Aldermen race, there were ten candidates running for the five board positions, four of whom were black. In the mayoral race, three individuals, one of whom was

African American, qualified.    Three weeks before the election, and following the close of candidate qualification, the town sought to cancel the election.    On May 15, 2001, with no notice to the community, the board unanimously voted to cancel the general election.    The town obtained approval from the town election commission and from a state circuit court for this action.    In the Matter of the General Election for Mayor and Aldermen of the Town of Kilmichael of June 2001, Case No. 2001-0073CV-L (Cir. Ct. Montgomery Cty. Miss. May 21, 2001).    The following day, the town advised the candidates of the court's decision and provided them with copies of the court order.

The stated purpose for the town's action was to develop a single-member ward system for electing town officials.    However, our analysis of the information provided by the town, taken as a whole, has caused us to conclude that the town has not established that its decision was motivated by reasons other than an intent to cause retrogression in minority voting strength.

A significant factor in our analysis is the context in which the town reached its decision.    First, the decision to cancel the election came only after black persons had become a majority of the registered voters and the release of census data indicated that black persons were now a majority of the population in the town.    Second, the decision occurred only after the qualification period for the election had closed, and it became evident that there were several black candidates for office, and that under the existing at-large electoral method, the minority community had the very strong potential to win a majority of municipal offices, including mayor.

The town's purported non-racial rationales for the decision do not withstand scrutiny.    First, the town points to a conversation, which occurred in February or March of this year, between former aldermanic candidate Robert Hamer and one of the current board members.    However, there is no evidence that Mr. Hamer advocated any change in the upcoming election date.    Furthermore, the minutes of the March 6, 2001, meeting in which Mr. Hamer's request is noted reflect the board's position not only that a decision on the change could be postponed, but also that any discussion on the change was not of immediate import.    It thus appears that the board did not focus on changing the method of election until it became clear that the minority community potentially could win the mayoral seat as well as four of the five aldermanic seats.

Second, the town points to federal litigation filed in April as a reason to cancel the election.    One aspect of that litigation concerned the effect that the recent release of the census data would have on the municipalities that elected its governing bodies from districts.    Mississippi State Conference, NAACP v. Amory, Mississippi, Civil Action No. 01-CV-98 (N.D. Miss. Apr. 25, 2001).    However, that part of the litigation had no relevance to the town's existing at-large method of election. The litigation also alleged that the at-large method of election violated federal law in several other identified municipalities, but Kilmichael was not named as a defendant or a potential defendant in the litigation.    Thus there was no imminent danger of litigation that would lead the town to cancel the election.    Finally, we note that election-related federal litigation has been occurring in Mississippi for approximately 30 years.

In addition to the town's failure to establish the absence of a discriminatory purpose, we have concluded

that it also has failed to establish that the change does not have a prohibited effect under Section 5. Canceling an election in which the minority community would be able to exercise effectively the electoral franchise - especially one in which there is a significant number of minority candidates qualified for office and black voters are a majority of registered voters - is retrogressive. Had the election been held, blacks would have exercised the opportunity to attempt to elect candidates of their choice to the mayoral and board seats. The cancellation of this election leaves black citizens worse off because of the denial of that opportunity.

Under the Voting Rights Act, a jurisdiction seeking to implement a proposed change affecting voting must establish that, in comparison with the benchmark standard, the change does not "lead to a retrogression" in the position of minority voters with respect to the "effective exercise of the electoral franchise." See Beer v. United States, 425 U.S. 130, 141 (1976). In addition, the jurisdiction must establish that the change was not adopted with an intent to retrogress. Reno v. Bossier Parish School Board, 528 U.S. 320, 340 (2000). The submitting authority has the burden of demonstrating that the proposed change has neither the prohibited purpose nor effect. Id. at 328; see also Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the cancellation of the June 5, 2001, general election.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the change continues to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the Town of Kilmichael plans to take concerning this matter. If you have any questions, you should call Mr. David H. Harris, Jr. (202-305-2319), an attorney in the Voting Section. Refer to File No. 2001-2130 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

Ralph F. Boyd, Jr.
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20035_

June 28, 1999

John H. White, Jr., Esq.
City Attorney
P.O. Box 667
McComb, Mississippi 39648-0667

Dear Mr. White:

This refers to the 1997 redistricting plan, the creation of three additional voting precincts (Voting Precincts 2A, 4B and 5B) and the polling places designated therefor, and two polling place changes to the Harrell Temple Church (District 3) and Martin Luther King Center (District 5) for the City of McComb in Pike County, Mississippi, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your most recent responses to our January 27, 1998, request for additional information (and our July 10 and October 23, 1998, follow-up letters) on April 29, June 16 and 25, 1999.

The Attorney General does not interpose any objection to the 1997 redistricting plan, the creation of Voting Precincts 4B and 5B, and the polling places designated therefor, and the polling place changes to the Harrell Temple Church and the Martin Luther King Center. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin enforcement of the change. See the Procedures for the Administration of Section 5, 28 C.F.R. 51.41.

We cannot reach the same conclusion, however, regarding the polling place designated for Voting Precinct 2A at the American Legion Hut. The 1997 redistricting plan altered the configuration of Districts 2 and 3 by removing some concentrations of minority voters in the northwestern portion of District 3 and assigning those voters to District 2. In the past, these voters voted at the Martin Luther King Center (the old polling place for District 3), which was in close proximity and easily within walking distance of their homes. The available

- 2 -

information indicates that there are as many as 600 minority persons who reside in this area, which is located east of the railroad tracks that run in a north/south direction through the length of the city, dividing it practically in half. In addition, a number of minority persons were added to District 2 from an area recently annexed into the city who also live to the east of the railroad tracks, just north of the concentration of approximately 600 minority persons referenced above.

The city now proposes that all of these voters vote at the American Legion Hut, which is located on the west side of the railroad tracks, on the south side of the lake. In order for minority residents who reside to the east of the railroad tracks to reach the proposed new polling place, they will have to travel north into the City of Summit, turn west and then head southward back down into the City of McComb, a distance of approximately four miles, or they will have to travel south to a point where they may safely cross the railroad tracks in the City of McComb, then head north past the lake to the proposed polling place. This represents a distance of at least one and a quarter miles.

It appears that many of the minority voters who reside in new District 2, east of the railroad tracks do not have access to a private vehicle and our investigation indicates that there is no readily available public transportation in the city that would assist these voters in getting to their new polling place location. The available information also indicates that these concerns were raised with the city during deliberations on the new polling place locations; no effort was made, however, to consider alternative locations that would address the problems almost 700 minority persons in new District 2 will face in getting to their new polling place location in order to vote, despite the fact that most of these voters in the past walked to their polling place location on the east side of the railroad tracks at the Martin Luther King Center.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the designation of the American Legion Hut as a polling place location.

- 3 -

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  See 28 C.F.R. 51.44.  In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the use of the American Legion Hut as the polling place location for District 2 voters continues to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

With regard to the creation of Voting Precinct 2A, the Attorney General will make no determination to this change at this time because it is directly related to the objected-to American Legion Hut polling place location designated therefor. See 28 C.F.R. 51.22(b) and 51.35.

Your letter of June 25, 1999, acknowledges the difficulty that many of the minority persons who now reside in District 2, but live east of the railroad tracks will have getting to the American Legion Hut to vote.  Furthermore, you indicate your willingness to bring this situation to the city's attention in the near future and to try to find an alternate voting location for the affected voters.  We look forward to hearing from the City of McComb regarding this matter to enable us to meet our responsibility to enforce the Voting Rights Act.  If you have any questions, you should call Zita Johnson-Betts (202-307-3718), Deputy Chief of the Voting Section.

Sincerely,

Bill Lann Lee
Acting Assistant
   Attorney General
Civil Rights Division

SEP 10 1971

Mr. Albert J. Lilly, Jr.
Attorney for the Commonwealth
for Caroline County
Post Office Box 441
Bowling Green, Virginia 22427

Dear Mr. Lilly:

This is in response to your submission, on be-
half of Caroline County, Virginia, of a redistricting
plan and precinct realignment. The submission was
made to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, 42 U.S.C. 1973c.

The Attorney General will not at this time inter-
pose an objection to the submitted redistricting plan.
You should be aware, of course, that Section 5 provides
that this failure to object does not preclude future
legal action should it later be determined that the
change violates the Fifteenth Amendment.

We have received complaints from some of the citi-
zens of Caroline County to the effect that the great dis-
tance between Port Royal and the residences of voters
previously assigned to Sparta precinct will discourage
many black voters from exercizing their voting rights.
In light of your request that we provide an expedited
response to your submission of precinct changes, we are
unable in the time available to conclude that the pre-
cinct realignment affecting these voters will not have
the effect of abridging voting rights on account of
race and accordingly must interpose an objection to the
implementation of that part of the precinct realignment.

- 2 -

Section 5 provides that you may bring an independent action in the District Court for the District of Columbia for a declaratory judgment that the objected to change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. Until such a judgment is obtained, however, the effect of this objection is to render unenforceable the assignment of the former voters at Sparta to Port Royal precinct.

It is our understanding that there are no contested races in the September primary election in Port Royal Election District. For this reason, our limited objection to your precinct realignment should have no adverse effect upon the conduct of primary elections in Caroline County. The operation of this objection, however, will make it illegal to conduct future elections in Port Royal District without creating a suitable polling place and precinct for the voters mentioned above at or near the town of Sparta or at some other convenient location. As soon as action has been taken by the appropriate local officials to create such a precinct, its submission here would receive our prompt and careful consideration.

Sincerely,

DAVID L. NORMAN
Assistant Attorney General
Civil Rights Division

U.S. Department of Justice

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

Perkins Wilson, Esq.                                JUL 31 1981
Assistant Attorney General
Supreme Court Building
1101 East Broad Street
Richmond, Virginia 23219

Dear Mr. Wilson:

        This is in reference to the reapportionment of the
Virginia House of Delegates by Chapter 5, 1981 Acts of the
General Assembly (Special Session), submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of
1965, as amended.  Your submission was completed on July 2,
1981.  In accordance with your request, this submission has
been reviewed on an expedited basis.

        Under Section 5, the Commonwealth of Virginia has
the burden of proving that its proposed reapportionment does
not represent a retrogression in the position of its black
residents, and that the new plan was adopted without any
racially discriminatory purpose.  See <u>Beer</u> v. <u>United
States</u>, 425 U.S. 130 (1976).  We have carefully reviewed
the material you submitted and for the most part find the
proposed reapportionment plan to have neither the purpose
nor effect of diluting or abridging the voting rights of
black citizens.

        However, there is one general area where the pro-
posed plan appears to dilute and fragment black voting
strength unnecessarily.  According to the 1980 census the
southern part of the Commonwealth contains five contiguous
rural counties with black population majorities (Brunswick,
Greensville, Sussex, Surry and Charles City).  The nearby
City of Petersburg also has a majority black population of
61.09%.  Under the pre-existing apportionment plan four of
the five black majority counties were grouped together with
New Kent County to make up District 45, which by 1980 census
figures was 53.09% black.  In the proposed plan each of the
five majority black counties is combined with one or more
predominently white counties in such a way that there is a
black minority in each of the resulting districts (Nos. 26,
27, 35, 41 and 46).  We note that one of the resulting dis-
tricts (No. 27), which combines Nottaway, Dinwiddie and
Greensville Counties and Emporia City, connected only by a
two mile stretch of the Nottaway River, does not seem to
comply with the Commonwealth's standard of compactness.

~ 2 ~

Testimony prepared for the pending lawsuits indicate that the legislature was aware that dispersing the majority black counties that were in former district 45 would necessarily dilute the voting strength of blacks in this area.

Similarly, the City of Petersburg is combined in the plan with the virtually all white city of Colonial Heights resulting in a district (No. 28) which is 43.66% black. This district was formed notwithstanding the fact that Colonial Heights had historically been associated with Chesterfield County and, in fact, had been combined under the 1971 plan with Chesterfield to form District No. 36 which, with a population of 157,881, could have been continued as a viable three-member district in the new plan. This latter approach was supported by representatives of the Colonial Heights city government. Material submitted to us indicates there are a number of options available that would not have the effect of diluting the voting strength of the black citizens of Petersburg.

Accordingly, after careful consideration of the materials you have submitted, as well as comments and information provided by other interested parties, I am unable to conclude, as I must under the Voting Rights Act, that the submitted plan for the reapportionment of the House of Delegates is free of any racially discriminatory purpose or effect in the described area. For that reason, I must, on behalf of the Attorney General, interpose an objection to Chapter 5 of the 1981 Acts of the General Assembly of Virginia (Special Session) as it affects the district lines in the SouthsidePetersburg area.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (Section 51.44, 46 Fed. Reg. 878) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court is obtained, the effect

- 3 -

of the objection by the Attorney General is to make the reapportionment of the Virginia House of Delegates legally unenforceable with respect to the districts in question.

We are aware that there is a severe time problem if the Commonwealth is to hold timely elections for the General Assembly. Please be assured that we stand ready to do all we can to assure that any future review of such limited changes as may be necessary to comply with the requirements of Section 5 is accomplished in the most expeditious way possible. If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-7439), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_          _Washington, D.C. 20530_

## 20 JAN 1982

Mr. Alex K. Brock
Executive Secretary-Director
State Board of Elections
Suite 801 Raleigh Building
5 West Hargett Street
Raleigh, North Carolina  27601

Dear Mr. Brock:

This is in reference to Chapter 1130 - Special
Session 1981 (H.B. 1428) providing for the reapportionment
of the North Carolina State House of Representatives.
Your submission, pursuant to Section 5 of the Voting
Rights Act, 42 U.S.C. 1973c, was initially received on
November 6, 1981, and was thereafter supplemented with
additional information on November 21, 1981.

As you know, on November 30, 1981, an objection
was interposed to a 1968 amendment to the North Carolina
Constitution which provided that no county shall be divided
in the formation of a Senate or Representative district.
In objecting to the 1968 amendment, we observed "that the
prohibition against dividing the 40 covered counties
in the formation of Senate and House districts predictably
requires, and has led to the use of, large multi-member
districts."  Our analysis of the 1968 constitutional
amendment also showed "that the use of such multi-member
districts necessarily submerges cognizable minority
population concentrations into larger white electorates."
Thereafter, on December 7, 1981, an objection was interposed
to a proposed redistricting plan for the State Senate.
In objecting to the Senate reapportionment plan, we noted
several instances where the State's seeming adherence to
the 1968 constitutional prohibition against the division
of counties had resulted in the submergence of cognizable
black communities into large, predominantly white, multi-
member districts.

- 2 -

We have considered carefully all of the information submitted in support of the House redistricting plan as well as information and comments from other interested parties. Our analysis and review of the House plan reveal, as did our review and analysis of the Senate reapportionment, that the use of large multi-member districts effectively submerges sizeable concentrations of black population into a majority white electorate. In Guilford County, for example, the use of a county-wide district submerges a significant concentration of black citizens in the city of Greensboro, and at present, Guilford County does not have a black representative in the House even though black persons comprise over one-third of Greensboro's population. On the other hand, under a single-member district election system, black voters in Greensboro likely would be able to elect a candidate of their choice to the North Carolina House of Representatives. In other areas of the State covered under the Voting Rights Act, such as in Cumberland County, concentrations of black citizens likewise suffer a submergence of their voting strength as a result of large, multi-member districts.

Our analysis also shows that the plan has other dilutive effects on black voting strength in covered areas of the State. For instance, in the Bertie, Gates, Halifax, Hertford, Martin and Northampton counties area (District 5), the State proposes to reduce the black percentage from 57.5% to 51.7% in this 3-member district. Black voters in the current multi-member district have been able to elect a candidate in District 5. Thus, the proposed reduction in black population percentage in that district would appear to be a retrogression in the position of racial minorities with respect to their effective use of the electoral franchise. Beer v. United States, 425 U.S. 130, 141 (1976).

As we noted in our December 7, 1981 letter concerning the Senate reapportionment plan, we understand that the submergence of minority voting strength occurring in that reapportionment plan may well have been a result of the State's adherence to the 1968 constitutional prohibition

- 3 -

against dividing counties during redistricting. It would appear that the State's use of the 1968 constitutional provision as a guide in its House redistricting effort has similar consequences here. In view of these proscribed effects, however, I am unable to conclude, as I must under the Voting Rights Act, that the proposed House reapportionment plan is free of a racially discriminatory purpose and effect. Accordingly, on behalf of the Attorney General, I must interpose an objection to the House plan as it relates to the covered counties.

Of course, I am fully aware that counsel for the State has indicated a desire to have a number of State representatives meet with us to present additional arguments and information supporting the redistricting plan. As always, we are willing to meet with you or other State officials in an effort to resolve the issues that exist and, in that regard, a meeting is scheduled for Friday, January 22, 1982. You can be assured that we will give full consideration to any new information presented. However, because of the time constraints under Section 5, a determination must be made at this time.

If you have any questions concerning this matter, please feel free to call Carl W. Gabel (202-724-8388), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

January 8, 1990

Michael Crowell, Esq.
Tharrington, Smith & Hargrove
P.O. Box 1151
Raleigh, North Carolina  27602

Dear Mr. Crowell:

     This refers to our letter of December 4, 1989, interposing a
provisional objection, under Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c, to Chapter 195, H.B. 595
(1989), which allows, until August 1, 1990, the board of
commissioners to change its method of election without holding a
referendum election and permits the adoption of specified
additional election features, and the June 26, 1989, Resolution
of the board of commissioners, which implements Chapter 195
(1989) to provide for an increase in the number of commissioners
from five to seven; a change in the method of election from at
large by majority vote and staggered terms (3-2) to four
commissioners elected from single-member districts and three
commissioners elected at large, all by plurality vote for
staggered terms (4-3), with the three at-large seats elected
concurrently without numbered posts; a districting plan; an
implementation schedule; and procedures for selecting party
nominees in the event of a tie in the primary for Lee County,
North Carolina.

     As promised in the December 4, 1989, letter, we have now
completed our analysis of the proposed changes.  In doing so, we
have considered carefully all of the information and materials
you have supplied, along with information from other interested
parties and the Bureau of the Census.  As a result, we find no
basis for continuing the objection to the changes involved in
Chapter 195 (1989) or to the proposed method of election changes,
districting plan, and related changes involved in the June 26,
1989, Resolution.  Accordingly, the objection is hereby
withdrawn.  However, we feel a responsibility to point out that

- 2 -

Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such changes. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.41).

Sincerely,

*for* James P. Turner
Acting Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

*Office of the Assistant Attorney General*                     *Washington, D.C. 20530*

# DEC 14 1989

Michael Crowell, Esq.
Tharrington, Smith & Hargrove
P.O. Box 1151
Raleigh, North Carolina  27602

Dear Mr. Crowell:

This refers to Chapter 195, H.B. 595 (1989), which allows,
until August 1, 1990, the board of commissioners to change its
method of election without holding a referendum election and
permits the adoption of specified additional election features;
and the June 26, 1989, Resolution of the board of commissioners,
which implements Chapter 195 (1989) to provide for an increase in
the number of commissioners from five to seven; a change in the
method of election from at large by majority vote and staggered
terms (3-2) to four commissioners elected from single-member
districts and three commissioners elected at large, all by
plurality vote for staggered terms (4-3), with the three at-large
seats elected concurrently without numbered posts; a districting
plan; an implementation schedule; and procedures for selecting
party nominees in the event of a tie in the primary for Lee
County, North Carolina, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c.  Information completing your submission
was received on November 9, 1989.

The information initially provided by the county with
respect to these changes was received by the Attorney General on
June 19 and July 7, respectively.  Thereafter, on August 16,
1989, pursuant to Section 51.37 of the Procedures for the
Administration of Section 5, 28 C.F.R. 51.37, we requested
additional information needed to analyze the changes.  In
response you submitted additional information on several dates

- 2 -

culminating with a letter received by us on November 9, 1989, in
which you specifically addressed various allegations by other
interested parties which we had passed on to you at your request.
As we explained in our November 20, 1989, letter, we found the
supplemental information you provided in the response received
November 9, 1989, necessary to a proper review of the changes
under Section 5 and we, therefore, advised you that the statutory
sixty-day period for substantive review of the submitted changes
began with your response received November 9, 1989, making a
final determination regarding the submitted changes due no later
than January 8, 1990.

By your November 29, 1989, letter, you have taken the
position that the response received November 9, 1989, does not
materially supplement the county's submission so as to extend the
statutory sixty-day period of review to January 8, 1990, and you
therefore take the position that the deadline for an objection
under Section 5 is December 4, 1989.  Of course, we disagree.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
no discriminatory purpose or effect.  See Georgia v. United
States, 411 U.S. 526 (1973); see also the Procedures for the
Administration of Section 5 (28 C.F.R. 51.52(a)).  In making the
required determination, we view it important to take into
consideration all of the information and comments available to
us.  Because we have not had an adequate opportunity to do so
subsequent to receiving your November 9 response in this matter
and to eliminate any question about whether these changes may be
considered as precleared after December 4, 1989, we feel it
incumbent upon us to interpose an objection, provisionally, until
such time as we can complete a careful analysis of this
submission.  See Procedures for the Administration of Section 5
(28 C.F.R. 51.52(c)).  Therefore, on behalf of the Attorney
General, I must interpose an objection to the submitted changes
at the present time.  However, we will continue to evaluate all
of the material that we have received, including the supplemental
information and arguments received November 9, 1989, and will let
you know as soon as a determination on the merits can be made.
At that time we will advise you as to whether the objection
interposed herein will be continued or withdrawn.  In the
meantime, we understand that the county is anxious to obtain a
determination quickly and we will expedite our review to the
extent possible consistent with our responsibilities under
Section 5.

- 3 -

If you have any questions concerning these matters, feel free to call Sandra S. Coleman, Deputy Chief, Voting Section, at 202-724-6718.

Sincerely,

*James P. Turner*
Acting Assistant Attorney General
Civil Rights Division

U.S. Department of Justice

Civil Rights Division

JKT:MSR:ER:par
DJ 166-012-3
2007-2417

*Voting Section - NWB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

June 18, 2007

Larry T. Menefee, Esq.
407 South McDonough
Montgomery, Alabama  36104

Dear Mr. Menefee:

This refers to seven annexations (Ordinance Nos. 17-2002, 73-2003, 56-2004, 95-2004, 31-2005, 82-2005, and 84-2005) and their designations to council districts for the City of Montgomery in Montgomery County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your submission on April 19, 2007; supplemental information was received on June 6, 2007.

The Attorney General does not interpose any objection to the specified changes. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes. In addition, as authorized by Section 5, we reserve the right to reexamine this submission if additional information that would otherwise require an objection comes to our attention during the remainder of the sixty-day review period. Procedures for the Administration of Section 5 of the Voting Rights Act (28 C.F.R. 51.41 and 51.43).

Sincerely,

John Tanner
Chief, Voting Section

U.S. Department of Justice

Civil Rights Division

JKT:MSR:ER:par
DJ 166-012-3
2007-2669

*Voting Section - NWB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

June 28, 2007

Larry T. Menefee, Esq.
407 South McDonough Street
Montgomery, Alabama  36104

Dear Mr. Menefee:

This refers to the changes to and consolidation of polling locations, the consolidation and realignment of voting precincts, an annexation (Ordinance No. 42-2006) and its designation to City Council District No. 9 for the City of Montgomery in Montgomery County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your submission on May 4, 2007; supplemental information was received on June 19, 2007.

The Attorney General does not interpose any objection to the specified changes. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes. In addition, as authorized by Section 5, we reserve the right to reexamine this submission if additional information that would otherwise require an objection comes to our attention during the remainder of the sixty-day review period. Procedures for the Administration of Section 5 of the Voting Rights Act (28 C.F.R. 51.41 and 51.43).

Sincerely,

John Tanner
Chief, Voting Section