`IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Janet May, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 2:07-cv-738-N |
| v. | ) | |
| | ) | |
| City of Montgomery, Al. et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS' BRIEF OPPOSING INJUNCTIVE RELIEF**

Defendants, City of Montgomery, Alabama, and Bobby Bright, in his official capacity as Mayor of the City, offer the following brief in opposition to the Plaintiffs' request for any injunctive relief. The issues before the court are whether to stay the elections scheduled for Tuesday, August 28, 2007 and the court indicated in the scheduling conference of Monday, August 20, 2007 that it would consider a final ruling on the merits of whether or not the June 14, 2007 preclearance letter from the Department of Justice (DOJ) is an effective preclearance of this election schedule. Defendants point out that if DOJ decides to object to this election schedule and if this court declines to find the continuing validity of the June 14th preclearance letter, the Defendants may still challenge the DOJ determination in the U.S. District Court for the District of Columbia.

Defendants will first offer a statement of facts and then address the legal issues. Because this case is before the Court for entry of final judgment on the claims under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, we present our arguments analyzing the case in light of the history of Section 5 practices by the Department of Justice and the relevant case law. Those practices show quite clearly two things: that the Department of Justice's consistent practice when interposing an objection to a Section 5 preclearance submission is to explicitly state that the Department of Justice

is interposing an objection; second, that when the Department of Justice acts on an expedited basis and interposes an objection, the Department has interposed a provisional objection as set forth in 28 CFR 51.43.

In view of the proximity of the election (one week from today) and plaintiffs' request to enjoin it, Defendants are of the view that in the event this Court decides that the City's election schedule has not been precleared in view of the June 14, 2007 letter and by operation of law, this Court should nevertheless permit the elections to go forward. In this event, this Court should apply the traditional four part test for granting preliminary injunctive relief in the context of the Section 5. Finally, defendants argue herein that plaintiffs lack standing to sue, and that the equitable doctrine of laches bars any relief in this case. A list of filed Exhibits attached to this brief is at the end of this brief.

**A. Statement of Facts**

The City of Montgomery operates under Act No. 618 of the 1973 Regular Session of the Alabama Legislature. City elections for a Mayor and nine council members from single-member districts are held every four years. The Act provides for a three week period between the first election and any necessary runoff election. In preparing for the 2007 elections the City needed an election schedule that would allow at least six weeks between the first election and any runoff election so as to comply with the Uniformed and Overseas Citizens Absentee Voting Act of 1986, 42 U.S.C. §§ 1973ff (UOCAVA). That six week time is deemed a best practice to allow for the transmission and return of absentee ballots from registered voters serving in the miliary overseas. UOCACA applies to municipal elections by virtue of Section 17-11-3 of the *Alabama Code*, which provides in part:

2

> (a) Any qualified elector of this state may apply for and vote an absentee ballot ...in any primary, general, special, or **municipal election**, if he or she makes application ...and meets one of the following requirements:.....
> **(5) The person is a member of, or spouse or dependent of a member of, the armed forces of the United States or is similarly qualified to vote absentee pursuant to the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. 1973ff.** (*emphasis added*) full text at Exhibit 1

This interpretation of state law was supported by the Attorney General for the state, the Alabama League of Municipalities, and Montgomery County election officials.[1]  The City was confronted with having any election conducted under Act 618 being challenged in court for failure to comply with UOCAVA.

The only other existing statutory provision that would allow the City to hold UOCAVA compliant election was  *Alabama Code* (1975) § 11-46-5:

> The governing body of a municipality having a general municipal election or runoff election required by general or local act at a time different from the dates now or hereafter provided by Article 2, Chapter 46 of Title 11, **may elect by ordinance to have the election at the same time required by Article 2** and the election made by ordinance shall not have the effect of changing the beginning of a term of office or the time for taking office.

The election schedule is provided for in § 11-46-21 and the schedule for qualifying is provided for in §§ 11-46-22 and 25(g).  Exhibit 5   At the regular city council meeting on February 6, 2007 the council unanimously, including plaintiff May, adopted Ordinance 13-2007 which provides for the same election schedule before this court.  Exhibit 6 p.1 Subsequently, Dr. Joe Reed requested that

---

[1]  There is extensive "guidance" from the federal government as to the need for a six week election interval for handling absentee ballots.  See Exhibit 2  Report of the U.S. Election Assistance Commission, Best Practices for Facilitating Voting by U.S. Citizens Covered by the Uniformed and Overseas Citizens Absentee Voting Act, September 2004, Executive Summary. Exhibit 3 Letter from U.S. Department of Justice, Assistant Attorney General Acosta to Honorable Nancy Worley, Alabama Secretary of State, September 29, 2004.  Exhibit 4 Complaint *United States v. State of Alabama*, et. al. MD. Ala, filed March 9, 2006 filed against the State of Alabama in 2006 alleging a violation of UOCAVA because the State election schedule did not allow enough time between the primary and runoff for an overseas ballot to make the roundtrip and be counted.

City attempt to obtain legislation to change the election dates for Act 618 to meet UOCAVA standards.  The Mayor agreed to try that approach and vetoed Ordinance 13-2007 which was unanimously upheld by the council on February 20th.

At the March 6th City Council meeting the Mayor reported the election dates in proposed legislation known as HB 866 and the council voted 8-0 in favor of those dates and urged the legislature to pass the bill.  On June 5th, after efforts failed in a very contentious legislative session, the City Council voted 9-0, including plaintiff May,  to suspend the rules and consider Ordinance 42-2007.  Then the council voted 9-0, again with plaintiff May voting in favor, to adopt the Ordinance. Ex. 6 p. 10-11 Thus, there were three separate unanimous votes over four months in support of this election schedule.

The Ordinance was promptly submitted to the Department of Justice for preclearance on June 13th, (Ex. 7) and expedited review was requested.  The Ordinance was precleared by letter June 14, 2007.  Ex 8.[2]

The City immediately began election preparations including publishing legal notices, confirming polling sites and poll workers etc.  There was no mention of the election schedule at the next council meeting on June 19th.  Candidate qualifying opened on July 3rd and closed on July 17th.  Four candidates have qualified to run for Mayor and sixteen candidates have qualified for the nine city council seats.  Five of the council seats are uncontested. Ex. 10  On July 23rd undersigned counsel received the letter attached to the Complaint as Exhibit G from the Department of Justice

---

[2]There was nothing remarkable about the language of the preclearance letter.  It contained standard language.  See Exhibit 9 for two other preclearance letters received by the city in the same month.  Note that the same reservation of an ability to "reexamine" the "no objection" determination within the time remaining was included.  That language was included in those two letters even though there was little or no time remaining of that 60 day period.

informing the City that pursuant to 28 C.F.R. 51.43 the DOJ would "reexamine" the submission. Since the City's initial submission of the new election schedule on June 13, 2007, sixty nine days ago, the Department of Justice has not interposed an objection to the election schedule.  The only Section 5 decision that the Department of Justice has made, as noted above, was the June 14, 2007 decision to preclear the new election schedule.

Absentee ballots were mailed in July.  Many of those are already returned.  Eight-seven absentee ballots for UOCAVA applicants were mailed, forty-two of those ballots were to black registered voters. Ex. 11  Early absentee voting at city hall is also taking place.  At this point candidates have campaigned vigorously, 650 poll workers have been trained, ballots of the candidates who qualified have been printed, and post cards have been mailed to all 114,000 voters informing them of the election dates and their place of voting.

When the allegations by Dr. Reed that 3,000 newly arriving college students at ASU would be "disenfranchised" by the change in election date were first received (well after preclearance was obtained), the City sought to determine the registration history of ASU students.  A search of the voter registration database maintained by the County to determine the number of 18 through 22 year olds, a five year age cohort, who registered to vote during the month of September at ASU for each year from the last municipal election to the present.  The results are:

| Year | Number registered | |
|------|-------------------|---|
| 2003 | 18 | |
| 2004 | 141 | |
| 2005 | 1 | |
| 2006 | 142 | Ex.12 |

## **ARGUMENT**

### **B.  The Relevant Legal Standards**

By its very terms, Section 5 of the Voting Rights Act states that the Attorney General must

act on a submission within sixty days or the voting changes set forth in that submission may be enforced.  The relevant Section 5 language is as follows:

Whenever a State or political subdivision … shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, **or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made.**  Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. **In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section.** Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 and any appeal shall lie to the Supreme Court. **(emphases added).**

In this case, the City requested expedited approval as set forth in Section 5.  The Attorney General apparently felt that the City had made a "good cause show[ing]" for "expedited approval" and thus made a decision the next day.  In making his expedited decision as set forth in the June 14, 2007 letter, and to quote the exact language of Section 5, "the Attorney General has affirmatively indicated that such objection will not be made."    While Section 5 does authorize the Attorney General to reexamine the submission, the Attorney General must do so "during the remainder of the sixty day period".  The plain language of Section 5, therefore, would seem to dispose of the

plaintiffs' Section 5 claim.  Preclearance occurs under Section 5 <u>either</u> when the Attorney General fails to object to a submission within sixty days <u>or</u> if he grants preclearance on an expedited basis and no objection has occurred during the sixty day period.  In this case, both events have now happened.  That should be the end of the matter.

When the Attorney General granted preclearance to the City on June 14, 2007, the Attorney General apparently believed that the submission was complete at that time or he would have asked for more information.  He did not do so and instead precleared the election schedule.   Thus since the submission was deemed complete at that time, the Attorney general had sixty days to render his decision to object and he has failed to do so.

So that the defendants' position is clear to this Court, we take the position that preclearance of the voting changes has occurred here because the Attorney General failed to object within sixty days of the City's submission, a submission that the Attorney General was complete when he precleared it on June 14.

It is important for this Court to understand why Congress was concerned that state and local governments receive prompt review of their voting changes.  As the Supreme Court has explained:

> In light of the potential severity of the s 5 remedy, the statutory language, and the legislative history, we think it clear that Congress intended to provide covered jurisdictions with an expeditious alternative to declaratory judgment actions. The congressional intent is plain: The extraordinary remedy of postponing the implementation of validly enacted state legislation was to come to an end when the Attorney General failed to interpose a timely objection based on a complete submission.

*Morris v. Gressette*, 432 U.S. 491, 504 (1977).  In *Morris, supra*, the Court read section 5 to impose strict time limits on the Attorney General:  **"**Although there was to be no bar to subsequent constitutional challenges to the implemented legislation, there also was to be 'no

dragging out' of the extraordinary federal remedy beyond the period specified in the statute. *Switchmen's Union v. National Mediation Board*, 320 U.S., at 305, 64 S.Ct., at 99." *Morris, supra*, 504.

The reason that Congress decided to provide two alternative routes for obtaining Section 5 preclearance--judicial preclearance from the DC court or administrative preclearance from the Attorney General--was "to provide covered jurisdictions with an expeditious alternative to declaratory judgment actions." *Morris v. Gressette*. 432 U.S. 491, 504 (1977).  That "expeditious alternative" would be undermined if the Attorney General either fails to act within the statutory sixty day period, or if the Attorney General grants Section 5 preclearance on an expedited basis and then attempts to interpose an objection later.

When a jurisdiction receives a letter granting Section 5 preclearance, as the City of Montgomery did here, it is entitled to rely on that decision.  That is because voting changes that have not been precleared are legally unenforceable unless and until they are precleared.  *Clark v. Roemer*,   Thus, even in those cases where the  Attorney General grants expedited review and preclears voting changes, and in the process of doing so informs the state or political subdivision that the Attorney General reserves the right to reexamine the decision to preclear during the remainder of the sixty day period (which does not appear to be authorized by the language statute), the jurisdiction must be given a clear decision from the Attorney General regarding the legal status of the voting changes that have been submitted.

It was apparently for this reason that the Department of Justice has adopted a regulation which states that if it makes a decision not to object to a voting change but later reexamines that

decision, the Attorney General should interpose an objection to the changes.  The regulation,[3]

codified at 28 CFR §51.43 states as follows:

**51.43 Reexamination of decision not to object.**

After notification to the submitting authority of a decision to interpose no objection to a submitted change affecting voting has been given, the Attorney General may reexamine the submission if, prior to the expiration of the 60-day period, information indicating the possibility of the prohibited discriminatory purpose or effect is received. **In this event, the Attorney General may interpose an objection provisionally and advise the submitting authority that examination of the change in light of the newly raised issues will continue and that a final decision will be rendered as soon as possible. (emphasis added).**

The Court can plainly see the value to a submitting jurisdiction if the Department of

Justice had followed this approach in this case.  The City obtained a letter of preclearance and

immediately started to implement the change in election schedule: candidates started qualifying

and campaigning, the City spent between $100,000 and $200,000 (Ex 10) in election

preparations, etc.   If the Department believed that allegations made after preclearance was

granted were sufficiently serious that they might call for an objection, the reasonable and

responsible thing to do would have been to interpose an objection during that reexamination,

provisionally or otherwise, as prescribed in its own regulations.  On the other hand, if the

Department did not believe that a reexamination would result in an objection, it might do what it

---

[3]  We understand that the Department of Justice intends to participate in this case during the hearing today.  They may argue that their interpretation of the Voting Rights Act or their own regulations is different from the defendants, and further, that their interpretation is entitled to deference.  But deference has its limits.  As the Supreme Court explained in *Presley v. Etowah County Com'n*, 502 U.S. 491, 508-09 (1992), in rejecting the Attorney General's interpretation of Section 5: "Deference does not mean acquiescence. As in other contexts in which we defer to an administrative interpretation of a statute, we do so only if Congress has not expressed its intent with respect to the question, and then only if the administrative interpretation is reasonable. See, *e.g.*, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-844, 104 S.Ct. 2778, 2781-2782, 81 L.Ed.2d 694 (1984). Because the first of these conditions is not satisfied in the cases before us we do not defer to the Attorney General's interpretation of the Act."
.

did here and not object.  Regardless of the Department of Justice's current views, one thing is

clear: it would be blatantly irresponsible for the Department of Justice to sit back following

preclearance, watch the City implement the new election schedule, tell the City it was re-

examining its decision but not interpose an objection, and later interpose an objection on the eve

of an election.  Obviously, the Department of Justice has not interposed an objection, but if it

was going to attempt to do so during the sixty day period, it should have followed its own

regulations and interposed an objection within the statutory time frame.

**C.  Legal Standards for Equitable Relief**

The Eleventh Circuit has established that the Plaintiff must satisfy the following four

factors for preliminary injunctive relief to be ordered: (1) a substantial likelihood of success on

the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) the

threatened injury to the plaintiff outweighs the harm an injunction may cause to the defendant;

and (4)  granting the injunction would not disserve the public's interest.  *Church v City of*

*Huntsville*, 30 F. 3d 1332, 1342 (11th  Cir.1994);  *Gold Coast Publications, Inc. v. Corrigan,* 42

F. 3d 1336, 1343 (11th  Cir. 1994).

**1. Likelihood of Success on the Merits**

As noted above, defendants are of the view that preclearance has been obtained.  This

defense is strongly supported not only by the language of Section 5 itself, but the correspondence

and actions taken (or not taken) by the Department of Justice during the sixty day period.

The Plaintiffs' claim for success on the Section 5 claim is based on their attorney's interpretaion

of the July 23rd letter from DOJ to Menefee.   The relevant paragraph quoted in its entirety is:

> Title 28 C.F.R. 51.43 provides that the Attorney General has the right to
> reexamine a submission if additional information is received within the sixty -day

period whcih indicated the possiblility of a prohibited discriminatory purpose or effect.  The sixty-day review period of this submission ends on August 13, 2007.  On July 13, 2007, we received a letter alleging that the proposed changes are discriminatory under Section 5.  Accordingly, the Attorney Gneral is reexamining the submitted changes.  **Furthermore, in view of the additonal information we have received, we find the information contained in the submission is insufficient to enable us to determine that the proposed changes do not have the prupos and will not have the effect of denying or abridging the right to vote on accout of race, color, or membership in a language minority group, as required under Section 5.**  The following information is necessary so that we may complete our review of your submission: (and then lists four questions)

(emphasis added)

The plaintiffs say in their Complaint and in their Brief that the emphasized sentence "...means that the Attorney General has effectively withdrawn the preclearance..."  We strongly disagree.  If that is what the Attorney General meant to say then that is what the Attorney General would have said.  If the Attorney General had intended to say "this effectively withdraws preclearance" he would have said so.  He did not and the City relied on that language.  We do not know what an "effective withdrawal" is.

However, to be clear the Attorney General would have followed the language of the same C.F.R. section that he cited in the letter and thus interposed a " provisional objection". (See Ex 17 for an example of a "provisonal objection" in 1990)  The Attorney General did  not avail himself of the second option afforded the Attorney General in 28 CFR 51.43, which is quoted above.  With no provisional objection, nor any other objection,  having been rendered, the time has expired for review on August 13, 2007 and the preclearance letter of June 14, 2007 is fully effective.

This reading is consistent with the language and structure of that letter.  As to the language, there is no word of objection, provisional objection, recision or cancellation of the

preclearance letter of June 14[th,] or any similar language.  The Department of Justice has long experience knowing how to interpose an objection.   Typical language used by the Attorney General would be "On behalf of the Attorney General, therefore, I must interpose an objection to..."[4]  This paragraph in the letter invokes the C.F.R. 51.43 reexamination of the submission, the reasons for the reexamination, and the questions needed to be answered.

This reading is consistent with the language and structure of Title 28 C.F.R. 51.43.  This section is entitled "Reexamination of decision not to object." and is directly applicable to this situation.  This Code section has two sentences.  The first sentence says when the section applies,  "After notification...of a decision to interpose no objection...has been given..".  The first sentence the lists the first of two discretionary actions that the Attorney General **may** take.  First, "..the  Attorney General **may reexamine** the submission if, prior to the expiration of the 60-day period..." and he decided to do so and explains why in the letter.  Note that the reexamination can only take place prior to the expiration of the 60-day period.   If the Attorney General exercises his first option to reexamine the submission the second sentence then gives him a second option "...the Attorney General **may interpose an objection provisionally**...".  The Attorney General decided not to exercise his second option and interpose a provisional objection.

This reading is consistent with broad purpose and structure of the Voting Rights Act and its regulations.  The 60-day period has long been understood to close any reexamination of a previously precleared submission or any submission that the Attorney General did not timely act

---

[4] See, for example, Exhibit 13 DOJ Objection Letter to King and Park,  Jan. 8, 2007 at p.3. and similarly Ex. 14 DOJ to Kilmichael, Ex. 15 DOJ to McComb. Ex 16 DOJ three letters 1970-80

upon.

It is critical for the submitting jurisdiction to have a clear understanding of the DOJ determination and a limit on the time of review so as to plan their affairs, particularly so in the present case where election preparations were well underway in reliance upon the preclearance granted June 14th.  In situations very different from the present one, where the initial submission "does not satisfy the requirements of Sec. 51.27" and no prelcearance has been issued, the Attorney General may obtain additional information from the authority and have time beyond the initial 60 days to make his decision.  See 28 C.F.R. 51.37.

Whatever the Attorney General intended, other than to reexamine, by the July 23rd letter he certainly did not object, provisionally object, or cancel or rescind the preclearance letter of June 14th.  That preclearance letter of June 14th remains the default baseline from which we operate.  The City  had no option but to continue to proceed with preparing for the election. The Attorney General continues to review materials and what or when he intends to do anything further on this matter we are not informed.  Whatever the Attorney General may claim is the correct reading of his own regulations the City should be able to rely on the plain meaning or those regulations.  If DOJ needs different authority than this understanding permits he can simply rewrite their regulations.

Defendants' further retain the right to go to the District Court for the District of Columbia to challenge any adverse determination from DOJ.   However, this court can find that the 60-day period has run and, no objection being interposed, the Ordinance is precleared.

**2. Threat of irreparable harm**

*Wright, Miller and Kane*, at section 2948.1, describe this factor as

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstrations that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered........

The chief function of a temporary restraining order is to preserve the *status quo* until the merits of the controversy can be fully and fairly adjudicated. *Suntrust Bank v. Houghton Mifflin Co.,* 268 F.3d 1257, 1265 (11th Cir. 2001); *citing Notheastern Fl. Chapter of Ass'n of Gen. Contractors of America v, City of Jacksonville, Fl*, 896 F.2d 1283, 1284 (11th Cir.1990). A court enters a preliminary injunction to prevent the plaintiff from being injured, and where there is no adequate remedy at law. Irreparable harm to the moving party creates the urgency justifying immediate relief, and is, therefore, a vital element of injunctive relief.   See generally, 11 A. C. Wright, A. Miller, and M. Kane, *Federal Practice and Procedure*, Section 2948.1 (2d ed. 1995).

There is no irreparable harm.  There clearly is an adequate remedy at law.  The court can order new elections if, after a full hearing, it determines that remedy is appropriate in light of the violation it may find.  There is no urgency other than that created by the Plaintiffs.  This could have all been presented to the court more than two months ago.  This eleventh hour request should not be considered.

This court in 1982, also as a three judge panel, faced an even more compelling claim where the Department of Justice had clearly objected to the legislative redistricting plan.  While some changes were made to the plan they were not adequate to meet all of the DOJ objections and the elections were allowed to go forward as scheduled.  *Burton v. Hobbie*, 543 F.Supp 235 (M.D.Ala. 1982) (3-judge court), aff'd, 459 U.S. 961, 103 S.Ct. 286, 74 L.Ed. 2d 272 (1982) and see the later District court opinion at 561 F.Supp. 1029

**3. Balance of Hardships**

None of the interests before this court are harmed by holding elections.  All parties would appear to be harmed by **not** holding elections.  The plaintiffs are three candidates, one being an incumbent, seeking public office.  They have campaigned since at least June 5th and indefinitely delaying these elections would seem to harm even these plaintiff-candidates.  Unless the plaintiffs see some advantage to their campaign in filing this litigation or in delaying the public vote on their candidacy.  Certainly 114,000 registered voters of the city, including those voting by absentee ballot from military service will be harmed by granting a stay.  The public purse and public officials who have paid for and prepared for this elections will be harmed.  All candidates who have spent their own funds and the funds their supporters will be seriously harmed if elections are cancelled.  The money and effort are largely wasted and for most candidates, particularly those non-incumbents with modest resources, will have great difficulty running again at a later date.

## 4. Public Interest

The public interest is largely discussed above.  The right to vote is central to the democracy and should go forward.  The voters have attended candidate forums, studied campaign literature and advertisements and should be allowed to cast their ballots.

## ADDITIONAL FACTORS MITIGATING AGAINST ISSUANCE OF INJUNCTIVE RELIEF

The preliminary and injunctive relief sought is at the heart of the equitable powers of the court.  Therefore, the court should consider the delay caused by the plaintiffs in bringing this request to the court.  Certainly the plaintiffs have known at least since June 5th about these election dates and they waited over two and half months to request this action.

Additionally, plaintiff May has on at least three occasions over a period four months

voted in support of this election schedule, most recently on June 5th.   Up to this point, as both a public official and a private citizen, her request to this court to stop this election is not deserving of the type of protection that she seeks from this court.

All three of the named plaintiffs are candidates.  Their right to vote and participate in this election has in no way been harmed by these election dates.  They try to assert claims for students who do not live in Montgomery.  The are attempting to use this court to manipulate the election system in their quest for political office.  This court should be extremely cautious not to allow it be an instrument for the personal political advantage in this electoral contest.  These named plaintiffs lack standing. Standing is a threshold question in every case before a federal court.  In *Robert v Wamser*, 883 F.2d 617, 621-22 (8th Cir. 1989) the court said that the candidate, Roberts, did not have standing to assert a voting rights claim.  He was a candidate trying to further his own interests:

> Here, Roberts is not an aggrieved voter suing to protect his right to vote. Nowhere in his complaint (or anywhere else) does Roberts claim that his right to vote has been infringed because of his race. Nor does Roberts allege that he is suing on behalf of persons who are unable to protect their own rights. ...Because Roberts is not seeking to enforce his right to vote, but rather to improve the odds of his being elected, the question becomes whether he is an "aggrieved person" within the meaning of the Voting Rights Act. ....We conclude that an unsuccessful candidate attempting to challenge election results does not have standing under the Voting Rights Act. ..The possible divergence of interests between a candidate seeking office and a citizen attempting to protect his right to vote underscores the dubious nature of Roberts's claim to standing under the Voting Rights Act. The history of this litigation exhibits that Roberts's primary concern was in getting elected, and that whatever displeasure he might have regarding election procedures originates from that concern.

These plaintiffs are not entitled to this extraordinary relief of canceling the elections for all the other candidates, including their opponents, and all the voters of this city.

C.  Argument

16

This court should deny any preliminary injunctive relief to stay the pending elections regardless of what determination it makes about preclearance.  The City comes to this court with "clean hands" having done all within its power to conduct timely and legal elections and having done everything within its power to expedite the DOJ review process.  The plaintiffs come to this court late and with "unclean hands".  In even more extreme circumstances where defendants were before the court with "unclean hands" or clear objections by DOJ or had displayed dilatory tactics the courts have refused to enjoin elections at such a late time.  *Burton v Hobbie*, *supra*. See also *Charlton County Board of Ed. V. U.S.* 459 F. Supp. 530, 536 (D.D.C. 197), "The eleventh-hour nature of the Government's injunctive motion provides a final reason to decline to interfere with the August 8 primary."  In *Wilson v North Carolina Board of Elections*, 317 F.Supp. 1299 (M.D.N.C. 1970) the defendant county board had not even submitted the change to DOJ but the court declines to order special elections.

The Section 5 cases cited by the plaintiffs are not really applicable to the issues before this three-judge court.  Both *Clark v. Roemer* and *Lopez v. Monterey County* cases (cited at pp. 4-5 of their brief) stand for the proposition that if the Attorney General interposes a timely objection to a submitted change, Section 5 plaintiffs are entitled to an injunction barring enforcement of the changes.  Both cases are inapplicable to the case <u>sub judice</u> for the simple reason that the voting changes occasioned by the City's new election schedule have <u>not</u> been the subject of a timely objection by the Department of Justice.

Nor is the election eve injunction issued by Justice Kennedy as Circuit Justice in *Lucas v. Townsend*, 486 U.S. 1301 (19__) applicable to the issues present here.  In *Lucas*, the voting change at issue was the date for holding a school bond referendum and it was "acknowledged

that the Attorney General had not precleared the referendum." *Lucas*, *supra* at 1301.  Given the allegations in *Lucas* that the County's selection of the date to hold the bond referendum was purposefully discriminatory aimed at minimizing black voter turnout, and the fact that preclearance was admittedly not obtained, one can understand why an injunction might issue. Moreover, in granting the injunction, Justice Kennedy's in chambers' decision noted that while the injunction would impose a burden on the county, that burden can "fairly be ascribed to [the County's] own failure to seek preclearance sufficiently in advance of the date chosen for the election." *Id.*

We respectfully submit that those cases are really beside the point, since none of them address the legal issue here: whether the Department of Justice interposed a timely objection within the statutory sixty-day period when it initially precleared a new election schedule for the City and later notified the City that it was re-examining that decision (but failed to interpose any objection).      We submit that given the current posture of this case, the best course of action for the Court to follow is similar to the one described by the Supreme Court in *Berry v. Doles*, 438 U.S. 190 (1978).  In *Berry*, the Court was faced with a situation where a Georgia county implemented staggered terms without getting Section 5 preclearance.  Four days prior to the election, private plaintiffs filed an action to enforce Section 5 of the Voting Rights Act on the grounds that the staggered terms provisions had not been precleared.  The request for relief was not acted on by the three-judge court until several months after the election.  At that time, the three-judge court found that the change to staggered terms had not been precleared and enjoined further enforcement of the changes. The three-judge court, however, refused to set aside the election and plaintiffs filed a direct appeal to the Supreme Court.

18

The Supreme Court did not set aside the elections. Instead, the Court "adopt[ed] the suggestion of the United States that the District Court should enter an order allowing appellees 30 days within which to apply for approval of the 1968 voting change under § 5. If approval is obtained, the matter will be at an end. If approval is denied, appellants are free to renew to the District Court their request for simultaneous election of all members of the Board at the 1978 general election." *Berry, supra*, at 192-193.

Although *Berry* involved a situation where the local government had not obtained preclearance (unlike the City of Montgomery here), the Supreme Court's common sense approach to the remedial issue is instructive in the event this Court determines that the City has <u>not</u> obtained preclearance of the change in election schedule. If the Department of Justice now attempts to object, and this Court rejects the City's arguments that such an objection would be untimely, the City respectfully submits that this three-judge Court should not enjoin the election for the reasons set forth above. Instead, this Court should give the City thirty days to file an action in the DC court seeking judicial preclearance under section 5 of the Voting Rights Act of the change in election schedule. If the City obtains judicial preclearance, then "the matter will be at an end." *Berry v. Doles, supra*. If preclearance is denied, plaintiffs can renew their request for injunctive relief in the form of special elections. *Id*.

### Conclusion

The City of Montgomery has diligently attempted since the beginning of this year to find an election schedule that complies with UOCAVA. By early June there was only one option available. The City adopted Ordinance 42-2007, promptly submitted  it  for preclearance, and promptly received preclearance. With no time to waste, the City began to prepare for elections

relying on the preclearance from DOJ.  It is now clear that at least 87 absentee voters under

UOCAVA would not be allowed to vote in a runoff if the Ordinance had not been adopted.

Defendants believe that, based on history, at most 18 potential new registered voters may not

have time to establish residency in the City before elections.

This court should today issue an order denying any temporary or preliminary relief.  The

court should then issue an opinion and order dismissing the Section 5 claim of the plaintiffs,

finding that Ordinance 42-2007 was precleared.

 **Exhibit List**

1       Ala. Code 17-11-3
2       Report U.S. Election Assistance Commission
3       Letter DOJ to Nancy Worley
4       Complaint, U.S. v Ala, MD Ala
5       Ala Code 11-46-5
6       Minutes of City Council meetings
7       DOJ Submission June 13, 2007
8       DOJ Preclearance June 14, 2007
9       DOJ Two preclearance letters
10      Affidavit of City Clerk -Brenda Blalock
11      List of UOCAVA absentee voters
12      Declaration of Larry Menefee
13      DOJ objection letter to King & Park 1-07
14      DOJ objection letter Town of Kilmichael Dec. 2001
15      DOJ objection letter McComb June, 1999
16      DOJ Three objection letters 1970-80
17      DOJ provision objection January 8, 1990

Respectfully submitted this 17th day of  August, 2007.

**/s/ Larry Menefee**

LARRY T. MENEFEE
407 S. McDonough Street
Montgomery, AL 36104
(334) 265-6002
Fax: (334) 832-9476
Bar No: ASB-0745-F35L

20

lmenefee@knology.net

J. Gerald Hebert
Campaign Legal Center
1640 Rhode Island Ave., NW Suite 650
Washington, DC 20036
(202) 736-2200 ext. 11 (office)
(202) 736-2222 (fax)
Virginia Bar Number 38432
GHebert@campaignlegalcenter.org

Attorneys  for Defendants

## CERTIFICATE OF SERVICE

I certify that on this   17th   day of August, 2007. I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

| | |
|---|---|
| Edward Still | Sam Heldman |
| Email: still@votelaw.com | sam@heldman.net |
| | |
| Cecil Gardner | **/s/ Larry Menefee** |
| cgardner@gmlegal.com | LARRY T. MENEFEE |