IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| Janet May, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 2:07-cv-738-N |
| v. ) | |
| ) | |
| City of Montgomery, Al. et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT**

Defendants submit the following brief in support of their Motion to Dismiss or, alternatively, for Summary Judgment filed contemporaneously. After a statement of the case, the brief will address lack of standing of the plaintiffs, mootness of the claims asserted, and, finally, failure of the complaint to state a claim.

STATEMENT OF THE CASE

A summary of the litigation is contained in this court's Opinion and Order of August 24th. Doc 29 p 3   The events prior to litigation began at the regular city council meeting on February 6, 2007 when the City Council unanimously adopted Ordinance 13-2007 which provided for the same election schedule as in Ordinance 42-2007.[1]  Ex. 1[2]  Subsequently, Dr. Joe Reed requested

---

[1] Ordinance 42-2007 followed the provisions of *Alabama Code* (1975) § 11-46-21 which has the first election on the fourth Tuesday in August (August 28, 2007) and any necessary runoff six weeks later (October 9, 2007).   Act 618 provides for elections to be held on the second Tuesday in October (October 9, 2007) with any necessary runoff being held three weeks later (October 30, 2007).

[2] Exhibits refer to those exhibits attached to Defendants' Evidentiary Submission filed contemporaneously with this Brief and accompanying Motion.

and the City agreed to try to obtain local legislation to change the election dates for Act 618 to meet UOCAVA standards. Ordinance 13-2007 was vetoed by the Mayor and that veto was unanimously upheld by the council on February 20th. On March 6th the City Council voted 8-0 in favor of the election dates in the proposed legislation and urged the legislature to pass the bill. On June 5th, after efforts failed in a very contentious legislative session, the City Council voted 9-0, including plaintiff May, to suspend the rules and consider Ordinance 42-2007. Then the council again voted unanimously to adopt the Ordinance. Ex. 1 p. 10-11

The Ordinance was submitted to the Department of Justice for preclearance on June 13th, (Ex. 2) and was precleared on June 14, 2007. Ex 3. The City immediately began election preparations including publishing legal notices, confirming polling sites and hiring poll workers. Candidate qualifying opened on July 3rd and closed on July 17th. Four candidates qualified to run for Mayor and sixteen candidates qualified for the nine city council seats. Absentee ballots were mailed in July. Eight-seven absentee ballots for UOCAVA applicants were mailed, forty-two of those ballots were to black registered voters. Ex. 5

The Complaint was filed August 16th with three named plaintiffs; Janet May, an incumbent City Council member seeking re-election, John Dow and William Boyd, both candidates for Mayor. All three named plaintiffs are black citizens of Montgomery and registered voters. An Amended Complaint was filed August 20th adding two additional named plaintiffs but changed no allegations or claims. Duncan Kirkwood and Kenyada S. Adams are black students at Alabama State University (ASU). Both are registered voters. The Complaint contends that Ordinance 42-2007 violates the Voting Rights Act, Sections 2 and 5, and state law.

On August 23rd the City informed the Department of Justice that the submission of the

election dates for 2007 "....should be considered to apply to the 2007 elections only. The submission is withdrawn in so far as it applies to all future elections, and as a recurring practice." Ex. 7  On the same day the Department precleared the election date as submitted with that qualification. Ex. 8  On August 24th the three judge panel dismissed the Section 5 claim as moot. Docs. 27 and 28

City elections were conducted Tuesday, August 28th. There were 114,000 registered voters for that election and a turnout of about 39,437 voters or about 34.6%. The incumbent Mayor, Bobby Bright, won with more than 58% of the vote, with almost 10,000 more votes than the second place candidate. Five City Council seats, Districts 1, 2, 6, 8, and 9, were uncontested. Two council seats, Districts 5 and 7, were won without a runoff. Runoff elections for two council seats, Districts 3 and 4, were conducted October 9th.   Ex. 4; Ex. 9 p. 8   The newly elected city officials were sworn-in and took office Tuesday, November 13th.

The plaintiffs allege there are thousands of "disenfranchised" voters. But the reality is that most incoming college freshmen have other things on their mind than voting in city elections in a new city they do not know. The number of votes in the August 28th election at the ASU precinct for the District 3 election was only 305 of the 4,215 registered voters or 7.23%. On October 9th, after six additional weeks to register voters, voter turnout at the ASU precinct in the District 3 runoff between Mrs. May and Mr. Larkin was only 223 votes or 5.29%. **Voter turnout fell 82 votes or 26.9%.** Ex. 9, pp. 3 and 13  Evidence indicates that only 18 students registered to vote at ASU in September during the last municipal election in 2003. Ex. 6  Assuming a 5% turnout would indicate perhaps one or two additional voters. It appears that an unusually vigorous voter registration effort was conducted at ASU in August and September, perhaps

inspired by this litigation.  Voter registration data shows that twenty-three apparent students registered before the August 28th election and another 242 registered to vote before the October 9th runoff.  However, voter turnout was minuscule.   Only six of the newly registered voted in the first election and only eleven voted in the runoff.  Named plaintiff Kenyada Adams apparently did not vote.  As plaintiff Kirkwood, a senior from Buffalo, N.Y., described in his deposition:

> So a lot of freshmen, they feel -- they don't -- they don't know who is running a lot of times, and they don't care who is running.  You know, and we don't watch the local news -- the local news, because when we first get here, we're not part of the city yet.  We're -- I mean, we're part of the city in the fact that we're citizens, but we still pull -- we still have those values and things we want to see and everything from your home.
>
> So, you know, your local news at home in Buffalo they'll say, something happened on Jefferson.  You might go, oh, that's down the street.  But here in Montgomery, you know, something happened on Decatur Street, you don't even know that the school is right there on Decatur Street.  So a lot of times you feel detached.

Ex 14  p. 9 ln 8 p. 10 ln 2   However, even for a senior like Mr. Kirkwood, President of the SGA and a named plaintiff in this litigation, he managed to only vote in the initial election and did vote in the runoff.

### LEGAL POSTURE OF THIS ACTION

Defendants' motion is styled as both a Motion to Dismiss and, alternatively, as a Motion for Summary Judgment.  We understand that the court will determine the appropriate treatment of the motion, whether under FRCP 12 or 56.  Since the August 16th original Complaint there has been no change in the plaintiffs' position except to further explain their Section 2 claim in Section 5a. of the Rule 26 Planning Report (Doc 33) stating that the plaintiffs intended to try this case without presenting any of the "preconditions of *Thornburg v. Gingles*" and would present evidence on only one of the seven "typical factors", "the extent of any history of official discrimination".  There are no class action allegations.  Uniform Scheduling Order, Section 4 Doc

4

35

This motion primarily raises questions going to the jurisdiction of this court. The Article III requirement of a live "case or controversy" is a threshold issue that the court must address at all stages of the litigation. Subsidiary to the Article III requirement of "case or controversy" is the concept of standing which is typically analyzed at the point of filing a complaint. Subsequent events in the litigation are usually addressed under concepts of mootness and ripeness. *Dillard v. Chilton Co.* No. 06-14950 (11th Cir. August 20, 2007) Slip op. at 31-32. And see *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562-571, 112 S.Ct.2130, 2137-2143, 119 L.Ed.2d 351 (1992) discussing "injury" and "redressabiltiy" as elements of standing, particularly at footnote 5. See *Capitol Infrastructure, L.L.C. v. Hernando County, Fla*. 2007 WL 3202678 (M.D.Fla. October 29, 2007) Slip op. at p. 5 discussing ripeness.

**THE NAMED PLAINTIFFS LACK STANDING TO PURSUE THESE CLAIMS.**

The Amended Complaint makes clear that plaintiffs' claim is that new students at ASU, who have not previously been residents of Montgomery, are "disenfranchised" by the August 28th election date because classes at ASU did not begin soon enough to establish residency. Doc 12 p. 8 para. 22  All five named plaintiffs are registered to vote. These named plaintiffs do not have standing to assert claims on behalf of persons who are not registered to vote.

The Amended Complaint utterly fails to allege any injury suffered by candidates for public office nor does it allege injury for any citizen who could register to vote in time to vote in the August 28th election. The plaintiffs have made clear that they do not contend that the voting strength of all black citizens of Montgomery were diluted by the August 28th election date. Plaintiffs claim only that those newly arriving students could not establish residency. Doc 33 §

5a  The plaintiffs have not alleged any class actions claims or other representational capacity.

There is no claim in the complaint that anyone with the city selected the election dates with the intent or effect to deny black citizens the right to register to vote. The known and undisputed facts support that reality. The bi-racial city council unanimously voted numerous times over many months to proceed with the election schedule. If the named plaintiffs were injured, had standing, and sued in a representational capacity, the number of black voters that would be affected by the election dates selected was politically insignificant and the claim would still not be redressible at this time.

One of the early voting cases of the Fifth Circuit, *Fairley v. Patterson,* 493 F.2d 598 (5th Cir. 1974), described standing for two groups of potentially aggrieved voters. First, was a group of voters in an underrepresented county commission district. An intervenor who had alleged residence in one of the underrepresented districts did have standing to challenge the malapportionment of his own district. However, the named plaintiffs, who did not allege residence in any particular district, but rather represented a class of all adult negro citizens and qualified electors of the county, did not have standing to challenge the malapportioned districts. Second, the court was faced with the decision to apportion the districts with a population base that removed most students at two colleges in the county. The court held that the neither the plaintiffs nor intervenors had standing to challenge the omission of the students. As Judge Tuttle stated almost thirty-five years ago:

> The legal rights under these theories **may be asserted only by this group of excluded students**. Neither the plaintiffs nor the intervenor alleged or demonstrated that the class of qualified electors contains, as a member, any of the omitted students. Therefore, since it must be assumed that none of the injured students are among the plaintiffs or their class and since the original plaintiffs, themselves, lack standing, there is no standing to assert those rights. See *Socialist*

*Labor Party v. Gilligan,* 406 U.S. 583, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972); *Tileston v. Ullman*, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). (emphasis added)

493 F.2d at 604

The decision in *Fairley* was recently followed in *Boddie v. City of Cleveland*, 297 F. Supp. 2d 901 (N.D. Miss. 2004)

In arguing against exclusion of the subject DSU students, the Defendants assert that excluding the students would violate their rights under the equal protection clause and the principle of one person/one vote. This is the same argument raised in *Fairley* on behalf of the Forrest County students who were excluded from the apportionment base. As the Fifth Circuit held in that case, the court here finds that such claims can only be asserted by the students themselves; no other person or entity has standing to assert those rights on behalf of the students. (Citations omitted) The Defendants' arguments against exclusion, therefore, are without merit. 297 F. Supp. 2d at 906

This court is fully familiar with standing issues in voting cases. *Kelley v. Bennett*, 96 F Supp.2d 1301 (M.D.Ala.2000) (3 judge court) (dissent) *reversed*, *Sinkfield v. Kelley*, 531 U.S. 28, 121 S.Ct. 446 (2000) relying upon *United States v. Hays*, 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). *Dillard v. Chilton Co.*, supra.

The standing of the five named individual plaintiffs to assert their claims and seek the relief are essential to establishing an Article III case or controversy and this court's jurisdiction.

"the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561, 112 S.Ct.2130, 2136, 2137, 119 L.Ed.2d 351 (1992)

*Hays*, 515 U.S. at 742-3.

Most of the Amended Complaint is a narrative of early city history and the events

surrounding the adoption of Ordinance 42-2007.  There is virtually no statement explaining the harm caused to these five named plaintiffs. The most significant description of harm these five plaintiffs claim is found at paragraph 22 of the Amended Complaint.  Doc 12

> 22. In response to the death of HB866.....the Council adopted Ordinance 42-2007,...  While the election will take place five days after ASU's students return, it will nonetheless disenfranchise them.  Alabama law requires that voter registration must close ten days before a municipal election.  It further requires a prospective municipal elector to be a resident of the city for 30 days before the election.  Thus, a person must reside in a city for at least 20 days prior to the voter registration deadline in order to vote.  This has not been an issue under Act 618, as the residence deadline has be in late August or early September, after ASU students have returned for the fall semester.  However, under Ordinance 42-2007, the residency deadline ends on July 29.  Thus, all ASU students who have not previously registered to vote, virtually all of whom are black, will be disenfranchised.  This is a dramatic change from previous years and eliminates a potential voting block of thousands of young black citizens.

Nowhere in paragraph 22 or elsewhere in the Amended Complaint is there any allegation that these named plaintiffs tried to register and were unable to do so.  Nowhere in the Amended Complaint is there any statement or claim that these plaintiffs have personally experienced any injury that entitles them to any relief requested.  The depositions show clearly that all five plaintiffs are registered to vote.  Plaintiffs May, Dow, Boyd, and Kirkwood have all been residents of Montgomery for at least four years, registered to vote and voted in the August 28th election.  May Ex. 11 p.7 ln 5 -9, Dow Ex. 12 p. 6 ln 22- p 7 ln 7, Boyd Ex. 13 p.6 ln 23- p. 7 ln 4, Kirkwood Ex. 14 p. 6 ln 10 - p.7 ln 1  According to plaintiff Adams, she registered to vote Tuesday, September 25th (Adams Ex. 15 p. 6 ln 1 -17) in time to vote in the Oct 9th  runoff.  Adams made no effort to register to vote when she came to Montgomery in May or in July or anytime after August 16th until September 24th.  Ex. 15 p. 6 ln 1-p 9 ln 22; p.21 ln 19- p. 23 ln 22 Adams successfully registered to vote the first and only time she tried.

It is particularly noteworthy that the plaintiffs in their complaint and in two separate requests for a temporary restraining order sought to enjoin the holding of the elections. The plaintiffs never sought an order allowing that they be allowed to vote in the August 28th election. Docs 1, 6, 12, and 25[3]  Of course they could not request to be allowed to vote because four of the named plaintiffs had long been registered to vote. The fifth plaintiff, Adams, had not tried to register to vote and could not and still cannot show that she was denied the right to register to vote. There are at least nine registered voters, students at ASU, who registered during August in time to vote on August 28th and, based on their birth date are members of the 2007 high school graduating class like plaintiff Adams. It therefore appears that the plaintiffs' real motivation was to stop the elections in order to influence the outcome. If plaintiff Adams had asked for a TRO to cast a provisional ballot in the August 28th election and made a showing that she had tried and been unable to register to vote it would have at least been consistent with the claims in the complaint.

In *Bell Atlantic v Towmbly*, 550 U.S. _____ (2007) the Supreme Court revisited pleading standards under Federal Rules of Civil Procedure 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41 (1957).

> ...a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do,(on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation") Factual allegations must be enough to raise a right to relief above the speculative level. (citations omitted)

---

[3] The second motion for TRO (Doc 25) does not actually specify any relief except in the title of the pleading. We presume that plaintiffs wanted the same relief requested in their first TRO motion and in their complaint.

*Bell Atlantic v Towmbly* Slip op. at 8

The Amended Complaint is overwhelmingly a historical narrative with a few conclusory allegations of "disenfranchisement". But, fatally for these plaintiffs, there is no explanation of any injury suffered by the five plaintiffs nor any allegation that connects any injury with the relief requested.

The five named plaintiffs, all registered voters, lack standing to complain that the election dates in Ordinance 42-2007 violate the rights of persons unable to register to vote. These complaints amount to no more than a "generalized grievance" about the operation of the election system and therefore does not meet the standing requirement of Article III. *Lance v Coffman*, 549 U.S. ____ March 5, 2007 Per Curium, Slip Op. at 3:

> "We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Id.*, at 573–574. See also *DaimlerChrysler Corp. v. Cuno*, 547 U. S. ___, ___ (2006) (slip op., at 8).

**THE CLAIMS UNDER SECTION 2 OF THE VOTING RIGHTS ACT AND STATE LAW ARE MOOT.**

Ordinance 42-2007 was precleared by the Attorney General and used by the City for the 2007 elections. Ordinance 42-2007 has **not** been precleared for use in any future election. The only current lawful election schedule for the City of Montgomery is that contained in Act 618. The plaintiffs state no claim against Act 618.

Neither do the plaintiffs state any redressible claim from the operation of Ordinance 42-2007 during the recently completed 2007 election cycle. The entire relief requested in the Amended Complaint (Doc 12, p. 11-12) is:

   ¶ 36. Convene a three judge court to consider the Section 5 claim. (Dismissed)
   ¶ 37. Enjoin the enforcement of Ordinance 42-2007
   ¶ 38. Enjoin the defendants to withdraw the notice of election.
   ¶ 39. Award costs and attorney fees
   ¶ 40. Other further relief.

What would plaintiffs have this court do with this requested relief? Only paragraphs 37 and 38 have even minimal relevance. Because plaintiffs claim that one person, Adams, could not vote on August 28th they seek to "enjoin enforcement" of the ordinance and "withdraw the notice of election"? Time has passed. The ordinance was enforced and the newly elected officials have been sworn in. The plaintiffs have not requested any meaningful relief that this court can give Adams (assuming, without conceding, that she is entitled to relief) for her failure to try to register in time for the August 28th election. The ordinance, not being precleared for future use, is not legally enforceable for the 2011 elections.

  Even if plaintiff Adams had standing on August 20th when she was added as a plaintiff, and we contend she did not, it is clear that her claims soon thereafter became moot. She never sought TRO or preliminary relief to be allowed to vote in the election eight days later. She only sought preliminary relief to stay the entire election process. She never even tried to register prior to the August 28th election. After August 24th it was clear that Act 618 was the only legally enforceable election schedule for the city in future elections. The plaintiffs did not amend their claims or their prayer for relief.

  In *KH Outdoor v. Clay County, Fla.*, 482 F.3d 1299 (11th Cir. 2007) the plaintiff KH Outdoor applied for but was denied permits to erect outdoor advertising. KH Outdoor then filed suit in federal court. Several months later the defendant county adopted a new outdoor sign ordinance. KH Outdoor filed an amended complaint that added a claim for monetary damages

but maintained the same constitutional challenges originally filed against the old ordinance. The Eleventh Circuit affirmed the district court's dismissal. The court held that even though normally the change in a challenged statute will render a pending action moot the current action was not moot because KH Outdoor had added a claim for monetary damages. The court went on to find that KH Outdoors lacked standing.

> We find that KH Outdoor has not satisfied the redressability requirement. Any injury KH Outdoor actually suffered from the billboard and offsite sign prohibition is not redressible because the applications failed to meet the requirements of other statutes and regulations not challenged.   482 F.3d at 1303

Even if the court here found that plaintiff Adams was prevented from registering to vote before August 28th, contrary to any known facts, what prayed for relief can it offer to redress the claim? She doesn't seek damages or declaratory relief. She seeks an injunction against the enforcement of Ordinance 42-2007 but there is no reasonable likelihood of using Ordinance 42-2007 at the next municipal elections in 2011. Plaintiff Adams has obtained what she most wanted, registering to vote, the first time she tried to do so.

A similar situation was confronted by the court in *Diaz v. Cobb*, 475 F. Supp. 2d 1270 (S.D. Fla. 2007). Diaz, an individual plaintiff, challenged the rejection of her voting registration application in federal court just before the 2004 presidential elections. She was afforded no judicial relief in the few days before the election but subsequently completed a new application and registered to vote. The court held her claim moot and discussed an exception to mootness, when an action that was capable of repetition yet evading review:

> Generally, "a case is moot when events subsequent to the commencement of a lawsuit create a situation in which the court can no longer give the plaintiff meaningful relief." *Jews for Jesus, Inc. v. Hillsborough County Aviation Auth.,* 162 F.3d 627, 629 (11th Cir.1998). An exception to the mootness doctrine arises when an injury is "capable of repetition yet evading review." *Teper v. Miller,* 82 F.3d 989, 992 (11th Cir.1996). This

> exception applies when, "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). As election periods are generally too short in duration to be fully litigated, the Eleventh Circuit has applied this exception to many cases involving disputes over election-related laws. *See, e.g., ACLU v. The Florida Bar,* 999 F.2d 1486 (11th Cir.1993)
>
> In this case, however, the exception does not apply because there is no reasonable expectation that Ms.Diaz will again have problems with her registration. Voter registration in Florida is permanent; once a voter is registered, she does not have to re-register to vote in subsequent elections. 475 F. Supp. 2d at 1275

The decision by the City of Montgomery to use Ordinance 42-2007 only for the 2007 election cycle is due a presumption from this court that it will not be used in the future.  Ex. 10

> ...However, governmental entities and officials have been given considerably more leeway than  private parties in the presumption that they are unlikely to resume illegal activities. *See Ragsdale v. Turnock,* 841 F.2d 1358, 1365 (7th Cir.1988) ("[C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties.").

*Coral Springs Street Systems v. City of Sunrise, Fla.*  371 F.3d 1320, 1329-30 (11th Cir. 2004).

There is no "likelihood" that Ordinance 42-2007 will be used in 2011.  The plaintiffs' claims are merely speculative, conjectural and hypothetical.  *Lujan*, supra. 560-61 These claims are not ripe.  There certainly is no need for this court in 2007 to adjudicate or speculate about the city election schedule for 2011.

**PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 2.**

The plaintiffs' complaint almost exclusively focuses on the claim that the City's change in election schedule violated the preclearance provisions of the Voting Rights Act. That claim has been resolved and is not before the Court.

Thus, with regard to their allegations that relate to Section 2 of the VRA, plaintiffs allege

13

only that there is a history of discrimination against black voters in the Montgomery and that new students at ASU did not have time to register to vote. The defendants have admitted many of the historical allegations in their answer. It is interesting to note, however, that plaintiffs allege nothing more. Their allegations regarding this history of discrimination end with the 1980's. Although plaintiffs allege that there was a city council redistricting in 1998 they fail to acknowledge that the redistricting was precleared and was never found unlawful by any court. Doc 12 ¶ 13

So the question really is, must plaintiffs prove more than a history of discrimination in order to establish a prima facie case under Section 2 of the Voting Rights Act? The answer is clearly yes, as we show below. In fact, if the answer was anything other than yes, then any political subdivision in the Deep South (and many Northern locales as well) would be found liable under Section 2 in every lawsuit brought against it.

In 1982, Congress amended § 2 of the Voting Rights Act largely in response to the Supreme Court's decision *City of Mobile v. Bolden*, 446 U.S. 55 (1980). *Mobile* required that plaintiffs in § 2 cases prove that the challenged electoral system was created or maintained for the purpose of discriminating against minorities. The 1982 amendments made clear that proving intent was not a statutory requirement; instead, § 2 plaintiffs could prevail by proving that minorities were denied an equal opportunity to participate in the political process and elect candidates of their choice as a result of an electoral practice. *Thornburgh v. Gingles*, 478 U.S. 1, 35 and 43-44 (1986).

Section 2, as amended, reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which

> results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....
> (b) A violation of subsection (a) is established if, based on the **totality of circumstances**, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
> 42 U.S.C. §1973. (bold added)

The Supreme Court interpreted Section 2 for the first time in a challenge to a multimember at-large districting scheme in North Carolina in *Thornburgh v. Gingles*, supra. The Court noted that "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles,* supra at 47. The *Gingles* Court held that, in order to establish a prima facie case of unlawful dilution of minority voting strength, or "vote dilution," a plaintiff must show that (1) the minority group "is sufficiently large and geographically compact to constitute a majority in a [hypothetical] single-member district"; (2) the minority group is "politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it-in the absence of special circumstances ...-usually to defeat the minority's preferred candidate." *Gingles*, supra at 50-51.

Proof of these three factors is not enough to demonstrate a violation of Section 2. Even if these factors are satisfied, a court must also consider whether, under the totality of the circumstances, the challenged standard, practice or procedure "impair[s] the ability of ...

15

[minority] voters to participate equally in the political process and to elect candidates of their choice." *Gingles*, supra at 80. *Gingles* explicitly treated as relevant to this vote dilution inquiry the factors set forth in the Senate Judiciary Committee Report (the "Senate Report Factors"), *see Gingles at 36-37, 44-45*.

The Senate Report lists these relevant factors as follows:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
S.Rep. at 28-29, 1982 U.S.C.C.A.N. 206-07 (footnotes omitted), *cited in Gingles, supra at 36-37, 44-45*.

The Senate factors are "neither comprehensive nor exclusive" and "there is no requirement that a particular number of factors be proved, or that a majority of them point one way or the other." *Gingles,* supra, 478 U.S. at 45. Rather, the ultimate "question whether the political processes are equally open depends upon **a searching practical evaluation of the past and present reality, and on a functional view of the political process**." Id. at 45. (quoting S.Rep. at 30, 1982 U.S.C.C.A.N. at 208) (emphasis added)  This evaluation [should] be assessed 'based on the totality of circumstances. *Johnson v. De Grandy*, 512 U.S. 997, 1018 (1997).

16

The Supreme Court emphasized that the three *Gingles* factors are "generally necessary" to prove a § 2 violation, but not sufficient. Courts are required to look explicitly at the totality of the circumstances, because "ultimate conclusions about equality or inequality of opportunity were intended by Congress to be **judgments resting on comprehensive, not limited, canvassing of relevant facts**." *Johnson v. DeGrandy*, 512 U.S. 997 (1994). (emphasis added) The courts repeatedly describe proof of a Section 2 claim in broad contextual terms. None of the descriptions of the appropriate proof speak of an individual or unique experience. The plaintiffs' bareboned attempt to prove a Section 2 claim by a showing only a past history of discrimination and then a discrete, allegedly discriminatory, event unrelated to the current political context and without any political consequence for the ability of black voters to elect a candidate of their choice fails to meet the standard of proof for Section 2. Compare *United States v. Jones*, 57 F.3d 1020, 1024-25 (11th cir. 1995)

Against this legal backdrop we assess the plaintiffs' Section 2 case. Plaintiffs claim is not that they have been denied the right to elect their preferred candidate nor that they have been the right to vote. Instead, their Section 2 claim appears to be premised entirely on the theory that there has been a history of discrimination in Montgomery and they were not given enough time to move to Montgomery and establish residency and register. This falls far short of stating a claim under Section 2.

All of the plaintiffs were able to participate in the city election and they make no allegation that they have been denied the right to elect the candidate of their choice. The one plaintiff who was not registered to vote in time for the first city election, Adams, made no effort to register. Moreover, the first election in which all of the other plaintiffs voted, failed to

produce a winner in District 3, and thus a runoff election was held to fill that seat. All of the plaintiffs were registered to vote in that runoff election. Surprisingly, apparently neither of the students, plaintiffs Adams and Kirkwood, chose to vote in the runoff. No one can claim that the black voters in the District 3 were unable to elect their preferred candidate to city council. The conclusion is really inescapable: on these facts, no Section 2 case can be constructed.

### THE PLAINTIFFS' PRAYERS FOR RELIEF

The Court would do well to also consider the prayers for relief in plaintiffs' complaint. None of the relief they seek is even available to them at this juncture. They seek only injunctive relief with regard to the 2007 elections. Those elections have been held and plaintiffs did not seek to enjoin them under Section 2 of the Voting Rights Act or seek to have plaintiff Adams registered to cast a provisional ballot. Their failure to seek such pre-election relief bars them from seeking relief from those election results now.

### CONCLUSION

The plaintiffs are registered voters and therefore lack standing to assert claims for those citizens who have not registered to vote. Both the legal status and facts have changed to render the plaintiffs claims moot. Ordinance 42-2007 is not now a legally enforceable ordinance. The claims the plaintiffs assert against the operation of Ordinance 42-2007 are moot since the elections have been held and the officials elected have taken office. Since the plaintiffs seek only injunctive relief there is no remedy available. The complaint fails to state a claim upon which relief maybe granted relying entirely upon a history ending more than twenty years ago.

The complaint should be dismissed and judgment entered for the defendants.

Respectfully submitted this   16st   day of November,  2007.

| | |
|---|---|
| **/s/ Larry Menefee**<br>LARRY T. MENEFEE<br><br>LARRY T. MENEFEE<br>407 S. McDonough Street<br>Montgomery, AL 36104<br>(334) 265-6002<br>Fax: (334) 832-9476<br>Bar No: ASB-0745-F35L<br>lmenefee@knology.net | J. Gerald Hebert<br>Campaign Legal Center<br>1640 Rhode Island Ave., NW Suite 650<br>Washington, DC 20036<br>(202) 736-2200 ext. 11 (office)<br>(202) 736-2222 (fax)<br>Virginia Bar Number 38432<br>Ghebert@campaignlegalcenter.org<br><br>Attorneys for Defendants |

### CERTIFICATE OF SERVICE

I certify that on this 16st day of November, 2007 as agreed upon by all counsel, I served via email the foregoing to the following attorneys:

| | |
|---|---|
| Edward Still<br>Email: still@votelaw.com | Sam Heldman<br>sam@heldman.net |
| Cecil Gardner<br>cgardner@gmlegal.com | **/s/ Larry Menefee**<br>LARRY T. MENEFEE |