IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| **Janet May, John Dow, William Boyd, and Kenyada S. Adams, and Duncan Kirkwood** | |
| Plaintiffs, | CIVIL ACTION NO. 2:07 cv 738-MHT-WC |
| v. | |
| **City of Montgomery, Alabama,** a municipal corporation; **Bobby N. Bright,** in his official capacity as Mayor of the City of Montgomery | |
| Defendants. | |

# Plaintiffs' Brief in Opposition to Motion for Summary Judgment

**I.       Plaintiffs have standing, and the claims are not moot.**

Defendants contend that the Court has no jurisdiction under Article III (Defendant's Brief, p. 5).  More precisely , Defendants contend that the § 2 and state-law claims are moot (*id.*, pp. 10-13), and in any event that the Plaintiffs have no standing to pursue those claims (*id.*, pp. 5-10).  If Defendants were correct about this asserted lack of jurisdiction, the proper order would then be a dismissal without prejudice, rather than a judgment in favor of Defendants.  But more importantly, Defendants are incorrect; Plaintiffs do have standing, and the case is not moot.

## A.    Mootness based on whether the Ordinance will be used in the future.

In contending that the case is moot, Defendants argue based on their assessment as to how likely it is that they will try to use the challenged Ordinance in the next regularly-scheduled election in 2011.  (Defendants' Brief, pp. 10-13).  The only actual basis for doubt on that point is that such use has not *yet* been precleared under Section 5 of the Voting Rights Act. (The City, in the end, submitted the Ordinance for preclearance only in regard to the 2007 election, and withdrew its submission insofar as it dealt with future elections.)  While the City says (through the affidavit of the City Attorney) that it will explore the possibility of seeking future state legislation to further change the election date, there is no way to assess how likely it is that such legislation will be enacted, and no way to assess whether such now-hypothetical legislation would itself be precleared.

The City has *not* admitted that the Ordinance conflicts with state statutory law.  Furthermore, the City has *not* promised that it will not seek preclearance of the Ordinance in the future, for use in the 2011 election.  The City is thus hedging its bets – implicitly still arguing that nothing in state law prohibits the use of the Ordinance, and preserving the possibility that it will seek and obtain federal-law approval for the Ordinance as well.  The City's evidentiary submission shows only the City Attorney's subjective impression that he himself "do[es] not believe there is any significant likelihood" that the City will end up using the challenged Ordinance in 2011. No elected official of the City has been willing even to state that much; and no one at all has committed that the City *will not* attempt to use the

Ordinance in that election, or in any other. This – along with the fact that, so far, all efforts to obtain a state legislative solution have failed – is the factual context in which the "mootness" question arises.

The City's mootness argument begins with a discussion of what relief was sought in the *ad damnum* portion of the Complaint, as though this were dispositive. *See* Defendants' brief, pp. 10-11 (discussing *ad damnum* portion of the Complaint at length); *id.* at 11 (noting that Plaintiffs did not amend their *ad damnum*); *id.* at 12 (arguing that Plaintiffs did not seek declaratory relief). But a federal court should not dismiss a claim on the basis of what relief was, and was not, sought in the Complaint; the question instead is whether any relief is available, regardless of whether it was mentioned in the Complaint itself. *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 65 (1978) ("We agree with appellants that a federal court should not dismiss a meritorious constitutional claim because the complaint seeks one remedy rather than another plainly appropriate one. Under the Federal Rules of Civil Procedure 'every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings.' Rule 54 (c). Thus, although the prayer for relief may be looked to for illumination when there is doubt as to the substantive theory under which a plaintiff is proceeding, its omissions are not in and of themselves a barrier to redress of a meritorious claim.").

As to mootness, therefore, the question is not what the Complaint says, but whether there is *any* relief that could be issued. So that there is no confusion, we now state clearly that we would welcome all available relief,

whether it be an injunction against future attempts to use the Ordinance, and/or a declaration that it violates state statutory law and § 2, and/or any other appropriate relief. We also seek, as to the state law claim, an order setting aside the 2007 election altogether, because it was held in violation of state law. We believe that the possibility of setting aside the election, because it was held in violation of state law, is itself obviously enough to save the state-law claim from mootness. For the sake of completeness on the state law claim, and in order to prove that the § 2 claim is not moot either, we now go further and show that – even leaving aside the possibility of setting aside the election – other potential relief makes this a live controversy as well.

Defendants' "mootness" argument, regarding the degree of likelihood of future use of the ordinance, is based on the "voluntary cessation of illegal conduct" doctrine of mootness. This was the doctrine at issue in the only Eleventh Circuit mootness case on which the Defendants rely. *See* Defendants' Brief, p. 12 (quoting the analysis of this "voluntary cessation" doctrine from *Coral Springs Street Systems v. City of Sunrise, Fla.,* 371 F.3d 1320, 1329-30 (11th Cir. 2004)).[1]

The present case does not fit within the doctrine that Defendants seek to apply. As *Coral Springs* itself shows, that doctrine is often applied to find challenges to municipal ordinances moot, where the municipality has *repealed* the challenged ordinance. That was what happened in *Coral*

---

[1] In the "mootness" section of their argument, Defendants also discuss *KH Outdoor v. Clay County, Fla.*, 482 F.3d 1299 (11th Cir. 2007). But they are relying not on the *mootness* discussion of *KH Outdoor*, but instead on its discussion of *standing*. We will address standing in the next section of this brief.

*Springs*: the municipality repealed the ordinance.  The Eleventh Circuit specifically based its decision on that repeal – a repeal that the municipality had effected even before being sued – along with the municipality's promise that the challenged ordinance *would not* be reenacted.  *Coral Springs*, 371 F.3d at 1332-33.

This case is entirely different from *Coral Springs*.  Here, the challenged Ordinance is still on the books.  The City has not repealed it, and has not even said that it would.  The City defended the Ordinance in this Court, sought preclearance of it (then belatedly modifying its request only to seek preclearance for one-time use, while still retaining the right to seek further preclearance in the future).  The City has not even promised not to use the Ordinance in the future.  *Coral Springs* is no support for dismissing this case.

Other Eleventh Circuit precedent confirms what is implicit in *Coral Springs*: that a challenge to a municipal ordinance is *not* moot on the grounds of "voluntary cessation," where the ordinance has not been repealed.  The Eleventh Circuit has explained *Coral Springs* and similar precedent in this way: "[T]his Court has consistently held that a challenge to a government policy that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated." *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1285 (11th Cir. 2004).  The policy in question – such as an ordinance – must be

"unambiguously terminated" in order to demonstrate mootness.[2]  *Id.*  This case falls far outside that rule.

The Eleventh Circuit's most recent precedent in this area, *Sheely v. MRI Radiological Network, P.A.*, 505 F.3d 1173 (11th Cir. 2007), also shows that this case is not moot.  While the Court in *Sheely* did indicate that "voluntary cessation" will more likely moot a case against governmental defendants than private ones (*Sheely,* 505 F.3d at 1184), the Court more importantly emphasized various principles that weigh against mootness here. *See Sheely,* 505 F.3d at 1184-85 (a finding of mootness is less likely where the behavior in question was "deliberate," citing cases involving governmental defendants as well as private ones); *Sheely,* 505 F.3d at 1186 (a finding of mootness is less likely where the alleged cessation occurs *after* suit is filed, again citing cases involving governmental defendants as well as private ones); *Sheely,* 505 F.3d at 1187 (a finding of mootness is less likely where defendant does not acknowledge the wrongfulness of the challenged conduct, again citing cases involving governmental defendants as well as private ones).  All of these principles weigh forcefully against mootness here.[3]

---

[2]  We believe that the language of *Troiano* goes too far in allowing mootness based on a governmental defendant's promises about its future conduct, and that it conflicts with the earlier (binding) precedent of *Hall v. Board of School Comm'rs*, 656 F.2d 999, 1000-01 (5th Cir. 1981) ("Jurisdiction may abate if there is no reasonable expectation the alleged violations will recur and if intervening  events have completely and irrevocably eradicated the effects of the alleged violations… To defeat jurisdiction on this basis, however, defendants must offer more than their mere profession that the conduct has ceased and will not be revived.")  This issue is academic here, though, since Defendants have not even promised not to use the Ordinance in the future.

[3] This case is even more clearly "live" than are various cases in which the Eleventh Circuit has rejected mootness arguments.  *See Nat'l Advertising.*

Based on the discussion above, this case is not moot, where the City has aggressively defended its ordinance, has not repealed it, and has not even promised that it will not use it in the future.  The mere hypothetical possibility that future legislation *might* supplant the ordinance is not enough. Nor is the existence of Section 5 of the Voting Rights Act, in itself, enough to make other challenges to an ordinance's future use moot.  What Defendants' argument means, in the end, is that a state law or ordinance cannot be attacked on state-law grounds, or even on federal-law grounds other than Section 5, if the law is also subject to the Section 5 preclearance requirement. On Defendants' view, apparently, if there is a potential Section 5 claim, any other claim is "moot."  But Defendants have cited no case remotely supporting that asserted principle.  The Court should therefore reject Defendants' "mootness" argument.

> ## B.        Standing, and mootness, based on the particular circumstances of the individual Plaintiffs.

Defendants also argue that the Court has no jurisdiction because of the alleged inadequacy of the stake that the particular individual Plaintiffs have in the issues.  This is primarily an issue of "standing" (Defendants'

---

*Co. v. City of Fort Lauderdale*, 934 F.2d 283, 286 (11th Cir. 1991) (finding challenge to ordinance not moot, even though the ordinance had been subsequently modified, where defendants did not promise that they would not reenact the original ordinance nor did they "establish[] that the likelihood of further violations is sufficiently remote to dismiss National's claims"); *Jager v. Douglas County School Dist.*, 862 F.2d 824, 834 (11th Cir. 1989) (finding challenge to school policy not moot, even though a new policy had been adopted, where defendants did not promise that they would not revert to the old policy).

brief, pp. 5-10) along with a "mootness" argument as to Plaintiff Adams (*id.*, pp. 11-13). Again, Defendants' arguments are wrong.

### 1.    Applicable general principles.

Standing is to be "determined as of the time . . . the plaintiff's complaint is filed, and is not altered by events unfolding during litigation." *Charles H. Wesley Educ. Foundation, Inc. v. Cox*, 408 F.3d 1349, 1352 n.3 (11th Cir. 2005). "A plaintiff need not have the franchise wholly denied to suffer injury. Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient." *Wesley Educ. Foundation,* 408 F.3d at 1352. If one Plaintiff has standing, it is unnecessary to determine whether others do as well. *Public Citizen, Inc. v. Miller*, 813 F.Supp. 821, 826 (N.D. Ga. 1993), *aff'd* 992 F.2d 1548 (11th Cir.) (per curiam).

Part of Defendants' argument about standing is an argument about what Plaintiffs' "real motivation" is. (Defendants' Brief, p. 9). Notably, Defendants cite no case that makes the resolution of a standing issue dependent on a defendant's speculations as to what a plaintiff's subjective motivations are. And in any event, Defendants' speculation is nonsense; they say that Plaintiffs' only motivation was to "to stop the elections in order to influence the outcome." (*Id.*) The fact that we are still pursuing our claims, now that the election has passed, should put that speculation to rest.

### 2.    Plaintiff Adams has standing, and her claim is not moot.

Relevant facts as to Plaintiff Adams are set forth in Defendants' own brief, although defendants try to minimize their effect. The fact is that Ms. Adams registered to vote on September 25, 2007. (Defendants' Brief, p.

8).  Had the election been carried out on the schedule that Plaintiffs maintain it should have been, then Ms. Adams would have been eligible to vote in the special election.  But, since Defendants changed the election date, she was not eligible; the election had already occurred.  (Defendants' Brief, p. 3).

As to Plaintiff Adams, therefore, standing is crystal-clear: she would have had the franchise if the law (as Plaintiffs see it) was followed, but she did not because of Defendants' actions.  Defendants try to frame the case as simply being one about voter registration (Defendants' Brief, p. 8 ("Adams successfully registered to vote the first and only time she tried."), but this is not a case challenging the rules for voter **registration**.  It is instead a case challenging an unlawful setting of the election date, thereby affecting voter **qualification**.  The fact is that Ms. Adams would have been able to vote in the general election if it had been held at the time required by law.  Thus she has standing.  *Public Citizen, Inc. v. Miller*, 813 F.Supp. at 827, *quoting Baker v. Carr*, 369 U.S. 186, 206, 208 (1962) ("Voters who allege facts showing disadvantage to themselves have standing to sue…. [because t]hey are asserting 'a plain, direct and adequate interest in maintaining the effectiveness of their votes', not merely a claim of 'the right, possessed by every citizen, to require that the government be administered according to law….'")).

Attempting to evade this conclusion, Defendants try to shift the blame on to Ms. Adams, on the grounds that she could have registered earlier.  (*Id.* "Adams made no effort to register to vote when she came to Montgomery in May or in July or anytime after August 16th until September

24th."). Even if it were demonstrated that Adams *could have* registered earlier – though Defendants have in fact not even demonstrated that – this attempt to shift the blame is legally meritless. It is the same sort of evasion that the Eleventh Circuit rejected in *Wesley Foundation* itself, when the defendants in that case said that a voter could have secured her right to vote by sending in the proper form on her own behalf. The Eleventh Circuit recognized that this blame-shifting argument did not eliminate the voter's standing, because her inability to vote was causally connected to the defendants' actions. *Wesley Educ. Foundation*, 408 F.3d at 1352.

   The same is true here. Had Defendants followed the law about when the election should have been held, Ms. Adams would have been eligible to vote in the general election.[4] But, because of Defendants' utilization of an earlier election date, she could not. Thus she has standing. She is not raising a "generalized grievance" about simply wanting to enforce compliance with the law (*see* Defendants' Brief, p. 10). Instead, her grievance is quite specific to her: she couldn't vote in the general election, because of the date on which Defendants set it, but she could have voted if Defendants had set it on the date required by law.

   Furthermore, despite Defendants' argument, Plaintiff Adams's claim is not moot. She could still receive effective relief, through the setting

---

[4]  Defendants say that Ms. Adams "apparently did not vote" in the run-off election, although she was eligible by that time. (Defendants' Brief, p. 4). After mentioning this in passing, Defendants rightly do not actually make any legal argument that it is relevant. And it obviously is not. It certainly does not prove that she would not have voted in the general election, where more candidates would have been on the ballot – including the mayor's race.

aside of the election and an order requiring a new election at which she could vote. The Court may or may not ultimately decide that this is appropriate relief; but the appropriateness of a particular sort of equitable relief, under all the circumstances, is a separate question from the question of Article III "case or controversy" jurisdiction. *See Sheely,* 505 F.3d at 1182 n.10 (noting that the question of whether requested relief will ultimately issue is quite distinct from, and not dispositive of, the question of mootness).

### 3.    Plaintiff May has standing.

Plaintiff May was a member of the City Council who ran for re-election in 2007 and will be in the position of deciding whether to run again in 2011. As such, she has an important interest – an interest as *candidate*, more particularized than the interest of any non-candidate voter – in determining what election date is required by applicable law. A candidate needs to know not only the election date itself, but also related dates such as the date for declaring candidacy, the date by which supporters need to be encouraged to register to vote, in order to run the most effective campaign. Election strategies will often depend on the length of a campaign, and on the date of the election itself; a sophisticated campaigner knows how to pace a campaign properly to take best advantage of the particular amount of time allotted to the race. Therefore, even without proof that the candidate's chances will be helped or hindered by a particular date, such a candidate should be held to have standing to seek appropriate judicial relief to establish the legally correct election date. While we find no case directly on point to this precise question, we submit that the principles we have just stated are

11

sufficiently a matter of common sense to satisfy Article III's "case or controversy" requirement. A candidate has a concrete stake in the legal question of when an election is to take place; this concrete stake is enough to confer standing.[5]

Plaintiff May also has standing by virtue of the disenfranchisement of potential voters, which is the result of the change in election date. She has standing based on this disenfranchisement, both on her own behalf and on behalf of the disenfranchised voters. There is ample caselaw reflecting the principle that candidates have standing to raise and litigate the rights of voters, in election-related litigation. *See, e.g., Walgren v. Bd. of Selectmen*, 519 F.2d 1364, 1365 n.1 (1st Cir. 1975); *Mancuso v. Taft*, 476 F.2d 187, 190 (1st Cir. 1973); *Bay County Democratic Party v. Land*, 347 F.Supp.2d 404, 422 (E.D. Mich. 2004) (noting that "political parties and candidates have standing to represent the rights of voters," and citing cases).

In fact, *Walgren v. Bd. of Selectmen* is quite analogous to this case, on the standing issue. That case, like this one, involved an election that had been timed in a way that excluded many college students from participation; the merits of that case, like the merits of this one, were a challenge to the timing of the election. The plaintiffs in *Walgren* were two students who

---

[5] For similar reasons, Plaintiffs Dow and Boyd had standing at the time the action was commenced, which is the relevant time for the determination of standing. *See Wesley Educ. Foundation, supra.* At the time suit was filed, they had a particularized and highly relevant need to know when the election would take place. Defendants make no "mootness" contention that is particular to the circumstances of Dow and Boyd, or even to May, beyond the general "mootness" contention that we already addressed in the earlier portion of this brief.

"were not affected by defendants' actions" (*id.*, 519 F.2d at 1365 n. 1), along with Walgren, who was a candidate in the election.  The Court of Appeals noted, but did not pass on, the District Court's conclusion that the students had no standing since they had not been affected (in other words, presumably, they had voted).  *Id.*  The Court of Appeals then noted that the District Court had not ruled on the issue of Walgren's standing; and the Court of Appeals noted, "We have in the past indicated that a candidate has standing to raise the constitutional rights of voters."  *Id.*  The Court then went on to address the merits of the case – which it should not have done, if no plaintiff had standing, because standing is a jurisdictional matter.  In context, this was a recognition by the Court of Appeals that the candidate, Walgren, *did* have standing to challenge the timing of the election, on the basis of the disenfranchisement of some student would-be voters.  And there is no hint in the opinion that Walgren had proven that the outcome of the election would have been different, to his benefit, if the election had been held at a different time.[6]

       *Walgren* demonstrates that Plaintiff May does have standing here, to protest the effective exclusion of new students from voting eligibility. Standing on this basis is particularly apt in this case, in regard to the § 2 vote-denial claim.  As a black candidate with a largely black constituency, Plaintiff May is both affected in her own right by the vote denial, and well-

---

[6] Defendants rely on *Fairley v. Patterson*, 493 F.2d 598, 604 (5th Cir. 1974), suggesting that it holds that no one but an excluded voter himself or herself would have standing.  But it does not appear that any plaintiff in *Fairley* was a candidate, so *Fairley* is not dispositive of the question of candidates' standing.

situated to represent the affected citizens.  Like any candidate, she has a vital interest in knowing the rules as to whose votes will be counted; and as a black candidate in particular, she has a vital interest in ensuring that black voters are not unlawfully excluded.

II.        **The Plaintiffs have stated a claim under § 2 of the Voting Rights Act.**

The Defendants have violated § 2 of the Voting Rights Act[7] by changing the city election to an earlier date.  Section 2 prohibits the "denial

---

[7] Section 2 (42 U.S.C. § 1973) reads as follows:

**(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

**(b)** A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered:  *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

. . . of the right . . . to vote on account of race." That denial of the right to vote is what this case is about.

The Defendants assert that § 2 of the Voting Rights Act must be read as interpreted by the three-part test of *Thornburgh v. Gingles,* 478 U.S. 30, 50-51 (1986). To the contrary, *Gingles* was concerned only with the application of § 2 to vote dilution cases, but this case is a vote denial case.

### A.     Vote denial vs. vote dilution.

"Vote denial" and "vote dilution" are related but distinct forms of discrimination. As the Supreme Court said in *Allen v. State Board of Elections,* 393 U.S. 544, 569 (1969), "The right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot." Earlier in *Reynolds v. Sims,* 377 U.S. 533, 555 (1964), the Court had said, "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." To **deny** a person a vote is prevent that person from voting by some means.

On the other hand, **dilution** of the vote is to count the vote at a lesser value or to have an election system in which a voter effectively has less influence.[8] Or, as Justice Scalia said, "One's vote is diluted if it is not, *as it*

---

[8] "In general, racial vote dilution refers to an unfair undervaluation of the voting strength of a politically cohesive racial group." James U. Blacksher and Larry T. Menefee, *From Reynolds v. Sims to City of Mobile v. Bolden: Have the White Suburbs Commandeered the Fifteenth Amendment?* 34 Hastings L.J. 1, 4 n.17 (1982).

*should be,* of the same practical effect as everyone else's." *Chisom v. Roemer,* 501 U.S. 380, 414 (1991) (dissent).

Vote denial may be proven in a couple of ways. First, a statute or rule might say something like, "No Negroes shall be allowed to vote in the Texas Democratic Party primary."[9] Or a statute or rule could be written in such a way that it bars a group (not identified by race) from voting, but it has a disparate impact on a racial group.[10]

Under the defendants' reading of the statute, if a state adopted a statute forbidding those of Iranian ancestry from voting even though they were American citizens, the plaintiffs in a § 2 suit would have to prove the three *Gingles* prerequisites plus the "totality of the circumstances" by going through the list of the Senate Factors. The fact that the State did not have enough Iranian-Americans to form a majority in a single-member district would effectively block relief to them, according to the Defendants.

What if a city were a bit craftier or (to use Justice Frankfurter's phrase) used more "sophisticated … modes of discrimination"? Assume that the city produced a test or device that effectively blocked nearly all the

---

[9] *See, e.g., Nixon v. Herndon,* 273 U.S. 536 (1927).

[10] "'In order to prevail on an equal-protection claim based upon the application of a facially neutral statute, it must be established that: (1) the plaintiff was treated differently than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff.' *Strickland v. Alderman,* 74 F.3d 260, 264 (11th Cir.1996) (citations omitted). Furthermore, 'proof of discriminatory intent or purpose is a necessary prerequisite to any Equal Protection Clause claim.' *Parks v. City of Warner Robins, Ga.,* 43 F.3d 609, 616 (11th Cir.1995)." *Evans v. Alabama Dept. of Corrections,* 418 F.Supp.2d 1271, 1283 (M.D. Ala. 2005). Because of § 2 of the Voting Rights Act, no proof of discriminatory intent is necessary.

Iranians while affecting none of the non-Iranians?  That would be the same as the State of Alabama did in the Tuskegee Gerrymander case.  In that case, Justice Frankfurter stated,

> It is difficult to appreciate what stands in the way of adjudging a statute having this inevitable effect invalid in light of the principles by which this Court must judge, and uniformly has judged, statutes that, howsoever speciously defined, obviously discriminate against colored citizens.  'The (Fifteenth) Amendment nullifies sophisticated as well as simple-minded modes of discrimination.'  *Lane v. Wilson,* 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281.

*Gomillion v. Lightfoot,* 364 U.S. 339, 342 (1960).  Or as Justice Frankfurter said in *Lane,*

> The Amendment nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race.

*Lane v. Wilson,* 370 U.S. 268, 275 (1939).

But according to the defendants, a "sophisticated . . . mod[e]" of vote denial could only be attacked under § 2 by the whole panoply of proof outlined in *Gingles* and the Senate Factors.  We are aware that the *Lane* and *Gomillion* cases were decided under the Fifteenth Amendment, but § 2 was adopted to implement that Amendment.

> [I]t is apparent that the language of § 2 no more than elaborates upon that of the Fifteenth Amendment, and the sparse legislative history of § 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself.

*City of Mobile v. Bolden,* 446 U.S. 55, 60-61 (1980). In response to the *Bolden*
decision, Congress adopted the 1982 amendments to the Voting Rights Act.
Amended § 2 was not meant to make Fifteenth Amendment litigation harder,
but easier. As the Senate's report on the bill said, "The 'results' standard is
meant to restore the pre-*Mobile* legal standard which governed cases
challenging election systems or practices as an illegal **dilution** of the
minority vote." S. Rep. No. 97-417, at 27, *as reprinted in* 1982 U.S.C.C.A.N.
177, 206 (emphasis added). In other words, the amendment of § 2 was meant
to correct a problem Congress saw with the burden of proof primarily in vote
dilution cases, not vote denial cases. However, the way in which the
amendment was drafted changed the burden of proof in all kinds of voting
discrimination cases – whether vote denial or vote dilution. First, Congress
amended § 2 to make it apply to discriminatory results, not just
discriminatory intent. It did this by amending the original language of § 2 by
changing "standard, practice, or procedure shall be imposed or applied . . . **to
deny or abridge** the right . . . to vote on account of race or color" to
"standard, practice, or procedure shall be imposed or applied . . . **in a
manner which results in a denial or abridgement** of the right . . . to vote
on account of race or color" (emphasis added).

      Just reading subsection (b) of § 2, it is clear that it can be applied to
vote denial claims. The "political processes leading to nomination or election
. . . are not equally open to participation" by those who have been denied the
right to vote. Those denied the right to vote certainly "have **less** opportunity
than other members of the electorate to participate in the political process

and to elect representatives of their choice" – they have **no** opportunity to participate.

Even though the emphasis in the Senate Report was on dilution cases, the Committee acknowledged that § 2 is not limited to vote dilution cases. The Committee said,

> *Whitcomb, White, Zimmer,* and their progeny dealt with electoral system features such as at-large elections, majority vote requirements and districting plans. However, Section 2 remains the major statutory prohibition of **all voting rights discrimination**. It also prohibits practices which, while episodic and not involving permanent structural barriers, result in the denial of equal access to any phase of the electoral process for minority group members.
>
> If the challenged practice relates to such a series of events or episodes, the proof sufficient to establish a violation would nto necessarily involve the same factors as courts have utilized when dealing with permanent structural barriers. Of course, the ultimate test would be the White standard codified by this amendment of Section 2: whether, in the particular situation, the practice operated to deny the minority plaintiff an equal opportunity to participate and to elect candidates of their choice.

S. Rep. No. 97-417, at 30, *as reprinted in* 1982 U.S.C.C.A.N. 177, 207 (emphasis added; footnote omitted). The *Gingles* Court cited that portion of the Senate Report with approval, *Gingles,* 478 U.S. 30, 45 & n.10 (1986).

*Gingles* involved a claim of vote dilution, not vote denial: "[The black plaintiffs] contend that the legislative decision to employ multimember, rather than single-member, districts in the contested jurisdictions dilutes their votes . . . ." *Gingles,* at 46. It is simply inappropriate to try to fit the present case into the three-part test the *Gingles* Court used to determine if

plaintiffs had met the "necessary preconditions" for a dilution case, *Gingles,* at 50,.

The Eleventh Circuit agrees with this analysis. In *Burton v. City of Belle Glade,* 178 F.3d 1175 (11th Cir. 1999), the court held,

> Vote denial occurs when a state, or here a municipality, employs a "standard, practice, or procedure" that results in the denial of the right to vote on account of race. To prevail, [plaintiffs] must prove that, "under the totality of the circumstances, ... the political processes ... are not equally open to participation by [members of a protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." In making this determination, "a court must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'"

*Burton,* at 1197-98 (citations omitted).

## B.     The proof of knowingly discriminating.

This Court has "objective factors" on which to rely: the City of Montgomery has knowingly adopted a date for an election at a time that excludes a particular group (first-year and other first-time college students) from being able to register in time to participate in the first round of the City election. That group of students is disproportionately black. (See part II.D, below.)

The City may have blundered into choosing the election date initially, but after Dr. Joe L. Reed objected that the chosen date would adversely affect Alabama State University students, the City was acting with

full knowledge of the effect of its choice. As City Attorney Walter Byars

(testifying as the City's representative) testified:

> Q. Now, take a look at Page 7 [of Byars Exhibit 3] and down at the bottom of Page 7 it says, Mr. Joe L. Reed discussed election dates with the council. And this is the meeting of March 6th. Were you there when --
> A. Yes.
> Q. -- Dr. Reed discussed that with the council?
> A. Yes.
> Q. What did he tell the council?
> A. He said that because of Seamon [sic: Siegelman] against Farmer it required legislative approval of any change in the election dates with an amendment that would affect Act 618 election dates and that he wanted to make certain that UOCAVA people were covered, and that was his reason that he wanted to make sure that it was legal. That was in essence what he said. I cannot remember but maybe that day for the first time he said something about Alabama State.
> Q. And what is it he said about Alabama State?
> A. Wanted to make sure that they were covered in the election; that they had time to get to school and would have an opportunity to vote in the election, students would.
> Q. Did he mention anything about what date they came back to campus to begin their fall semester?
> A. I can't remember that he knew that day. It was later determined as I recall it was August the 23rd that they would be back.

Byars Deposition at 24:1 to 25:15.[11]

---

[11] The Byars deposition is attached to Plaintiffs' Submission of Evidence as Exhibit U, with its exhibits numbered as in the deposition. Byars Exhibit 3 is included as part of Defendants' Exhibit 21 (Doc. 48-7). The court reporter erroneously copied only the odd-numbered pages of that exhibit. When plaintiffs' counsel discovered this just after the defendants' counsel filed Doc. 48, he provided a complete set of pages to Mr. Menefee. The complete set of pages is included with Exhibit U.

Dr. Reed testified that he had spoken to both the mayor and the council about the effect an advanced election date would have on Alabama State students:

> Q.   From the very beginning, your concern has been that these -- the late August election date, August 28th, interfered with the ability of newly arriving ASU students to establish residency and vote; is that correct?
> A.   That's essentially it.  There may have been something else.
> Q.   Did you express that from the beginning as a concern?
> A.   Yeah, to the mayor.
> Q.   And to the council members?
> A.   Yes.
> Q.   Janet May and others?
> A.   Right.  In fact, I carried to them a -- what I thought was a workable document that would have -- that would do two things.  It would preserve the right of the students at Alabama State to vote in the election very close to the time they already had been voting; and at the same time, carry out what the mayor said he was concerned about, that was to be sure that the folks overseas would have a chance to vote.
> Q.   Okay.
> A.   And we worked it out, I thought, and passed it.  And I tried to get it through the legislature, help him get it through the legislature.
> Q.   So the city council members, and Ms. May in particular, were all aware of this concern about college students being able to register and vote for the city elections beginning back in February; is that correct?
> A.   Yes.  Mayor -- the mayor too, all of them.
> Q.   The mayor too.
> A.   And council.  All of them.

Reed Deposition at 18:13 to 20:2.[12]

---

[12] Submission of Evidence, Exhibit V.

### C.    The method of vote denial.

Ala. Code 17-3-50 (2007) (formerly § 17-4-120) forbids voter registrars from registering any voters within 10 days before an election.  In addition, voters in municipal elections must have "resided in the county 30 days and in the ward 30 days prior to the election."  Ala. Code § 11-46-38 (1992).  Effectively, this means that, for an election on 28 August 2007, a prospective voter must have moved into Montgomery no later than 28 July.

On the other hand, if the election is set for 9 October 2007, the prospective voter must have moved to Montgomery no later than 9 September.  Students who move to Montgomery to attend college usually arrive for the fall semester in late August.  See Submission of Evidence, Exhibit X (Colleges responses to subpoena); Exhibit E to the Complaint (Doc. 1-6), Affidavit of Alfred Smith.

### D.    The proof of racial discrimination.

Montgomery has several colleges and universities, but black students are the most affected by the change of the election date to 28 August.  Those colleges have the following numbers of students who are enrolling for the first time:

| College | Total new students | Black new students | % black |
|---------|--------------------|--------------------|---------|
| Alabama State[13] | 4951 | | 95% |
| AUM[14] | 1296 | 458 | 35% |

[13] Black percentage taken from Submission of Evidence, Exhibit W (selected pages from Alabama Statewide Student Database).  Number of new students taken from Exhibit E to the Complaint (Doc. 1-6), Affidavit of Alfred Smith.

[14] Statistics for remaining colleges taken from Submission of Evidence, Exhibit X (Colleges responses to subpoena).  The information supplied by the

23

| Faulkner   | 440 | 197 | 44% |
| Huntingdon | 307 | 51  | 17% |
| Troy       | 701 | 434 | 62% |

More than three-quarters of the students (whether or not we include the Troy students) are black.  That is considerably more than the 2000 Census (49.6%) and the latest Census Bureau's estimate in the 2006 American Community Survey (53.8%) show for the City of Montgomery.[15]


**Conclusion**

For the reasons set out in this brief, the Court should deny the Defendants' motion for summary judgment.

Submitted by,


Cecil Gardner                          /s/ Edward Still
The Gardner Firm                       Edward Still
Post Office Drawer 3103                2112 11th Avenue South
Mobile AL 36652                        Suite 201
    phone 251-433-8100        Birmingham AL 35205-2844
    fax 251-433-8181              phone: 205-320-2882
    email cgardner@gmlegal.com        fax: 877-264-5513
                             email: Still@votelaw.com


Sam Heldman
The Gardner Firm
2805 31st St. NW
Washington DC 20008
    phone 202-965-8884
    email sam@heldman.net


CERTIFICATE OF SERVICE

---

colleges was provided to the defendants promptly after receipt by the plaintiffs.

[15] Figures obtained from http://factfinder.census.gov.

I certify that on 14 December 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

J. Gerald Hebert, Esq.                      Larry Menefee, Esq.
The Campaign Legal Center              407 South McDonough Street
1640 Rhode Island Ave., NW, Suite      Montgomery, AL 36104
650
Washington, DC 20036

/s/ Edward Still