IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| **Janet May, John Dow, William Boyd, and Kenyada S. Adams, and Duncan Kirkwood**<br><br>                    Plaintiffs,<br><br>        v.<br><br>**City of Montgomery, Alabama,** a municipal corporation; **Bobby N. Bright,** in his official capacity as Mayor of the City of Montgomery<br><br>                    Defendants. | CIVIL ACTION NO.<br>2:07 cv 738-MHT-WC |

# Plaintiffs' Submission of Additional Evidence

The plaintiffs submit the following evidence in opposition to the

defendants' motion for summary judgment:

Exhibit U – Deposition of Walter Byars with exhibits 1 through 4

Exhibit V – Deposition of Dr. Joe L. Reed

Exhibit W – Alabama Statewide Student Database (selected pages)

Exhibit X – Colleges' responses to plaintiffs' subpoena

Submitted by,

/s/ Edward Still

Cecil Gardner                                    Edward Still
The Gardner Firm                                 2112 11th Avenue South
Post Office Drawer 3103                           Suite 201
Mobile AL 36652                                   Birmingham AL 35205-2844
     phone 251-433-8100             phone: 205-320-2882
     fax 251-433-8181               fax: 877-264-5513
     email cgardner@gmlegal.com       email: Still@votelaw.com


Sam Heldman
The Gardner Firm
2805 31st St. NW
Washington DC 20008
     phone 202-965-8884
     email sam@heldman.net


## CERTIFICATE OF SERVICE

     I certify that on 14 December 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

J. Gerald Hebert, Esq.                           Larry Menefee, Esq.
The Campaign Legal Center                         407 South McDonough Street
1640 Rhode Island Ave., NW, Suite                 Montgomery, AL 36104
650
Washington, DC 20036


     /s/ Edward Still

1

1      IN THE DISTRICT COURT OF

2      THE UNITED STATES FOR THE

3      MIDDLE DISTRICT OF ALABAMA

4          NORTHERN DIVISION

5

6   CASE NUMBER:  C:2:07-CV-00738-MHT-WC

7

8   JANET MAY, et al.,

9        Plaintiffs,

10       vs.

11

12  CITY OF MONTGOMERY, et al.,

13       Defendants.

14

15      S T I P U L A T I O N

16      IT IS STIPULATED AND AGREED by

17  and between the parties through their

18  respective counsel, that the deposition

19  of WALTER BYARS may be taken before

20  Leslie K. Hartsfield, at the offices of

21  Larry Menefee, 407 South McDonough

22  Street, Montgomery, Alabama, 36104,

23       DEPOSITION OF WALTER BYARS

Page 2

1 taken on the 14th day of November, 2007.
2      IT IS FURTHER STIPULATED AND
3 AGREED that the signature to and the
4 reading of the deposition by the witness
5 is waived, the deposition to have the
6 same force and effect as if full
7 compliance had been had with all laws
8 and rules of Court relating to the
9 taking of the deposition.
10      IT IS FURTHER STIPULATED AND
11 AGREED that it shall not be necessary
12 for any objections to be made by counsel
13 to any questions except as to the form
14 or leading questions, and that counsel
15 for the parties may make objections and
16 assign grounds at the time of the trial,
17 or at the time said deposition is
18 offered in evidence, or prior thereto.
19      IT IS FURTHER STIPULATED AND
20 AGREED that the notice of filing of the
21 deposition by the Commissioner is
22 waived.
23

Page 3

1         INDEX
2 EXAMINATION BY:    PAGE NUMBER:
3 Mr. Still          6
4
5
6
7
8 PLAINTIFFS' EXHIBITS:
9 1 - E-mails          7
10 2 - E-mail and attachments  10
11 3 - Council minutes      17
12 4 - Dr. Reed's version    27
13
14
15
16
17
18
19
20
21
22
23

Page 4

1 BEFORE:
2      LESLIE K. HARTSFIELD,
3      Commissioner.
4
5 APPEARANCES:
6      EDWARD STILL LAW FIRM, LLC, by
7 Mr. Edward Still, 2112 11th Avenue
8 South, Suite 201, Birmingham, Alabama,
9 35205-2844, appearing on behalf of the
10 Plaintiffs.
11      LARRY T. MENEFEE, ATTORNEY AT
12 LAW, 407 South McDonough Street,
13 Montgomery, Alabama, 36104, appearing on
14 behalf of the Defendants.
15
16      ********
17
18      I, LESLIE K. HARTSFIELD, a Court
19 Reporter of Prattville, Alabama, acting
20 as Commissioner, certify that on this
21 date, as provided by the Federal Rules
22 of Civil Procedure and the foregoing
23 stipulation of counsel, there came

Page 5

1 before me at the offices of Larry
2 Menefee, 407 South McDonough Street,
3 Montgomery, Alabama, 36104, beginning at
4 10:25 a.m., WALTER BYARS, witness in the
5 above cause, for oral examination,
6 whereupon, the following proceedings
7 were had:
8
9      WALTER BYARS
10 being first, duly sworn, was examined
11      and testified as follows:
12
13      THE REPORTER:  Usual
14 stipulations?
15      MR. MENEFEE:  Yeah.
16      MR. STILL:  Yes.
17      MR. MENEFEE:  Are you going
18 to make a statement on this or your
19 notice or shall I?
20      MR. STILL:  Go ahead.
21      MR. MENEFEE:  We are here
22 for the deposition noticed pursuant to
23 Rule 30(b)6 to the City of Montgomery in

Page 6

1  this matter and we have produced as the
2  deponent Walter Byars.  And the subject
3  to testify about the subject designated
4  is the need or advisability of changing
5  the 2007 election schedule, all plans,
6  proposed ordinances, proposed
7  legislation, parenthesis, whether
8  adopted or not, closed parenthesis,
9  regarding the date of the 2007 election
10 and the reasons each suggested plan for
11 the date of the 2007 city election was
12 adopted or rejected. So Mr. Byars is a
13 lawyer and will to the best of his
14 ability answer your questions on that
15 subject.
16        MR. STILL:  Thank you very
17 much.
18
19 EXAMINATION BY MR. STILL:
20    Q.    Mr. Byars, I don't have to
21 go through the usual introduction to
22 you.
23    A.    No, you don't.

Page 7

1     Q.    Because you've been in a few
2  depositions, haven't you?
3     A.    A few, a few.
4     Q.    How long have you been city
5  attorney?
6     A.    Almost six years.
7  Approximately six years.
8     Q.    And you are full-time city
9  attorney?
10    A.    Not supposedly but almost.
11    Q.    But you also have a private
12 practice?
13    A.    I do.
14    Q.    And is part of your
15 responsibility to assist the city in
16 meeting the requirements of various
17 state laws regarding city elections?
18    A.    Yes.
19
20    (Plaintiffs' Exhibit No. 1 was
21    marked for identification and
22    attached hereto.)
23

Page 8

1     Q.    Let me show you first of all
2  a group of e-mails that you provided to
3  me this morning.  And first of all,
4  there are two pages of e-mails then a
5  letter from the Justice Department to
6  Misty Fairbanks, assistant attorney
7  general, and then two pages which are
8  labeled voting rights submission.  And
9  I'm going to mark that as Plaintiffs'
10 Exhibit No. 1, these -- I think it's
11 five sheets.  Let me count them to be
12 sure.  Yes, sir, it's five sheets.  And
13 I'd ask you to tell me what those are.
14    A.    Initially the -- Page 1 of
15 this exhibit is an e-mail from Brenda
16 Blalock, who is the city clerk, City of
17 Montgomery, to my secretary because I do
18 not open my e-mails and she gets all the
19 e-mails.  And it's just -- it's a
20 reminder that Ken Smith, who was then
21 and still is the lawyer or general
22 counsel for league of municipalities,
23 had advised everyone that two acts had

Page 9

1  passed which affected municipal
2  elections.  And he states out there has
3  been no preclearance at this stage.
4  That's Page 1.
5          Page 2 is -- it's a
6  statement that those of you with
7  upcoming elections -- this is also from
8  Ken Smith but it came to me from the
9  same city clerk -- may not want to hear
10 this but the Department of Justice has
11 just precleared the two acts and the --
12 or the municipal portion of those two
13 acts, and that he's advising them that
14 his previous instructions to proceed
15 with the elections under the current law
16 is now -- since preclearance that there
17 will be change.  That's what he meant by
18 that.
19          The preclearance letter is
20 the third page.  It's addressed to Misty
21 Fairbanks, assistant attorney general,
22 from the chief of the voting section
23 preclearing those acts.  And then here's

Page 10

1 a summary prepared by Mr. Smith which
2 was attached to the two acts themselves
3 giving a summary of how it affected
4 municipalities. That's in essence it.
5    Q.    Just to make it clear, when
6 you gave me the stack this morning, the
7 two acts were attached to it?
8    A.    That's correct.
9    Q.    We decided not to copy
10 those.
11    A.    That's correct. They were
12 attached as well as this summary that
13 was to the letter about preclearance had
14 been granted.
15
16        (Plaintiffs' Exhibit No. 2 was
17         marked for identification and
18         attached hereto.)
19
20    Q.    Now, while I'm thinking
21 about it, is it true that most cities
22 hold their elections during presidential
23 years?

Page 11

1    A.    I have no idea.
2    Q.    But Montgomery holds them
3 during -- well, held one in 2007 and we
4 can count back four years before or
5 after that.
6    A.    That's right. It's really
7 in the odd years which would be not
8 presidential elections but that's
9 correct. It's all set back 618.
10    Q.    Let me give you Plaintiffs'
11 Exhibit No. 2 and it looks to me like
12 the second and third pages of that may
13 be out of order but take a look at it
14 and tell me what that cover page is.
15    A.    The cover page again is an
16 e-mail from Ken Smith, general counsel
17 league, saying I haven't put anything
18 together on these bills talking about
19 the two that passed the Legislature.
20 They've not been precleared. And he's
21 attached a copy of the summary which may
22 be out of order but that's what the next
23 three pages are. They're the summary of

Page 12

1 those two acts. He refers to it, hope
2 it helps.
3        MR. STILL: Let's go off the
4 record a second.
5
6        (A discussion was held off the
7         record.)
8
9    Q.    (By Mr. Still) We've looked
10 at Exhibit 2 again and you -- tell me
11 what you think about Page 2 of this
12 exhibit now.
13    A.    I think it was part of an
14 earlier summary or something. It's an
15 oddball page that does not fit with the
16 other two which I believe to be a
17 complete summary, Pages 3 and 4.
18    Q.    Now, part of the bills that
19 Ken Smith is talking about here deal
20 with what's known as UOCAVA, which is
21 all caps, U-O-C-A-V-A, which is a
22 federal law; is that correct?
23    A.    That's correct.

Page 13

1    Q.    But Alabama was making it
2 applicable to nonfederal elections by --
3    A.    Yes.
4    Q.    -- so what they were
5 doing?
6    A.    Yes. And in that it wound
7 up as Section 17-11-3 I believe in the
8 code that said UOCAVA is covered in
9 municipal elections. It specifically
10 had municipal election in there.
11    Q.    And what was your
12 understanding then of what you would be
13 required to do with regard to making
14 absentee ballots available to overseas
15 Americans?
16    A.    The statute requires that we
17 do so and that was no problem. We
18 already had that and we adopted in this
19 UOCAVA standard, so to speak. But the
20 problem was that the regs, I'll call it
21 for no better term, or guidelines put
22 out by the feds was that there should be
23 approximately 45 days between the

Page 14

1  initial election and the runoff to give
2  the opportunity for the materials, the
3  ballots, to reach the subjects, the
4  people overseas, the uniformed folks,
5  whether they be overseas or not, and get
6  back in time for the election so they
7  could be counted. And so I felt that
8  our obligation was to get a 42 days, six
9  weeks spread in there in all, which was
10  what had been done in the state statute
11  for other municipalities.
12      Q.   And you mentioned it was
13  done for other municipalities, but is
14  Montgomery not covered by that general
15  law?
16      A.   It is not. It's not covered
17  by what came out as 11-46-21 which was
18  the general law setting all of the dates
19  to comply with UOCAVA. And Montgomery
20  was Act 618. It was a special act in
21  which it was organized as a
22  mayor/council form of government.
23  Previously it'd been a commission form

Page 15

1  of government. And so it took special
2  acts, so to speak, whether it be
3  legislative or ordinance for Montgomery
4  to do it. Montgomery did it under
5  11-46-5 which says we could adopt
6  11-46-21 any municipality in this state
7  could do so if it elected to do.
8      Q.   Well, given your reading of
9  these two acts and your understanding
10  about the responsibility to comply with
11  UOCAVA, what was the thing that you did
12  around the time of, let's see, the
13  e-mails from -- in Exhibit 2 is dated
14  December 8, 2006?
15      A.   Yes.
16      Q.   And you had an election
17  coming up in the fall or the late summer
18  of 2007?
19      A.   Correct.
20      Q.   So what did you do beginning
21  around December or January of this year
22  in order to make the changes
23  necessary?

Page 16

1      A.   We discussed, we being the
2  city clerk, the mayor and I, how we were
3  going to accomplish doing this. One of
4  the ways was to go to the Legislature
5  and we were not familiar with
6  11-46-5 which permitted by ordinance the
7  adoption. We turned that up in our
8  research and decided that it would be
9  very difficult because of the late
10  legislative session to pass something in
11  time for our election so we elected to
12  go under the ordinance procedure
13  provided by 11-46-5. And we did prepare
14  one that was adopted in February of 2007
15  unanimously.
16      Q.   So your office prepared the
17  ordinance that was introduced by one of
18  the members of the council; is that
19  correct?
20      A.   That's correct.
21      Q.   And who was the member of
22  the council who introduced that for
23  you?

Page 17

1      A.   I don't recall.
2
3      (Plaintiffs' Exhibit No. 3 was
4       marked for identification and
5       attached hereto.)
6
7      Q.   Let me show you what we'll
8  mark as Plaintiffs' Exhibit 3. There's
9  a copy for you, Larry.
10          MR. MENEFEE:  Okay.
11      Q.   And these are the -- some of
12  the documents you turned over to me at
13  the last depositions.
14      A.   Right.
15      Q.   And take a look at Page 2 of
16  this. I went through and numbered these
17  pages so I could keep up with them a
18  little bit better. But this particular
19  group is one Mr. Menefee identified to
20  me as a group regarding six work
21  sessions, work sessions --
22      A.   Okay.
23      Q.   -- of the council.

Page 18

1    A.    All right.
2    Q.    So --
3    A.    It's the second item on that
4 Page 2.
5    Q.    Right.  And so what is it
6 that the council does at a work
7 session?
8    A.    They go over what has been
9 proposed on the agenda for the council
10 meeting and they work on that.  They go
11 through it.  They have it explained or
12 they explain it themselves within them
13 or the sponsor would.  And they decide
14 sort of -- everybody gets to work out
15 whatever problems they might have, if
16 they have any questions, that sort of
17 thing.  That's the work session.
18    Q.    And is the work session
19 held -- it shows here these are -- most
20 of these I think are at 8:30 in the
21 morning?
22    A.    That's right.
23    Q.    And the city council meeting

Page 19

1 is later that morning?
2    A.    Ten.
3    Q.    And then there's also a work
4 session down here at 3:30 on Page 4.
5    A.    That's right.  And that one
6 meets at five.
7    Q.    So sometimes the council
8 meets at ten and some at five?
9    A.    The first Tuesday of the
10 month is at ten.  The third Tuesday in
11 the month it's at five.  Two meetings a
12 month.
13    Q.    So let's go back to Page 2
14 again.  There's just a discussion that's
15 listed -- let me put it this way.
16 There's an item that's listed that says,
17 Ordinance setting dates for general
18 municipal elections and runoff elections
19 and the dates for filing as candidates
20 in such elections.  Now, does that mean
21 that that was discussed at that
22 particular meeting?
23    A.    Yes, it was.

Page 20

1    Q.    And then it came up at the
2 city council meeting later during the
3 day; is that right?
4    A.    The same day.  That's
5 correct.
6    Q.    Is that -- did the council
7 adopt the ordinance that day?
8    A.    It did.  It waived which
9 takes unanimous consent.  It gave
10 unanimous consent and went right on into
11 the adoption process which again was a
12 unanimous vote nine to zero in favor of
13 it.
14    Q.    Until the council members
15 had seen this on the morning of February
16 the 6th, you and the mayor and the city
17 clerk had discussed this idea generally;
18 is that right?
19    A.    Correct.
20    Q.    And then who else had worked
21 on it?
22    A.    President of the city
23 council had it discussed with them,

Page 21

1 Charlie Jinright.  I don't know other
2 than that.
3    Q.    Who actually drafted the
4 bill or --
5    A.    I personally did.
6    Q.    Had you discussed it with
7 anybody outside the city government?
8    A.    Maybe Ken Smith, the league.
9 I don't believe so at that stage but I
10 may have.  Other than that, no one that
11 I can recall.
12    Q.    So after the council passed
13 this ordinance, did the mayor sign it?
14    A.    No.
15    Q.    And -- so he -- did he veto
16 it?
17    A.    He did veto it because Dr.
18 Reed had said it took a legislative act
19 to do this and cited a case to us and
20 the mayor said okay with a promise of
21 his cooperation we would go that route.
22    Q.    Were you in the meeting with
23 the mayor and Dr. Reed?

Page 22

1    A.    I was in a meeting with
2 them.  I can't remember whether they had
3 discussed it earlier, you know, before
4 but a meeting before the veto, yes, I
5 was there.
6    Q.    So how long does the mayor
7 have to veto an ordinance?
8    A.    Memory is ten days but you
9 have my 618 there.  I think it's ten
10 days.
11    Q.    Take a look again at Exhibit
12 3.
13    A.    Got it.
14    Q.    And look at Page 4 of that.
15    A.    All right.
16    Q.    If we can find it on here.
17    A.    It's about the second of the
18 following items were discussed.  Mayoral
19 veto and the mayoral veto of another
20 resolution both relating to the
21 municipal elections, is that what you're
22 talking about?
23    Q.    That's right.  I'm looking

Page 23

1 on the wrong page.  Thank you.  I see
2 them.  And the second of those
3 ordinances dealt with changing the dates
4 of the council meeting to coincide with
5 the municipal election?
6    A.    That's right.
7    Q.    Council meetings are on
8 Tuesday.  Elections are on Tuesday.
9 They're going to bump into each other
10 sometimes?
11    A.    Yes.  Yes.  And also you
12 have to go through a procedure whereby
13 the council signs that all were elected
14 and so forth so they try to make the
15 meetings coincide with the election so
16 that can all be done.
17    Q.    So at this work session, the
18 veto was discussed and --
19    A.    Yes.
20    Q.    And later that day did the
21 council override the mayor's veto or
22 sustain it?
23    A.    No, they sustained it.

Page 24

1    Q.    Now, take a look at Page 7
2 and down at the bottom of Page 7 it
3 says, Mr. Joe L. Reed discussed election
4 dates with the council.  And this is the
5 meeting of March 6th.  Were you there
6 when --
7    A.    Yes.
8    Q.    -- Dr. Reed discussed that
9 with the council?
10    A.    Yes.
11    Q.    What did he tell the
12 council?
13    A.    He said that because of
14 Seamon against Farmer it required
15 legislative approval of any change in
16 the election dates with an amendment
17 that would affect Act 618 election dates
18 and that he wanted to make certain that
19 UOCAVA people were covered, and that was
20 his reason that he wanted to make sure
21 that it was legal.  That was in essence
22 what he said.  I cannot remember but
23 maybe that day for the first time he

Page 25

1 said something about Alabama State.
2    Q.    And what is it he said about
3 Alabama State?
4    A.    Wanted to make sure that
5 they were covered in the election; that
6 they had time to get to school and would
7 have an opportunity to vote in the
8 election, students would.
9    Q.    Did he mention anything
10 about what date they came back to campus
11 to begin their fall semester?
12    A.    I can't remember that he
13 knew that day.  It was later determined
14 as I recall it was August the 23rd that
15 they would be back.
16    Q.    Now, at this point to recap,
17 the mayor has vetoed the ordinance and
18 that has been sustained by the council,
19 and so is it at this point that you
20 begin work on a legislative act?
21    A.    That's correct.
22    Q.    You've given me a pile of
23 various drafts --

Page 26

1    A.    Yes.
2    Q.    -- of these things.  And I'm
3  going to take a chance and not burden
4  the record with those things because I
5  think what's important is probably the
6  thing that actually got introduced.
7    A.    All right.
8    Q.    The bill that was introduced
9  in the Legislature by Representative
10  Holmes, who drafted that bill?
11    A.    He had the legislative
12  reference service draft it, and in my
13  opinion, it was unconstitutional.  He
14  did not use the bill that Dr. Reed had
15  approved and the mayor had approved.  He
16  went on his own and came up with an
17  amendment to Act 618 as local
18  legislation.
19    Q.    What was the problem with
20  the one that Representative Holmes had
21  the legislative reference service
22  draft?
23    A.    The City of Montgomery grown

Page 27

1  out of the category.  618 was one of
2  those old population categories.  And I
3  was fearful because we had discussed it
4  earlier with other -- the league and
5  other lawyers that it -- just to amend
6  Section 618 probably wouldn't affect the
7  City of Montgomery.  We'd still be under
8  the unamended 618.
9
10    (Plaintiffs' Exhibit No. 4 was
11      marked for identification and
12      attached hereto.)
13
14    Q.    So let me -- I am going to
15  mark one of these versions here as
16  Exhibit No. 4.  And this one says in the
17  upper right-hand corner Dr. Reed's
18  version?
19    A.    Correct.  And this is the
20  one that we sent to the Legislature,
21  sent to Mr. Reed and to -- not Mr. Reed,
22  to Mr. Holmes, who was chairman of the
23  delegation in the House, and to the two

Page 28

1  senators, Larry Dixon and Quinton
2  Ross.
3    Q.    Now, that bill I note refers
4  to Class 3 municipalities?
5    A.    That's right.  There was a
6  reason.
7    Q.    And what's your reason for
8  that?
9    A.    One of the members of the
10  House had threatened to kill the bill if
11  it were a local legislation because the
12  mayor hadn't come and talked to him
13  about it.  And if you do Class 3, no one
14  member of the delegation can kill it;
15  therefore, I drew it as Class 3 and that
16  was the reason.  And shopped it --
17  Huntsville is the other Class 3.  Sent
18  it to Huntsville and got their approval.
19    Q.    Let me get into the
20  nitty-gritty of legislation here.  If
21  it's a local -- if it's a piece of local
22  legislation, it would say this bill
23  applies to Montgomery -- City of

Page 29

1  Montgomery; is that right?
2    A.    Yes.
3    Q.    But -- and in that
4  situation, it would have to be
5  advertised --
6    A.    Yes.
7    Q.    -- as in a local newspaper
8  for a certain number of weeks?
9    A.    Correct.
10    Q.    Following all of the
11  constitutional procedures?
12    A.    Correct.
13    Q.    But we have an amendment to
14  the Constitution about dividing what we
15  got, eight classes or seven classes of
16  cities?
17    A.    I believe it's eight.  I
18  don't remember exactly.  We're Class 3
19  though.
20    Q.    You probably don't worry
21  about those --
22    A.    I don't.
23    Q.    -- with higher numbers than

Page 30

1  you; right?
2      A.    That's right.  That's right.
3      Q.    So if it's Class 3
4  legislation -- excuse me.  If it applies
5  only to Class 3 cities, it's not local
6  legislation?
7      A.    It's general legislation.
8      Q.    And does not need to be
9  advertised?
10     A.    Correct.
11     Q.    So that simplifies things?
12     A.    It does.  It does.
13     Q.    Now, when did you realize
14  Representative Holmes had gone off and
15  gone to the legislative reference
16  service?
17     A.    He sent it to me.  And
18  you'll find that in this folder you
19  took.
20     Q.    Okay.
21     A.    Where it says legislative
22  right there (indicated).
23     Q.    When you found out

Page 31

1  Representative Holmes had gotten the
2  reference service -- grab this.  Leave
3  the sticker on it.
4      A.    Yeah, let's see.  Yeah, this
5  is the one by Representative Holmes and
6  so forth.  He sent that to me.
7      Q.    Is that the one he
8  introduced?
9      A.    No.
10     Q.    So did you --
11     A.    I redid it hopefully to make
12  it constitutional by saying any city
13  that had previously elected to come
14  under 618 would be covered by this
15  amendment so it would be certain that
16  Montgomery County would be.
17         Now, under that class,
18  former -- whatever the population
19  classification was, to amend that 618 is
20  local and requires all the publications
21  and everything.  Even though it was a
22  general act of local application, you
23  must publish it if you amend it.

Page 32

1      Q.    So did Representative Holmes
2  or the city advertise the bill?
3      A.    Yes.  Which was 866, House
4  Bill 866.
5      Q.    Now, 866 passed the House of
6  Representatives?
7      A.    Yes.
8      Q.    And when it went to the
9  Senate, what happened to it?
10     A.    The Senate was in a stall
11  situation at that time; very little was
12  passing.  But when it came to the
13  Senate, as I recall the next to the last
14  legislative date, it was opposed by one
15  of the senators from Montgomery County,
16  which in essence means it will not come
17  up in the Senate.
18     Q.    And that was Senator Dixon
19  who opposed it?
20     A.    That is correct.
21     Q.    Did he tell you directly why
22  he opposed the bill?
23     A.    I can't remember.  I know

Page 33

1  what he said to the newspaper and I know
2  he said to me he was doing it, but I
3  can't remember that he gave me any
4  reason whatsoever.
5      Q.    So that happened as you said
6  about the end of the legislative
7  session?
8      A.    It would have been -- my
9  memory was the next to the last
10  legislative date.
11     Q.    And that would have been
12  around the end of May; is that right?
13     A.    I think that's right.
14     Q.    So after the Legislature
15  left and -- without passing this bill,
16  did you have a meeting with the mayor
17  and the city clerk again?
18     A.    I did.
19     Q.    Did you bring Dr. Reed in on
20  that meeting?
21     A.    I don't know that I brought
22  him in or they brought him in on that
23  meeting, but we informed him that we

Page 34

1  were going to have to go with that same
2  11-46-5.  And we redid the resolution
3  and the ordinance that was passed or let
4  me say we redid the ordinance -- I don't
5  think there was a resolution -- that was
6  identical with the one that'd previously
7  been passed and vetoed.
8      Q.    So you were going back to
9  the same thing you had in February?
10     A.    The only thing we felt was
11 available to us before election day.
12     Q.    And did Dr. Reed oppose that
13 at that time?
14     A.    He didn't at the meeting.
15 It passed unanimously.  You know, we
16 have a diverse council of five, four and
17 it passed unanimously even after what
18 Dr. Reed appeared and told them earlier.
19     Q.    Had you had additional
20 conversations before this ordinance
21 passed that -- with Dr. Reed about the
22 affect on Alabama State students?
23     A.    I don't think we had any

Page 35

1  additional information or discussion
2  about it.  He had discussed it earlier.
3  In fact his reason that August 23 didn't
4  affect him is he said, well, suppose
5  some of them register late.  So he
6  wanted more time than just beyond the
7  registration date, closing date.
8      Q.    Now, I notice that in the --
9  all the different versions of the bill
10 that you have given to me you have one
11 that has a handwritten note in the upper
12 right-hand corner that says e-mailed to
13 Peter Joffrion, J-O-F-F-R-I-O-N.  Who is
14 Peter Joffrion?
15     A.    He at the time, I assume
16 still is, but at the time was city
17 attorney, City of Huntsville.  Since
18 they were the only other Class 3
19 municipality, I wanted to make certain
20 they were -- had no objection to the
21 proposed Class 3 legislation.
22     Q.    Was Mr. Joffrion
23 agreeable?

Page 36

1      A.    He carried it around to the
2  mayor, to his lobbyist and so forth and
3  was agreeable.  'Cause it did not affect
4  them unless they passed an ordinance.
5      Q.    Now, I'm going back to our
6  Exhibit 3 again which is the council
7  work session minutes.
8      A.    Yeah.
9      Q.    Take a look at Page 12.
10     MR. MENEFEE:  Off the
11 record.
12
13     (A discussion was held off the
14     record.)
15
16     Q.    (By Mr. Still)  We're
17 looking at Page 12.  There's an item on
18 here about discussing -- its down toward
19 the bottom just below the indented
20 Councilor Pruitt entered.  And it says,
21 Ordinance repealing Ordinance 42-2000,
22 dates for general municipal elections
23 and runoff elections and filing as

Page 37

1  candidates.
2      MR. MENEFEE:  It was 2007.
3      Q.    What did I say?
4      MR. MENEFEE:  2000.
5      Q.    Excuse me.  Thank you.
6  42-2007.
7      A.    I see.
8      Q.    And so that just means the
9  council discussed it at the work
10 session; is that correct?
11     A.    Yes.
12     Q.    And I notice that it's also
13 on the agenda for 17 July which is Page
14 17.  And it's the --
15     A.    It must be 16.
16     Q.    I don't know.  Maybe I just
17 wrote the wrong page number down.  No.
18 I'm sorry.  It's Page 15.
19     A.    15?
20     Q.    15.  That's right.  It is
21 still the 17th of July.  It's just Page
22 15.  And under the following items were
23 discussed, again ordinance 42-2007.

Page 38

1    A.    No. 2.
2    Q.    That's right.  Were you
3  there for either one of those council
4  work sessions?
5    A.    I believe I was there for
6  both.
7    Q.    And would the reason that
8  this was on the work session for the
9  second time be that they couldn't get
10 unanimous consent to bring it up the
11 first time?
12   A.    Absolutely that was the
13 reason.
14   Q.    When they did bring it to a
15 vote, it was defeated; is that right?
16   A.    That's correct.
17   Q.    And 42-2007 is the ordinance
18 that changes the city council elections;
19 is that right?
20   A.    Dates, yes.
21       MR. STILL:  I believe that's
22 all the questions I've got.
23       MR. MENEFEE:  We've got no

Page 39

1  questions.
2
3
4
5
6
7
8
9
10     FURTHER DEPONENT SAITH NOT
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 40

1            CERTIFICATE
2
3  STATE OF ALABAMA)
4  AUTAUGA COUNTY)
5
6       I hereby certify that the above
7  and foregoing deposition was taken down
8  by me in stenotype and the questions and
9  answers thereto were transcribed by
10 means of computer-aided transcription,
11 and that the foregoing represents a true
12 and correct transcript of the testimony
13 given by said witness upon said hearing.
14       I further certify that I am
15 neither of counsel, nor of kin to the
16 parties to the action, nor am I in
17 anywise interested in the result of said
18 cause.
19
20     _____
21     LESLIE K. HARTSFIELD,
22     Certified Court Reporter
23     ACCR:  #312

**Davis, Tracie**

| | |
|---|---|
| **From:** | Blalock, Brenda |
| **Sent:** | Tuesday, May 16, 2006 9:19 AM |
| **To:** | Davis, Tracie |
| **Subject:** | FW: Elections |

Please print out as a reminder to Mr. Walter.....Thank you.



PLAINTIFF'S
EXHIBIT

_1 Byars_

*Brenda Gale Blalock, City Clerk*
City of Montgomery
Post Office Box 1111
Montgomery, AL 36101-1111
Phone: 334/241-2096
Fax:    334/241-2056
bblalock@ci.montgomery.al.us

---

**From:** Ken Smith [mailto:kens@alalm.org]
**Sent:** Monday, May 15, 2006 11:06 AM
**To:** Clerks List
**Subject:** Elections

Just to let everyone know and hopefully avoid any continuing confusion--

Two Acts passed this year affecting municipal elections.  One eliminates challenged balloting and instead adopts provisional voting for municipalities.  The other moves the municipal run-off date to accommodate the provisional voting time schedule.

To avoid timing problems in municipalities holding their regular elections for municipal officials this year, we have worked with the Attorney General's office to submit these bills for preclearance later.  Therefore, the municipalities who have their regular elections scheduled this year (Scottsboro, Huntsville and Gadsden are the ones I'm aware of) will continue to follow the previous time schedules for their elections and will use challenged ballots in their elections.

Additionally, if you have a special election prior to the date these bills are precleared, you will also follow challenged balloting.

I hope this clarifies the issues.

---

Ken Smith
Deputy Director/General Counsel
Alabama League of Municipalities
kens@alalm.org

DISCLAIMER:  Please read this notice before using any materials or relying on any advice from the League:

Any advice, ordinances, contracts, policies or other information of whatever nature which are mentioned and included in this mailing are not a substitute for obtaining individualized legal advice.  Users are advised that all materials must be updated and adapted to local needs and circumstances.  Use of these samples or advice is at the sole risk of the user.  The Alabama League of Municipalities and its staff disclaim any responsibility or liability which may arise or result from the use or implementation of all or any portion of the advice or materials included in this message.

5/16/2006

For Walter.

*Brenda Gale Blalock, City Clerk*
City of Montgomery
Post Office Box 1111
Montgomery, AL 36101-1111
Phone:  334/241-2096
Fax:     334/241-2056
bblalock@ci.montgomery.al.us

**From:** Ken Smith [mailto:Kens@alalm.org]
**Sent:** Thursday, December 21, 2006 9:53 AM
**To:** AAMA List; Clerks List
**Cc:** Brenda Smith; Lori Lein; Perry Roquemore (League); Tracy Roberts
**Subject:** FW: preclearance

Those of you with upcoming elections may not want to hear this, but the Department of Justice has just precleared Act No. 2006-281 (HB479) and the municipal portions of Act No. 2006-354 (SB529).  I've attached their preclearance letter and copies of both Act for those of you who may be holding elections in the near future.  I've also included a simplified summary of the provisions explaining how these bills affect municipalities I prepared for DOJ to help you apply these Acts.

Hope this info helps.

Ken Smith
Deputy Director/General Counsel
kens@alalm.org


DISCLAIMER: Please read this notice before using any materials or relying on any advice from the League:

Any advice, ordinances, contracts, policies or other information of whatever nature which are mentioned and included in this mailing are not a substitute for obtaining individualized legal advice. Users are advised that all materials must be updated and adapted to local needs and circumstances. Use of these samples or advice is at the sole risk of the user. The Alabama League of Municipalities,it's instrumentalities, and their staff disclaim any responsibility or liability which may arise or result from the use or implementation of all or any portion of the advice or materials included in this message.

12/26/2006

**U.S. Department of Justice**

Civil Rights Division

JF.l:MSR:HM:jdh
DJ 166-012-3
2006-6793

*Voting Section - NWB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

December 20, 2006

Ms. Misty Fairbanks
Assistant Attorney General
11 South Union Street
Montgomery, Alabama 36130

Dear Ms. Fairbanks:

This refers to Act Nos. 2006-281 and 2006-354, which provide for the elimination of challenged ballots and the adoption of provisional ballots in municipal elections, allows municipalities operating on eastern time to conduct elections on eastern time; changes canvassing dates; allows the city clerk to receive notice of proposed rules adopted that apply to provisional ballots at least 30 days prior to the certification of the rule or amendment; changes the date that municipal elected officials take office and the date for run-off elections and accommodates UOCAVA voters in State, county and municipal elections for the State of Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your submission on November 13, 2006; supplemental information was received on December 8, 2006.

The Attorney General does not interpose any objection to the specified changes. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes. Procedures for the Administration of Section 5 of the Voting Rights Act (28 C.F.R. 51.41).

Act No. 2006-281 includes provisions that are enabling in nature. Therefore, local jurisdictions are not relieved of their responsibility to seek Section 5 review of any changes affecting voting that are adopted pursuant to this legislation (e.g., procedures for municipal elections held on eastern time. See 28 C.F.R. 51.15.

Sincerely,

John Tanner
Chief, Voting Section

# Voting Rights Submission

## HB479 – Act 2006-281

- Makes clear that local governments operating on Eastern time due to proximity to Georgia can conduct elections on eastern time. Existing law provided that municipalities in the Eastern Time Zone could conduct elections on eastern time. Some Alabama municipalities have numerous residents who work in the eastern time zone and operate on eastern time to accommodate their residents. This change allows them to conduct their elections on eastern time to make that consistent with other activities in the municipality.

- In 2003, the state eliminated challenged balloting procedure as a result of the federal Help America Vote Act (HAVA) requirements. This bill eliminates challenged balloting in municipal elections, replacing it with provisional balloting. This makes procedure uniform with the current process followed state, federal and county elections. As a result, numerous provisions of existing law relating to challenged ballots were amended or repealed since these procedures do not work when using provisional ballots.

- Changes the date for canvassing the election results to noon, seven days after the election, rather than by noon the day after the election. This allows the board of registrars time to verify provisional ballots and return them to the city.

- Requires printing of ballots ten days after the first election, rather than seven. (NOTE: This was changed in SB529, part of which is being submitted for preclearance with this submission and is discussed below, to allow the same time frame for printing ballots as is in place now, once the provisional ballots are returned. Since the time to canvas the results is moved to a week after the election, keeping this date at seven days meant having the ballots printed before the candidates were known. This allows time to canvas the results and to order the ballots and supplies.

- This Act also allows the city clerk to receive notice of proposed rules adopted applying to provisional ballots at least 30 prior to the certification of the rule or amendment under the Administrative Procedures Act since any future rules changes related to provisional ballots at the state level may also apply in municipal elections.

## SB529 – Act 2006-354

- Changes the run-off date in municipal elections from the third Tuesday following the regular election to the sixth Tuesday following the election to allow time for counting provisional ballots, getting new supplies and sending absentee ballots to military voters and receiving their votes.

- Changes the time for having absentee ballot supplies ready from seven days following the regular election to fourteen days following the regular election to allow seven days to count the provisional ballots.

- Changes the date municipal elected officials take office from the first Monday in October to the first Monday in November to allow time to hold the run-off election and count provisional ballots.

Please give this to Walter.  Thanks.

I requested any information the League has on the new election laws.  See below, as well as, attached.

*Brenda Gale Blalock, City Clerk*
City of Montgomery
Post Office Box 1111
Montgomery, AL  36101-1111
Phone:  334/241-2096
Fax:     334/241-2056
bblalock@ci.montgomery.al.us

**PLAINTIFF'S EXHIBIT**

2  Byers

**From:** Ken Smith [mailto:Kens@alalm.org]
**Sent:** Friday, December 08, 2006 11:31 AM
**To:** Blalock, Brenda
**Subject:** RE: New Election Laws

Brenda—

I haven't put anything together on these bills yet.  They have not been precleared by DOJ yet, and they've raised questions regarding the procedures so there may be changes mandated in order to get them precleared.  I've attached a copy of a summary I did during the session and one I put together for the AG's office to make the DOJ preclearance submission.  Hope it helps.

_____
Ken Smith
Deputy Director/General Counsel
kens@alalm.org

DISCLAIMER: Please read this notice before using any materials or relying on any advice from the League:

Any advice, ordinances, contracts, policies or other information of whatever nature which are mentioned and included in this mailing are not a substitute for obtaining individualized legal advice. Users are advised that all materials must be updated and adapted to local needs and circumstances. Use of these samples or advice is at the sole risk of the user. The Alabama League of Municipalities,it's instrumentalities, and their staff disclaim any responsibility or liability which may arise or result from the use or implementation of all or any portion of the advice or materials included in this message.

12/8/2006

- Makes clear that local governments operating on Eastern time due to proximity to Georgia can conduct elections on eastern time.

- State eliminated challenged balloting procedure as a result of the federal Help America Vote Act (HAVA) requirements. This bill eliminates challenged balloting in municipal elections, replacing it with provisional balloting. This makes procedure uniform with state, federal and county elections.

- Changes the date for canvassing the election results to noon, seven days after the election, rather than by noon the day after the election. This allows the board of registrars time to verify provisional ballots and return them to the city.

- Requires printing of ballots ten days after the first election, rather than seven. Since the time to canvas moved to a week after the election, keeping this date at seven days meant having the ballots printed before the candidates were known. This allows time to canvas the results and to order the ballots and supplies.

- City clerk shall receive notice of proposed rules adopted applying to provisional ballots at least 30 prior to the certification of the rule or amendment under the Administrative Procedures Act.

Process in Municipal Elections, Example using provisional ballots, using 2008 municipal election—

- Election Day – Fourth Tuesday in August, 2008 (August 26, 2008)

   o Clerk takes possession of ballot box of provisional ballots. Clerks takes sealed materials relating to provisional ballots (reidentification cards, challenged statements and affirmations) and delivers them to board of registrars

   o Board updates voter's list using reidentification cards and verifies voter's authority to vote – Involves notice to voter and opportunity for voter to respond to any problems

   o Board returns certified findings to clerk by noon, seven days later (September 2, 2008)

- Council canvases election returns, including provisional ballots seven days later (September 2, 2008)

- If run-off election is necessary, ballots and supplies must be prepared within three days of canvas (September 5, 2008)

## Voting Rights Submission

### HB479 – Act 2006-281

- Makes clear that local governments operating on Eastern time due to proximity to Georgia can conduct elections on eastern time. Existing law provided that municipalities in the Eastern Time Zone could conduct elections on eastern time. Some Alabama municipalities have numerous residents who work in the eastern time zone and operate on eastern time to accommodate their residents. This change allows them to conduct their elections on eastern time to make that consistent with other activities in the municipality.

- In 2003, the state eliminated challenged balloting procedure as a result of the federal Help America Vote Act (HAVA) requirements. This bill eliminates challenged balloting in municipal elections, replacing it with provisional balloting. This makes procedure uniform with the current process followed state, federal and county elections. As a result, numerous provisions of existing law relating to challenged ballots were amended or repealed since these procedures do not work when using provisional ballots.

- Changes the date for canvassing the election results to noon, seven days after the election, rather than by noon the day after the election. This allows the board of registrars time to verify provisional ballots and return them to the city.

- Requires printing of ballots ten days after the first election, rather than seven. (NOTE: This was changed in SB529, part of which is being submitted for preclearance with this submission and is discussed below, to allow the same time frame for printing ballots as is in place now, once the provisional ballots are returned. Since the time to canvas the results is moved to a week after the election, keeping this date at seven days meant having the ballots printed before the candidates were known. This allows time to canvas the results and to order the ballots and supplies.

- This Act also allows the city clerk to receive notice of proposed rules adopted applying to provisional ballots at least 30 prior to the certification of the rule or amendment under the Administrative Procedures Act since any future rules changes related to provisional ballots at the state level may also apply in municipal elections.

### SB529 – Act 2006-354

- Changes the run-off date in municipal elections from the third Tuesday following the regular election to the sixth Tuesday following the election to allow time for counting provisional ballots, getting new supplies and sending absentee ballots to military voters and receiving their votes.

- Changes the time for having absentee ballot supplies ready from seven days following the regular election to fourteen days following the regular election to allow seven days to count the provisional ballots.

- Changes the date municipal elected officials take office from the first Monday in October to the first Monday in November to allow time to hold the run-off election and count provisional ballots.



PLAINTIFF'S EXHIBIT

3 Byars

A G E N D A
MONTGOMERY CITY COUNCIL
FEBRUARY 6, 2007 - 8:30 A.M.
COUNCIL CHAMBER

The Council met in work session on Tuesday, Feburary 6, 2007, at 8:30 a.m., in the Mayor's Conference Room, City Hall, with the following members present:

PRESENT: SPEAR, MAY, NUCKLES, COOK, PRUITT, JINRIGHT            —6

ABSENT: HEAD, CALHOUN, ROBY                                     —3

Also present for the meeting were: Mayor Bobby Bright, Jeff Downes and Michael Briddell, Executive Assistants to the Mayor, Lloyd Faulkner, Finance Director, Walter Byars, City Attorney, Ken Groves, City Planner, Tommy Tyson, Planning Controls, and Russell Stringer, City Forrester.

The President of the Council, Charles W. Jinright, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting.

The following items were discussed:

Hearing on proposed Ordinance rezoning one parcel of land on the northwest corner of Madison Avenue and Vonora Avenue from an INST District to a B-2 District. Recommended by the Planning Commission. (Z-41-1956)

Councillor Head and Councillor Roby entered the Mayor's Conference Room at 8:32 a.m.

Hearing on proposed Ordinance rezoning one parcel of land (5 lots) containing 2.25 acres located on the west side of Perry Hill Road, approximately 130 feet south of Haynes Lane, from an R-75-s District to a B-1-a-Q District. Recommended by the Planning Commission, restricted as follows: Stores selling good, general merchandise, apparel, furniture, housewares and household wares, drugs and sundries, jewelry, gift items, flowers, sporting goods, and similar types; small dry cleaning offices, banks, post offices, and similar services; and dwellings for any number of families. (Z-26-1981)

Hearing on proposed Ordinance rezoning one parcel of land located on the southeast corner of Palmetto Street and Arthur Street (2102 Palmetto Street) from an R-60-s District to an R-60-d District. Recommended by the Planning Commission. (Z-38-2006)

Hearing on proposed Ordinance rezoning one parcel of land containing 10.13 acres located on the east side of Taylor Road and the north side of Taylor Road East from an AGR-1 District to an O-1 District. Recommended by the Planning Commission. (Z-39-2006)

Hearing on proposed Ordinance rezoning one parcel of land located on the southwest corner of Mulberry Street and West Second Street (1500 Mulberry Street) from O-1 District to a B-2 District. Recommended by the Planning Commission. (Z-40-2006)

Councillor Calhoun entered the Mayor's Conference Room at 8:40 a.m.

Ordinance allowing for Automated Photographic Enforcement of Traffic Control Device Violations. (Sponsored by Councillor Pruitt)

Resolution assessing the cost of abatement of noxious and dangerous weeds at 0 Aaron Street. (Carried over at last meeting)

Ordinance amending portions of Ordinance No. 28-2004, Historical Preservation Commission.

Ordinance granting a Franchise to Huntingdon College to construct, install and maintain Directional Signage on a portion of Municipal right-of-way.

Ordinance setting the dates for General Municipal Elections and Runoff Elections and the dates for filing as Candidates in such Elections.

Ordinance amending Ordinance No. 70-2002 establishing Voting Precincts Appendix A & B to change voting precincts 1D, 2A, 2C, 2E, 2F, 3A, 5K and 5L.

Resolution changing the dates of Council Meetings to coincide with Municipal Elections.

Resolution setting the pay for Municipal Polling Officials pursuant to Section 17-8-12 of Code of Alabama.

Resolution authorizing the issuance and sale of $44,400,000 General Obligation School Warrants, Series 2007.

Application for an Alternative Transportation Service by Jesse J. Lawhorn, Jr., d/b/a S & J Transportation Service.

Application for a Private Investigator's License by Michael Foster.

Resolution reappointing Dottye Hannan to the Arts Council by Councillor May.

Resolution reappointing Albert Calhoun to the Board of Adjustment & Appeals – Gas Fitters by Councillor May.

Resolution reappointing Sandra Nickel to the Housing Code Board of Review by Councillor May.

Resolution appointing Karen Crawford to the Museum Board by Councillor May replacing Kathy Neely. Councillor May stated the correct name is Karen Campbell rather than Crawford.

Resolution reappointing Corrine Dunaway to the Electrical Board of Adjustment & Appeals by Councillor May.

Pursuant to Section 11-53B-1 et seq, Code of Alabama, authorization of demolition of an unsafe structure at 1571/1573 Holt Street

Pursuant to Section 11-53B-1, et seq, Code of Alabama, authorization of demolition of an unsafe structure at 504 Liberty Street.

Pursuant to Section 11-53B-1, et seq, Code of Alabama, authorization of demolition of an unsafe structure at 2260 Lower Wetumpka Road.

Pursuant to Section 11-53B-1, et seq, Code of Alabama, authorization of demolition of an unsafe structure at 2026 Stella Street.

Resolution assessing the cost of abatement of unsafe structures on various lots pursuant to Ordinance No. 10-2001.

Resolution declaring dangerous nuisances on various lots and ordering their immediate abatement by owner pursuant to Ordinance No. 28-2002.

Resolution assessing the cost of abatement of dangerous nuisances on various lots pursuant to Ordinance No. 28-2002.

Resolution declaring noxious and dangerous weeds on various lots and ordering their immediate abatement by owner pursuant to Ordinance No. 29-2002.

Resolution authorizing the abatement of noxious and dangerous weeds on various lots pursuant to Ordinance No. 29-2002.

Resolution assessing the cost of abatement of noxious and dangerous weeds on various lots pursuant to Ordinance No. 29-2002.

There being no further business to come before the Council, the meeting adjourned at 9:18 a.m.

**BRENDA GALE BLALOCK**
**CITY CLERK**

**CHARLES W. JINRIGHT, PRESIDENT**
**COUNCIL OF THE CITY OF MONTGOMERY**

MONTGOMERY CITY COUNCIL
WORK SESSION
FEBRUARY 20, 2007 – 3:30 P.M.
MAYOR'S CONFERENCE ROOM

The Council met in work session on Tuesday, February 20, 2007, at 3:30 p.m., in the Mayor's Conference Room, City Hall, with the following members present:

PRESENT:  SPEAR, HEAD, MAY, COOK, ROBY, PRUITT, JINRIGHT                    –7

ABSENT:  NUCKLES, CALHOUN                    –2

Also present for the meeting were:  Mayor Bobby Bright, Jeff Downes and Michael Briddell, Executive Assistants to the Mayor, Lloyd Faulkner, Finance Director, Walter Byars, City Attorney, Ken, Groves, City Planner, and Tommy Tyson, Planning Controls.

The President of the Council, Charles W. Jinright, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting.

The following items were discussed:

Mayoral Veto of Ordinance No. 13-2007 setting the dates for municipal elections.

Mayoral Veto of Resolution No. 23-2007 changing the dates of Council Meetings to coincide with municipal elections.

Ordinance rezoning one parcel of land containing 17.96 acres located on the east side of Norman Bridge Road (Highway 331) approximately 3400 feet south of Hyundai Boulevard, from an AGR-1 District to an R-60-m District.  Recommended by the Planning Commission.  (Tabled for 90 days at the November 21, 2006 Meeting.)  (Z-14-2006)

Ordinance Approving and Authorizing $44,400,000 in aggregate principal amount General Obligation School Warrants, Series 2007.

Ordinance amending Ordinance No. 70-2002 Appendix A & B, as amended, to combine voting precincts 2D and 2E with voting center to be 2D Boys & Girls Club West End, 220 Crenshaw Street.

Resolution adopting certain Cable-related needs and interests of the City of Montgomery as identified in the Formal Needs Assessment Report and Related Requirements set forth therein; authorizing the issuance of a request for formal renewal proposal for a Cable Franchise, and closing the initial state of Formal Franchise Renewal Proceedings.

Councillor Cook left the Mayor's Conference Room at 4:12 p.m.

Resolution authorizing Mayor Bright to have prepared legislation changing election dates and requesting Montgomery Legislative Delegation to introduce such legislation.

Resolution authorizing Mayor Bright to act as the City's official representative in connection with the proposed PH2007 HUD application for $2,160,366 in CDBG funds; $1,191, 043 in HOME funds $21,813 in ADDI funds; $92,510 in ESG funds.

Application for an Alternative Transportation Service by Randy Johnson and James Green, d/b/a B & H Shuttle, 1343 Dalraida Road.

Application for an Alternative Transportation Service by David Sadler, Concierge Services, Inc., d/b/a Concierge Airport Shuttle Service, 906 South Perry Street.

Application for a Private Investigator's Agency License by Francis R. Curry, d/b/a Southland Investigators, LLC.

Application for a Restaurant Retail Liquor License by Los Vaqueros, LLC, d/b/a Los Vaqueros, 2195 East Boulevard.

Application for a Restaurant Retail Liquor License by Martell Dewan Watson, d/b/a Better Days, 2477 East South Boulevard.

Application for a Lounge Retail Liquor License, Class I, by Darryl L. McWhorter, d/b/a 30 & Up, 2840 Birmingham Highway.

Application for a Lounge Retail Liquor License, Class I, by Daran Christopher Gaskin, d/b/a Club G's, 1187 West South Boulevard.

Resolution reappointing Carl Heal to the Planning Commission by Councillor Spear.

Resolution appointing Aduston Rogers to the Architectural Review Board replacing James L. Barganier by Councillor Roby.

Pursuant to Section 11-53B-1, et seq, Code of Alabama, authorization of demolition of an unsafe structure at 1120 Avondale Road.

Pursuant to Section 11-53B-1, et seq, Code of Alabama, authorization of demolition of an unsafe structure at  748 Clinton Street.

Pursuant to Section 11-53B-1, et seq, Code of Alabama, authorization of demolition of an unsafe structure at 1424 Mobile Road.

Pursuant to Section 11-53-B-1, et seq, Code of Alabama, authorization of demolition of an unsafe structure at 3743 Oak Street.

Resolution assessing the cost of abatement of unsafe structures on various lots pursuant to Ordinance No. 44-2006.

Resolution designating Nuisance Abatement Agents.

Resolution declaring dangerous nuisances on various lots and ordering their immediate abatement by owner pursuant to Ordinance No. 28-2002.

Resolution assessing the cost of abatement of dangerous nuisances on various lots pursuant to Ordinance No. 28-2002.

Resolution declaring noxious and dangerous weeds on various lots and ordering their immediate abatement by owner pursuant to Ordinance No. 29-2002.

Resolution authorizing the abatement of noxious and dangerous weeds on various lots pursuant to Ordinance No. 29-2002.

There being no further business to come before the Council, the meeting adjourned at 4:25 p.m.

BRENDA GALE BLALOCK
CITY CLERK

CHARLES W. JINRIGHT, PRESIDENT
COUNCIL OF THE CITY OF MONTGOMERY

AGENDA
MONTGOMERY CITY COUNCIL
MARCH 6, 2007 - 8:30 A.M.
COUNCIL CHAMBER

The Council met in work session on Tuesday, March 6, 2007, at 8:40 a.m., in the Mayor's Conference Room, City Hall, with the following members present:

PRESENT: SPEAR, MAY, NUCKLES, CALHOUN, ROBY                    –5

ABSENT:   HEAD, COOK, PRUITT, JINRIGHT                        –4

Also present for the meeting were: Mayor Bobby Bright, Jeff Downes and Michael Briddell, Executive Assistants to the Mayor, Lloyd Faulkner, Finance Director, Walter Byars, City Attorney, Tommy Tyson, Planning Controls, Chris Simmons, Attorney.

The President Pro Tem of the Council, James A. Nuckles, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting.

The following items were discussed:

Ordinance approving Master Plan and rezoning one parcel of land containing 225 acres, more or less, located on the south side of Hyundai Boulevard, approximately 3000 feet west of Norman Bridge Road, from an AGR-1 District to a PUD District. Not recommended by the Planning Commission. Carried over for 120 days on September 5, 2006, and carried over for 90 days on January 1, 2006. (Z-53-2005)

Hearing on proposed Ordinance providing for Text Amendment to Ordinance 31-73, Zoning Ordinance, Article VII, Section 6. Institutional Zoning District. Recommended by Planning Commission.

Hearing on proposed Ordinance rezoning three parcels of land located 600 feet north of North Eastern Boulevard in the rear of 1610 North Eastern Boulevard from an R-50 District to a B-3 District. Recommended by the Planning Commission. (Z-01-2007)

Hearing on proposed Ordinance rezoning 10 lots located on the east and west sides of Hampton Street, north of Park Place, from R-60-m and B-3 Districts to an O-1 District. Recommended by the Planning Commission. (Z-03-2007)

Hearing on proposed Ordinance rezoning one parcel of land containing 16.5 acres located on the east side of Hunter Loop Road, approximately 4300 feet north of Old Selma Road, from AGR-2 and M-3 Districts to an M-1 District. Recommended by the Planning Commission. (Z-4-2007)

Hearing on proposed Ordinance rezoning one parcel of land containing 20 acres located at the south end of Davenport Drive, approximately 800 feet south of West South Boulevard, and on the north side of West Fleming Road, from an R-75-2 District to a B-3 District. Recommended by the Planning Commission. (Z-06-2007)

Ordinance declaring and dedicating a portion of former South Court Street between Washington and Dexter Avenue as a public street.

Resolution authorizing Mayor Bright to Negotiate and Execute Agreements for Project Alpha.

Resolution commending and congratulating Mountain Home Baptist Church on their Anniversary & Memorial Day. (Sponsored by Councillor May)

Resolution designating Voting Delegate to the Alabama League of Municipalities Convention April 21-24, 2007.

Resolution designating 1st Alternate Voting Delegate to the Alabama League of Municipalities Convention April 21-24, 2007.

Resolution designating 2nd Alternate Voting Delegate to the Alabama League of Municipalities Convention April 21-24, 2007.

Application for a Lounge Retail Liquor License, Class II (Package Store) by Roosevelt Pettiway, d/b/a Hattie's, 2421-B Lower Wetumpka Road.

Application for a Restaurant Retail Liquor License by Nancy Paterson Catering, LLC, d/b/a Nancy Paterson's Bistro, 503 Cloverdale Road.

Resolution authorizing Mayor Bright to make application to the Alabama Law Enforcement Traffic Safety Division for $24,742.00 for overtime enforcement in the Central Region of Alabama.

Resolution authorizing Mayor Bright to make application to the Alabama Law Enforcement Traffic Safety Division for $30,746.00 for overtime funding for DUI enforcement.

Resolution appointing Will Barfoot to the Board of Adjustment by Councillor Head replacing Paul Blake.

Resolution reappointing Robert M. Hardwich, Jr. to the Industrial Development Board by Councillor Head.

Resolution reappointing Jeanne Smiley to the Mental Health Authority. (Sponsored by Councillor Jinright)

Resolution reappointing Glenn Rufrano to The Taylor-Ryan Improvement District No. 2. (Sponsored by Councillor Jinright)

Resolution designating Nuisance Abatement Agents.

Resolution assessing the cost of abatement of unsafe structures on various lots pursuant to Ordinance No. 44-2006.

Resolution declaring dangerous nuisances on various lots and ordering their immediate abatement by owner pursuant to Ordinance No. 28-2002.

Resolution declaring noxious and dangerous weeds on various lots and ordering their immediate abatement by owner pursuant to Ordinance No. 29-2002.

Resolution authorizing the abatement of noxious and dangerous weeds on various lots pursuant to Ordinance No. 29-2002.

Resolution assessing the cost of abatement of noxious and dangerous weeds on various lots pursuant to Ordinance No. 29-2002.

Councillor Tim Head entered the Mayor's Conference Room at 9:17 a.m.

Mr. Joe L. Reed discussed Election Dates with the Council.

There being no further business to come before the Council, the meeting adjourned at 9:44 a.m.

BRENDA GALE BLALOCK
CITY CLERK

JAMES A. NUCKLES, PRESIDENT PRO TEM
COUNCIL OF THE CITY OF MONTGOMERY

MONTGOMERY CITY COUNCIL
WORK SESSION
JUNE 19, 2007 – 3:30 P.M.
MAYOR'S CONFERENCE ROOM


The Council met in work session on Tuesday, June 19, 2007, at 3:34 p.m., in the Mayor's Conference Room, City Hall, with the following members present:

PRESENT:  SPEAR, MAY, NUCKLES, COOK, ROBY, JINRIGHT        --6

ABSENT:   HEAD, CALHOUN, PRUITT        --3

Also present for the meeting were:  Mayor Bobby Bright, Michael Briddell, Executive Assistants to the Mayor, Betty Beville, Deputy Finance Director, Walter Byars and Wallace Mills, City Attorneys, and Tommy Tyson, Planning Controls.

The President of the Council, Charles W. Jinright, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting.

The following items were discussed:

Ordinance rezoning one parcel of land containing 18.65 acres located on the side of Mobile Highway, approximately 450 feet north of I-65 from AGR-1 (Residential Agriculture) District to a B-2 (Commercial) District. Recommended by the Planning Commission. (Z-16-2007) Carried over at June 5th meeting.

Hearing on proposed Ordinance rezoning one parcel of land containing 20.051 acres located on the west side of Sanders Lane, approximately 40 feet north of Hayden Lane, from an R-50 (Single-Family Residential) District to an M-1 (Light Industrial) District. Planning Commission's motion for an unfavorable recommendation failed to pass. Appealed. (Z-32-2006)

Ordinance renaming Goode Street to Edgar D. Nixon Avenue. (Sponsored by Councillors Calhoun & Roby)

Resolution adopting a new Solid Waste Management Plan and repealing Resolution No. 128-2005.

Application for Off-Premise Retail Beer and Wine Licenses by Minar, Inc., d/b/a Shell Food Mart #28, 6890 Vaughn Road. Protested

Application for Off-Premise Retail Beer and Wine Licenses by Minar, Inc., d/b/a Shell Food Mart #36, 4000 Troy Highway. Protested

Ordinance establishing the Oath of Office for Law Enforcement.

Resolution approving the Petition for authority to incorporate The Somerhill Improvement District No. 2.

Resolution authorizing Mayor Bright to make application to the Department of Justice for FY2007 Justice Assistance Grant for $231,478.00 to be divided between City & County; City to purchase two bomb dogs and train two handlers and purchase in-car cameras for marked police vehicles.

Application for a Taxi Cab Company by Bernice Williams Adams, d/b/a Jazzy Airport Cab, 1932 Rosa L. Parks Avenue.

Application for a Special Retail – More than 30 Days Liquor License by Montgomery Trading Company, LLC, d/b/a Marquirette's Exquisite Jewelry, 7818 Vaughn Road.

Application for a Lounge Retail Liquor License, Class I, by T.S.M., LLC, d/b/a Santa Barbara, 2801 X Vaughn Plaza Road.

Application for a Restaurant Retail Liquor License by Montgomery Wings, LLC, d/b/a Hooters of Montgomery, 2701 Eastern Boulevard.

Resolution reappointing Rosalind A. Toles to the Montgomery Clean City Commission by Councillor Spear.

Resolution reappointing John D. Ashmore to the Montgomery Clean City Commission by Councillor Spear.

Resolution appointing Jimmy W. Gunn to the Montgomery Clean City Commission by Councillor Jinright, replacing Teresa Stanley.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 2319 Ajax Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 619 Alexander Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 3909 Court Street South.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 2120 Fourth Street West (OP).

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 2326 Fourth Street East (OP).

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 2208 Fifth Street East (OP).

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 3037-3039 Mobile Road.

Resolution designating nuisance abatement agent.

Resolution assessing the cost of abatement of unsafe structures pursuant to Ordinance No. 44-2006.

Resolution declaring dangerous nuisances on various lots and ordering their immediate abatement by owner pursuant to Ordinance No. 28-2002.

Resolution declaring noxious and dangerous weeds on various lots and ordering their immediate abatement by owner pursuant to Ordinance No. 29-2002.

Resolution authorizing the abatement of noxious and dangerous weeds on various lots pursuant to Ordinance No. 29-2002.

Councillor Nuckles discussed the on-going copper thefts in the City. He wanted the Council to appoint a committee to study ways to curtail copper thefts.

Councillor Roby asked if had been any discussions about water restrictions. Mayor Bright stated there were none at this time.

Councillor Cook reported that he was getting calls of concern regarding the new elections dates.

May v Mont-000010-City
11/1/07

There being no further business to come before the Council, the meeting adjourned at
4:24 p.m.

*Brenda Gale Blalock*
**BRENDA GALE BLALOCK**
**CITY CLERK**

*Charles W. Jinright*
**CHARLES W. JINRIGHT, PRESIDENT**
**COUNCIL OF THE CITY OF MONTGOMERY**

A G E N D A
MONTGOMERY CITY COUNCIL
JULY 3, 2007 - 8:30 A.M.
COUNCIL CHAMBER

The Council met in work session on Tuesday, July 3, 2007, at 8:36 a.m., in the Mayor's Conference Room, City Hall, with the following members present:

PRESENT:   SPEAR, MAY, NUCKLES,
           ROBY, JINRIGHT                                              --5

ABSENT:    HEAD, CALHOUN, COOK, PRUITT                                 --4

Also present for the meeting were: Mayor Bobby Bright, Jeff Downes and Michael Briddell, Executive Assistants to the Mayor, Lloyd Faulkner, Finance Director, Wallace Mills, Assistant City Attorney, and Tommy Tyson, Planning Controls.

The President of the Council, Charles W. Jinright, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting.

The following items were discussed:

Ordinance rezoning one parcel of land containing 18.65 acres located on the side of Mobile Highway, approximately 450 feet north of I-65 from AGR-1 (Residential Agriculture) District to a B-2 (Commercial) District. Recommended by the Planning Commission. (Z-16-2007) Carried over at June 5th & 19th meetings.

Hearing on proposed Ordinance approving a master plan and rezoning one parcel of land containing 72.3 acres located on the north side of Atlanta Highway, approximately 600 feet east of Taylor Road North, from an AGR-2 (General Agriculture) District to a PUD (Planned Unit Development) District. (Z-09-1998)

Application for a Taxi Cab Company by Bernice Williams Adams, d/b/a Jazzy Airport Cab, 1932 Rosa L. Parks Avenue.

Application for a Lounge Retail Liquor License, Class I, by T.S.M., LLC, d/b/a Santa Barbara, 2801 X Vaughn Plaza Road.

Ordinance requiring complaint and law enforcement contact report to City Council. (Sponsored by Councillors Cook, May, Nuckles)

Ordinance repealing Ordinance No. 42-2007, dates for general municipal elections and runoff elections and filing as candidates. (Sponsored by Councillors May, Nuckles, Calhoun, Cook)

Councillor Pruitt entered the Mayor's Conference Room at 8:59 a.m.

Resolution authorizing Mayor Bright to initiate advertising, bidding and acceptance of bid for the sale Maxwell Heights on Air Base Boulevard.

Resolution approving the Petition for assessment of certain land located within The Somerhill Improvement District No. 2.

Application for a Restaurant Retail Liquor License by L & H, LLC, d/b/a Michael's Table, 2960-A Zelda Road.

Application for a Lounge Retail Liquor License, Class II (Package Store) by Sturbridge Spirits, LLC, d/b/a Spiritz at Sturbridge, 7958 Vaughn Road.

Application for an Alternative Transportation Service by Willie Ann Williams, d/b/a Medical Wheels, 1632 Robinson Hill Road.

Resolution appointing Glenn Crumpton to the Montgomery Clean City Commission by Councillor Jinright replacing Dawn Hathcock.

Resolution reappointing Mike Jenkins to the Board of Trustees – Montgomery City/County Library by Councillor Jinright.

Appeal by Samuel Poole of proposed demolition of an unsafe structure at 27 Gordon Street.

Appeal by Okeala Martin of proposed demolition of an unsafe structure at 112 Kenilworth Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 2268 Ajax Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 2312 Ajax Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 115-117 Cromwell Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 739 Howe Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 18 Michigan Avenue.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 840 Murray Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 2117 Stella Drive.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 2127 Stella Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 1903 Stokes Street.

Resolution designating nuisance abatement agent.

Resolution assessing the cost of abatement of unsafe structures pursuant to Ordinance No. 44-2006.

Resolution declaring dangerous nuisances on various lots and ordering their immediate abatement by owner pursuant to Ordinance No. 28-2002.

Resolution declaring noxious and dangerous weeds on various lots and ordering their immediate abatement by owner pursuant to Ordinance No. 29-2002.

Resolution authorizing the abatement of noxious and dangerous weeds on various lots pursuant to Ordinance No. 29-2002.

Resolution assessing the cost of abatement of noxious and dangerous weeds on various lots pursuant to Ordinance No. 29-2002.

Councillor Nuckles asked Mayor Bright to appoint someone from Law Enforcement to serve on the Ad Hoc Committee on Copper Theft. Mayor Bright appointed Lt. Col. Steve Thompson to serve on this committee.

There being no further business to come before the Council, the meeting adjourned at 9:03 a.m.

_____
BRENDA GALE BLALOCK, CITY CLERK


_____
CHARLES W. JINRIGHT, PRESIDENT
COUNCIL OF THE CITY OF MONTGOMERY

May v Mont-000014-City
11/1/07

MONTGOMERY CITY COUNCIL
WORK SESSION
JULY 17, 2007 - 5:00 P.M.
MAYOR'S CONFERENCE ROOM

The Council met in work session on Tuesday, July 17, 2007, at 3:40 p.m., in the Mayor's Conference Room, City Hall, with the following members present:

PRESENT: MAY, NUCKLES, CALHOUN, ROBY, JINRIGHT          —5

ABSENT:  SPEAR, HEAD, COOK, PRUITT          —4

Also present for the meeting were: Mayor Bobby Bright, Jeff Downes and Michael Briddell, Executive Assistants to the Mayor, Lloyd Faulkner, Finance Director, Walter Byars and Wallace Mills, City Attorneys, and Carlos Kimbrough, Planning Department.

The President of the Council, Charles W. Jinright, presided as Chairman of the meeting, and Brenda Gale Blalock, City Clerk, served as the Clerk of the meeting.

The Chairman called on Jaunita Owes, Library Director and The Reverend Gary Burton, Chairman of the Library Board. They addressed the Council regarding the need for renovation or replacement of the libraries. They presented a study prepared by a consultant and requested the Council's support in the future with proposed changes.

Councillor Cook entered the Mayor's conference Room at 3:47 p.m.

The Chairman called on Mary Ann McCloud, Director of Jubilee Festival. Mrs. McCloud requested additional funding to help pay for outstanding bills from the previous Jubilee Weekend. The Jubilee Committee is asking for $200,000 from the City for the next three years. Mr. Jim Farrior also addressed the Council regarding this issue.

Councillor Pruitt entered the Mayor's Conference Room at 4:01 p.m.

The following items were discussed:

Ordinance requiring complaint and law enforcement contact report to City Council. (Sponsored by Councillors Cook, May, Nuckles)

Ordinance repealing Ordinance No. 42-2007, dates for general municipal elections and runoff elections and filing as candidates. (Sponsored by Councillors May, Nuckles, Calhoun, Cook)

Ordinance granting a franchise to Atlantic and Pacific Development LLC to construct, install and maintain a Balcony over a portion of Graham Street right-of-way.

Ordinance granting a franchise to Cook's Properties, L.L.C. to construct, maintain and use a paved parking lot over existing City drainage easement at 1861 Congressman Dickinson Boulevard.

Ordinance granting a franchise to Montgomery Cardiovascular Associates, P.C. to construct, maintain and use a paved parking lot over City drainage easement on Winton Blount Loop (Parcel 1).

Ordinance granting a franchise to Montgomery Cardiovascular Associates, P.C. to construct, maintain and use a paved parking lot over City drainage easement on Winton Blount Loop (Parcel 2).

Public Hearing to receive public comment on Formal Renewal Proposal for a Cable Franchise by Knology of Montgomery, Inc.

Resolution declaring preliminary assessment that Knology of Montgomery, Inc's Franchise should not be renewed.

Resolution authorizing the preservation and disposition of portions of buildings located at 22, 24, and 26-28 South Perry Street. Councillor Nuckles requested that the same procedure for bidding be used as in previous property sales.

Resolution authorizing Mayor Bright to make application to ADECA for a grant in the amount of $63,085.00 for a Section 402 Selective Traffic Enforcement Program Grant of SAFETEA-LU to provide overtime funding for DUI, speeding and seat belt enforcement.

Resolution authorizing Mayor Bright to make application to ADECA for a grant in the amount of $220,369.21 for a Section 402 Community Traffic Safety Program Fund (ADECA 080-SP-CP) to provide administrative staff funding for State Highway Safety Program management oversight of overtime enforcement grants in the Central Region of Alabama.

Application for a Restaurant Retail Liquor License by Cancun Mexican Grill, LLC, d/b/a Cancun Mexican Grill, 2625 Zelda Road.

Application for a Lounge Retail Liquor License, Class I, by De'Ja'Vu, LLC, d/b/a DE Ja Vu, 121 Burbank Drive.

Application for Off-Premise Retail Beer and Wine Licenses by Animar, Inc., d/b/a Shell Food Mart #27, 2949 Forbes Drive. PROTESTED.

Application for a Private Investigator's License by Linda Carol Eubanks, d/b/a Security Services LLC.

Resolution reappointing Willie Welch to the Architectural Review Board by Councillor Nuckles.

Appeal by Norman Hurst, attorney representing property owners, of repairs of unsafe structure, The Avon Group Property.

Appeal by Robert L. Bates of proposed demolition of an unsafe structure at 1513 Goode Street.

Appeal by Robert L. Bates of proposed demolition of an unsafe structure at 23 Gordon Street.

Appeal by James H. McGhee and Johnnye Tucker of proposed demolition of an unsafe structure at 344 Smith Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 2860 6th Street (GWP).

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 705 Alexander Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 706 Alexander Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 642 National Avenue.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 4044 Oak Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 916 Taylor Street.

Pursuant to Section 11-53B-1 et. seq. Code of Alabama, authorization of demolition of an unsafe structure at 807 Travis Street.

Resolution assessing the cost of abatement of unsafe structures pursuant to Ordinance No. 44-2006.

Resolution declaring dangerous nuisances on various lots and ordering their immediate abatement by owner pursuant to Ordinance No. 28-2002.

Resolution assessing the cost of abatement of dangerous nuisance on various lots pursuant to ordinance No. 28-2002.

Resolution declaring noxious and dangerous weeds on various lots and ordering their immediate abatement by owner pursuant to Ordinance No. 29-2002.

Resolution authorizing the abatement of noxious and dangerous weeds on various lots pursuant to Ordinance No. 29-2002.

Resolution assessing the cost of abatement of noxious and dangerous weeds on various lots pursuant to Ordinance No. 29-2002.

Councillor Calhoun reported that he would be introduced two resolutions for board appointments during the meeting.

The Chairman reported that Resolutions regarding Somerhill Improvement District No. 2 Assessment and appointing Pollworkers would be introduced.

There being no further business to come before the Council, the meeting adjourned at 4:40 p.m.

BRENDA GALE BLALOCK
CITY CLERK

CHARLES W. JINRIGHT, PRESIDENT
COUNCIL OF THE CITY OF MONTGOMERY



PLAINTIFF'S
EXHIBIT
4 Byers

                                                    DR. REED'S VERSION

1

2    SYNOPSIS:    Under current law, certain class 3 municipalities have a Mayor-

3                 Council form of government adopted pursuant to a general or local

4                 act which requires a general municipal election or runoff

5                 election at a time different from the dates which are in

6                 compliance with the Federal standards requirements and guidelines

7                 set forth in the Uniformed and Oversees Citizens Absentee Voting

8                 Act (UOCAVA) and which were not included within the amendment to

9                 Alabama Code § 11-46-21, as amended by Act 2006-354, Acts of

10               Alabama, 2006.  This Act would permit those class 3

11               municipalities to adopt, by ordinance, election times and dates

12               in compliance with UOCAVA.

13

14                                   A BILL

15                               TO BE ENTITLED

16                                   AN ACT

17

18        Relating to Mayor-Council elections in class 3 municipalities; to

19   provide that the governing body of a class 3 municipality having a Mayor-

20   Council form of government may elect by ordinance to have the general

21   municipal election or runoff election required by a general or local act,

22   under which its form of government was adopted, to be held at a time

23   different from that required by said general or local act so as to be in

24   compliance with the Federal standards, requirements and guidelines in

25   accordance with the schedule of times and dates set forth in this Act; and to

-1-

1    repeal all provisions of such existing general or local act which require a

2    time different from the dates set out in this Act and in the ordinance

3    adopted by the class 3 pursuant to this Act.

4

5    BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

6

7         Section 1.   The governing body of a class 3 municipality having adopted

8    a Mayor-Council form of government pursuant to a general or local act which

9    act required a general municipal election or a runoff election at a time not

10   in compliance with Federal standards, requirements and guidelines may elect

11   by ordinance to have the general or runoff election at the times and dates

12   provided herein, as follows:

13      (a)   The regular general municipal elections in said class 3

14            municipality shall be held on the 1st Tuesday in October in the

15            year during which its next municipal election is to be held in

16            accordance with the statute under which it is organized, and

17            quadrennially thereafter, and when necessary as provided in said

18            statute, a second or runoff election shall be held on the sixth

19            Tuesday next thereafter following the regular election.

20      (b)   Municipal officers elected at regular municipal elections shall

21            assume the duties of their respective offices on the third

22            Tuesday in November following their election.   Those individuals

23            serving as Mayor or member of the City Council on the effective

24            date of this Act shall serve until the third Tuesday in November

25            following the effective date of this Act.

-2-

1      (c)    The date for filing a statement of candidacy for the office of

2             Mayor or member of the City Council shall be no earlier than the

3             fourth Tuesday in July and no later than the third Tuesday in

4             August preceding the regular municipal election for Mayor and

5             members of the City Council.

6      Provided nothing contained in this Act shall have the effect of

7      changing the year during which a regular municipal election is to be held, or

8      the qualifications or requirements of candidates for election to the office

9      of Mayor or member of the City Council.

10     Section 2.  The provisions of the Act under which the class 3

11     municipality adopted its Mayor-Council form of government, including without

12     limitation the provisions of Act 618, Acts of Alabama (1973), relating to the

13     dates of the elections, for filing statements of candidacy or, and for taking

14     office of Mayor or City Council during a regular municipal election are

15     superseded to the extent the same are in conflict with the ordinance adopted

16     by the governing body of the class 3 municipality pursuant to this Act.

17     Section 3.  This Act shall become effective immediately following its

18     passage and approval by the Governor or is otherwise becoming law.

19

20

21

22

23

24

25

1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4


5    JANET MAY, et al.,

6          Plaintiffs,

7    vs.                          CIVIL ACTION NO.
                                  2:07-cv-738-N
8
     CITY OF MONTGOMERY,
9    ALABAMA, et al.,

10         Defendants.

11

12

13                  * * * * * * * * * * *

14

15         DEPOSITION OF JOE L. REED, taken pursuant to

16   stipulation and agreement before Julie A. Duncan,

17   Certified Court Reporter and Commissioner for the

18   State of Alabama at Large, in the Law Offices of Larry

19   T. Menefee, 407 South McDonough Street, Montgomery,

20   Alabama, on Monday, October 1, 2007, commencing at

21   approximately 9:25 a.m.

22

23                  * * * * * * * * * * *

Page 2

```
 1              APPEARANCES
 2  ON BEHALF OF THE PLAINTIFFS:
 3  Mr. Edward Still
    EDWARD STILL LAW FIRM, L.L.C.
 4  Attorney at Law
    2112 11th Avenue South
 5  Suite 201
    Birmingham, Alabama  35205-2844
 6
    ON BEHALF OF THE DEFENDANTS:
 7
    Mr. Larry T. Menefee
 8  Attorney at Law
    407 South McDonough Street
 9  Montgomery, Alabama  36104
10
11
12         * * * * * * * * * * * * *
13
14         EXAMINATION INDEX
15
    JOE L. REED
16
       BY MR. MENEFEE . . . . . . . . . . .   4
17
18
19         * * * * * * * * * * * *
20
21
22
23
```

Page 3

```
 1              EXHIBIT INDEX
 2
 3    (No exhibits marked to this deposition.)
 4
 5
           * * * * * * * * * * * * *
 6
 7
 8              STIPULATION
 9       It is hereby stipulated and agreed by and
10  between counsel representing the parties that the
11  deposition of JOE L. REED is taken pursuant to the
12  Federal Rules of Civil Procedure and that said
13  deposition may be taken before Julie A. Duncan, Court
14  Reporter and Commissioner for the State of Alabama at
15  Large, without the formality of a commission, that
16  objections to questions other than objections as to
17  the form of the question need not be made at this time
18  but may be reserved for a ruling at such time as the
19  said deposition may be offered in evidence or used for
20  any other purpose by either party provided for by the
21  Statute.
22       It is further stipulated and agreed by and
23  between counsel representing the parties in this case
```

Page 4

```
 1  that the filing of said deposition is hereby waived
 2  and may be introduced at the trial of this case or
 3  used in any other manner by either party hereto
 4  provided for by the Statute regardless of the waiving
 5  of the filing of the same.
 6       It is further stipulated and agreed by and
 7  between the parties hereto and the witness that the
 8  signature of the witness to this deposition is hereby
 9  not waived.
10
11         * * * * * * * * * * * * *
12
13       COURT REPORTER:  Usual
14         stipulations?
15       MR. MENEFEE:  Yes.
16       MR. STILL:  Yes.
17            JOE L. REED
18       The witness, after having first been duly sworn
19  to speak the truth, the whole truth and nothing but
20  the truth testified as follows:
21            EXAMINATION
22  BY MR. MENEFEE:
23  Q.  Would you please state your name.
```

Page 5

```
 1  A.  My name is J-O-E, Joe L. Reed, R-E-E-D.
 2  Q.  And your address?
 3  A.  My address is 874 John Brown Avenue,
 4      Montgomery, Alabama 36106.
 5  Q.  And your age, please, sir?
 6  A.  Sixty-nine.
 7  Q.  And you're married?
 8  A.  Yes.
 9  Q.  Have you ever been a plaintiff or a defendant
10      in any lawsuit?
11  A.  Yes.
12  Q.  Can you name them?
13  A.  It's been so many that -- well, one, I guess
14      was the Alabama Public School and College
15      Authority case.
16  Q.  Okay.
17  A.  That was one.  That's ASTA, Alabama State
18      Teacher Association, vs. Alabama Public School
19      and College Authority.  I was one in that
20      one.  I was one in -- a plaintiff in the case
21      of Buskey vs. Oliver.  I was in that case.  I
22      was in the case of -- I don't know if it wound
23      up being Reed vs. Folmar or not, but it was a
```

Page 6

1    case involving --
2    Q.  What was the subject matter?
3    A.  The case was involving whether or not they
4        could change the election dates.  I was in
5        that case.  I've been in several cases
6        involving --
7    Q.  Is that the -- what went to the Supreme Court
8        as Siegelman vs. Folmar?
9    A.  Yes, the one that was Siegelman vs. Folmar, I
10       think I was in that case.  However -- I think
11       I wound up in that case somehow.  Yes.  And
12       that -- let's see.
13   Q.  Did you have a lawsuit against the city at one
14       point about the so-called discretionary funds
15       for the city council?
16   A.  No, we didn't litigate that.  I was in a case
17       involving the misuse of -- what we were
18       alleging, misuse of Community Development
19       Block Grant money.
20   Q.  And you were a named plaintiff --
21   A.  I was a plaintiff in --
22   Q.  -- or a party?
23   A.  -- in that case.  Yeah, it was the Montgomery

Page 7

1    Improvement Association and some of the rest
2    of us in that case.
3    Q.  Okay.  What about appointments to boards and
4        committees?  Was there ever litigation about
5        the city --
6    A.  Yes.
7    Q.  -- appointment powers?
8    A.  I don't -- I don't think I was a party to that
9        piece of litigation.
10   Q.  Okay.
11   A.  But we did have a lawsuit against the city for
12       that, but I don't think I was a party to
13       that.  I've been involved in so many pieces of
14       litigation I can't remember them all.
15   Q.  And a number of them you were not a named
16       party in, but were involved?
17   A.  Some of them I was not a named party, but some
18       of them --
19   Q.  Right.
20   A.  Yes.
21   Q.  Okay.  And you're not a named plaintiff in
22       this lawsuit?
23   A.  No.

Page 8

1    Q.  Have you been active in organizing it?
2    A.  Yes.
3    Q.  Tell us what role you played in that.
4    A.  Well, when I first discovered that the city
5        council had voted overnight to approve an
6        ordinance, I raised some objections to it.
7        Because it was no different than what we had
8        objected to in February.  And I really thought
9        we had a clear understanding with the mayor
10       and the city council and everybody on the
11       issue from the February meeting.
12   Q.  Now, when you say we, is that sort of --
13   A.  That's a general --
14   Q.  -- that's Joe Reed --
15   A.  -- term that --
16   Q.  -- or is it -- are you speaking for a group
17       of --
18   A.  That's --
19   Q.  -- people?
20   A.  I'm talking about the Alabama Democratic
21       Conference, as a spokesman for that
22       organization.  And also I've spoken to some
23       black leaders in Montgomery too, including

Page 9

1    some legislators.  Because when the bill was
2    first enacted in February, I called the
3    mayor.  I told the mayor that we had
4    objections to it and why.  Then the mayor and
5    I began some dialogue.
6    Q.  Let me -- I'm going to try to hold you to the
7        first question.
8    A.  Okay.
9    Q.  Let's finish that up.
10   A.  All right.
11   Q.  Let me -- if it gives you some context, it was
12       June 5th that the city council met and
13       adopted --
14   A.  Correct.
15   Q.  -- ordinance 42-2007 that set --
16   A.  Okay.
17   Q.  -- the election dates.
18   A.  All right.
19   Q.  And you said we raised objections.  I would
20       like you, as best you can, to tell me who we
21       is, or are -- who's the we that you're
22       speaking for --
23   A.  I was --

Page 10

1   Q.  -- at that time?
2   A.  I was speaking for the Alabama Democratic
3        Conference, as well as I had spoken to some of
4        the black leaders in Montgomery, Montgomery
5        city council members, and to -- I had spoken
6        to John Knight about it and some others,
7        because he's the chairman of the Montgomery
8        County Democratic Conference.  So that's the
9        we.
10  Q.   Which city council members did you speak to
11       about this ordinance after it had been passed
12       and adopted?
13  A.   I spoke to the four black city council
14       members.
15  Q.   Okay.  And were you speaking --
16  A.   Janet May.
17  Q.   Calhoun?
18  A.   Reverend Nuckles, Councilman Calhoun, and
19       Councilman Cook.
20  Q.   And did they all agree with you?
21  A.   Well, when I told them what had happened --
22  Q.   What did you tell them?
23  A.   I told them that ordinance had the effect of

Page 11

1        diluting the black vote in Montgomery,
2        particularly Alabama State students, because
3        that ordinance would have an election before
4        the students at Alabama State would arrive,
5        and that this was no different than what
6        Emory Folmar had tried to do some years
7        earlier, and that -- I met with them and
8        talked to them.  But I didn't talk to Cook.
9        Cook didn't -- Cook had a conflict, but I
10       talked to the other three council members.
11  Q.   Okay.  And when did this meeting take place
12       with these three council members?
13  A.   I don't recall the exact date, but --
14  Q.   Was it one meeting with you and three council
15       members?
16  A.   Yes.
17  Q.   And was it within a week or two after the --
18  A.   I would say certainly, yes.
19  Q.   Okay.  But you were never able to meet with --
20       arrange a meeting with Councilman Cook?
21  A.   I had to leave and go to a convention.
22  Q.   Okay.
23  A.   So I didn't have time to follow through on

Page 12

1        it.
2   Q.   Okay.  And the other member -- person that you
3        indicated was John Knight.  Did you meet and
4        talk or --
5   A.   John lives right across the street from me.
6        So we just talked about it somewhere, as a
7        matter of fact, probably in the yard.
8   Q.   Sometime after June 5th --
9   A.   Yeah.
10  Q.   -- you spoke with John Knight.  Did you have a
11       meeting of the county ADC?
12  A.   No.
13  Q.   Well, you said -- was there any sort of
14       resolution adopted by the ADC?
15  A.   I don't think they did.
16  Q.   Okay.  Well, when you said ADC, would it be
17       more accurate to say that you meant the
18       chairman of the county ADC, John Knight; and
19       that's how it was --
20  A.   Yes.  I did not go before the body.
21  Q.   That's fine.  I'm just trying to understand
22       who all is involved.  Let me go back and catch
23       up on a few things then.

Page 13

1        Did you then go back and recruit at any
2        point plaintiffs for this litigation?
3   A.   Yes.
4   Q.   Did you ask -- did you ask Council Member May
5        to be a plaintiff?
6   A.   I don't know whether I asked her or not, but I
7        know I talked to her about it.  And she --
8   Q.   Okay.
9   A.   -- agreed to be -- or she agreed to be one of
10       them -- announced that she would be one.
11  Q.   What about -- there are four other named
12       plaintiffs.  Did you speak to any of them
13       about being a plaintiff?
14  A.   I spoke to at least three of them.  I spoke to
15       the student body president of Alabama State.
16       I spoke with the two candidates for mayor, the
17       black candidates for mayor.  And I don't think
18       I ever met one of the plaintiffs.  I think the
19       student body president got that plaintiff.
20       I'm not sure I ever met that one.
21  Q.   Okay.  Have you been intimately -- even though
22       you're not a named plaintiff, have you been
23       intimately involved with Mr. Still and the

Page 14

1   named plaintiffs in the course of developing
2   this litigation?
3   A.  Yes.  We've conversed many -- many times,
4   several times about it.
5   Q.  Okay.  Do you know yet whether or not -- do
6   you expect to be a plaintiff -- I mean, a
7   witness at the trial of this case?
8   A.  Not yet.  I have not been --
9   Q.  You have no idea?
10  A.  -- told I would be or asked to be one.
11  Q.  Okay.  Let's go back.  There's a few personal
12  things I just need to get on the record.
13      Give me -- where are you employed and in
14  what capacity?
15  A.  I'm employed with the Alabama Education
16  Association, commonly referred to as AEA.  And
17  I've been employed there for forty-three
18  years, counting the five years I was with the
19  Alabama State Teachers Association, prior to
20  the merger of the two organizations in 1969.
21  Q.  All right.  Do you hold any elective office?
22  A.  No.
23  Q.  Are you still on the board at Alabama State

Page 15

1       University?
2   A.  Yes.
3   Q.  And you have had a long relationship with that
4   institution.  How long have you been on the
5   board and in what capacities?
6   A.  Well, my relationship with the institution
7   started back in 1958, so forty -- forty-nine
8   years exactly.
9   Q.  How long have you been on the board of
10  trustees?
11  A.  Since 1980 -- I always get confused, '83 or
12  '87.  One of the two.
13  Q.  Okay.
14  A.  It's '83 or '87.
15  Q.  That's close enough.
16  A.  I think it's -- I think it's '83.
17  Q.  And you've held positions on that board such
18  as president?
19  A.  I've been chair of the board.
20  Q.  Chair of the board?
21  A.  Yes.
22  Q.  Are you chair now?
23  A.  No.

Page 16

1   Q.  How long were you chair and about what time --
2   time period was that?
3   A.  I was chair of the board for -- I believe I
4   was chair of the board from '87 to '99, I
5   think it was.
6   Q.  Okay.  Dr. Reed, did you appear at any council
7   meeting during this year to bring a petition
8   or object to these election plans, a public
9   meeting?
10  A.  No.  I did not appear at any city council
11  meeting.  There was a -- not what you call
12  meeting.  I call a city council meeting an
13  official meeting that's scheduled by the
14  rules.
15  Q.  That's fine.
16  A.  Now, there was one session they were holding
17  in the mayor's conference room.
18  Q.  I understand those may be called informal work
19  sessions?
20  A.  They may be, if that's what it was.  I went to
21  them after I talked to the mayor, because they
22  asked me to come by and explain what I was
23  talking about.

Page 17

1   Q.  And would that have been in February when this
2   matter was first brought up?
3   A.  Thereabouts, yes.
4   Q.  Okay.  There were two meetings in February.
5   There was the first one on February 6th when
6   they adopted an ordinance for this election
7   schedule; and then on February 20th, where
8   they -- the mayor, by that time, had vetoed
9   it, and the council upheld the veto.
10      Do you think you're referring to the work
11  session before that February 20th meeting?
12  A.  Yes.
13  Q.  Did you appear at any other work session
14  meetings to speak or any other city council
15  meetings to speak on this subject?
16  A.  No.
17  Q.  Did you have any further conversations with
18  Janet May or any other council member during
19  the course of this process beginning with --
20  after the February 20th meeting until
21  June 5th?
22  A.  Yes, I had some more conversations with some
23  of the council members.  I don't know what

Page 18

1    date it was, what it was about. But it was
2    generally about that ordinance.
3  Q.  Were there -- were you talking to all nine of
4    the council members?
5  A.  No.
6  Q.  Who were you speaking with?
7  A.  Informally with, I know, Janet May,
8    Council Lady Janet May. And I also -- I know
9    I talked to the mayor in between. I talked
10   to -- there may have been somebody else in
11   between, but it was about getting it through
12   the legislature. That's what that was about.
13 Q.  From the very beginning, your concern has been
14   that these -- the late August election date,
15   August 28th, interfered with the ability of
16   newly arriving ASU students to establish
17   residency and vote; is that correct?
18 A.  That's essentially it. There may have been
19   something else.
20 Q.  Did you express that from the beginning as a
21   concern?
22 A.  Yeah, to the mayor.
23 Q.  And to the council members?

Page 19

1  A.  Yes.
2  Q.  Janet May and others?
3  A.  Right. In fact, I carried to them a -- what I
4    thought was a workable document that would
5    have -- that would do two things. It would
6    preserve the right of the students at Alabama
7    State to vote in the election very close to
8    the time they already had been voting; and at
9    the same time, carry out what the mayor said
10   he was concerned about, that was to be sure
11   that the folks overseas would have a chance to
12   vote.
13 Q.  Okay.
14 A.  And we worked it out, I thought, and passed
15   it. And I tried to get it through the
16   legislature, help him get it through the
17   legislature.
18 Q.  So the city council members, and Ms. May in
19   particular, were all aware of this concern
20   about college students being able to register
21   and vote for the city elections beginning back
22   in February; is that correct?
23 A.  Yes. Mayor -- the mayor too, all of them.

Page 20

1  Q.  The mayor too.
2  A.  And council. All of them.
3  Q.  Okay. Did they say -- if they had been aware
4    of that, how did they -- why did they tell you
5    that on June 5th, some four months later,
6    they, nevertheless, unanimously adopted this
7    ordinance?
8  A.  I spoke to them about that.
9  Q.  Okay.
10 A.  And they said they were told that before the
11   night -- the day they voted that it had
12   already been precleared. And you and I know
13   enough that you can't preclear the thing in
14   advance.
15 Q.  Yes.
16 A.  But they didn't know that. That's why they
17   voted for it. And I explained to them what
18   had happened. They said, no, we made a
19   mistake, and we'll straighten it out. They
20   set out the next week to repeal it, but they
21   lost on a five to four racial vote.
22 Q.  Did you talk to any of the city council --
23   white city council members to get their

Page 21

1    support for changing it?
2  A.  No. I left it up to the black council members
3    to lobby their own colleagues. Yeah.
4  Q.  Have you spoken to any of the white city
5    council members about this issue since
6    February?
7  A.  No, I have not.
8  Q.  Okay. Let's go on to some other matters.
9    Did you vote on August 28th in the first
10   election, city council election?
11 A.  Yes.
12 Q.  Did you vote in -- at the regular time and
13   place or by absentee?
14 A.  I voted absentee.
15 Q.  Okay. This schedule did not deprive you of
16   your right to vote, did it?
17 A.  No.
18 Q.  Okay.
19 A.  Because I live here.
20 Q.  All right. Do you plan to vote in the runoff
21   a week from tomorrow?
22 A.  Yes.
23 Q.  And that schedule will not deprive you of your

Page 22

1    right to vote?
2    A.  No.
3    Q.  Other than the difficulty that newly arriving
4        ASU students have establishing a residency and
5        registering to vote, how else are votes of
6        African-Americans harmed by this election
7        schedule, in your opinion, if any?
8    A.  I'm trying to think through, see if anything
9        else comes to mind.  Except for just dilute
10       the overall black vote, period, in a municipal
11       election.  It dilutes it for the city council
12       seat and it dilutes it for the mayor's race.
13   Q.  Do you think it would have made a difference
14       in any race?
15   A.  I'm not certain that it would have.  Looking
16       at the returns, I'm not certain that it would
17       have.  It may have, but I -- that, I don't --
18       I don't know.
19   Q.  How many college students, ASU students, vote
20       in city elections?
21   A.  It depends.  It varies.
22   Q.  How many voted this last time?
23   A.  I didn't really count them.

Page 23

1    Q.  How would you go about counting them?
2    A.  Well, you really can't tell exactly how many.
3    Q.  What's your estimate?
4    A.  I don't remember that.  I don't -- I don't
5        remember that.  I don't want to even estimate
6        what it would have been.  It's easy -- it's
7        easy to look it up, which I don't mind doing,
8        and certifying it back to you.
9    Q.  How would you look it up?
10   A.  Oh, I would just look at the return, these are
11       how many folks returned -- how many folks
12       voted at the school there.
13   Q.  Yes.  I mean, how many of them were students
14       that voted?
15   A.  I -- well, I don't know exactly how many were
16       students.
17   Q.  How would you know that?  Is there any way to
18       know of the people who voted how many of them
19       were students at ASU?
20   A.  At this particular -- at that particular
21       election, you wouldn't know exactly.  I don't
22       know of a way of knowing exactly how many
23       voted.

Page 24

1    Q.  Do you know any way to make a reasonable
2        estimate?
3    A.  Yes.  I think if you look at some elections
4        back and forth.  For example, I remember one
5        time we had -- at that particular polling
6        place we had some nineteen hundred for the
7        Democrats and like a hundred for the
8        Republicans, that I remember.
9    Q.  What does that tell you about the number of
10       students that are registered?
11   A.  It -- and that number was higher than those
12       that voted in some previous city council
13       races, but I don't remember exactly.  It tells
14       you that certain times of the year -- I mean,
15       certain elections you get more students voting
16       than others.
17       And you have to work up the crowd.  It
18       depends on the enthusiasm in the election and
19       all of that.  All that has to do with -- like
20       any other election, you know, you have some
21       where you have more folks voting than others.
22       And it depends on how excited the students
23       get.

Page 25

1        So it -- I don't think anybody can give
2        you a definitive answer on that.
3    Q.  Would it help if I -- do you think if you look
4        at the election results for -- let's make sure
5        we're talking about the same thing.  District
6        three, which is your city council district,
7        right?
8    A.  Yeah, I live in the city -- city council
9        district three.
10   Q.  And just for background, you used to --
11   A.  I used to represent that district, yeah.
12   Q.  -- represent it for some twenty years or more,
13       right?
14   A.  Yes.  Yes.
15   Q.  From 1975 to 1999?
16   A.  Yes.
17   Q.  Okay.  And the first city council in 1975,
18       there were four blacks elected to that; is
19       that right?
20   A.  Yes.
21   Q.  Okay.  And you were one of the first four --
22   A.  Yes.
23   Q.  -- black city council members?

Page 26

1  A.  Yes.
2  Q.  I would -- here is the -- I'll just show you a
3      copy of the August 28th election returns for
4      city council district three.  I don't have a
5      calculator with me, but it looks like there's
6      about three thousand votes cast among the
7      three candidates.
8          Can you tell me how many of those were
9      student votes?
10 A.  No, I can't tell you.
11 Q.  Okay.  Would you know any way -- any other
12     information that might be available that would
13     help you know how many students voted?
14 A.  No.  I can't tell you exactly how many
15     students voted, no, because we don't -- we
16     just don't know that.
17 Q.  Do you know how many students have registered
18     to vote during this past month of September?
19 A.  No.
20 Q.  Has there been an active registration campaign
21     on the campus this month?
22 A.  I have not conducted one.  I don't know.  I
23     just don't know.

Page 27

1  Q.  Has ADC conducted those in the past on campus,
2      voter registration drives?
3  A.  Some in the past, but I don't know how many.
4  Q.  Did they this September?
5  A.  No.
6  Q.  Why wouldn't they have this September?
7  A.  This past September?
8  Q.  Yes.
9  A.  Because they were shut out.  The kids were
10     shut out.  The elections were August -- August
11     the 28th, which normally would have been the
12     qualifying date.
13 Q.  Do you think that they could have registered
14     to vote for the runoff election coming up a
15     week from Tuesday?
16 A.  I haven't counted the days to be sure.  I
17     suspect some of them -- yeah, more certainly
18     could -- from the 28th -- yeah.
19 Q.  Sure.
20 A.  Yes, thirty days would have been --
21 Q.  If you started class on August 23rd and
22     you're -- establish residency by that time in
23     Montgomery?

Page 28

1  A.  Well, everybody wouldn't start then.  Some
2      students don't get there until the 29th.  Some
3      get there at various times.
4  Q.  They're late arriving for class?
5  A.  No.  No.  No.  You've got certain classes --
6      all of the classes, I don't think, started on
7      the 28th.  I don't believe they did.
8  Q.  Do most freshmen live on campus?
9  A.  Not -- not on -- not on -- let's see, probably
10     not.
11 Q.  How many students -- do you know as -- with
12     your years on the ASU board, how many
13     residential students you have?
14 A.  About twenty-three hundred, thereabouts, give
15     some, take some.
16 Q.  Is there any priority given for --
17 A.  Freshmen.
18 Q.  -- freshmen versus seniors?
19 A.  Not really.
20 Q.  What do you know of the attrition rate between
21     first and second year students at ASU?
22 A.  I don't know that.  I can get it for you, but
23     I don't know that.

Page 29

1  Q.  Is it high?  Do most of the freshmen return
2      for their second year?
3  A.  I just don't know that.
4  Q.  Of the incoming freshmen that this suit is
5      principally concerned with -- is that a fair
6      premise?
7  A.  Not quite.  Because you've got some transfer
8      students.
9  Q.  Okay.  Well, the newly incoming students --
10 A.  Yes.
11 Q.  -- whether they be freshmen or
12     upperclassmen --
13 A.  Okay.
14 Q.  -- we are talking about people who live
15     outside the city of Montgomery, right?
16 A.  Yes.
17 Q.  Because if you live in the city of Montgomery,
18     you would have already established residency?
19 A.  That's right.
20 Q.  Do you know how many of those newly incoming
21     students usually have registered to vote at
22     their hometown?
23 A.  No.

Page 30

1  Q.  Have you made any study of that?
2  A.  No.
3  Q.  Did you make any effort to campaign for any
4      candidates on the ASU campus?
5  A.  This suit was -- the justice department
6      precleared this on what date?  What date did
7      the justice department preclear this?
8  Q.  It was about the 25th to the 27th of August.
9  A.  Of August.  No, it wasn't quite that.  Let's
10     see.  I left the -- I went on vacation, so I
11     was trying to figure that date.  I left on the
12     17th of August.  So it wasn't -- it must have
13     been precleared just before we left.  Wasn't
14     it precleared before we left?
15  Q.  That's what I said.  The election was
16     the 28th, and I think it was about --
17  A.  The bottom line -- the bottom line is, no, to
18     answer your question --
19  Q.  -- five to --
20  A.  -- I was trying to -- in the -- in the
21     context.  Because I was out of town during
22     most of that later campaign period, because I
23     was just so convinced that the Department of

Page 31

1      Justice was going to turn it down.
2  Q.  Oh, I see.
3  A.  And you -- you outfoxed us on that.  But at
4      any rate -- so we -- we weren't even planning
5      to -- I didn't ever think we would have an
6      election on the 28th.  I really didn't.
7  Q.  Did your lawyer give you that advice?
8  A.  I just about -- I read -- I had read the
9      rules.  That's all.  I had read the rules
10     myself.  I didn't need any advice from him.
11  Q.  We must have read different rules.
12  A.  We did.  We did.  We talked -- we had a
13     different conversation with the Justice
14     Department.  I'll give you -- I'll give you a
15     plus on that.  Yeah.
16  Q.  Do you know of any campaigning done by any
17     candidate for city offices on the ASU campus
18     before the August 28th election?
19  A.  I was gone.
20  Q.  Well, I know you were on -- what day did you
21     leave?
22  A.  I left on the -- I left on the 17th.  And I'm
23     telling you, leading up to the 17th, I didn't

Page 32

1      think we were going to have an election.
2  Q.  Well, I know, but --
3  A.  I didn't do a lot of campaigning really.
4  Q.  I didn't ask if you did the campaigning.  But
5      you live near ASU?
6  A.  Yeah, but --
7  Q.  You live in that district.  Was there
8      campaigning on the ASU campus?
9  A.  I saw some -- I saw some signs out.  That's
10     about all.  Because I was so busy trying to
11     stop this from going forward.  I was spending
12     all my time on this.  I didn't do much
13     campaigning.
14  Q.  Isn't it true that all other colleges in
15     Montgomery were affected by this election
16     date?  All of them have new students arriving?
17  A.  Yeah.
18  Q.  And it -- to whatever extent, it affected
19     their ability --
20  A.  Yeah.
21  Q.  -- to establish residency?
22  A.  Yeah, but all of these schools don't have the
23     black population that we have.

Page 33

1  Q.  I appreciate that, but --
2  A.  And that's -- that's -- that was our big
3      concern too, the dilution of the black vote.
4  Q.  So you're not complaining about discrimination
5      against college students; you're complaining
6      about discrimination against African-American
7      college students?
8  A.  Yeah.  Yeah.  I'm more concerned about the
9      impact -- I don't want anybody discriminated
10     against, period.  But I was more concerned
11     about the impact that the blacks would have,
12     because Montgomery has historically tried to
13     dilute the black vote at Alabama State ever
14     since we've had a city council.  I mean, the
15     record is so clear with it.
16         And that's what I was -- and that's why I
17     was willing -- willing and ready to work with
18     the mayor to achieve what he wanted to achieve
19     and at the same time protect the students.
20     That was doable.  The only reason it wasn't
21     doable was because Larry Dixon killed it in
22     the legislature.  If they had not killed it in
23     the legislature -- if Larry hadn't killed it

Page 34

1    in the legislature, we wouldn't be here
2    today.
3  Q.  Okay.  There's a runoff in city council
4    district three --
5  A.  Right.
6  Q.  -- between Mr. Larkin and Ms. May?
7  A.  Right.
8  Q.  And that will be decided a week from tomorrow?
9  A.  Yes.
10  Q.  That's the deciding election, is it not, for
11    that position?
12  A.  Yes.  It's deciding the election for that
13    position, yes.
14  Q.  Okay.  So to the extent students have had the
15    opportunity to establish a residency, that is,
16    if they were attending their first day of
17    class on August 23rd and had time, therefore,
18    to establish their residency, they'll -- they
19    had the opportunity to register and vote?
20  A.  Yes, but not --
21  Q.  In the --
22  A.  -- in the mayor's race.
23  Q.  -- in the runoff election?

Page 35

1  A.  In the runoff, yes, but not for mayor.
2  Q.  You're not contending, are you, that the
3    African-American vote in this city was diluted
4    and that there would have been any difference
5    in the results of the mayor's election by ASU
6    students not being -- having time to establish
7    residency?
8  A.  No.  I'm not contending for this election.
9    But I am making it very clear that the next
10    election a black could run.  And if the City
11    of Montgomery gets away with this one now,
12    this one being -- if they can -- if the City
13    of Montgomery is allowed to hold the future
14    election in July, then we're going to dilute
15    the chance of a black being elected mayor of
16    the city of Montgomery.
17  Q.  Okay.  And you are aware that the election
18    schedule used this year was approved for only
19    one year by -- only this one time by the
20    Department of Justice?  You're aware of that,
21    aren't you?
22  A.  Yes.
23  Q.  And you are aware that the city made that

Page 36

1    representation to DOJ, and DOJ accepted it?
2        MR. MENEFEE:  This is DOJ, caps,
3        Department of Justice.
4        COURT REPORTER:  Thank you.
5  Q.  And the DOJ accepted that when they precleared
6    it?
7  A.  Yes.
8  Q.  So do you think it's necessary to cancel the
9    election results for August 28th?
10  A.  Unless we get a settlement of this lawsuit,
11    what we've been trying to get done.
12  Q.  So you think that the failure of
13    African-Americans to be able to -- students to
14    be able to register and vote before the
15    August 28th election affected the mayor's
16    race?
17  A.  No, I think it could affect future races.  And
18    the DOJ now may have a totally different
19    leader four years from now.  And, you know, we
20    could have a totally different person, get a
21    pharaoh who knew not Joseph.  And you've got a
22    problem.  Yeah.  I do think this last election
23    was illegal, but I'm not begging that

Page 37

1    question.  That will be saved for another day.
2  Q.  Okay.  You had -- I asked you before we
3    started to look through the amended complaint.
4  A.  Yes.
5  Q.  And to -- particularly attention to
6    paragraphs 8 through 13, the factual
7    allegations.  And you had a chance to do
8    that.  Did you see any mistake or any addition
9    that you have knowledge of that should be
10    added to that -- to those paragraphs, 8
11    through 13?
12  A.  Counselor, I don't see any right offhand.
13  Q.  Okay.  Well, if you found something -- I'm
14    concerned that we show up at trial and all of
15    the sudden you have a significantly different
16    memory.  You'll tell your attorney and --
17  A.  I will -- I will tell you --
18  Q.  -- he'll let us know?
19  A.  I will tell my lawyer to tell you I found
20    something, something came to my mind.
21  Q.  Okay.  That's fine.
22  A.  I'll definitely do that.
23  Q.  Otherwise --

Page 38

1    A.   I won't surprise you.
2    Q.   Otherwise, it looks complete?
3    A.   Yes.
4    Q.   Okay.  I have one question -- actually, maybe
5         two, concerning this.  Look at paragraph
6         number 11 at the bottom of page 4 of the
7         amended complaint in this action.
8    A.   Uh-huh (positive response).
9    Q.   It says, despite this signed agreement -- and
10        that's referring up to the agreement you
11        had -- you discussed in the previous
12        paragraph.  Do you have a copy of that signed
13        agreement?
14   A.   No, but it ought to be in the record in
15        Buskey -- Buskey vs. Oliver.
16   Q.   Okay.
17   A.   I -- and I might could find it.  I don't -- I
18        don't know.  I couldn't put my hand on it
19        right now, but I could probably find it.  And
20        it may be in the clerk's office.  The clerk
21        may have it.
22   Q.   Now, describe what this -- this was an
23        agreement for the Greater Montgomery Plan to

Page 39

1         go through the legislature, right?
2    A.   Uh-huh (positive response).
3    Q.   Okay.  Can you -- was it on somebody's
4         letterhead?  Was it adopted by the city
5         council?  Describe that, as best you can, so
6         we'll know what we're looking for.
7    A.   Okay.  It should have five or six pages.  It
8         may be four.  That's been some time.  What
9         that agreement --
10   Q.   Who all signed it?  I'm trying to think of the
11        form, the number of pages, it's type-written,
12        it's double-spaced?
13   A.   We had some whereas and wheretos and
14        therefores in it, so -- and what it was was
15        this, we had -- we, being blacks -- we had
16        successfully killed the Greater Montgomery
17        Act.
18   Q.   I appreciate that.  But I'm not as interested
19        in the substance, because it's described.
20   A.   Okay.
21   Q.   I'm interested in the form.  Who all signed
22        it, and in what capacity were they signing
23        it?

Page 40

1    A.   They signed it as the city council members.
2    Q.   So you think all nine council members, to the
3         best of your memory?
4    A.   Yes.
5    Q.   And the mayor?
6    A.   I'm not sure if the mayor was a signatory or
7         was a witness.  But I think he was -- he
8         signed it.
9    Q.   He was part?
10   A.   He was part.
11   Q.   Who other than the council members?  Anybody
12        else?  Was there like a --
13   A.   No.
14   Q.   -- Montgomery Improvement Association?
15   A.   No.
16   Q.   -- or ADC Chapter representative?
17   A.   No.  It was just those of us working on the
18        agreement.
19   Q.   I see.
20   A.   In order to get it through.
21   Q.   I've got you.
22   A.   We looked at it.  And when they agreed that
23        they will support the plan that will nearly

Page 41

1         elect a black -- I was drawing the district
2         line those times.  And I looked at it and
3         figured by the time the population shifted and
4         all that, we could get it done.
5    Q.   I've got you.
6    A.   So that's what the agreement was about.  And
7         we led it through, because I don't guess we
8         trusted -- we didn't trust each other enough
9         to do a handshake.  We -- we had everybody to
10        sign it.
11   Q.   I understand.
12   A.   That's what it was.
13   Q.   Okay.  That's what I was trying to get a sense
14        of, who were the parties to it and what it
15        was.
16   A.   Yeah.  It was the city -- city council members
17        and the mayor.
18   Q.   Let me direct your attention to one other.
19        It's paragraph 13, the first sentence at the
20        bottom of page 5.  It refers to the
21        reapportionment in 1998.
22   A.   Yeah.
23   Q.   That was precleared by the Department of

1    Justice, wasn't it?
2  A.  Yes.
3  Q.  Okay.  That's not noted in here, just for the
4      record.
5        Was the principal contention at that
6      point council district seven and what the
7      racial make-up of that council district would
8      be?
9  A.  Yes.
10 Q.   And council district seven is fairly close
11      racially, contrary to most of the other
12      districts in the city; is that correct?
13 A.   Yes.  At that time, there was an exodus of
14      white residents out of the south -- south
15      Montgomery area.  And that district was
16      expected or projected to be a majority black
17      district, that would have given a majority,
18      five blacks on the city council.
19 Q.  I've got you.
20 A.   And Mayor Folmar recognized that.  He sent
21      somebody to -- one of his employees.  The
22      mayor said he wanted to redraw the district
23      lines.  I said -- or told me to draw them.

1      And I told him I would not draw them, because
2      I was not going to draw them for a majority
3      white district.
4  Q.  That's it.  Thank you.  That's -- I just
5      wanted to establish that the nearest thing to
6      a swing district in Montgomery, speaking in
7      terms of racial politics --
8  A.  Oh, yes, seven.
9  Q.  -- is seven?
10 A.   Seven.  Yeah, seven.  Seven -- seven is not
11      as -- the black population in seven now is not
12      what it would have been in '98 when it was
13      changed.  Because we were going to reapportion
14      in the year 2000.  And Folmar changed it two
15      years out.
16 Q.  I've got you.
17 A.  Yeah.
18 Q.   And then it was reapportioned again in 2001?
19 A.  Yeah.
20 Q.   And the lines were redrawn, right?
21 A.   Yeah.  Based on the 1998 drawings, not based
22      on the 1990 drawings.
23 Q.  The 2001 redistricting was based on the 2000

1      census?
2  A.  Based on the 2000 census.
3  Q.  Right.
4  A.  And then -- but your take-off point was based
5      on what the district was in 2000, not what the
6      district would have been.  So Folmar
7      straightened that out in 1998, two years ahead
8      of time.  That district was reconfigured.
9  Q.  Do you recall in 2001 when the mayor was
10      developing a plan to submit to the council
11      that an early draft of that had you, your
12      area, your neighborhood, moved into district
13      seven, and the line was drawn along
14      Carter Hill Road and meant you would have
15      voted at the Cloverdale Community Center
16      instead of at ASU and you would have been, and
17      your neighborhood would have been, in district
18      seven; and you contacted me and the mayor and
19      asked that your neighborhood be put into the
20      ASU box?  Do you recall that?
21 A.  Yeah, I told -- I told --
22 Q.  Do you remember meeting with me and the mayor?
23 A.  If you say I did, I wouldn't doubt it.

1      Because I'll take your word for it.  I've been
2      involved in so many different kind of
3      meetings.  I don't recall that meeting.  But,
4      now, if you say we did -- I do remember
5      contacting the mayor's office about it.
6  Q.  Yes.
7  A.   And my position was then, and still now, that
8      district -- that portion of the district had
9      been involved in -- that district has -- we
10      had a city council.
11 Q.  That's right.
12 A.  And --
13 Q.   That's right.  And the difference was that
14      early draft of the plan had the lines dividing
15      district three from seven running along
16      Carter Hill Road, whereas, historically it's
17      been at Felder --
18 A.  Felder.
19 Q.  -- Avenue, right?
20 A.  That's right.  Yeah.
21 Q.   So at your request, it was moved back to the
22      historical traditional dividing line at
23      Felder?

1  A.  Yes.  Yes.

2  Q.  Okay.

3  A.  Yes.  I don't know whether I made the sole

4      request or not, somebody else probably made it

5      too.  But I was one of those against Carter

6      Hill Road being the boundary.  And Janet May

7      probably would have had the same feeling too

8      about it as a councilwoman.

9  Q.  You don't know of anybody else that made that

10     request, do you?

11 A.  No, I wasn't doing a lot of collaborating, but

12     I'm sure -- I'm certain there were others who

13     were against it, including Janet May.  She

14     would not have wanted that.

15 Q.  Well, whether or not they were against it, do

16     you know of anyone else who made a request

17     that that line be moved from Carter Hill down

18     to Felder, made a request to the mayor or made

19     a presentation to the council?

20 A.  Let me say it this way.  Put it another way.

21     It wasn't a request that it be moved back.

22     The request was not to move it at all, keep it

23     like it was.  That's what it was.  The request

1      was, why change the line?  The line is already

2      here.  What are you changing it for?  That's

3      what we saw.  And so -- and if I stand alone

4      on that, okay.  I don't have a problem.

5  Q.  That's fine.  Your neighborhood, John Brown

6      Avenue, is predominantly black, is it not?

7  A.  It has three houses on it.

8  Q.  Yes.  And the neighborhood between there and

9      ASU and Carter Hill is predominantly black,

10     isn't it?

11 A.  Yes.

12 Q.  Okay.

13 A.  But Felder is all white.

14 Q.  And the north side of Felder is all white?

15 A.  Is all white.  That's right.

16 Q.  Okay.  Are your allegations concerning this

17     matter that anyone in city government was

18     acting with a racial motivation?

19 A.  If you say who, I can't tell you.  I'll tell

20     you what, it's a -- it's a racial result.

21 Q.  I'm talking about an intent or a motivation,

22     not as a result.

23 A.  Yeah.  Well, I can tell you what -- this much

1      I can tell you, because I don't toss the word

2      racial around a whole bunch.  But the bottom

3      line is, it was going to have a racial -- the

4      results were going to discriminate against

5      blacks because of our race.  Because it was --

6      the election was held at a time when black

7      students, a heavy black district, was going to

8      be cut out of the election.  And this has been

9      the pattern since day one.

10 Q.  Okay.  Well --

11 A.  Day one being 1975.

12 Q.  -- Dr. Reed -- Dr. Reed --

13 A.  I hear you.

14 Q.  You know the difference.  You have -- we have

15     been in voting rights cases --

16 A.  Yeah.

17 Q.  -- from day one.

18 A.  Yeah.

19 Q.  You know the difference between a result

20     question and an intent question.

21 A.  I think Larry Dixon was motivated racially

22     when he killed the plan.

23 Q.  I have asked you the question.

1  A.  Yeah.

2  Q.  Is anyone in city government, the council

3      members, or the mayor, or anyone else there

4      that was involved in this decision that you

5      can identify that acted with a racial

6      motivation in this matter?

7  A.  If you go -- go into the hearts and examine

8      them -- I don't know what they had in their

9      head, but the results were racially motivated,

10     yes.  Sure.

11 Q.  They --

12 A.  They being -- they being -- they being the

13     city council and the mayor.

14 Q.  Okay.

15 A.  They made this proposal.  Now, they came back

16     and changed it and came back and made it

17     again, you see.  That's where the rubber hits

18     the road.  Because they didn't have to do it

19     this way.

20 Q.  So you are -- let me make sure --

21 A.  Yeah.

22 Q.  I'm going to try to ask this as simply as I

23     can.

Page 50

1  A.  I know.  Go on.
2  Q.  You're saying that the mayor and city council
3     acted with a racial motivation when they set
4     this election schedule that began on
5     August 28th?
6  A.  I have no other basis for them setting it.
7     They have never advanced for me any other
8     reason.  Of course, they didn't advance race
9     either as a reason.  They never said.
10        Larry Dixon made it very -- pretty
11    clear.  He was the one that killed the bill.
12    But in terms of moving this election up, when
13    they moved it up, you know, the racial
14    results -- I didn't go in their head.  They
15    never testified openly what it was, but the
16    results were racial.
17 Q.  So do you know what their motivation was?
18 A.  To this day, God knows I don't know, except
19    the results are racial.
20 Q.  The results --
21 A.  Because I have --
22 Q.  I understand.  I'm trying to get to the
23    motivation.

Page 51

1  A.  Yeah, the --
2  Q.  And if you don't know, that's fine.
3  A.  And I can't go in their heads and tell -- I
4     told them it was going to affect -- adversely
5     affect Alabama State students and black
6     students from day one.
7  Q.  Now --
8  A.  And the bottom line was, they still did it.
9  Q.  Dr. Reed --
10 A.  And what they did it for -- they only said --
11    they never openly stated.  I just told you
12    what my belief was -- belief is.
13 Q.  Dr. Reed, you earlier had said that the mayor
14    had expressed concern about the overseas
15    voters?
16 A.  He had.
17 Q.  So you don't think that was a motivation for
18    change?
19 A.  Oh, yes.  Originally, that's what we all
20    worked together on.  I came back, gave the
21    mayor -- I gave the mayor -- I gave the mayor
22    the law that says that because this was a --
23    was a municipal election, that law didn't even

Page 52

1     apply.
2  Q.  What law do you believe says that, Dr. Reed?
3  A.  I don't know what --
4  Q.  Is it in Alabama Code?
5  A.  No, I'm not -- I'm talking about the federal
6     law.
7  Q.  I want to show you a copy of Section 17-11-3
8     from the Alabama Code, that paragraph A
9     specifically says -- and this is for absentee
10    ballots.  It says, municipal elections -- I
11    have put it in bold, you see, up at the top
12    there -- includes municipal elections.
13 A.  You mean this section here?
14 Q.  That's right.
15 A.  Yeah, what does this say?
16 Q.  That's the Alabama Code.  It talks about
17    absentee ballot provisions --
18 A.  Yeah.
19 Q.  -- for municipal elections.
20 A.  That's a general -- that's a general absentee
21    ballot provision.  That's not an absentee
22    ballot provision with change.  This -- not
23    only -- it goes on to say, five days prior to

Page 53

1     the election which he desires to vote.  I
2     don't read this to mean what you're saying it
3     meant, that that was a mandate.  I really
4     don't.
5  Q.  What do you --
6  A.  I think -- I see this as a -- making it
7     possible for a person to vote in municipal
8     elections, which is okay, fine, we're all for
9     that.  I'm for the overseas people voting.
10 Q.  And you see down -- the fifth item listed, the
11    group of voters it includes, that's also in
12    bold -- I think it's five down.  They list the
13    different types of classifications.  And the
14    last one listed are the folks voting under the
15    Federal Uniform Overseas Voting Provisions,
16    UOCAVA?
17        MR. STILL:  Let me just jump in here
18           with an objection generally
19           to -- I know Dr. Reed is
20           involved in a lot of legal
21           matters, but he isn't a lawyer.
22           And so I object --
23        MR. MENEFEE:  Sure.

Page 54

1      MR. STILL: -- to his testimony
2         about -- about the meaning of
3         statutes, but he can go ahead
4         and answer.
5   A.  Now, go back to that. What are you saying
6         that means?
7   Q.  I'm --
8   A.  I'm serious. I'm just trying to understand.
9   Q.  I'm suggesting that the Alabama Code has now
10        incorporated the Federal Overseas Voting Group
11        as a requirement for municipal elections.
12        They have to accommodate those overseas
13        voters, the federal overseas voters, for
14        municipal elections.
15  A.  Okay. That's your contention.
16  Q.  That's our contention.
17  A.  Okay.
18  Q.  And this is one of --
19  A.  That's your contention.
20  Q.  Yes.
21  A.  Okay. That's not mine.
22  Q.  You don't agree with that?
23  A.  No.

Page 55

1   Q.  Do you think compliance with the -- allowing
2         the overseas voters -- the federal overseas
3         voters to vote in municipal elections was a
4         motivation for anybody in city government to
5         adopt this election schedule?
6   A.  I think that was motivated by some, sure.
7   Q.  Okay.
8   A.  I think they wanted to do that.
9   Q.  And that was expressed by various people --
10  A.  Various people.
11  Q.  -- in city government?
12  A.  Yeah. And my response was you can do it, but
13        not at the expense of the students at Alabama
14        State. You can't deprive one person of his
15        right and give it to another one.
16  Q.  I didn't --
17  A.  That was our argument.
18  Q.  With due respect, I didn't ask you that.
19        We've spoken briefly about ADC. I would
20        like to go a little bit more into their role
21        in the city elections in particular. Let me
22        just ask you a couple of quick ones.
23        Alabama Democratic Conference is an arm

Page 56

1         of the Democratic party; is that right?
2   A.  Not really.
3   Q.  Okay.
4   A.  No.
5   Q.  It's a separate organization --
6   A.  It's a separate organization --
7   Q.  -- that --
8   A.  -- on its own. It's an organization --
9         organization of Democrats.
10  Q.  It's Democrats. And it's African-American
11        Democrats?
12  A.  Right.
13  Q.  Are there any white members?
14  A.  Yes, some, a few.
15  Q.  But it is identified to further the
16        interest --
17  A.  As a black Democratic caucus of Alabama.
18  Q.  Okay.
19  A.  That's exactly right.
20  Q.  Okay. And is a principal function to
21        encourage candidates to run and endorse
22        candidates?
23  A.  Yes.

Page 57

1   Q.  Okay. On the municipal elections held in
2         Montgomery, they endorsed candidates, ADC did,
3         right?
4   A.  The local organization endorsed.
5   Q.  That's right.
6   A.  The state organization has no control over
7         municipal elections.
8   Q.  Okay. So the --
9   A.  It's handled by the local chapter.
10  Q.  So the decision was made by your county
11        officials -- and John Knight is the chair of
12        the county --
13  A.  Yes.
14  Q.  -- ADC?
15  A.  Right.
16  Q.  And would they have held a meeting to make the
17        decision of who to endorse?
18  A.  I would assume they did. I was not there.
19  Q.  Did you ever see who they endorsed?
20  A.  No.
21  Q.  Or do you know who they endorsed?
22  A.  They told me. I was -- I might have been on
23        the road. I don't know where I was, but they

1    told me who they endorsed.
2  Q.  Can you -- do you remember enough to tell me
3       who they endorsed for mayor?
4  A.  I think one of the black guys.  I think it was
5       Dow.
6  Q.  Okay.
7  A.  Yeah.
8  Q.  And then in district three, your city council
9       district, who did they endorse?
10 A.  I think they endorsed Janet May in that one.
11 Q.  Okay.  And in district seven, the nominally
12      swing district, there was a Ms. Sankey and a
13      Ms. Roby running.  Do you know who they
14      endorsed?
15 A.  I can tell you what I think.  I think they
16      endorsed Ms. Sankey.  I think they did.  I
17      don't -- I think I was gone when it happened.
18 Q.  Is Janet May a member of ADC?
19 A.  Yes.
20 Q.  Is Mr. Dow a member of ADC?
21 A.  I would think so, but that would be handled
22      through the local chapter.
23 Q.  Are there other political endorsing

1       organizations in Montgomery locally?  Does
2       New South endorse anybody --
3  A.  I really don't know.
4  Q.  -- that you're aware of?
5  A.  I really don't know.
6  Q.  Okay.
7  A.  Sometimes they do.  Sometimes they don't.  I
8       really don't know whether they endorsed this
9       last time or not.  I don't know.
10 Q.  Are there any other organizations that you're
11      aware of that endorse a slate of candidates
12      like ADC?
13 A.  Offhand, I don't know of any.
14 Q.  Okay.  Let's see.  A good bit of your history
15      in the complaint discusses the time when
16      Mayor Folmar was in office?
17 A.  Yes.
18 Q.  And he was in office until --
19 A.  1999.
20 Q.  -- the 1999 elections?
21 A.  Yes.  He and I went on the council together
22      and left together.
23 Q.  Okay.  And shortly after him going on the

1       council, he soon became mayor, right?
2  A.  Yes.
3  Q.  Four years later or --
4  A.  Well, less than four.
5  Q.  Less than four.  It was an interim thing --
6  A.  Yes.
7  Q.  -- when Mr. Robinson stepped down?
8  A.  Yes.
9  Q.  How would you describe your relationship with
10      Mr. Folmar over the years?  By the -- he is
11      white, for the record?
12 A.  Contentious.
13 Q.  Contentious?
14 A.  Yeah.
15 Q.  How was he viewed by the African-American
16      community, the black community in Montgomery?
17 A.  The majority didn't think well of him.
18 Q.  Opposed in many instances to their interests?
19 A.  Yes.  We had a lot of differences.  Blacks --
20      and also as a council member and also the
21      black people had a lot of differences with
22      Mayor Folmar.
23 Q.  Do you think that the defeat of Mayor Folmar

1       in 1999 was a significant change in city
2       government in the view of most black citizens
3       in Montgomery?
4  A.  Yes.  Most blacks supported the current
5       mayor.  Folmar would not have had a lot of
6       black support.  He might have had a little,
7       but not much.  So most who saw his departure
8       saw it as a plus.
9  Q.  Okay.  When you were in office --
10 A.  Yes.
11 Q.  -- were you -- as a member of the city
12      council, were you responsive to the needs of
13      the black community that you represented?
14 A.  Yes.  Yes.  Very much so.
15 Q.  Are black elected city council members
16      approximately proportional to their proportion
17      of the voting-age population, of black
18      voting-age population in the city?
19 A.  I'm sorry.  I missed --
20 Q.  Yes.  Are the number of black city council
21      members roughly proportional to the percentage
22      of black voting-age population in the city?
23 A.  Yes.

Page 62

1   Q.   Same question for the local legislature
2        delegation.
3   A.   Yes.
4   Q.   Is it racially --
5   A.   Yes.
6   Q.   And what about on the county commission?
7   A.   Yes.  County commission, it's close.  Yeah.
8   Q.   Roughly.  And on the school board, county
9        school board?
10  A.   Yes.
11  Q.   Okay.  Well, let me just ask it -- have the
12       black elected officials in these various
13       bodies been responsive to the needs of the
14       black community?
15  A.   I think some of them have.  Some of them
16       haven't.
17  Q.   Sure.  By and large, most of them have been?
18  A.   I think overall.  I would put it on the plus
19       side.  I think there's some other things they
20       could have done.
21  Q.   Could have done more?
22  A.   Yes.
23  Q.   Okay.

Page 63

1   A.   And whites too.
2   Q.   Absolutely.  Do you consider the city council
3        districts in Montgomery large, difficult to
4        campaign in, expensive to conduct campaigns?
5   A.   Overall, no.
6   Q.   Do most candidates for city council office buy
7        expensive electronic media, television?
8   A.   That, I don't know.
9   Q.   Do you see many TV ads for city council races?
10  A.   Not a lot.
11  Q.   Did you buy TV ads --
12  A.   Yes.  Yes.
13  Q.   -- when you were --
14  A.   Yes.
15  Q.   What did you -- what type of budgets did you
16       spend when you ran for city council?
17  A.   I don't remember what my budget was.  I
18       didn't -- I had money.  I know that.  I
19       raised -- I raised enough money to conduct a
20       good city council race.
21  Q.   Okay.
22  A.   And, of course, that election there were other
23       council members who bought television ads and

Page 64

1        what have you.
2   Q.   Okay.  In your city council district three,
3        did Ms. May -- or does Ms. May have support
4        from the white community that's in that
5        district?
6   A.   I don't know, but I would -- if I -- I don't
7        know.  I would speculate she has some support
8        from the white community, yes.
9   Q.   Do you know -- do you have an opinion whether
10       she has more support from the white community
11       in that district than Mr. Larkin?
12  A.   No.  They both live close together, so I don't
13       know what the friends and neighbor factor is
14       in that district.
15  Q.   It's true, is it not, that the white community
16       and business community have held fundraising
17       efforts for Ms. May?
18  A.   Yes.
19  Q.   And you've attended those, haven't you?
20  A.   I attended one, yes.  And I don't -- I don't
21       know whether they had one for Mr. Larkin or
22       not.  I couldn't say they didn't have one for
23       him.  But I've been to one.

Page 65

1   Q.   Do you think Mayor Bright got more votes from
2        the black voters, the black community, than
3        Mr. Dow and Mr. Boyd got from the black
4        community?
5   A.   I have not analyzed that to see exactly
6        whether he got -- his overall vote was more
7        than the combined vote of the two.  Your data
8        may show something that I have not analyzed,
9        because I have not analyzed the -- but that
10       doesn't surprise me if he did.
11  Q.   Would the Alabama State box be a pretty good
12       one to look at, one that you're familiar with?
13  A.   Yes.  It wouldn't surprise me --
14  Q.   Okay.
15  A.   -- if he did.
16  Q.   He got -- in the Alabama State box, he got two
17       hundred and thirty-four votes.
18  A.   Okay.
19  Q.   The second leading vote-getter in the Alabama
20       State box was Mr. Simmons, who is white; is
21       that correct?
22  A.   Yes.
23  Q.   He got ninety-one votes.

Page 66

1   A.  Okay.
2   Q.  Mr. Dow was third at forty-seven, and Mr. Boyd
3      was fourth at seventeen.
4   A.  Okay. That doesn't -- that doesn't surprise
5      me.
6   Q.  Mr. Bright appears to have gotten something
7      like --
8   A.  He --
9   Q.  -- sixty or seventy percent of the vote at
10     Alabama State.
11   A.  He may have. He may have gotten that, yeah.
12     Because those guys weren't known in the first
13     place. Some folks probably didn't even know
14     they were black.
15   Q.  Did Ms. Roby get more black votes in her
16     district than Ms. Sankey?
17   A.  Let me tell you -- I can tell you -- I can't
18     tell you what any of them got. I have not
19     analyzed their votes, so I can't tell you
20     that.
21         MR. MENEFEE: I think that's it.
22         THE WITNESS: All right.
23         MR. MENEFEE: I have nothing

Page 67

1         further.
2         Ed?
3         MR. STILL: I'm certainly not going
4         to ask any questions today.
5
6
7         (The deposition concluded at
8         approximately 10:30 a.m.)
9
10      * * * * * * * * * * * *
11      FURTHER DEPONENT SAITH NOT
12      * * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23

Page 68

1        SIGNATURE PAGE
2     I, JOE L. REED, hereby certify that I
3 have read the foregoing transcript of my deposition
4 given on Monday, October 1, 2007, and it is a true
5 and correct transcript of the testimony given by me
6 at the time and place stated with the corrections,
7 if any, and the reasons therefor noted below.
8 PAGE  LINE   CORRECTION AND REASON THEREFOR
9
10
11
12
      _____
13     JOE L. REED
14
      SWORN TO AND SUBSCRIBED before me this
15 _____ day of _____, 20 ___.
16
17     _____
    NOTARY PUBLIC
18
19     MY COMMISSION EXPIRES:
20     _____
21
22     * * * * * * * * * * * * *
23

Page 69

1      REPORTER'S CERTIFICATE
2 STATE OF ALABAMA:
3 BUTLER COUNTY:
4     I, Julie A. Duncan, Court Reporter and
5 Commissioner for the State of Alabama at Large, do
6 hereby certify that I reported the deposition of:
7       JOE L. REED
8 who was first duly sworn by me to speak the truth,
9 the whole truth and nothing but the truth, in the
10 matter of:
11     JANET MAY, et al.,
12     Plaintiffs,
13     vs.
14     CITY OF MONTGOMERY, ALABAMA,
15     et al.,
16     Defendants.
17     In the United States District Court
18     for the Middle District of Alabama,
19     Northern Division,
20     Civil Action No. 2:07-cv-738-N,
21 on Monday, October 1, 2007.
22     The foregoing 69 computer-printed pages
23 contain a true and correct transcript of the

Page 70

1  examination of said witness by counsel for the parties
2  set out herein.  The reading and signing of same is
3  hereby not waived.
4       I further certify that I am neither of kin
5  nor of counsel to the parties to said cause nor in any
6  manner interested in the results thereof.
7       This 15th day of October, 2007.
8
9
10  _____
    Julie A. Duncan, ACCR#: 256
11  Certified Court Reporter and
    Commissioner for the State
12  of Alabama at Large
13
14
15
16
17
18
19
20
21
22
23

**Alabama Statewide Student Database**
SUMMARY REPORT

| | |
|---|---|
| April 11, 2007 | Reporting Year: 2006 |
| | Reporting Term: FA |

**Alabama State University**

---

| **Total Number of Records added to Student Database Master File:** | **Gender** | | **Race/Ethnicity** | | | |
|---|---|---|---|---|---|---|
| **5,565** | | | African American/Black, Non-Hispanic | 5,305 | White, | 206 |
| **Veteran's Benefits** | Male | 2,153 | American Indian or Alaskan Native | 2 | Non-Resident Alien | 25 |
| | Female | 3,412 | Asian or Pacific Islander | 11 | Other | 4 |
| Received 166    Not Received 5,399 | Unknown | 0 | Hispanic | 12 | Unknown/Not Reported | 0 |

---

**Enrollment Status**

| | | | | **Admission Status** | | **Initial Enrollment at Current Degree Level** | | | |
|---|---|---|---|---|---|---|---|---|---|
| Full-Time | 981 | Part-Time Remedial | 0 | Provisional | 84 | First-Time Freshman | 3,961 | First-Time 1st Prof | 0 |
| Part-Time | 4,584 | Full-Time Other IPEDS | 0 | Regular | 5,175 | Undergraduate Transfer | 692 | First-Time 1st Prof Transfer | 0 |
| Full-Time Audit | 0 | Part-Time Other IPEDS | 0 | Concurrent | 0 | First-time Graduate | 758 | Special Admissions | 87 |
| Part-Time Audit | 0 | Full-Time Other | 0 | Other | 306 | Graduate Transfer | 67 | Other | 0 |
| Full-Time Rem | 0 | Non-IPEDS | 0 | | | | | | |

---

**Housing Status**

| | | **Residency Status** | | **Student Level** | | | |
|---|---|---|---|---|---|---|---|
| | | | | Non-Degree Seeking Undergrad | 0 | Doctoral | 111 |
| Institutional Housing | 2,065 | In-State | 3,935 | Freshman | 2,202 | First Professional | 0 |
| Other Housing | 3,500 | Out-of-State | 1,630 | | | | |
| Unknown/Not Reported | 0 | Unknown | 0 | Sophomore | 877 | High School Student | 0 |
| | | | | Junior | 704 | Unclassified Graduate | 0 |

**Type of Tuition Paid**

| | | **Remedial Students** | | | | | |
|---|---|---|---|---|---|---|---|
| In-State | 3,935 | | | Senior | 755 | Unclassified Undergraduate | 0 |
| Out-Of-State | 1,630 | Math | 643 | | | | |
| In-State-Other | 0 | English | 421 | Post Baccalaureate | 1 | Other Graduate | 7 |
| Out-Of-State Paying Instate | 0 | Math & English | 299 | | | | |

**Citizenship**

| | | **Financial Aid** | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | Specialist Degree | 81 | Other Undergraduate | 46 |
| United States Citizen | 4,457 | | | | | | |
| Non-Resident Alien | 13 | Received | 5,036 | Master's Degree | 742 | Other | 0 |
| Resident Alien | 0 | Not Received | 529 | | | | |
| Other | 0 | | | Post Master's | 39 | | |
| Unknown/Not Reported | 1,095 | | | | | | |

---

**Fall Cohort Year**

| | | | |
|---|---|---|---|
| Full-Time | 0 | Part-Time | 1,343 |

**Alabama Statewide Student Database**
SUMMARY REPORT

April 11, 2007

**Auburn University at Montgomery**

Reporting Year:  2006
Reporting Term:  FA

| Total Number of Records added to Student Database Master File: |
| --- |
| **5,081** |

### Veteran's Benefits

| Received | 252 | Not Received | 4,829 |
| --- | --- | --- | --- |

### Gender

| Male | 1,793 |
| --- | --- |
| Female | 3,280 |
| Unknown | 8 |

### Race/Ethnicity

| African American/Black, Non-Hispanic | 1,616 | White, | 3,087 |
| --- | --- | --- | --- |
| American Indian or Alaskan Native | 87 | Non-Resident Alien | 0 |
| Asian or Pacific Islander | 105 | Other | 153 |
| Hispanic | 22 | Unknown/Not Reported | 11 |

### Enrollment Status

| Full-Time | 2,950 | Part-Time Remedial | 0 |
| --- | --- | --- | --- |
| Part-Time | 2,129 | Full-Time Other IPEDS | 0 |
| Full-Time Audit | 0 | Part-Time Other IPEDS | 0 |
| Part-Time Audit | 2 | Full-Time Other | 0 |
| Full-Time Rem | 0 | Non-IPEDS | 0 |

### Admission Status

| Provisional | 1,070 |
| --- | --- |
| Regular | 3,593 |
| Concurrent | 200 |
| Other | 218 |

### Initial Enrollment at Current Degree Level

| First-Time Freshman | 1,848 | First-Time 1st Prof | 0 |
| --- | --- | --- | --- |
| Undergraduate Transfer | 890 | First-Time 1st Prof Transfer | 0 |
| First-time Graduate | 752 | Special Admissions | 1,278 |
| Graduate Transfer | 0 | Other | 313 |

### Housing Status

| Institutional Housing | 497 |
| --- | --- |
| Other Housing | 0 |
| Unknown/Not Reported | 4,584 |

### Residency Status

| In-State | 4,904 |
| --- | --- |
| Out-of-State | 177 |
| Unknown | 0 |

### Student Level

| Non-Degree Seeking Undergrad | 1 | Doctoral | 42 |
| --- | --- | --- | --- |
| Freshman | 1,281 | First Professional | 0 |
| Sophomore | 797 | High School Student | 112 |
| Junior | 741 | Unclassified Graduate | 35 |
| Senior | 1,194 | Unclassified Undergraduate | 0 |
| Post Baccalaureate | 148 | Other Graduate | 0 |
| Specialist Degree | 59 | Other Undergraduate | 26 |
| Master's Degree | 622 | Other | 0 |
| Post Master's | 23 | | |

### Type of Tuition Paid

| In-State | 4,904 |
| --- | --- |
| Out-Of-State | 68 |
| In-State-Other | 109 |
| Out-Of-State Paying Instate | 0 |

### Remedial Students

| Math | 262 |
| --- | --- |
| English | 40 |
| Math & English | 57 |

### Citizenship

| United States Citizen | 4,937 |
| --- | --- |
| Non-Resident Alien | 140 |
| Resident Alien | 1 |
| Other | 0 |
| Unknown/Not Reported | 3 |

### Financial Aid

| Received | 2,795 |
| --- | --- |
| Not Received | 2,286 |

### Fall Cohort Year

| Full-Time | 413 | Part-Time | 67 |
| --- | --- | --- | --- |

**Alabama Statewide Student Database**

SUMMARY REPORT

April 11, 2007

**Bevill State Community College**

Reporting Year: 2006
Reporting Term: FA

| Total Number of Records added to Student Database Master File: | | |
|---|---|---|
| **3,837** | | |

**Veteran's Benefits**

Received          12          Not Received          3,825

**Gender**

| Male | 1,329 |
|---|---|
| Female | 2,508 |
| Unknown | 0 |

**Race/Ethnicity**

| African American/Black, Non-Hispanic | 474 | White, | 3,185 |
|---|---|---|---|
| American Indian or Alaskan Native | 5 | Non-Resident Alien | 12 |
| Asian or Pacific Islander | 85 | Other | 29 |
| Hispanic | 27 | Unknown/Not Reported | 20 |

**Enrollment Status**

| Full-Time | 2,084 | Part-Time Remedial | 30 |
|---|---|---|---|
| Part-Time | 1,719 | Full-Time Other IPEDS | 0 |
| Full-Time Audit | 0 | Part-Time Other IPEDS | 0 |
| Part-Time Audit | 4 | Full-Time Other | 0 |
| Full-Time Rem | 0 | Non-IPEDS | 0 |

**Admission Status**

| Provisional | 51 |
|---|---|
| Regular | 3,185 |
| Concurrent | 418 |
| Other | 183 |

**Initial Enrollment at Current Degree Level**

| First-Time Freshman | 2,192 | First-Time 1st Prof | 0 |
|---|---|---|---|
| Undergraduate Transfer | 1,264 | First-Time 1st Prof Transfer | 0 |
| First-time Graduate | 0 | Special Admissions | 380 |
| Graduate Transfer | 0 | Other | 1 |

**Housing Status**

| Institutional Housing | 196 |
|---|---|
| Other Housing | 3,641 |
| Unknown/Not Reported | 0 |

**Residency Status**

| In-State | 3,649 |
|---|---|
| Out-of-State | 188 |
| Unknown | 0 |

**Student Level**

| Non-Degree Seeking Undergrad | 25 | Doctoral | 0 |
|---|---|---|---|
| Freshman | 2,246 | First Professional | 0 |
| Sophomore | 1,443 | High School Student | 123 |
| Junior | 0 | Unclassified Graduate | 0 |
| Senior | 0 | Unclassified Undergraduate | 0 |
| Post Baccalaureate | 0 | Other Graduate | 0 |
| Specialist Degree | 0 | Other Undergraduate | 0 |
| Master's Degree | 0 | Other | 0 |
| Post Master's | 0 | | |

**Type of Tuition Paid**

| In-State | 3,649 |
|---|---|
| Out-Of-State | 69 |
| In-State-Other | 3 |
| Out-Of-State Paying Instate | 116 |

**Remedial Students**

| Math | 484 |
|---|---|
| English | 138 |
| Math & English | 197 |

**Citizenship**

| United States Citizen | 3,588 |
|---|---|
| Non-Resident Alien | 12 |
| Resident Alien | 1 |
| Other | 0 |
| Unknown/Not Reported | 236 |

**Financial Aid**

| Received | 2,562 |
|---|---|
| Not Received | 1,275 |

**Fall Cohort Year**

Full-Time          699          Part-Time          182

**Alabama Statewide Student Database**

SUMMARY REPORT

| | |
|---|---|
| April 11, 2007 | Reporting Year: 2006 |
| | Reporting Term: FA |

## Troy University

### Total Number of Records added to Student Database Master File:

**14,667**

### Veteran's Benefits

| | | | |
|---|---|---|---|
| Received | 800 | Not Received | 13,867 |

### Gender

| | |
|---|---|
| Male | 4,921 |
| Female | 9,746 |
| Unknown | 0 |

### Race/Ethnicity

| | | | |
|---|---|---|---|
| African American/Black, Non-Hispanic | 5,585 | White, | 7,698 |
| American Indian or Alaskan Native | 103 | Non-Resident Alien | 578 |
| Asian or Pacific Islander | 133 | Other | 70 |
| Hispanic | 168 | Unknown/Not Reported | 332 |

### Enrollment Status

| | | | |
|---|---|---|---|
| Full-Time | 8,345 | Part-Time Remedial | 0 |
| Part-Time | 6,322 | Full-Time Other IPEDS | 0 |
| Full-Time Audit | 0 | Part-Time Other IPEDS | 0 |
| Part-Time Audit | 0 | Full-Time Other | 0 |
| Full-Time Rem | 0 | Non-IPEDS | 0 |

### Admission Status

| | |
|---|---|
| Provisional | 776 |
| Regular | 11,942 |
| Concurrent | 63 |
| Other | 1,886 |

### Initial Enrollment at Current Degree Level

| | | | |
|---|---|---|---|
| First-Time Freshman | 5,676 | First-Time 1st Prof | 0 |
| Undergraduate Transfer | 5,463 | First-Time 1st Prof Transfer | 0 |
| First-time Graduate | 2,279 | Special Admissions | 295 |
| Graduate Transfer | 3 | Other | 951 |

### Housing Status

| | |
|---|---|
| Institutional Housing | 1,528 |
| Other Housing | 13,139 |
| Unknown/Not Reported | 0 |

### Residency Status

| | |
|---|---|
| In-State | 12,344 |
| Out-of-State | 2,323 |
| Unknown | 0 |

### Student Level

| | | | |
|---|---|---|---|
| Non-Degree Seeking Undergrad | 0 | Doctoral | 0 |
| Freshman | 4,400 | First Professional | 0 |
| Sophomore | 2,158 | High School Student | 33 |
| Junior | 2,091 | Unclassified Graduate | 0 |
| Senior | 3,184 | Unclassified Undergraduate | 0 |
| Post Baccalaureate | 0 | Other Graduate | 0 |
| Specialist Degree | 250 | Other Undergraduate | 0 |
| Master's Degree | 2,551 | Other | 0 |
| Post Master's | 0 | | |

### Type of Tuition Paid

| | |
|---|---|
| In-State | 12,344 |
| Out-Of-State | 946 |
| In-State-Other | 607 |
| Out-Of-State Paying Instate | 770 |

### Remedial Students

| | |
|---|---|
| Math | 946 |
| English | 167 |
| Math & English | 85 |

### Citizenship

| | |
|---|---|
| United States Citizen | 14,023 |
| Non-Resident Alien | 578 |
| Resident Alien | 8 |
| Other | 0 |
| Unknown/Not Reported | 58 |

### Financial Aid

| | |
|---|---|
| Received | 11,563 |
| Not Received | 3,104 |

### Fall Cohort Year

| | | | |
|---|---|---|---|
| Full-Time | 1,581 | Part-Time | 383 |

Envelope-to: still@votelaw.com
X-VirusChecked: Checked
X-Env-Sender: cgardner@thegardnerfirm.com
X-Msg-Ref: server-6.tower-170.messagelabs.com!1194470915!9053854!1
X-StarScan-Version: 5.5.12.14.2; banners=thegardnerfirm.com,-,-
X-Originating-IP: [208.62.100.195]
X-Mailer: Novell GroupWise 5.5.5
Date: Wed, 07 Nov 2007 15:25:20 -0600
From: "Cecil Gardner" <cgardner@thegardnerfirm.com>
To: <still@votelaw.com>
Subject: Fwd - Re: Subpoena - Auburn University Montgomery
X-HMDNSGroup-MailScanner-Information: Please contact the ISP for more information
X-HMDNSGroup-MailScanner: Found to be clean
X-HMDNSGroup-MailScanner-SpamCheck: not spam, SpamAssassin (not cached,
    score=-6.599, required 5, autolearn=not spam, BAYES_00 -2.60,
    RCVD_IN_DNSWL_MED -4.00)
X-HMDNSGroup-MailScanner-From: cgardner@thegardnerfirm.com

Ed, this should be the final response.  Is that correct according to
your estimation?

>>> Melinda Kramer <mkramer@aum.edu>
Mr. C. Gardner:
Per your request, I am emailing the following demographic information.

In response to subpoena:
Case Number 2:07 cv 738-MHT-WC

1. Auburn University Montgomery admitted 1296 new students for the Fall
Semester 2007.
2. The self-identified ethnic description for these new students is as
follows:
Ethnicity

    Total

Alaskan Indian

1

Asian

19

Black

458

Hispanic

20

Native American

1

Other

10

Unknown

32

White

755

TOTAL

1296


3. Of these students 811 were not Montgomery residents.
Our records indicate that 278 students moved to the Montgomery area,
188 of those moved into University housing.
4. Fall term classes began on August 15, 2007.


Melinda A Kramer
Associate Registrar
334-244-3796

_____
This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email
_____



# Faulkner University
#### — A CHRISTIAN UNIVERSITY —

November 1, 2007

J. Cecil Gardner
The Gardner Firm
PO Drawer 3103
Mobile, AL 36652

Dear Mr. Gardner:

The number of new students to Faulkner University's Traditional Program for the fall of 2007 is 440. The ethnic breakdown is as follows:

|              |     |
|--------------|-----|
| Black        | 197 |
| Native Amer. | 1   |
| Asian        | 3   |
| Hispanic     | 3   |
| White        | 223 |
| Unknown      | 7   |
| Other        | 6   |

Your third question cannot accurately be answered but I can tell you that only 31 of the 440 students listed their address as Montgomery, AL, including a zip code for Montgomery.

September 3rd was the day for new students to report for orientation.

I hope this information is found useful. If you have other questions or concerns about our general population, feel free to contact me again.

Sincerely,

Donald R. Reynolds
University Registrar
Faulkner University

*Office of the Registrar*

STATE OF ALABAMA
COUNTY OF MONTGOMERY

## AFFIDAVIT OF SIDNEY STUBBS, PH.D.

My name is Sidney Stubbs. I am Associate Vice President for Records, Assessment, and Accreditation and Registrar of Huntingdon College. This affidavit is in response to a subpoena served on the College in May v. City of Montgomery, United States District Court, Middle District of Alabama, Case Number 2:07 cv 738-MHT-WC.

The following numbers are the College's best estimates as to each of the specific requests:

1. The estimated number of newly incoming students for the fall term of 2007 is 307.

2. Of those 307 new students, four are Asian/Pacific Islanders, fifty-one are Black, non-Hispanic, three are Hispanic, three are non-resident aliens, three are of unknown ethnic/racial origin, and 243 are White, non-Hispanic.

3. Of those 307 new students, fifty-one have a permanent residence with a City of Montgomery ZIP code as defined in the subpoena, 256 have a permanent residence with a non-City of Montgomery ZIP code as defined in the subpoena

4. Classes for the Fall 2007 Semester started at Huntingdon College on August 20, 2007. There were several dates prior to August 20th on which new students could have reported to campus based on participation in athletics, cheerleading, band, or dance team.

Further Affiant sayeth not.

Sidney J. Stubbs, Ph.D.

Sworn to and subscribed before me on this the 18th day of October, 2007.

Notary Public
My Commission Expires:

(SEAL)

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Oct 19, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

Office of the Vice
Chancellor

P.O. Drawer 4419
Montgomery,
Alabama
36103-4419

334-241-9537
334-241-9591 FAX

October 31, 2007

Attorney J. Cecil Gardner
The Gardner Firm, P.C.
P.O. Drawer 3103
Mobile, AL 36652



Dear Mr. Gardner:

In reference to your letter dated October 8, 2007 concerning Subpoena Case No.
2:07 cv 738-MHT-WC (Janet May, et al V. City of Montgomery, Alabama, and
Bobby N. Bright), following are the responses for the four items requested:

1. The number of newly incoming students to your school's Montgomery
   facility, who arrived for the first time for the fall term of 2007.

   **RESPONSE: There were 701 new students who arrived to take courses
   on the Troy University Montgomery Campus for fall term 2007.**

2. The number of such persons who are African-American, White, or other
   self identified racial or ethnic description.

   **RESPONSE: The 701 students ethnic descriptions are as follows:**

   0. **African-American – 434**
   0. **White – 219**
   0. **Asian – 13**
   0. **Hispanic – 12**
   5. **Indian – 11**
   6. **Other – 2**
   7. **Unknown – 10**

3. The number of such persons who, upon entering your school, moved from
   a residence outside the City of Montgomery to housing (either school-
   provided or otherwise) within the City.

   **RESPONSE: Troy University Montgomery Campus is a commuter
   campus where students drive to the campus for their classes, then
   drive home. There are no school housing for the Montgomery
   Campus students; therefore, the University does not collect or track
   how long the students have lived at a particular residence, or if they
   have moved recently. The only information collected relative to where
   they live is that they must have lived in Alabama for at least one year,
   otherwise they must pay out-of-state tuition. None of the 701 studen**

were identified as out-of-state; therefore, they reported having lived in Alabama for at least one year. **The majority of Montgomery Campus students who attend the University live and work in one of the three surrounding counties (Montgomery, Elmore and Autauga) and commute to the university to take classes.**

4. The date by which newly incoming students were to report to campus in August or September, 2007, for the fall term.

   **RESPONSE: The fall semester is divided into three sessions which start at different times. The full 16-week session began on August 13, 2007. The 9-week A Session also began on August 13, 2007. The 9-week B Session began on October 16, 2007. Nearly all 701 students took at least one class in one of the sessions that began on August 13, 2007. Only a dozen or so students took only the B session which began on October 16, 2007.**

Call me at (334) 241-9537 if you have any questions on any of these responses.

Sincerely,

Ray White
Vice Chancellor

cc: Dr. Ed Roach, Executive Vice Chancellor and Provost
    Dr. Doug Patterson, Senior Vice Chancellor for Administration
    Mr. Nicholas Cervera, University Attorney
    Ms. Vickie Miles, Registrar

2